**RUSING LOPEZ LIZARDI & SAFFER, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800
Facsimile: (520) 529-4262
mdlammers@rllsaz.com
zkotzambasis@rllsaz.com

Mark D. Lammers
State Bar No. 010335
Zoey Kotzambasis
State Bar No. 034607
*Attorneys for Defendants State of Arizona, Ryan Thornell,*
*Christopher Josefowicz, Kaylan Nasta, and Talon Hanks*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| O.W., an individual,<br><br>                              Plaintiff,<br><br>vs.<br><br>State of Arizona, et al.,<br><br>                              Defendants. | No. 2:25-cv-00044-DWL<br><br>**STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Oral Argument Requested<br><br>(Assigned to Hon. Dominic W. Lanza) |

Defendants Ryan Thornell, Christopher Josefowicz, Kaylan Nasta (then-Corporal), and Talon Hanks (Corrections Officer II) (together, "Individual Defendants") and the State of Arizona respectfully submit this Motion for Summary Judgment on Counts One (violation of Fourteenth Amendment substantive due process rights under the state-created danger doctrine brought under 42 U.S.C. § 1983), Two (intentional infliction of emotional distress), Three (negligence), Four (gross negligence), and Six (hostile work environment under Title VII of the Civil Rights Act of 1964) of Plaintiff's First Amended Complaint.

## I.    Introduction

This case arises from a sexual assault that occurred on September 28, 2023, when Inmate Demarco Hines attacked Plaintiff O.W. in a staff restroom in the kitchen of the Rincon unit at the Arizona State Prison Complex-Tucson. While the assault was a horrific crime—

for which Hines was tried and convicted, the undisputed facts establish that Plaintiff cannot satisfy the essential elements of her claims.

## II.      Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A genuine dispute exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, the "mere existence of a scintilla of evidence" in support of the nonmoving party's position is insufficient to defeat summary judgment. *Id.* at 252.

## III.     Undisputed Material Facts

Plaintiff was hired by Trinity Service Group/TKC Holdings ("Trinity") to work as a Food Service Worker at the Arizona State Prison Complex-Tucson ("ASPC-Tucson") in September 2022. (**Ex. 2**, No. 1.) She began working in the kitchen of the Rincon unit at ASPC-Tucson approximately 5–7 months later. (**Ex. 3** at 35:3–5.) Plaintiff's job "entail[ed] working closely with the inmates to ensure food safety standards are met," including inventory and "supervis[ing] the inmates while they cook, clean, all of that." (**Ex. 4** at 7:11–16.) Specifically, she had the authority to give orders to inmates such as how to do their jobs in the kitchen, where their jobs would take place within the kitchen building, if she needed them to lift anything, and how to work the grills, fryers, and dishwashers. (**Ex. 3** at 38:4–15) Plaintiff knew from her training that "it would be [her] responsibility to supervise them while they're doing anything that has to do with the food" and she "was made aware that they should always be supervised, whether it be an officer or a Trinity person." (**Ex. 3** at 24:18–22.) She was also trained to not go into a secluded area where she would put herself in an unsafe position, to be aware of blind spots without cameras, and to "avoid being in these areas with just one inmate." (**Ex. 5** at 60:4–11; **Ex. 6** at TRINITY 001187.)

**Rusing Lopez Lizardi & Saffer, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

63883644.1                                    2

Rusing Lopez Lizardi & Saffer, P.L.L.C.
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

As a civilian worker within the prison, Plaintiff was issued a can of Oleoresin Capsicum spray ("OC spray" or, sometimes referred to in the transcripts cited here in as "mace") by ADCRR, which she was required by ADCRR policy to carry on her person at all times while on duty. (**Ex. 7**.) And each day that she came to work, Plaintiff checked out a radio and a set of keys from ADCRR, which had to be checked in at the end of every shift. (**Ex. 3** at 17:14–24.) The OC spray, however, was issued to her specifically and was hers to take to and from work. (**Ex. 3** at 18:17–19:2.) Plaintiff received various trainings from ADCRR and Trinity, including training to never be alone with an inmate and on how to use the OC spray and radio. (**Ex. 4** at 10:20–11:8; **Ex. 3** at 15:12–17; 19:13–22; **Ex. 5** at 60:4–11.)

Within the Rincon kitchen, there was a room known as the "small dining area" or "small DA" (hereinafter, "DA"), which is used to feed smaller groups of inmates, such as inmate work crews and kitchen workers. (**Ex. 8** at 30:9–19.) The staff restroom for the Rincon kitchen was located within the DA. Staff members, both corrections officers and Trinity workers alike, had to pass through the DA to get to the locked staff restroom. (**Ex. 3** at 27:16–28:1.)

On September 28, 2023, Plaintiff came to work at the Rincon kitchen and went back and forth from the main kitchen area to the Trinity office within the Rincon kitchen to assess the ingredients she needed for her shift, and distributed notes to the inmate workers regarding the servings for the day. (**Ex. 4** at 20:22–21:10, 25:5–11.) She then needed to use the restroom. (**Ex. 4** at 22:13–17.)

At approximately 10:40 a.m., Plaintiff went to the DA to access the staff restroom; the door from the main kitchen area to the DA was locked, so she had to use her key to unlock it. (**Ex. 4** at 26:19–21; **Ex. 3** at 52:1–3; **Ex. 9** at O.W. 000003.) That door from the main kitchen area to the DA has a window on it and Plaintiff did not look through the window to see if anyone was inside the DA before she unlocked it, but, once inside, she immediately observed Hines alone, sweeping inside. (**Ex. 3** at 52:4–9, 13–22, 53:12–13.) Instead of

63883644.1                                                                3

Rusing Lopez Lizardi & Saffer, P.L.L.C.
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

leaving or getting a corrections officer, Plaintiff locked the door behind her and then walked through the DA to the staff restroom. (**Ex. 3** at 53:6–11.)

The door to the staff restroom had a handle that automatically locked and could only be unlocked from the outside with a key or from the inside by someone in the staff restroom; thus, the restroom door automatically locked when it closed after Plaintiff entered. (**Ex. 3** at 55:9–17; **Ex. 4** at 28:10–14.)

While Plaintiff was using the restroom, she saw shadows moving around under the door, so she knew someone was standing outside the door, and she waited for the shadows to move away before she opened the locked door. (**Ex. 3** at 55:5–8, 55:23–56:2; **Ex. 4** at 78:14–24.) Plaintiff opened the restroom door and Hines burst in and violently assaulted her. (**Ex. 3** at 54:12–14; **Ex. 4** at 28:16–29:3.) During the attack, Plaintiff's radio, which she kept in her shirt pocket, fell to the floor and she was unable to reach it. (**Ex. 4** at 30:1–12; **Ex. 3** at 32:23–33:1.) She was not carrying her OC spray that day. (**Ex. 4** at 30:15–16.) Plaintiff lost consciousness during the attack as Hines sexually assaulted her. (Doc. 1-1 at 20, ¶¶ 79–85.) The attack ended after Hines ejaculated and then he attempted to clean up and re-dress Plaintiff. (**Ex. 4** at 36:2–7.)

At approximately 10:58 a.m., one of Plaintiff's Trinity coworkers, Rhonda Lehner, went into the DA to use the restroom. (**Ex. 9** at O.W. 000003; **Ex. 10** at 14:19–15:7.) As she was walking to the restroom, Lehner saw the restroom door was open, which "should never happen." (**Ex. 10** at 15:8–13.) Lehner then saw Plaintiff and Hines standing in the restroom, fully clothed, but Plaintiff was leaning over the toilet, and Hines acted like Plaintiff was ill. (**Ex. 10** at 15:14–25.) Plaintiff stood up, her radio fell out of her shirt pocket, and Hines picked it up; Plaintiff had her E-cigarette "vape" in her hand and she turned to Lehner and said, "Get me out of here." (**Ex. 10** at 16:1–9.) Lehner then took Plaintiff by the arm and walked her out of the restroom, walked her to the DA door that goes to the kitchen, and unlocked it. (**Ex. 10** at 16:10–12; **Ex. 4** at 39:7–14.)

Plaintiff then went to the Trinity office within the kitchen and activated the Incident Command System ("ICS") by making a transmission over the radio in which she stated that

63883644.1                                            4

she had been raped by Hines in the DA in the Rincon kitchen. (**Ex. 4** at 39:16–40:5; **Ex. 3** at 62:2–14.) At that moment, Nasta was in the control room with the sergeant assigned to the Rincon kitchen, Sergeant Stein (not named as a defendant in this lawsuit), when she and the sergeant heard the ICS initiated by Plaintiff. (**Ex. 8** at 50:9–51:5.) Nasta and Sergeant Stein immediately responded to the DA because that is where Plaintiff said she had been assaulted; after Nasta did not see Plaintiff in the DA or the staff restroom, she heard someone say Plaintiff was in the Trinity office, and Nasta ran to the Trinity office to offer support. (**Ex. 8** at 51:19–52:20.) In addition to Nasta, "a bunch of officers" came to the Trinity office in response to the ICS; someone called 911, paramedics responded, and Plaintiff was transported to Tucson Medical Center. (**Ex. 4** at 40:14–7.) Nasta rode with Plaintiff in the ambulance to the hospital and was comforting her; Nasta stayed with Plaintiff at the hospital for 12–13 hours and left only to go to the store to purchase Plaintiff new clothing because her clothing had been taken into evidence. (**Ex. 3** at 64:23–66:20.)

ADCRR conducted an immediate criminal investigation, which formed the basis of criminal charges brought by the Pima County Attorney's Office against Hines: aggravated assault on a corrections officer, kidnapping, sexual abuse, and sexual assault. (**Ex. 9**; **Ex. 11**.) The day after the assault, a surveillance camera was installed inside the DA, as there had not previously been one in that room.[1] (**Ex. 8** at 92:24–93:2; **Ex. 10** at 44:21–45:8.)

In February 2026, a jury convicted Hines of kidnapping and aggravated assault on a corrections officer, but "hung" on the remaining counts of sexual assault and sexual abuse. (**Ex. 12**.) Plaintiff, Nasta, Lehner, and the lead detective on ADCRR's criminal investigation, Detective Cooper, testified for the prosecution; Hines also testified. The re-trial of the sexual assault and sexual abuse counts is currently set for June 2026.

Before the assault, Hines was serving sentences for armed robbery and theft of means of transportation, which began in 2017; he had no previous convictions for sexual offenses. (**Ex. 13** at O.W. 002184.) Hines's ADCRR disciplinary history includes repeated refusals of

---

[1]The installation of a surveillance camera is a subsequent remedial measure that is not admissible to prove negligence or culpable conduct. *See* Fed. R. Evid. 407.

**Rusing Lopez Lizardi & Saffer, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

63883644.1                      5

**Rusing Lopez Lizardi & Saffer, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

assignments, disobeying orders, substance-related infractions, as well as one ticket for stalking a staff member and two tickets for indecent exposure. (**Ex. 13** at O.W. 002188–2190.) The basis of the stalking ticket was Hines's refusal to leave a classroom he was not assigned to because he wanted to stay and chat with his friends. (**Ex. 14** at ADCRR_003859–3861.) The two tickets for indecent exposure were based on masturbatory conduct in his cell to the female officers who witnessed it. (**Ex. 14** at ADCRR_003691–3693, 3695–3606.)

After the assault, Plaintiff applied for and received workers' compensation benefits. (**Ex. 3** at 68:5–10.)

## IV.    Substantive Due Process § 1983 Claim – State-Created Danger (Count One) Fails

### 1.    The State-Created Danger Doctrine

"The general rule is that a state is not liable for its omissions and the Due Process Clause does not impose a duty on the state to protect individuals from third parties." *Martinez v. City of Clovis*, 943 F.3d 1260, 1271 (9th Cir. 2019) (internal citations omitted). "An exception to the rule applies when government employees 'affirmatively place[] the plaintiff in a position of danger, that is, where [their] action[s] create[] or expose[] an individual to a danger which he or she would not have otherwise faced.'" *Hernandez v. City of San Jose*, 897 F.3d 1125, 1133 (9th Cir. 2018) (quoting *Kennedy v. Ridgefield City*, 439 F.3d 1055, 1061 (9th Cir. 2006)); *see also Deshaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195–96 (1989) ("the Due Process Clause of the Fourteenth Amendment was intended to prevent government from abusing its power, or employing it as an instrument of oppression"; "Its purpose was to protect the people from the State, not to ensure that the State protected them from each other." (alterations and internal citations omitted)).

Specifically, "[i]n the context of public employment, although state employers have no constitutional duty to provide their employees with a safe working environment, the state-created-danger doctrine holds them liable when they affirmatively, and with deliberate indifference, create or expose their employees to a dangerous working environment." *Polanco v. Diaz*, 76 F.4th 918, 926 (9th Cir. 2023) (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 126 (1992)). Thus, a plaintiff must satisfy two requirements: "First, the plaintiff

must establish that the officer's affirmative conduct exposed the plaintiff to a foreseeable danger that she would not otherwise have faced.' Second, the plaintiff must show that the officer acted with 'deliberate indifference to a known or obvious danger." *Est. of Soakai v. Abdelaziz*, 137 F.4th 969, 982 (9th Cir. 2025) (internal citations and quotations omitted).

### 2. No Evidence to Support First Prong (Affirmative Action)

To satisfy the first prong, Plaintiff must prove that each Defendant's affirmative actions: "(1) placed [her] in a worse position than [she] would have occupied had Defendants not acted at all; (2) created or exposed [her] to an actual and particularized danger; and (3) resulted in foreseeable harm to [her]." *Id.* at 983 (citing *Polanco v. Diaz*, 76 F.4th 918, 926 (9th Cir. 2023)).

### A. <u>No affirmative action placed Plaintiff in a worse position.</u>

"[A] state actor cannot affirmatively place an individual in danger merely by failing to act, regardless of how reprehensible that failure may be." *J.K. v. Ariz. Bd. of Regents*, No. CV 06-916-PHX-MHM, 2008 WL 4446712, at *17–18 (D. Ariz. Sept. 29, 2008) (collecting cases); *see also Tobin v. Washington*, No. C06-5630RJB, 2007 WL 3275073, at *20 (W.D. Wash. Nov. 5, 2007) ("if there is no 'involuntary exposure to harm as a result of a state actor's command,' then there is no affirmative state action").

### i. *Thornell and Josefowicz*

Plaintiff asserts Thornell engaged in affirmative conduct by: (a) "establishing, promulgating, and maintaining the prisoner labor classification system" that allowed Hines to be assigned to work in the kitchen alongside civilian workers; (b) "establishing and condoning an unofficial policy where, because of understaffing, inmates at ASPC-Tucson were allowed to enforce and maintain order within the prison"; and (c) "approving and assigning Inmate Hines, a high security risk inmate with a history of violence and sexual misconduct, to a work assignment with civilian workers." (Doc. 1-1 at 22, ¶ 104; **Ex. 2**, No. 12.) Plaintiff asserts Josefowicz engaged in the same conduct alleged against Thornell as (b) and (c). But there is no evidence to support any of those assertions.

**Rusing Lopez Lizardi & Saffer, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

Rusing Lopez Lizardi & Saffer, P.L.L.C.
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

First, although Thornell, as Director of ADCRR, could be said to have engaged in "establishing, promulgating, and maintaining" a system like the prisoner labor classification system mandated by the Arizona Legislature in A.R.S. § 31-251, doing so does not constitute affirmative conduct that created or exposed Plaintiff to a particularized danger that she would not otherwise have faced. Plaintiff was an employee at a prison. Prison is a dangerous place. As a worker in a male prison, Plaintiff knew she would necessarily work alongside and, therefore, be exposed to dangerous men. Indeed, she received training and was instructed by ADCRR that inmates can be dangerous, she had heard examples of instances in which inmates had harmed people, and she had been instructed on what to do if an inmate attempted to sexually assault her. (**Ex. 3** at 28:16–29:12.) This case is not like *L. W. v. Grubbs*, 974 F.2d 119 (9th Cir. 1992) ("*Grubbs I*"), cited in Plaintiff's FAC, where a nurse employed at a male prison was raped and terrorized by an inmate. There, the defendants were her supervisors and they knew that the inmate had been elevated to work as a cart boy—which he was not qualified to do, that he had "an extraordinary history of unrepentant violence against women and girls" and was likely to assault a female if left alone with her, that the plaintiff would be alone with the inmate during her rounds, and that the plaintiff "would not be prepared to defend against or take steps to avert an attack because she had not been informed at hiring that she would be left alone with violent offenders." *Id.* at 121. Based on those facts, and the fact that the defendants there had misrepresented to the plaintiff the risks attending her work, the Ninth Circuit concluded that the defendants had created an opportunity for the inmate to assault the plaintiff that would not have otherwise existed. *Id.* Here, there is no evidence that Hines was not qualified to serve as a kitchen cleaner and he had no history of violence against women or girls. He was serving time for armed robbery and vehicle theft, and although he did have one disciplinary ticket for "stalking" a female staff member, the basis of that ticket was Hines's refusal to leave a classroom he was not assigned to because he wanted to stay and chat with his friends. While he did have two tickets for indecent exposure based on masturbatory conduct in his cell to the female officers who witnessed it, such conduct is a far cry from a history of violence against women and girls like the inmate in *Grubbs I*. Further,

Defendants had no reason to believe that Plaintiff would ever be alone with an inmate. Indeed, she was specifically trained to never be alone with an inmate and was trained on how to defend herself or avert an attack. The undisputed facts further show that the Defendants did not misrepresent the risks to Plaintiff. (**Ex. 6**.)

Second, there is no evidence whatsoever that Thornell or Josefowicz established or condoned an unofficial policy where, because of understaffing, inmates at ASPC-Tucson were allowed to enforce and maintain order within the prison. Despite conducting extensive written discovery in this case, in addition to a prelitigation public records case, Plaintiff cannot identify any evidence to support the preposterous allegation that there was an unofficial policy of allowing inmates at ASPC-Tucson to enforce and maintain order within the prison. (**Ex. 15** ¶ 10.) Further, the only unit here that is relevant is the Rincon unit where Plaintiff worked in the kitchen and where Hines was housed. Evidence of any other units would be irrelevant to what happened in the Rincon kitchen. Moreover, although understaffing occurred on occasion, the Rincon unit was never critically understaffed. (**Ex. 15** ¶¶ 7, 10.) In the event that corrections officers called out sick or were otherwise unavailable to staff every position within ASPC-Tucson, positions within the prison were reassigned so as to ensure that all critical positions were always covered. (**Ex. 15** ¶¶ 6–9.) The Rincon unit was never critically understaffed and staffing levels never impacted the Rincon unit's ability to secure and control inmates. (**Ex. 15** ¶¶ 7, 10.) And even if the Rincon unit had not always been staffed adequately to enforce and maintain order, there is simply no evidence that Plaintiff can point to in support of her assertion that there was an "unofficial policy" whereby inmates were allowed to enforce and maintain order. This attack, horrific and tragic as it was, was a criminal act undertaken by a criminal named Hines who attacked an employee who entered a room by herself without her OC spray and without calling for a corrections officer to escort her or to remove Hines from the DA.

Third, there is no evidence to support Plaintiff's assertion that Thornell or Josefowicz approved and assigned Hines to work in the Rincon kitchen. As high-level administrators,

**Rusing Lopez Lizardi & Saffer, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

neither Thornell nor Josefowicz had any knowledge of Hines, his work assignments, or his disciplinary history. (**Ex. 16**, RFA No. 10; **Ex. 17**, RFA Nos. 8–10.)

### ii.     *Nasta and Hanks*

The only conduct Plaintiff identifies as affirmative is that Nasta allegedly left Hines "unsupervised in the Rincon kitchen with unrestricted access to the staff restroom" for the approximately 30 minutes between when she left Hines by himself in the DA around 10:26 a.m. and when Plaintiff initiated ICS after Lehner found her in the staff restroom after the assault. (Doc. 1-1 ¶¶ 108–09; **Ex. 2**, No. 14.) Similarly, the only conduct she alleges as to Hanks is that he left Hines "unsupervised in the Rincon kitchen while taking a group of inmate laborers outside for a [smoke] break." (Doc. 1-1 ¶ 112; **Ex. 2**, No. 15.) But it was not uncommon for inmates to forgo the smoke break and stay behind to finish their work. (**Ex. 10** at 85:17–86:6.) Further, at least one corrections officer remained in the kitchen during this smoke break, as there always had to be one in the control room. (**Ex. 18** at 21:6–20.) And that day, Sergeant Stein was also in the kitchen. (**Ex. 18** at 11:3–13.)

The evidence does not support Plaintiff's allegations against Nasta and Hanks, and even if it did, Nasta and Hanks leaving Hines by himself in a locked room is not an affirmative action—it is an omission or failure to act, which is not sufficient to support a state-created danger claim. *See J.K.*, 2008 WL 4446712 at *17–18.

First, Hines never had "unrestricted access to the staff restroom"—the staff restroom was locked at all times, and Hines was not able to access it until Plaintiff opened the door from the inside to leave the restroom and he forced his way in. Second, Plaintiff's claims against Nasta appear to be based on a misunderstanding of who did what. In her deposition, she testified that she did not see who put Hines in the DA, so she speculated that Nasta put Hines in the DA. (**Ex. 3** at 53:20–54:1.) But Lehner testified that she was the one who did it. (**Ex. 10** at 14:2–18.) The investigative report establishes, based on surveillance footage, that Hines left and re-entered the DA more than once while cleaning between 10:27 a.m. and 10:36 a.m., and he walked near Trinity employee Amy Link. (**Ex. 9** at O.W. 000002.) Hines was seen on camera walking around various areas of the kitchen during this time and the

camera feed was visible in the control room, which is where Nasta was with Sergeant Stein when Plaintiff initiated ICS. (*Id.*) Third, Plaintiff testified that when she entered the DA, she unlocked the door (**Ex. 3** at 52:1–3), so before she did that, Hines was secured in a room in which he could not harm anyone because he was alone. Thus, it is irrelevant who locked Hines in the DA. Leaving an inmate by himself in a secured room where he cannot harm anyone or go anywhere is not leaving an inmate "unsupervised." Thus, there is no evidence from which a reasonable jury could find that Nasta or Hanks undertook any affirmative action that put Plaintiff in a worse position than she would have been had Nasta or Hanks not done anything at all. *See Est. of Soakai*, 137 F.4th at 983.

> B.    No affirmative actions created or exposed Plaintiff to the danger of Hines.

Finally, even if any of the above could constitute an affirmative action that put Plaintiff in a worse position than she would have been had Defendants not acted at all, it was not their actions that created or exposed Plaintiff to the danger of being attacked by Hines. Defendants did not require or instruct Plaintiff to go into the DA by herself that day. They did not do anything to place Plaintiff in a room alone with Hines. The evidence shows the opposite: Plaintiff had been trained and instructed to never be alone with an inmate. She had been trained on how to use her radio and OC spray, and how to report an inmate that made her feel uncomfortable. Tragically, despite ADCRR and Defendants' actions in training and instructing Plaintiff accordingly, Plaintiff entered the DA, immediately saw Hines was there, did not feel she was at any risk of harm, and she then opened the restroom door after seeing what she believed were Hines's shadows on the other side of the door. She did not carry her OC spray that day because it had expired and she had not gotten around to requesting another one (**Ex. 3** at 37:1–24; **Ex. 4** at 30:15–20), and she did not use her radio when she first entered the DA to request that someone either remove Hines or escort her while she went to the restroom, or while she was in the restroom before she opened the door and Hines charged in. None of these actions were undertaken by Thornell, Josefowicz, Nasta, or Hanks.

**Rusing Lopez Lizardi & Saffer, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792–4800

63883644.1

Defendants do not dispute that Hines was apparently capable of horrific violence and do not dispute the gravity of Plaintiff's terrifying experience. But not every tragic event constitutes a civil-rights violation. Here, the evidence simply does not support Plaintiff's claim that Thornell, Josefowicz, Nasta, and Hanks created or exposed her to the danger of Hines attacking her.

### C.    No affirmative actions resulted in foreseeable harm.

The evidence does not support this third element of the first prong because Defendants undertook no affirmative action for the reasons above. Nonetheless, even if they had done so, the harm here was not foreseeable based on the training and instruction that Plaintiff had received. Inmate-on-staff assaults are not unforeseeable in a prison setting. Prison is a dangerous place, populated, in this case, by men who are there often because they have committed violence. This is why ADCRR trains its employees—including civilian workers like Plaintiff—to never be alone with an inmate. It's why ADCRR issued OC spray and a radio to each employee, including Plaintiff, and it's why Plaintiff's training included instruction to never be alone with an inmate and to leave the area or radio for assistance. Because of those preventative measures, a reasonable jury could not find that any supposed affirmative action resulted in foreseeable harm.

The Ninth Circuit has not extended the state-created danger doctrine to hold state actors liable for failing to prevent specific criminal acts that are not foreseeable consequences of the state's conduct. To do so would impose an impossible burden on state actors to predict and prevent all possible criminal conduct by inmates. No reasonable state actor could have foreseen that Hines would commit this specific assault on this specific date based solely on the fact that he was left alone, behind a locked door, in the DA.

Plaintiff's own conduct and awareness further undermine any argument that the assault was foreseeable. Plaintiff did not feel at risk prior to the incident. She found Hines's presence in the DA odd but assumed there was a reason for it, and she did not feel threatened by him being in there. She did not report Hines as a threat, despite having the training and demonstrated ability to report other threatening inmates. She did not request additional

**Rusing Lopez Lizardi & Saffer, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

supervision or take any precautions to protect herself from Hines. If Plaintiff, who worked directly with Hines and had the most direct knowledge of his behavior, did not perceive him as a threat, it is implausible that Defendants should have foreseen that he would commit a violent sexual assault.

### 3.   No Evidence to Support Second Prong (Deliberate Indifference)

As to the second prong, Plaintiff must prove that Defendants "showed deliberate indifference in the presence of the known danger that they created." *Est. of Soakai*, 137 F.4th at 984. The Ninth Circuit employs a subjective "deliberate indifference" standard, which means Plaintiff must prove that Defendants "kn[ew] that something was going to happen, but 'ignored the risk and exposed [her] to it anyway.'" *Est. of Soakai*, 137 F.4th at 984 (quoting *Martinez v. City of Clovis*, 943 F.3d 1260, 1274 (9th Cir. 2019)) (first alteration in original). "Deliberate indifference remains a 'stringent standard of fault,' requiring a 'culpable mental state.' Not even gross negligence will do." *Id.* at 985 (quoting *Murguia v. Langdon*, 61 F.4th 1096, 1111 (9th Cir. 2023)); *L.W. v. Grubbs*, 92 F.3d 894, 898 (9th Cir. 1996) ("*Grubbs II*") ("gross negligence is not sufficient to establish a due process violation based on a state created danger to employees").

### A.  Thornell and Josefowicz

Plaintiff alleges that both Thornell and Josefowicz were "deliberately indifferent" because they each "knew that Inmate Hines was a high security risk inmate with a history of violence and sexual misconduct and that he posed a substantial risk of serious harm to civilian workers, including Plaintiff." (Doc. 1-1 at ¶¶ 105, 107, 110, 113.) When specifically asked in discovery to set forth the facts supporting deliberate indifference, in her verified response, she merely asserted that as the Director of ADCRR, Thornell "knew that the prisoner labor classification system would result in high risk, violent inmates being assigned to work closely with civilians and that persistent staffing issues would mean that those inmates would not be adequately supervised, thereby exposing civilian workers to a substantial risk of harm." (**Ex. 2**, No. 12.) As to Josefowicz, Plaintiff asserted that as the Warden of ASPC-Tucson, he was "aware that high risk, violent inmates in the Rincon Unit were assigned to work closely with

Rusing Lopez Lizardi & Saffer, P.L.L.C.
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

Rusing Lopez Lizardi & Saffer, P.L.L.C.
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

civilians and that persistent staffing issues would mean that those inmates would not be adequately supervised, thereby exposing civilian workers to a substantial risk of harm." (**Ex. 2**, No. 13.) She asserted both Thornell and Josefowicz "recognized an unreasonable risk of harm to civilian workers, including Plaintiff, and consciously disregarded that risk." (**Ex. 2**, Nos. 12, 13.)

True, Thornell and Josefowicz were aware that the prisoner labor classification system resulted in close-custody inmates being assigned to work with civilian workers. But the mere fact that close-custody inmates are assigned to work alongside civilian workers does not mean Thornell or Josefowicz knew something was going to happen to Plaintiff but exposed her to the risk anyway. As Plaintiff herself testified, she had worked in the Rincon kitchen for many months *without ever feeling she was at risk for being harmed*. (**Ex. 3** at 30:2–5.) Further, Plaintiff testified in her deposition that she believed Trinity was understaffed "[m]ost of the time" that she worked there and that she thought the Rincon kitchen was understaffed with respect to corrections officers and that she had talked to her Trinity manager, Nasta, and Hanks several times. (**Ex. 3** at 87:4–89:18.) Taking those allegations as true for the purposes of this Motion, that means that Plaintiff worked in a chronically understaffed kitchen for many months, and she never felt at risk of harm until the moment she was attacked by Hines. Plaintiff's admission that she never felt at risk of being harmed in the many months she had worked there alongside close-custody inmates in an understaffed kitchen directly undercuts her assertion that the Director and Warden—who had no personal involvement whatsoever in the inmate work assignments for the Rincon kitchen—had the kind of knowledge required for deliberate indifference. Simply put, there is no evidence from which a reasonable jury could find that Thornell or Josefowicz knew "something was going to happen, but 'ignored the risk and exposed [Plaintiff] to it anyway.'" *Id.* at 984. Additionally, there is no evidence showing that Thornell or Josefowicz showed deliberate indifference "in the presence of the known danger that they created," *id.*, because there is no evidence that they assigned Hines to work in the kitchen or that they were ever knew Hines was working in the Rincon kitchen, and they did not create any danger as defined by the Ninth Circuit.

**B.**     Nasta and Hanks

Plaintiff asserts Nasta and Hanks were deliberately indifferent because they knew Hines "was a high security risk inmate with a history of violence and sexual misconduct" and were "aware that Inmate Hines was classified as a high security risk (IR 4) and was held in close custody and that he therefore posed a high risk to staff, including civilian kitchen workers such as Plaintiff." (Doc. 1-1 ¶¶ 110, 113; **Ex. 2**, Nos. 14, 15.) She further asserts Nasta was aware that Hines posed a risk to Plaintiff specifically because during her interview with Detective Cooper, Nasta said Hines was "very mouthy" with Plaintiff and that she thought either Nasta or Plaintiff had written an incident report about Plaintiff wanting Hines removed from the kitchen because he gave Plaintiff a "weird feeling" about one month before the assault. (**Ex. 2**, No. 14.) Nasta also told Detective Cooper that Hines was known for wandering off and not wanting to listen to orders or do as he was told, which is obviously not uncommon in a prison setting. (*Id.*) Indeed, Nasta testified that Hine was a "normal" inmate. (**Ex. 8** at 9:16–25.) These allegations are insufficient to demonstrate deliberate indifference.

First, neither Nasta nor Hanks knew anything about Hines's criminal or disciplinary history other than the disciplinary tickets they wrote. (**Ex. 19**, RFA No. 6; **Ex. 20**, RFA No. 6.)

Second, although Nasta and Hanks knew that Hines was classified as Internal Risk 4 ("IR 4") and was held in custody, they only knew that because all inmates in the Rincon unit at that time were IR 4 and close custody. (**Ex. 19**, RFA No. 4; **Ex. 20**, RFA No. 4.) Per ADCRR policy, all inmates classified as IR 4 present "a high risk to the public, staff, and other inmates, of escape or committing violence within the perimeter and/or under the direct supervision of Department staff." (**Ex. 21** § 6.2.) Thus, Hines was not an outlier for the Rincon unit in terms of his Internal Risk level or custody classification.

Third, as to Nasta knowing Hines was "very mouthy" with Plaintiff or giving her a "weird feeling," Plaintiff's own testimony contradicts this as Plaintiff said she could not remember whether Hines had ever given her any problems before the assault and that she had never felt she was at risk for being harmed before the assault. (**Ex. 3** at 40:5–25, 30:2–5.)

63883644.1                                                    15

Finally, and dispositively, none of these assertions against Thornell, Josefowicz, Nasta, or Hanks, even if accepted as true for this Motion, amount to deliberate indifference because there is no evidence from which a reasonable jury could find that any of these Defendants knew that something was going to happen to Plaintiff but ignored the risk and exposed it to her anyway. *See Est. of Soakai*, 137 F.4th at 984. The Ninth Circuit requires a plaintiff to prove that the defendants acted with a "culpable mental state" and has held that "[n]ot even gross negligence will do." *Id.* (first quotation from *Murguia*, 61 F.4th at 1111, and citing *Grubbs II*, 92 F.3d at 898)). Because the undisputed facts are such that no reasonable jury could find that Thornell, Josefowicz, Nasta, or Hanks's mental state meets the stringent standard for deliberate indifference, Plaintiff's claim against all four of them fails and these Defendants are entitled to judgment as a matter of law.

**4.     Thornell, Josefowicz, Nasta, And Hanks Are Entitled To Qualified Immunity.**

Defendants are entitled to qualified immunity "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) (cleaned up); *DeFrancesco v. Robbins*, 136 F.4th 933, 938 (9th Cir. 2025). "This demanding standard protects all but the plainly incompetent or those who knowingly violate the law." *Wesby*, 583 U.S. at 63 (cleaned up). "To surmount the 'clearly established' threshold, 'a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Monzon v. City of Murrieta*, 966 F.3d 946, 957 (9th Cir. 2020) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (cleaned up)).

The undisputed facts show that neither Thornell, Josefowicz, Nasta, nor Hanks took any affirmative action that created or exposed Plaintiff to a danger that resulted in foreseeable harm and that none of these Defendants acted with deliberate indifference. Therefore, Plaintiff cannot establish a constitutional violation. Yet, even if she could establish such a violation, she cannot meet her burden of showing that she had a clearly established right.

Rusing Lopez Lizardi & Saffer, P.L.L.C.
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

63883644.1

**Rusing Lopez Lizardi & Saffer, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

The Supreme Court recently explained the second prong of the qualified-immunity analysis as follows:

> To find that a right is clearly established, courts generally "need to identify a case where an officer acting under similar circumstances . . . was held to have violated" the Constitution. *Escondido* v. *Emmons*, 586 U. S. 38, 43 (2019) (*per curiam*) (internal quotation marks omitted). The relevant precedent must define the right with a "high degree of specificity," so that "every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *District of Columbia v. Wesby*, 583 U. S. 48, 63 (2018) (internal quotation marks omitted). Principles stated generally, such as that "an officer may not use unreasonable and excessive force," do not suffice. *Kisela* v. *Hughes*, 584 U. S. 100, 105 (2018) (*per curiam*). In short, officers receive qualified immunity unless they could have "read" the relevant precedent beforehand and "know[n]" that it proscribed their specific conduct. *City and County of San Francisco* v. *Sheehan*, 575 U. S. 600, 616 (2015).

*Zorn v. Linton*, 146 S. Ct. 926, 930 (2026).

As to Thornell and Josefowicz, Plaintiff relies on a high level of generality regarding policy. To defeat qualified immunity, she must identify precedent that would have put every reasonable official on notice that promulgating/establishing/maintaining a prisoner labor classification system that allowed close-custody inmates to work alongside civilian workers, approving such work assignments, or securing an inmate in a locked room constituted an affirmative action that placed Plaintiff in danger. In the absence of precedent clearly establishing that such high-level policy functions violate due process in these circumstances, qualified immunity applies.

Plaintiff alleges Nasta and Hanks affirmatively created danger by leaving Hines unsupervised (i.e., without eyes on him) with access to the staff restroom. But the clearly-established inquiry requires precedent that squarely establishes that every reasonable officer would have understood that the particular supervision decisions alleged here constituted an affirmative act creating or increasing danger—not merely a failure to protect—and that such conduct violated due process. *See Zorn*, 146 S. Ct. at 930; *Monzon*, 966 F.3d at 957 (courts

must "examine the specific context of the case" (internal citations and quotation marks omitted)). Plaintiff has not identified such precedent.

Although Plaintiff cites *Grubbs II* in her FAC for the general proposition that state-created danger liability exists, she must identify precedent holding that these specific operational decisions in a prison kitchen constitute affirmative acts that created or exposed a civilian worker to a danger, or that leaving an inmate worker alone in a locked room by himself violates clearly established due process rights. But she cannot do so. Her own testimony that she did not perceive any danger and that she herself controlled the unlocking and locking of the DA door when she entered, the lack of any evidence of previous assaults in the DA, and the lack of any allegation that anyone here misrepresented the nature of Plaintiff's job such that she was unable to avert or defend herself against an assault, distinguish this case from *Grubbs II*.

Because Plaintiff has not identified the precedent required under *Zorn*, Defendants are entitled to qualified immunity and, therefore, judgment as a matter of law.

## V.   <u>Intentional Infliction of Emotional Distress Claim (Count Two) Fails</u>

To survive summary judgment on intentional infliction of emotional distress, "an Arizona plaintiff must demonstrate that: (1) the conduct by defendant was 'extreme' and 'outrageous'; (2) the defendant either intended to cause emotional distress or recklessly disregarded the near certainty that such distress would result from his conduct; and (3) severe emotional distress actually resulted from the defendant's conduct." *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 746–47 (9th Cir. 2004) (citing *Ford v. Revlon, Inc.*, 734 P.2d 580, 585 (Ariz. 1987)). "It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." Id. at 747 (quoting *Watts v. Golden Age Nursing Home*, 619 P.2d 1032, 1035 (Ariz. 1980)). "A plaintiff must show that the defendant's acts were 'so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.'" *A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d 1195, 1208 (9th Cir. 2016) (quoting *Mintz v. Bell Atl. Sys. Leasing Int'l, Inc.*,

**Rusing Lopez Lizardi & Saffer, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

905 P.2d 559, 563 (Ariz. App. 1995)). "[I]t is only when reasonable minds could differ in determining whether conduct is sufficiently extreme or outrageous that an IIED claim should survive summary judgment." *Id.* (citing *Mintz,* 905 P.2d at 563).

### 1. No outrageous and extreme conduct.

Plaintiff cannot show that the State's acts, through its employees/agents, were sufficiently extreme or outrageous to survive summary judgment. The conduct Plaintiff identifies for her IIED claim is: (a) "establishing and condoning an unofficial policy of abdicating authority to inmates at ASPC-Tucson and allowing inmates themselves to enforce and maintain order within the prison"; (b) "Approving and assigning a high security risk inmate with a history of violence and sexual misconduct to a work assignment with civilian workers"; and (c) "Allowing a high security risk inmate with a history of violence and sexual misconduct to have unsupervised and unrestricted access to a restroom designated as a restroom for female civilian kitchen workers." (Doc 1-1 ¶ 122.) But these are not the types of actions that constitute outrageous and extreme conduct for IIED—these are alleged institutional and operational failures to prevent harm, and these alleged failures were not directed at Plaintiff. Further, there is no evidence to support the alleged conduct.

First, only the Rincon unit is relevant here—not the entire ASPC-Tucson complex—because the assault was perpetrated in the Rincon kitchen by an inmate housed in the Rincon unit. Plaintiff cannot point to any evidence that the State or its agents/employees established or condoned an unofficial policy of "abdicating authority to inmates" and allowing them to enforce and maintain order. The evidence here shows the opposite. Hines's disciplinary history shows he was written up several times for disobeying orders from staff while he was housed in the Rincon unit between his arrival on May 8, 2023 and the assault on September 28, 2023. (**Ex. 14**.) The evidence also shows that the State's response to the assault was immediate and overwhelming, as multiple corrections officers responded to the DA as soon as Plaintiff activated ICS and they immediately restrained Hines.

Second, Plaintiff may point to Hanks's deposition testimony that he had heard about— but did not witness—an incident in the Rincon kitchen DA in which a female staff member

(he did not say whether it was a civilian or corrections officer) activated ICS from inside the restroom because an inmate was on the other side of the restroom door and was attempting to gain access. (**Ex. 18** at 12:2–19.) This incident, if true, is not sufficient to support the assertion that the State abdicated authority to inmates. In any event, Hanks's testimony about it is hearsay that cannot be admitted in any form. Hanks could not recall when it happened, but he said it happened when he was assigned to the Cimarron unit. (*Id.* at 12:20–14:2.) Hanks's personnel records show that he started working in the Cimmaron unit on September 13, 2014 until June 6, 2020, when he was transferred to the Rincon unit. (**Ex. 22**.) So based on his testimony, that incident happened sometime within the span of almost four years. Notably, the employee there properly activated ICS to call for help from behind the automatically locking restroom door. There is no evidence Plaintiff can identify that the inmate was able to gain access or that any attack occurred, so the reasonable inference is that officers responded to the ICS and restrained the inmate, thus preventing an assault. This incident, although factually similar in that it happened in the same room as the attack here, demonstrates that ADCRR and its agents/employees did the opposite of abdicating authority to inmates—rather, the employee there properly utilized her training and radio to activate ICS, officers responded, and an assault was prevented because the officers and staff maintained and enforced order and control.

There is also evidence that on September 13, 2022, an inmate assaulted a contract worker in the Rincon kitchen. (**Ex. 23** at ADCRR_004905–4906.) But the circumstances of that assault are nothing like what happened here. There, a contract worker aggressively bumped into a corrections officer in the Rincon kitchen and an inmate who witnessed it then confronted the contract worker; it turned into a physical altercation and the inmate punched the contract worker and as the contract worker got up from the floor and attempted to reach the inmate, the contract worker struck the corrections officer in the head with a mop handle. This incident occurred in full view of the kitchen cameras and is too factually distinguishable from the attack on Plaintiff for it to establish any sort of unofficial policy of abdicating

**Rusing Lopez Lizardi & Saffer, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

Rusing Lopez Lizardi & Saffer, P.L.L.C.
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792–4800

authority to allow the inmates to run the prison or to constitute notice of a possible sexual assault.

Two incidents over the course of 2–4 years cannot possibly establish a policy of abdicating control to the inmates. Inmates are fed three meals a day every single day. That's approximately 2,190 mealtimes that would have happened over the span of two years in the Rincon kitchen. No reasonable jury could find that the State established or condoned an official policy of abdicating authority to inmates to enforce and maintain order.

Finally, even assuming Hines had a history of violence and sexual misconduct (two instances of masturbating in his cell in February 2021 and April 2023, when housed in the Cimarron unit (**Ex. 14**.) as Plaintiff alleges, allowing an inmate with his history to work with civilian workers is not outrageous or extreme. As Plaintiff's own expert testified in his deposition, prisons are "extremely dangerous places" and even murderers are given work assignments. (**Ex. 24** at 82:5–83:1.) Plaintiff's expert further agreed inmates masturbating in their cells happens "every day in every institution." (**Ex. 24** at 80:15–17.) Following the logic of Plaintiff's argument that these tickets demonstrate Hines was a known sexual predator leads to the absurd conclusion that every time an inmate masturbates in his cell in prison, he should be considered a known sexual predator and precluded from work assignments that involve civilian workers or female workers. And contrary to Plaintiff's allegations, Hines was not given "unsupervised and unrestricted access to a restroom designated as a restroom for female civilian kitchen workers." Hines was given access to the DA so he could fulfill his work assignment as a kitchen cleaner and surveillance footage shows he went in and out of the DA and into other areas of the kitchen several times and passed by Amy Link at least once before going into the DA around 10:36 a.m. (**Ex. 9** at O.W. 000002.) Lehner testified that she locked Hines by himself in the DA and Plaintiff testified that the door to the DA was locked when she entered, so Hines was secured in a room where he could not escape and could not hurt anyone, until Plaintiff unlocked the door, entered, saw him, and, instead of stepping back into the kitchen or radioing for a corrections officer, she locked the door behind her before walking through the DA to the restroom. Further, the restroom was not

"designated" for female civilian kitchen workers—it was designated for all "staff," including males and corrections officers.

Based on these undisputed facts, no reasonable jury could find that assigning Hines to work in the Rincon kitchen and allowing him to clean the DA was so outrageous and extreme that it went "beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *A.G.*, 815 F.3d at 1208.

### 2.     No intent or reckless disregard for near certainty.

Even if the above were sufficient to meet the outrageous and extreme standard, there is no evidence that anyone "intended to cause emotional distress or recklessly disregarded the near certainty that such distress would result." *Bodett*, 366 F.3d at 746–47. Thornell and Josefowicz had no knowledge of Hines in the first place. And even assuming for the sake of argument that Nasta or Hanks did something wrong by not checking on Hines sooner, there is no evidence that either of them intended to cause emotional distress or that either of them acted with reckless disregard. There is also no evidence to support this horrible attack was a "near certainty."

Plaintiff never felt she was at risk of harm before the attack. When she saw Hines by himself in the DA, it struck her as "odd," but she rationalized that there must have been a legitimate purpose for him being locked in there and she did not feel unsafe. (**Ex. 3** at 54:18–55:4.) And after the assault, she exchanged text and Facebook messages with Nasta and Hanks, hosted Nasta at her home for dinner, and considered them her friends. (**Ex. 3** at 43:10–44:8; 83:13–16.) Nasta rode with her in the ambulance and stayed at the hospital with her for 12–13 hours, comforted her, and checked on her regularly after the assault. (**Ex. 3** at 45:7–23; 65:10–15.) This post-incident conduct demonstrates that even Plaintiff did not believe Nasta or Hanks acted with the purpose of causing her any distress or with reckless disregard. If they had, one would expect evidence of hostility or at least distrust in Plaintiff's relationships with Nasta and Hanks—not continued friendship.

. . . .

. . . .

**Rusing Lopez Lizardi & Saffer, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

63883644.1

### 3. The State's conduct did not cause Plaintiff severe emotional distress.

For this Motion, the State does not contest that Plaintiff suffered severe emotional distress—but that distress was caused by Hines's conduct, not any conduct on the part of any Defendant or employee/agent of the State.

Because no reasonable jury could find that any State employee or agent's conduct was sufficiently extreme or outrageous or that any of the Defendants acted intentionally or with reckless disregard, the State is entitled to judgment on this claim.

## VI. Negligence Claims (Counts Three and Four) Are Barred Because Worker's Compensation Is Her Exclusive Remedy

"It is well settled that work-related injury claims are generally redressed exclusively under Arizona's workers' compensation scheme." *Trischan v. Suns Legacy Partners LLC*, No. CV-24-03184-PHX-SHD, 2025 WL 2695573, at *11 (D. Ariz. Sep. 22, 2025) (quoting *Gamez v. Brush Wellman, Inc.*, 34 P.3d 375, 378 ¶ 5 (Ariz. App. 2001)). Absent "willful misconduct" by the employer, and unless the plaintiff has specifically rejected their right to workers' compensation, those benefits are "the exclusive remedy" against an employer for qualifying work-related injuries. A.R.S. §§ 23-1022(A), 23-906; ARIZ. CONST. art. XVIII § 8. Because the State was Plaintiff's statutory employer, her claims are controlled by A.R.S. § 23–1024(A), which provides that "[a]n employee . . . who accepts [workers'] compensation waives the right to exercise any option to institute proceedings in court against his employer." As a result, Arizona's worker's compensation scheme "preclude[s] claims predicated on an employer's negligence." *Trischan v. Suns Legacy Partners LLC*, WL 2695573, at *12 (citing *Mosakowski v. PSS World Med., Inc.*, 329 F. Supp. 2d 1112, 1130–31 (D. Ariz. 2003)).

This Court concluded that this argument was previously improperly raised as a jurisdictional issue in the State's motion to dismiss and that Plaintiff should be permitted to pursue discovery and noted that "courts typically address this issue at summary judgment." (Doc. 66 at 4.) Discovery has concluded and Plaintiff undertook zero discovery requests or depositions aimed at the issue of whether the State was her statutory employer. Just as Plaintiff did not contest that the State was her statutory employer in her response opposing

Rusing Lopez Lizardi & Saffer, P.L.L.C.
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

the State's motion to dismiss (Doc. 56), she cannot credibly do so here because the contracts between the State and Trinity demonstrate the State as her statutory employer. Therefore, she cannot, as a matter of law, recover against the State on her claims for negligence (Count Three) and gross negligence (Count Four).

### 1. The State has not waived this defense.

While Plaintiff may argue the State waived this defense, she is wrong. In its Answer, the State asserted "statutory and common law absolute and qualified immunities under state and federal law" in its affirmative defenses. (Doc. 16 ¶¶ 175.) This defense is known as "statutory employer *immunity*" under Arizona law. *See Young v. Env'tal Air Prods., Inc.*, 665 P.2d 40, 44 (1983) ("The rationale of statutory employer immunity is that since the remote employer shoulders the burdens imposed by the Act, he should enjoy the immunity which that Act grants a direct employer."). Thus, the State's Answer adequately pleaded this defense. Moreover, Plaintiff was on notice of this issue when Trinity pleaded it in their Answer. (Doc. 17 at 21, ¶ 14.) Plaintiff was indisputably on notice of this defense in June 2025 when the State specifically cited this defense in response to her interrogatories. (**Ex. 25**, Interrogatory No. 5.) And Plaintiff was certainly on notice by the time the State filed its motion to dismiss on this very issue on November 3, 2025. (Doc. 53.) Further, as demonstrated by the State's previous motion on this issue, the State also believed in good faith (although, apparently, mistakenly) and in reliance on another district court decision, *Fox v. Arizona,* No. CV-21-01089-PHX-MTL, 2023 WL 4315221, at \*2 (D. Ariz. July 3, 2023)., that this issue was one of subject-matter jurisdiction that could not be waived. Fact discovery was ongoing when that motion was filed and denied (Doc. 40), and Plaintiff did not undertake any discovery whatsoever on the issue, so Plaintiff cannot possibly argue that she is surprised or somehow prejudiced by this issue, particularly when one of her attorneys was the same one on *Fox*, where Judge Liburdi correctly decided this issue.

. . . .

. . . .

. . . .

Rusing Lopez Lizardi & Saffer, P.L.L.C.
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

**2.      Plaintiff's injuries fall within the scope of Arizona's Workers' Compensation Act.**

An injury falls within the scope of Arizona's Workers' Compensation Act (the "Act") when the employee "sustained [the] injury by accident 'arising out of' and 'in the course of' his employment." *Ibarra v. Indus. Comm'n of Ariz.*, 425 P.3d 1114, 1117 ¶ 14 (Ariz. App. 2018) (quoting A.R.S. § 23-1021). The Arizona Court of Appeals has explained that "'[a]rising out of' refers to the origin or cause of the injury, while 'in the course of' refers to the time, place, and circumstances of the injury in relation to the employment." *Id.* "To arise out of employment, the injury must result from some risk of the employment or be incidental to the discharge of employment duties." *Id.* ¶ 15. Employment-related risks include risks that, by their nature, are: "(1) peculiar to the employment; (2) increased by the employment, but qualitatively not peculiar to the employment; (3) actual risks of the employment; or (4) risks that would not occur 'but for the fact that the employment placed the employee in a position where he or she was injured.'" *Id.* at 1117–18, ¶ 15 (quoting *Lane v. Indus. Comm'n*, 178 P.3d 516, 520 ¶ 11 (Ariz. App. 2008)). "In addition to evaluating the nature of the risk, it is also necessary to consider whether the origin of the risk is: (1) distinctly work related; (2) wholly personal; (3) mixed, i.e., partially work related and partially personal; or (4) neutral." *Id.* (citations omitted). Further, psychological injuries sustained from being sexually assaulted at work by a coworker are covered by workers' compensation when the stress causing the injuries, i.e., the assault, was an "unexpected injury-causing event." *Irvin Invs., Inc. v. Superior Ct. In & For Cnty. of Maricopa*, 800 P.2d 979, 982 (Ariz. App. 1990) (citation omitted).

The undisputed facts establish that Plaintiff's injuries arose out of her employment because it resulted from the risk of being assaulted by an inmate and the risk of being assaulted by an inmate is peculiar to working in a prison, or at least is increased by working in a prison and would not occur but for the fact that Plaintiff's employment placed her in a position where she was assaulted by an inmate. *See Ibarra*, 425 P.3d at 1117–18 ¶ 15. The undisputed facts also establish that the origin of the risk of being assaulted by Hines was

Rusing Lopez Lizardi & Saffer, P.L.L.C.
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

distinctly work related; there is no evidence to suggest that there was anything personal motivating Hines's criminal acts or that Hines and Plaintiff had any interactions outside of her employment. And, as established by Plaintiff's testimony, the assault was an unexpected injury-causing event. Therefore, Plaintiff's injuries fall within the scope of workers' compensation.

Lastly, Plaintiff cannot credibly contest that her injuries fall within the scope of workers' compensation because the undisputed evidence shows she not only applied for but accepted and received workers' compensation benefits. She should not now be permitted to argue that the award of those benefits somehow was erroneous. Arizona law afforded her the right to waive those benefits in order to maintain the right to pursue legal action, and she did not do so. Thus, she has waived the right to maintain her state-law negligence claims against the State.

### 3.    The State is Plaintiff's statutory employer under A.R.S. § 23-902(B).

Under Arizona's Workers' Compensation Act, an entity's "employer" status extends not only to its direct employees, but also the employees of contractors over whom the entity retains supervision or control. A.R.S. § 23-902(B). In other words, employers are legally required to provide workers' compensation benefits for its "remote employees" just the same as it must for "direct employees." *Young*, 665 P.2d at 44. And because the remote employer "shoulders the burdens imposed by the Act," it "should enjoy the immunity which that Act grants a direct employer." *Id.* at 44.

An employer seeking to enforce the statutory immunity provided in §§ 23-906 and 23-1022 must show: "(1) retention of supervision or control over the work procured to be done by a contractor and (2) the work entrusted to the subcontractor must be a 'part or process in the trade or business' of the employer against whom the third-party tort action is asserted." *Pruitt v. State of Arizona*, 571 P.3d 356, 361 (Ariz. App. 2025) (quoting *Young*, 665 P.2d at 44); *see also* § 23-902(B). Here, both prongs are satisfied.

. . . .

. . . .

**Rusing Lopez Lizardi & Saffer, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

A.   The State retained supervision and control over Trinity's work.

The first prong requires consideration of the totality of the circumstances, which includes the following factors:

> [T]he duration of the employment; the method of payment; who furnishes the necessary equipment; the right to hire and fire; who bears responsibility for work[ers'] compensation insurance; the extent to which the employer may exercise control over the details of the work[] and whether the work was performed in the usual and regular course of the employer's business.

*Pruitt*, 571 P.3d at 361(alterations in *Pruitt*) (quoting *Home Ins. Co. v. Indus. Comm'n*, 123 Ariz. 348, 350 (1979)). The court is to consider only "the control exercised by the employer over the contractor, not the employee," and, where a written contract exists between the parties, the level of control exercised by the employer is generally defined by the unambiguous terms of that contract. *Id.* at 362; *Wagner v. Arizona*, 393 P.3d 156, ¶ 7 (Ariz. App. 2017) (courts "look to the substance of the contract" to determine application of statutory employer framework).

Arizona courts have applied this test to state contractors performing work in Arizona prisons under substantially similar circumstances to the instant case. *See, e.g.*, *Pruitt*, 571 P.3d 356; *Wagner*, 393 P.3d 156; *Fox*, 2023 WL 4315221. Those cases are instructive and provide context for the level of control and supervision required to satisfy the supervision-and-control prong, specifically as it relates to ADCRR contractors.

In *Wagner*, the Arizona Court of Appeals concluded that a clinical social worker at an ADCRR prison was the statutory employee of the State, despite being the direct employee of a contractor entity, Wexford, with whom the State had contracted to provide healthcare services for inmates. 393 P.3d 156, ¶¶ 1–2. Even though the contract expressly stated that neither Wexford nor its employees should be considered employees of ADCRR "under any circumstances," that could not defeat a finding of statutory employment where the contract as a whole gave ADCRR the right to control Wexford's provision of healthcare to inmates. *Id.* ¶¶ 8–10. Specifically, ADCRR had a three-year, exclusive contract with Wexford, under which ADCRR provided and maintained the necessary health service facilities, ADCRR

Rusing Lopez Lizardi & Saffer, P.L.L.C.
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

retained the power to approve Wexford's hires, and Wexford was required to notify and consult with ADCRR before firing staff. *Id.* ¶ 10. Moreover, Wexford was required to allow ADCRR free access to all contract areas, staff, work products, and other materials dealing with the contract on request such that ADCRR could ensure compliance with mandated procedures. *Id.* And, "[a]lthough Wexford carried workers' compensation insurance for its employees, it did so pursuant to [ADCRR's] requirements." *Id.* Thus, ADCRR maintained sufficient supervision and control over Wexford to satisfy the first prong. *Id.*

Following *Wagner*, the court in *Pruitt* similarly found sufficient control and supervision by ADCRR over a contractor, Televerde, which operated call centers in ADCRR prisons to provide meaningful job opportunities for inmates. 571 P.3d at 359, 361.While Televerde provided the necessary call center business equipment, knowledgeable supervisors, and workers' compensation insurance, ADCRR provided the building and facilities. *Id.* 361–62. ADCRR also retained the right to screen and approve Televerde's hires and required compliance with ADCRR policies regarding inmate employment, inmate supervision, and the type of equipment that could be used in the call center. *Id.* The court explained "[t]hese contract provisions show the same type of control over the work by ADCRR as in *Wagner*, if not more." *Id.* at 362.

In *Fox*, the district court reached the same conclusion under similar facts, acknowledging the test is based on a "totality of the circumstances," and further recognizing that control is not necessarily defeated for failure to fully establish each factor. *Fox*, 2023 WL 4315221, at *8. Consistent with *Wagner*, the *Fox* court placed significant weight and emphasis on ADCRR's active role in the contractor's employee selection, retention, and oversight, as well as monitoring rights over the contractor's provision of services. *Id.* at *4–8. Although the contract was only for an initial term of two years, required the contractor to maintain workers' compensation insurance, and required the contractor to provide and maintain much of the equipment needed to provide its services, the *Fox* court determined that the requisite control existed, given the relative strength of ADCRR's oversight rights. *Id.*

Here, the Contract between the State and Trinity is a near perfect parallel to the contracts at issue in the cases identified above. And in several respects, the Contract provides even stronger evidence of the State's control, particularly with regard to its contractual oversight over Trinity in nearly every aspect of its performance.

**Contract Duration:** The State contracted with Trinity for the management and provision of food services at all Arizona state prison complexes and units for a term of 10 years. (Doc. 53-1 at 7, § 1.2.1). This far exceeds the two- and three-year contracts in *Fox* and *Pruitt*, respectively. *See Fox*, 2023 WL 4315221, at *4 (implicitly recognizing that a long-term contractual relationship supports the control prong). Moreover, the State retained the unilateral discretion to terminate the Contract without penalty at any time for its own convenience. (Doc. 53-1 at 78, § 9.4.)

**Method of Payment:** As noted in *Fox*, this factor is primarily relevant to distinguishing between employees and independent contractors. 2023 WL 4315221, at *5–6. *Compare Home Ins. Co.*, 123 Ariz. at 350 (using same test to evaluate employee-independent contractor distinction) *with Wagner*, 393 P.3d 156, ¶ 9 (quoting and applying *Home Insurance Co.* test to statutory employer analysis). There is no dispute that Plaintiff was an employee of Trinity, not an independent contractor.

**Necessary Equipment:** As in *Wagner*, 242 Ariz. 95, ¶ 10, *Pruitt*, 571 P.3d at 361–62, and *Fox*, 2023 WL 4315221, at *6, the State provided Trinity with the facilities and fixtures for the operation of prison food services in each prison complex, including: warehouse storage (Doc. 53-1 at 7, § 1.2.2.2); vehicles and equipment for transportation of food products (*id.* at 7, § 1.2.3 and 14, § 1.6.5); kitchens (Doc. 53-1 at 14, § 1.6.3); its current inventory of "Fixed Food Service Equipment" like ovens, stoves, steam tables, grills, etc. (*id.* at 45, § 1.26.1.3); its current inventory of "Non-Fixed Equipment" such as slicers, mixers, toasters, choppers, food processors, etc. (*id.* § 1.26.1.4); and even its current inventory of "Small Wares" items like cutlery, dinnerware, storage containers, and other cooking utensils (*id.* § 1.26.1.7). The State was responsible for any repairs or replacements to equipment, as well as the maintenance and repair of the building. (*Id.* §§ 1.26.1.3–4, 1.26.1.6.) Although Trinity

**Rusing Lopez Lizardi & Saffer, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

was responsible for providing its own "office furnishings, safes and office machines" (*id.* at 30, § 1.16.5), as well as certain cleaning and consumable items (*id.* at 31, § 1.16.10), the vast majority of equipment was provided and maintained by the State, unlike the contractor in *Fox*, who was required to provide and maintain much of the necessary equipment for their work. 2023 WL 4315221, at *5.

**Employee Retention:** Courts have placed significant emphasis on whether the State retains a contractual right to oversee the contractor's employment decisions, a factor that was present in each of the cases illustrated above. *See, e.g.*, *Wagner*, 393 P.3d at 158, ¶ 10; *Pruitt*, 571 P.3d at 361–62; *Fox*, 2023 WL 4315221, at *6. Here, the State's control over Trinity's workforce is similarly pervasive. Although Trinity was responsible for staffing its food service operations (§ 1.17.1), it was required to maintain a position list and was prohibited from making any changes to "the final approved staffing" without written approval from the State (§ 1.17.1.2). (Doc. 53-1 at 38–39.) The Contract also sets out strict requirements for weekly staff hours, staff absences, and staff tracking, and mandates that Trinity maintain written "job descriptions, task analysis, and time line charts for all positions." (*Id.* at 39, § 1.17.1). Most importantly, the State retained the right to "review the qualifications of all the food service staff that [Trinity] proposes to hire" and to deny approval of any proposed hires. (*Id.* § 1.17.1.5) Furthermore, the State could require Trinity to remove any of its employees from the premises "for any reason sufficient to the Department," was responsible for performing all necessary background checks for Trinity personnel and had the discretion to reject any employee who did not meet ADCRR's standards. (*Id.* at 47, §§1.26.1.11–12).

**Workers' Compensation Insurance:** Even where workers' compensation insurance is provided through the contractor, this factor may nevertheless weigh in favor of control where it is an express requirement under the contract. *See Wagner*, 393 P.3d at 158, ¶ 10 ("Although Wexford carried workers' compensation insurance for its employees, it did so pursuant to [ADCRR's] requirements."). Here, the State required that Trinity maintain workers' compensation insurance as a condition of the Contract. (Doc. 53-1 at 60, § 2.27.7.)

**Rusing Lopez Lizardi & Saffer, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

**Control Over Work Details:** Although Trinity was generally responsible for the management of all kitchens, food service, and ordering of food items and supplies, and was required to use inmate labor. (Doc. 53-1 at 7, § 1.2.2.2), Trinity was required to strictly comply with all specified health and safety standards as well as the general food service standards promulgated by the State, including those set out in the Contract. (*Id.* at 32–36, §§ 1.16.18–19, 1.16.34–35, 1.16.47.) Specifically, "The Department shall review and direct the Contractor per the terms of this contract with respect to the quality and quantity of the food being served, method of service thereof, operational hours of the food service areas, safety issues, sanitation, and the maintenance of all food service facilities." (*Id.* at 47, § 1.26.1.10). Further, Trinity was required to use the State's "Standard Department Cycle Menu," follow all standardized recipes without modification, and obtain approvals of any changes made to any menu or recipe. (*Id.* at 35, 38 §§ 1.16.45, 1.16.56.) The Contract also held Trinity to performance standards related to: the number of item changes to any menu per week; accommodation of inmates with restricted diets; portion control; documentation of all foods received and costs; monthly profit and loss statements for meal services; weekly sanitation inspections; staff turnover; employee training; maintenance of accounting records; and the creation of regular written reports regarding operations. (*Id.* at 42–44, § 1.22.)

Furthermore, the State was permitted, on request, to require Trinity to meet to review operating statements and "explain deviations, discuss problems, and mutually agree on a course of action to improve the operation of the Food Service Unit," (*id.* at 34, § 1.16.37), and to inspect areas assigned to Trinity at any time (*id.* at 46, § 1.26.1.9).

The above factors demonstrate that the State retained extensive supervision and control over Trinity, as in *Wagner*, *Pruitt*, and *Fox*.

B.    Trinity's work was a part or process of the State's business

A contractor's work is a "part or process in the trade or business of the employer" when it is "a particular work activity that in the context of an ongoing and integral business process is regular, ordinary or routine in the operation of the business or is routinely done through the business' own employees." § 23-902(B). In *Wagner* and *Fox*, the courts

Rusing Lopez Lizardi & Saffer, P.L.L.C.
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

63883644.1

31

concluded that because ADCRR was legally obligated to provide adequate healthcare services for its prisoners, the contractor's health care services were a necessary part or process of ADCRR's business of operating and maintaining State prison facilities. *See Wagner*, 393 P.3d at 159, ¶ 12; *Fox*, 2023 WL 4315221, at \*9. Consistent with this rationale, in *Pruitt*, where the contractor at issue operated call centers to provide employment opportunities for inmates, the court concluded that because ADCRR was empowered by A.R.S. § 41-1623(D) to contract with a private corporation "for the purpose of establishing and operating . . . [a] commercial enterprise deemed by the director to provide employment opportunities for inmates in meaningful jobs for wages," the work of running a call center that was entrusted to the contractor was a "'part or process in the trade or business' undertaken by ADCRR to provide rehabilitation services." *Pruitt*, 571 P.3d at 363, ¶ 20.

Here, the State contracted with Trinity to provide food services for inmates, which, like healthcare, is an indispensable necessity as it relates to the health and safety of prisoners in the State's custody. As noted in *Fox*, the Eighth Amendment imposes duties on officials to provide humane conditions of confinement, which, the Supreme Court has explained, includes a duty to "ensure that inmates receive adequate food." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Moreover, in 2023, a permanent injunction was issued by the District Court in a separate civil rights action against ADCRR requiring that ADCRR, among other things, provide prisoners with "a minimum of three separately provided meals a day (breakfast, lunch, and dinner) consisting of two hot meals and one cold meal with no more than 14 hours between dinner and breakfast." *Jensen v. Thornell*, No. 2:12-cv-00601-ROS, Doc. 4410 at 61–62, ¶ 26 (D. Ariz. Apr. 7, 2023).

The undisputed facts establish that Trinity was contracted by the State to not only feed the inmates but also to provide inmates with employment opportunities. Thus, the work entrusted to Trinity was a part or process in the business of the State.

Because both prongs are satisfied, the State is the statutory employer of Trinity's employees, including Plaintiff, and her exclusive remedy against the State is through workers' compensation benefits, which she indisputably has already received.

**Rusing Lopez Lizardi & Saffer, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

**4.      The "willful misconduct" exception of A.R.S. § 23-1022(A) does not apply.**

An exception to the Act's exclusive remedy provision exists where a plaintiff's injury was caused by the employer's "willful misconduct." This means the injury must have resulted from "an act done knowingly and purposely with the direct object of injuring another." § 23-1022(A)–(B); *see also Mosakowski v. PSS World Med., Inc.*, 329 F. Supp. 2d 1112, 1129 (D. Ariz. 2003). The Arizona Legislature made clear that the "willful misconduct" exception only allows a plaintiff to seek alternative remedies to the extent that the plaintiff has not already claimed workers' compensation benefits under the Act: "if the injury is caused by the employer's wilful [sic] misconduct . . . the injured employee may ***either*** claim compensation ***or*** maintain an action at law for damages against the person or entity alleged to have engaged in the wilful [sic] misconduct." § 23-1022(A) (emphases added). "The exception is clear that the employee can either seek workers' compensation benefits for injuries sustained from willful misconduct at work or file a damages suit." *Fox*, 2023 WL 4315221, at *9.

It is undisputed that Plaintiff did not disclaim workers' compensation benefits. Rather, Plaintiff applied for and continues to receive workers' compensation benefits for her injuries arising from the subject incident. (Doc. 53-1 at 84.) Therefore, she cannot seek double recovery by pursuing tort claims against the State for the same injuries. *See Fox*, 2023 WL 4315221, at *9. This is true regardless of whether the State allegedly engaged in any "willful misconduct."[2]

Again, the State does not dispute that Plaintiff suffered injuries as the result of a horrific assault. But no matter how injured or sympathetic a plaintiff may be, the Arizona Legislature has made clear through the Act that a plaintiff, the law simply does not allow her to maintain claims for negligence claims against her statutory employer after she has received workers' compensation. Therefore, the State requests judgment in its favor on Counts Three and Four.

. . . .

---

[2] As demonstrated in Section V [IIED], there is no evidence that the State or any of its employees/agents engaged in any willful misconduct that resulted in Plaintiff's injuries.

Rusing Lopez Lizardi & Saffer, P.L.L.C.
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

## VII.    <u>Count Six (Hostile Work Environment) Fails</u>

To establish that she was subjected to a hostile work environment, Plaintiff "must prove that "1) she was subjected to verbal or physical conduct of a sexual nature, 2) this conduct was unwelcome, and 3) this conduct was sufficiently severe or pervasive to alter the conditions of . . . employment and create an abusive working environment." *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 966 (9th Cir. 2002) (quoting *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir. 1995)). And "to prevail on a hostile work environment claim, an employee must show that her employer is liable for the conduct that created the environment." *Fuller v. Idaho Dep't of Corr.*, 865 F.3d 1154, 1161 (9th Cir. 2017) (quoting *Little*, 301 F.3d at 966).

In the Ninth Circuit, employers are liable for harassing conduct by non-employees "where the employer either ratifies or acquiesces in the harassment by not taking immediate and/or corrective actions when it knew or should have known of the conduct." *Freitag v. Ayers*, 468 F.3d 528, 538 (9th Cir. 2006) (quoting *Folkerson v. Circus Circus Enters., Inc.,* 107 F.3d 754, 756 (9th Cir. 1997)); *Christian v. Umpqua Bank*, 984 F.3d 801, 811 (9th Cir. 2020). "This theory of liability is grounded not in the harassing act itself—i.e., inmate misconduct—but rather in the employer's 'negligence and ratification' of the harassment through its failure to take appropriate and reasonable responsive action." *Freitag*, 468 F.3d at 538 (quoting *Galdamez v. Potter,* 415 F.3d 1015, 1022 (9th Cir. 2005)). "With respect to the question of liability for harassment caused by a third party, the employer's corrective measures must be reasonably calculated to end the harassment; the reasonableness of the corrective action will depend on, *inter alia,* the employer's ability to stop the harassment and the promptness of the response." *Id.* at 468 539–40 (internal quotations omitted); *see also Campbell v. Hawaii Dep't of Educ.*, 892 F.3d 1005, 1017 (9th Cir. 2018) (no liability for hostile work environment where employer "did quite a lot in response" once it learned of students' harassment of employee, including promptly investigating, issuing warnings to students placing some in detention, suspending students, and transferring some out of the employee's classes).

**Rusing Lopez Lizardi & Saffer, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

63883644.1

There is no doubt that the violent assault perpetrated against Plaintiff by Hines was sexual and unwanted. But the State is not liable for this horrific criminal act because it took immediate corrective action. As soon as Plaintiff activated ICS, multiple corrections officers responded, apprehended Hines, removed him from the Rincon unit and transferred him to a maximum-security unit, cited him with a disciplinary ticket, conducted a criminal investigation and referred the investigative findings to the Pima County Attorney's Office for prosecution, and installed a surveillance camera in the DA the very next day. No reasonable jury could find that the State, through its employees/agents, failed to adequately respond as soon as it learned of the assault. Therefore, the State cannot be held liable on this claim.

## VIII.  Conclusion

Defendants Thornell, Josefowicz, Nasta, and Hanks did not violate Plaintiff's constitutional rights, the State is not subject to state-law negligence liability, and Plaintiff cannot prove her claims for intentional infliction of emotional distress or hostile work environment. Therefore, the State Defendants respectfully request that this Court grant their Motion for Summary Judgment on all counts and enter judgment in their favor as a matter of law.

DATED this May 22, 2026.

RUSING LOPEZ LIZARDI & SAFFER, P.L.L.C.

/s/ Mark D. Lammers
_____
Mark D. Lammers
Zoey Kotzambasis
*Attorneys for Defendants State of Arizona,*
*Ryan Thornell, Christopher Josefowicz,*
*Kaylan Nasta, and Talon Hanks*

## CERTIFICATE OF SERVICE

I certify that on May 22, 2026, I electronically transmitted the attached document to the Clerk's office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to all counsel of record, with a copy to:

Jesse M. Showalter
Lauren E. Channell
ROBBINS CURTIN MILLEA & SHOWALTER, LLC
301 East Bethany Home, #B-100
Phoenix, Arizona 85012
jesse@rcmslaw.com
lauren@rcmslaw.com
*Attorneys for Plaintiff*

R. Shawn Oller
Chrisanne M. Gultz
LITTLER MENDELSON, P.C.
Camelback Esplanade
2425 East Camelback Road, Suite 900
Phoenix, Arizona 85016
soller@littler.com
cgultz@littler.com
*Attorneys for Defendants*
*TKC Holdings, Inc. and Trinity Services Group, Inc.*


By:      */s/ Aneta Wrzeszcz*

Rusing Lopez Lizardi & Saffer, P.L.L.C.
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

# **TABLE OF EXHIBITS**

1. Declaration of Mark D. Lammers
2. Plaintiff's Responses to State Defendants' First Set of Interrogatories
3. Plaintiff's Deposition Transcript
4. Jury Trial Day 1, Testimony of O.W.
5. Amy Link Deposition Transcript
6. TKC Holdings CEASE (Trinity Training)
7. ADCRR Department Order 503 – Employee Grooming and Dress
8. Kaylan Nasta Deposition Transcript
9. Office of Inspector General Investigative Report
10. Lehner Deposition Transcript
11. State of Arizona v. Demarco Hines Direct Indictment
12. State of Arizona v. Demarco Hines – 2/13/2026 Minute Entry
13. ACIS Report for Demarco Hines
14. Demarco Hines Disciplinary Tickets
15. Declaration of Christopher Josefowicz
16. Ryan Thornell's Responses to Plaintiff's First Set of Discovery Requests
17. Christopher Josefowicz's Responses to Plaintiff's First Set of Discovery Requests
18. Talon Hanks Deposition Transcript
19. Talon Hanks' Responses to Plaintiff's First Set of Discovery Requests
20. Kaylan Nasta's Responses to Plaintiff's First Set of Discovery Requests
21. ADCRR Department Order 801 – Inmate Classification
22. Talon Hanks' Personnel File Excerpts
23. Rincon Kitchen Incident 9/13/2022
24. Aubrey Land Deposition Transcript
25. State's Responses to Plaintiff's Discovery Requests

# EXHIBIT 1

**RUSING LOPEZ LIZARDI & SAFFER, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800
Facsimile: (520) 529-4262
mdlammers@rllaz.com
zkotzambasis@rllaz.com

Mark D. Lammers
State Bar No. 010335
Zoey Kotzambasis
State Bar No. 034607

*Attorneys for Defendants State of Arizona, Ryan Thornell,*
*Christopher Josefowicz, Kaylan Nasta, and Talon Hanks*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| O.W., an individual,<br><br>                                    Plaintiff,<br>vs.<br><br>State of Arizona, et al.,<br><br>                                    Defendants. | No. 2:25-cv-00044-DWL<br><br>**DECLARATION OF MARK. D. LAMMERS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>(Assigned to Hon. Dominic W. Lanza) |

I, Mark D. Lammers, declare under penalty of perjury that the following statements are true. I am above the age of 18 and am competent to make this Declaration. I am an attorney of record for Defendants State of Arizona, Ryan Thornell, Christopher Josefowicz, Kaylan Nasta, and Talon Hanks, and have personal knowledge regarding the facts stated hereto. This Declaration is based upon my personal knowledge, information, and belief.

1.      All exhibits submitted in support of this Motion for Summary Judgment are true and correct copies.

. . . .

. . . .

. . . .

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED this May 22, 2026.

_____
Mark D. Lammers

Rusing Lopez & Lizardi, P.L.L.C.
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

MDL Declaration(63887220.1)                    2

# EXHIBIT 2

Jesse Showalter (026628)
Lauren E. Channell (033484)
**ROBBINS CURTIN MILLEA & SHOWALTER, LLC**
301 East Bethany Home, Suite B-100
Phoenix, Arizona 85012
Tel: 602-400-4400
Fax: 602-265-0267
jesse@rcmslaw.com
lauren@rcmslaw.com
*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| O.W., an individual,<br><br>Plaintiff,<br><br>vs.<br><br>State of Arizona, a body politic; Ryan Thornell, an individual, on his own behalf and on behalf of his marital community; Christopher Josefowicz, an individual, on his own behalf and on behalf of his marital community; Kaylan Nasta, an individual, on her own behalf and on behalf of her marital community; Talon Hanks, an individual, on his own behalf and on behalf of his marital community; TKC Holdings, Inc., a Missouri corporation; Trinity Services Group, Inc., a Florida corporation; and John and Jane Does 1-40,<br><br>Defendants. | No. 2:25-cv-00044-DWL<br><br>**PLAINTIFF'S RESPONSES TO STATE DEFENDANTS' FIRST SET OF INTERROGATORIES TO PLAINTIFF** |

Plaintiff, O.W., through counsel undersigned and in accordance with Rules 26 and 33 of the Federal Rules of Civil Procedure, provides the following for her answers to Defendants' State of Arizona, Ryan Thornell, Christopher Josefowicz, Kaylan Nasta, and Talon Hanks First Set of Interrogatories to Plaintiff to Plaintiff.

. . . .

ROBBINS CURTIN MILLEA & SHOWALTER, LLC
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

## INTERROGATORIES

**INTERROGATORY NO. 1:**    Please describe in detail your employment from the time you were 18 years old until September 29, 2023, identifying all positions you held and employers you worked for, including the time frame during which you held each position identified, salary/wage, and benefits.

**ANSWER:** From approximately March 2018 to November 2018, Plaintiff worked as a barista for Starbucks inside of Safeway in Tucson, Arizona. She does not recall her wage and did not receive benefits.

From approximately November 2018 to March 2019, Plaintiff worked as a customer service representative for Alorica, a call center. She was paid approximately $14 per hour and did not receive benefits.

From approximately March 2019 to September 2019, Plaintiff worked as a delivery driver for Jimmy John's. She does not recall her wage and did not receive benefits.

From approximately October 2019 to March 2020, Plaintiff worked for McDonald's as a guest experience specialist. She does not recall her wage and did not receive benefits.

From approximately August 2020 to June 2022, Plaintiff worked as a barista for another Starbucks in Tucson. She was paid approximately $14.25 an hour and did not receive benefits.

For approximately one month in the summer of 2022, Plaintiff worked as a receptionist for a dog grooming salon, Jackie's K9 Korral, in Tucson. She was paid $13.00 an hour and did not receive benefits.

Plaintiff began working for Trinity Services Group and/or TKC Holdings in September 2022. Her position was Food Service Worker. Her starting pay was $15.25/hour, and at some point her pay was increased to $21.75/hour. Trinity/TKC Holdings offered benefits, including medical, dental, and vision insurance and eligibility to participate in a 401(k) plan. *See* Letter re: Employment Offer, produced by Trinity

ROBBINS CURTIN MILLEA & SHOWALTER, LLC
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

that the request calls for information previously disclosed in Plaintiff's initial and supplemental disclosure statements and which is already in Defendants' possession. Plaintiff's records speak for themselves with respect to her prior medical and mental health treatment. In addition, Plaintiff also objects to the extent that the request appears to call for expert testimony, which will be disclosed in accordance with the Court's case management deadlines.

Notwithstanding the foregoing objections, Plaintiff responds as follows: In 2020, a provider at Palo Verde Behavioral Health Services told Plaintiff she had been diagnosed with borderline personality disorder, and Plaintiff was prescribed medication for that condition. Prior to the assault, Plaintiff was not diagnosed with any physical condition that has any relevance to the subject assault.

**INTERROGATORY NO. 12:**   Please set forth all facts supporting your claim that Defendant Thornell acted with deliberate indifference, as alleged in Paragraph 105 of your First Amended Complaint.

**ANSWER:** Plaintiff's First Amended Complaint sets forth the facts presently known to Plaintiff which support her claim that Defendant Thornell acted with deliberate indifference. The First Amended Complaint, paragraph 104, states that Defendant Thornell engaged in affirmative conduct that exposed Plaintiff to an actual, particularized danger by: (a) establishing, promulgating, and maintaining the prisoner labor classification system whereby Inmate Hines, a high security risk inmate with a history of violence and sexual misconduct, was assigned to a work assignment with civilian workers; (b) establishing and condoning an unofficial policy where, because of understaffing, inmates at ASPC-Tucson were allowed to enforce and maintain order within the prison; and (c) approving and assigning Inmate Hines, a high security risk inmate with a history of violence and sexual misconduct, to a work assignment with civilian workers. The evidence in this case will show that Defendant Thornell was deliberately indifferent to the known or obvious danger his actions created because he knew that the prisoner labor classification system would

Page 11 of 15

ROBBINS CURTIN MILLEA & SHOWALTER, LLC
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ◆ Fax: (602) 265-0267

result in high risk, violent inmates being assigned to work closely with civilians and that persistent understaffing issues would mean that those inmates would not be adequately supervised, thereby exposing civilian workers to a substantial risk of harm. As the director of ADC and person responsible for establishing and implementing these policies, Defendant Thornell recognized an unreasonable risk of harm to civilian workers, including Plaintiff, and consciously disregarded that risk.

Discovery is ongoing, and Plaintiff reserves the right to supplement as additional information becomes available.

**INTERROGATORY NO. 13:**    Please set forth all facts supporting your claim that Defendant Josefowicz acted with deliberate indifference, as alleged in Paragraph 107 of your First Amended Complaint.

**ANSWER:** Plaintiff's First Amended Complaint sets forth the facts presently known to Plaintiff which support her claim that Defendant Josefowicz acted with deliberate indifference. The First Amended Complaint, paragraph 106, states that Defendant Josefowicz engaged in affirmative conduct that exposed Plaintiff to an actual, particularized danger by: (a) establishing and condoning an unofficial policy where, because of understaffing, inmates at ASPC-Tucson were allowed to enforce and maintain order within the prison; and (b) approving and assigning Inmate Hines, a high security risk inmate with a history of violence and sexual misconduct, to a work assignment with civilian workers. As the Warden of ASPC-Tucson, Defendant Josefowicz was aware that high risk, violent inmates in the Rincon Unit were assigned to work closely with civilians and that persistent understaffing issues would mean that those inmates would not be adequately supervised, thereby exposing civilian workers to a substantial risk of harm. Defendant Josefowicz recognized an unreasonable risk of harm to civilian workers, including Plaintiff, and consciously disregarded that risk.

Discovery is ongoing, and Plaintiff reserves the right to supplement as additional information becomes available.

ROBBINS CURTIN MILLEA & SHOWALTER, LLC
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax:  (602) 265-0267

**INTERROGATORY NO. 14:**   Please set forth all facts supporting your claim that Defendant Nasta acted with deliberate indifference, as alleged in Paragraph 110 of your First Amended Complaint.

**ANSWER:** Plaintiff's First Amended Complaint sets forth the facts presently known to Plaintiff which support her claim that Defendant Nasta acted with deliberate indifference. The First Amended Complaint, paragraphs 108 and 109, states that Defendant Nasta engaged in affirmative conduct that exposed Plaintiff to an actual, particularized danger by leaving Inmate Hines alone and unsupervised for approximately 30 minutes in the Rincon kitchen where he had unrestricted access to the small dining area and staff restroom. Video footage and the CIU investigation report (O.W. 000002-3) show that Defendant Nasta last observed Inmate Hines when they both entered the dining area at 10:26 a.m. Defendant Nasta then left the dining area, leaving Inmate Hines inside and the door open and unlocked, at 10:28 a.m. Defendant Nasta did not check on Inmate Hines again until 11:00 a.m., after he had assaulted Plaintiff.

Defendant Nasta was deliberately indifferent to the known or obvious danger her actions created because she was aware that Inmate Hines was classified as a high security risk (IR 4) and was held in close custody and that he therefore posed a high risk to staff, including civilian kitchen workers such as Plaintiff. Moreover, Defendant Nasta was aware that Inmate Hines presented a substantial risk of harm to Plaintiff specifically. During her recorded interview with CIU Detective Cooper, Defendant Nasta stated that Inmate Hines was "very mouthy" with Plaintiff and that either she or Plaintiff had written an IR about Plaintiff wanting Inmate Hines out of the kitchen because he gave Plaintiff a "weird feeling" approximately one month before the assault. Defendant Nasta also told Detective Cooper that Inmate Hines was "known for wandering off," "doesn't want to listen," and "doesn't want to do as he's asked." Defendant Nasta also stated that she had to watch Inmate Hines to make sure he got where he was supposed to be because he would try to wander off and enter other houses.

ROBBINS CURTIN MILLEA & SHOWALTER, LLC
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

Thus, Defendant Nasta was aware that Inmate Hines presented a substantial risk of harm to Plaintiff, and Defendant Nasta consciously disregarded that risk when she left Inmate Hines alone and unsupervised for an extended period while Plaintiff was also working in the kitchen.

Discovery is ongoing, and Plaintiff reserves the right to supplement as additional information becomes available.

**INTERROGATORY NO. 15:**    Please set forth all facts supporting your claim that Defendant Hanks acted with deliberate indifference, as alleged in Paragraph 113 of your First Amended Complaint.

**ANSWER:** Plaintiff's First Amended Complaint sets forth the facts presently known to Plaintiff which support her claim that Defendant Hanks acted with deliberate indifference. The First Amended Complaint, paragraph 112, states that Defendant Hanks engaged in affirmative conduct that exposed Plaintiff to an actual, particularized danger by leaving Inmate Hines alone and unsupervised in the Rincon kitchen while he took a group of inmates outside for a break. Defendant Hanks was deliberately indifferent to the known or obvious danger his actions created because she was aware that Inmate Hines was classified as a high security risk (IR 4) and was held in close custody and that he therefore posed a high risk to staff, including civilian kitchen workers such as Plaintiff. Defendant Hanks consciously disregarded that risk when he left Inmate Hines alone and unsupervised for an extended period while Plaintiff was also working in the kitchen.

Discovery is ongoing, and Plaintiff reserves the right to supplement as additional information becomes available.

DATED: October 1, 2025

                    ROBBINS CURTIN MILLEA & SHOWALTER, LLC

                    By:  s/ Jesse M. Showalter
                         Jesse M. Showalter
                         Lauren E. Channell
                         *Attorneys for Plaintiff*

Page 14 of 15

**CERTIFICATE OF SERVICE**

I hereby certify that on October 1, 2025 I e-mailed the foregoing to:

Mark D. Lammers
Zoey Kotzambasis
Rusing Lopez & Lizardi, P.L.L.C.
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
mdlammers@rllaz.com
zkotzambasis@rllaz.com

*Attorney for Defendants State of Arizona, Ryan Thornell,*
*Christopher Josefowicz, Kaylan Nasta, and Talon Hanks*

R. Shawn Oller
Chrisanne M. Gultz
Littler Mendelson
2425 E. Camelback Rd., Suite 900
Phoenix, Arizona 85016
soller@littler.com
cgultz@littler.com

*Attorney for Defendants TKC Holdings, Inc. and Trinity Services Group, Inc.*

By:  *s/ Jennie Leetham*

Jesse Showalter (026628)
Lauren E. Channell (033484)
**ROBBINS CURTIN MILLEA & SHOWALTER, LLC**
301 East Bethany Home, Suite B-100
Phoenix, Arizona 85012
Tel: 602-400-4400
Fax: 602-265-0267
jesse@rcmslaw.com
lauren@rcmslaw.com
*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| O.W., an individual, | No. 2:25-cv-00044-DWL |
| Plaintiff, | **Plaintiff's Verification to Plaintiff's Responses to State Defendants' First Set of Interrogatories to Plaintiff** |
| vs. | |
| State of Arizona, a body politic; Ryan Thornell, an individual, on his own behalf and on behalf of his marital community; Christopher Josefowicz, an individual, on his own behalf and on behalf of his marital community; Kaylan Nasta, an individual, on her own behalf and on behalf of her marital community; Talon Hanks, an individual, on his own behalf and on behalf of his marital community; TKC Holdings, Inc., a Missouri corporation; Trinity Services Group, Inc., a Florida corporation; and John and Jane Does 1-40, | |
| Defendants. | |

I, O.W., am the Plaintiff in the above-captioned matter and hereby declare, under oath:

I have personally reviewed Plaintiff's Responses to State Defendants' First Set of Interrogatories to Plaintiff. To the extent said Responses pertain to factual matters within my personal knowledge, they are true to the best of my knowledge, information and belief.

Page 1 of 2

I am not familiar with the legal requirements of the lawsuit and have relied on my attorneys to provide the legal basis of the claims in this case.

Subject to the foregoing, I hereby declare and verify under oath that the matters in which I have direct knowledge are true and correct to the best of my understanding.

DECLARED under oath this ___29___ day of September, 2025.



O.W.

ROBBINS CURTIN MILLEA & SHOWALTER, LLC
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

Page 2 of 2

# Verification to Interrogatory Responses

Final Audit Report                                                          2025-10-01

| | |
|---|---|
| Created: | 2025-09-30 |
| By: | Jennie Leetham (jennie@robbinsandcurtin.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA5AjH5E1ep0NH-TM-fV8MJDTuvDzCZO1s |

## "Verification to Interrogatory Responses" History

📄 Document created by Jennie Leetham (jennie@robbinsandcurtin.com)
2025-09-30 - 0:12:35 AM GMT

✉ Document emailed to O.W. (O.W. com) for signature
2025-09-30 - 0:12:38 AM GMT

📄 Email viewed by O.W. O.W. com)
2025-10-01 - 8:57:08 PM GMT

✍ Document e-signed by O.W. ( O.W. com)
Signature Date: 2025-10-01 - 8:58:03 PM GMT - Time Source: server

✅ Agreement completed.
2025-10-01 - 8:58:03 PM GMT

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF ARIZONA


O.W., an individual,          )
                              )
              Plaintiff,      )
                              )
         vs.                  )
                              )No. 2:25-cv-00044-DWL
State of Arizona, et al.,     )
                              )
              Defendants.     )
                              )



DEPOSITION OF O.W.




Tucson, Arizona
February 23, 2026
11:08 a.m.



REPORTED STENOGRAPHICALLY BY:
PAMELA A. GRIFFIN, RPR, CRR, CRC
Certified Reporter
Certificate No. 50010

PREPARED FOR:
CONDENSED/ASCII

(Certified Copy)



that.

Q.   Did they tell you about various situations to avoid?

A.   Yes.

Q.   Tell me about that.

A.   **Anything involving an inmate, talking too much about your private life or discussing inappropriate topics, things like that.**

Q.   Was there ever any training on being alone with an inmate?

A.   **I don't remember.**

Q.   I assume they gave you some training on how to use the radio?

A.   **Yes.**

Q.   And they gave you some training -- I will make an assumption here -- on you about using Mace?

A.   **Yes.**

Q.   Did they give you training on any other device to use?

A.   **The keys.**

Q.   Keys.  Anything else?

A.   **I can't recall anything else.**

Q.   Okay.  So as of -- as -- it's been explained to me that when you go in, you're checking in for the -- for your day, your work, you check in up front.  Right?  What

FEMALE SPEAKER:  Yes.

MR. LAMMERS:  Okay.  Thank you.

MR. SHOWALTER:  And just -- just for the record, is the Zoom call being recorded?  I don't care if it is.  I just -- we should know and make a record of it if it is.

THE CERTIFIED STENOGRAPHER:  It's not.  It's not.

MR. SHOWALTER:  Okay.  So I'm fine -- I think we're all fine.  I like that the video seems to be centered on me so if I do something extremely inappropriate, everybody will know.  But all right.  Thank you.

BY MR. LAMMERS:

Q.    So was there a process when you got there about checking in and getting your equipment, your radio, and your keys?

A.    Yes.

Q.    Tell me about that.

A.    So after you had your belongings checked and went through the metal detector and you're okay to go into the yard, they would open a gate door for you to go in.  And then there's, like, a control building right there upon entrance where they would sign out a radio to you and the set of keys that you needed.

Q.    Were there any other items that they would give

you?

A.    Not at that control building, no.

Q.    I'm going to assume in your training they talked about how to handle the keys --

A.    Yes.

Q.    -- is that right?

What do you remember about that?

A.    Certain keys would open certain doors so you would have to familiarize yourself with which key went to which door and use them accordingly.

Q.    Would you keep the keys on yourself?

A.    Yes.

Q.    And where did you keep your keys?

A.    Some people had, like, a clip on their belts.  I would keep them in, like, a pocket.  Or if I had a belt clip, I would use a belt clip.

Q.    At that point when you're checking in to get your keys and radio, they don't give you the Mace.  Is that correct?

A.    No.

Q.    Do you have the Mace with you before you even get there?

A.    Yes.

Q.    And how -- how do you get the Mace?  How is the process?



A.    It was given to us initially, but if it had expired, you would need to request another one.

Q.    Request it through?  Who?

A.    I believe you would do, like, an information report and request it, but I don't remember exactly who you would need to request it from.

Q.    On the day of the incident here, I think I remember someone saying the Mace you had had expired.

A.    Yes.

Q.    Does that -- did that mean it couldn't be used? What did that mean to you, "expired"?

A.    I don't know.  I hadn't attempted to use it.

Q.    Had you ever used Mace before?

A.    Only during the training for it.

Q.    But no incident involving inmates?

A.    No.

Q.    In the training, someone said that you get sprayed with the Mace.

Is that part of the training?

A.    Not us directly.  I know that the correctional officers do.  But for the non-officer staff, we sprayed it into a trash can and, like, smelled it in the trash can.

Q.    And before you started working there, Trinity gave you your outfit to wear.  Right?

A.    No.  We actually had to wear our own uniform until

24

BY MR. LAMMERS:

Q.    That's why I went on to Mace.

MR. SHOWALTER:  Okay.  Yeah.

BY MR. LAMMERS:

Q.    So you got training on not to be alone with an inmate.  Is that right?

A.    **Not particularly, no.**

Q.    Did you get training about -- you talked to us about training you received on how to interact with inmates.  Right?  Not give them personal information and first name and that sort of thing.  You remember that?

A.    **Yes.**

Q.    So was there any discussion other than just don't give them your personal information and the other things about how far away you should be -- stay from an inmate, whether the inmate should always be supervised or not, who does the supervision, any training like that?

A.    **Sort of.  So there would be -- like, if there were any food or anything, then it would be my responsibility to supervise them while they're doing anything that has to do with the food.  I was made aware that they should always be supervised, whether it be an officer or a Trinity person.**

There would be training on, like, you can't give them pens or paper or hair ties, anything that might be considered contraband, things like that.

27

mean no.  Okay?

If that's the situation, just tell me --

A.   Okay.

Q.   -- okay?

Had you ever been alone with an inmate in the dining area, the small dining area?

A.   Yes.

Q.   How many times?

A.   Countless times.

Q.   Was -- give me some examples of these incidents.

A.   So for the dining area specifically for Rincon, there's, like, two entrances to it.  It's kind of, like, an open space kind of room that you can enter from two different sides or -- it's not, like, shut or closed in by a door.

Q.   Are you talking about the big dining room or the small --

A.   I'm talking about, like, the serving line where I would serve food.  I was never alone with inmates in the dining area.

Q.   Okay.  And the dining area, this is the area where you have to pass through to get to the restroom.  Right?  That's what I'm talking about.

A.   So there's two dining rooms.

Do you mean the small dining area?



28

Q.   Yes.

A.   I don't remember.

Q.   So let me ask the question again.

Have you -- have you ever been alone with an inmate in the small dining area?

A.   No.

Q.   Had you ever seen anyone alone with an inmate in the dining area?

MR. SHOWALTER:  Form.

THE WITNESS:  I don't remember.

BY MR. LAMMERS:

Q.   Have you ever -- did you ever see, other than this incident, did you ever see an inmate in the small dining area by himself?

A.   I don't remember.

Q.   In your training, when you got there, did DOC talk to you about risk, that inmates can be risky or some risk associated with them?

A.   Yes.

Q.   And what did they tell you about that and what you needed to do?

A.   They had mentioned various times where inmates had inflicted harm on people in the state of Arizona or specific examples and stuff and their recommendations on what to do if we were being attacked.



29

Q.   Did they talk about sexual assault or sexual contact of any kind?

A.   They did.

Q.   Do you remember what they said?

A.   I remember them telling us that if we were being sexually assaulted, to attempt to soil ourselves to get the inmate to stop.

Q.   What if it didn't go so far as a sexual assault; it was just some type of flirting situation?

A.   They addressed all of that in the Prison Rape Elimination Act and being compromised in that kind of training, that you needed to maintain being professional.

Q.   So you've talked about the Rape Elimination Act.

How do you know about that?

A.   It was in -- it was a part of my training.

Q.   And did they give you written material or digital material to look at?

A.   I believe they did.

Q.   Written or digital?

A.   Probably both.

Q.   Did they talk about security with the inmates, any type of security that you need to maintain?

A.   Not that I needed to maintain.

Q.   So tell me about the security they did talk about.

A.   They would talk about cameras, the radio, the

30

keys, the Mace, the doors.

Q. Did you ever feel at risk or that you could be harmed at any time prior to this incident while working in the prison?

A. No.

Q. Did the prison tell you what the work or inmates who were working in the kitchen, what offense they were in prison for?

A. Sometimes, yes.

Q. Who would tell you that?

A. Officers.

Q. Which officers? Do you remember?

A. I don't remember.

Q. Did Nasta, Kaylan Nasta, ever tell you that?

A. I don't remember.

Q. Talon Hanks, did he ever talk about what an inmate was in for?

A. I don't remember.

Q. Did you ever talk to an inmate about what they were in for --

A. Yes.

Q. -- or offense?

How many times?

A. I'm not sure.

Q. More than once?

O.W. vs
State of Arizona

O.W.

32

Q.    Did that inmate stay in the kitchen --

A.    No.

Q.    -- or was he removed?  He was removed?

A.    He was removed.

Q.    After these reports?

A.    Yes.

Q.    So -- so other than him, you had -- you didn't fear any inmate that was working in the kitchen?

A.    No.

Q.    It was my understanding based -- I was in court last week watching some of the testimony, that you had a vape with you?

A.    I did.

Q.    Did you always have a vape?

A.    Yes.

Q.    And that's not against prison policy, is it?

A.    No.

Q.    And where would you keep your vape?

A.    In my shirt pocket on my right side.

Q.    And did your shirt pocket have pockets on both left and right?

A.    I don't remember.

Q.    Where would you keep your radio?

A.    Either in a shirt pocket or a pants pocket.

Q.    The same shirt pocket that the vape was in?

O.W. vs
State of Arizona

O.W.

33

A.    **Probably sometimes.**

Q.    And then you said also your pants pocket?

A.    **Uh-huh.  Yes.**

Q.    Some of them have these belts they wear when they hook the keys on them and Mace and the radio.

Did you ever have such a belt?

A.    **No.**

Q.    So you never used such a belt?

A.    **No.**

Q.    Did you see others using such a belt?

A.    **Yes.**

Q.    Who?

A.    **I know Amy Link had one.  Several of my other coworkers would use one.**

Q.    Did anyone ever suggest to you to use one?

A.    **Yes.**

Q.    Who?

A.    **I don't remember.**

Q.    More than one occasion?

A.    **Yes.**

Q.    Can you tell me how many times?

A.    **No.**

Q.    More than five?

A.    **No.**

Q.    Do you know who the CO was that talked to you

35

home, you return that equipment.  Correct?

A.   Yes.

Q.   When did you start working in the Rincon kitchen?

A.   A few months into me working there.  Possibly five -- anywhere from five to seven months in.

Q.   Who was the supervisor for Trinity at that time. Do you remember?

A.   I'm not sure what you mean.

Q.   Well, when you got to the Rincon kitchen for the very first time, were there other Trinity workers working?

A.   Yes.

Q.   Do you remember who?

A.   A few.

Q.   Do you remember their names?

A.   I know Amy Link was the food service director.  I have a hard time remembering their names.

Q.   That's okay.

Was Amy Link your direct supervisor?

A.   She was everybody at Trinity's boss at Arizona State Prison Complex Tucson.

Q.   For Trinity?

A.   Yes.

Q.   And what I'm getting at is, was there anyone else between you and Amy to report incidents to or to report to? She was the boss for Trinity in that unit.  Right?

38

incident?  Was it a day?  A week?  A month?  Two months?  Can you give us any idea?

A.    I don't know.

Q.    Did you have the authority to give orders to inmates?

A.    Yes.

Q.    What kind of orders?

A.    How to do their job properly in the kitchen, where their job would take place, if I needed them to lift anything in the kitchen, things of that manner.

Q.    Would that include how to work the grills and the fryers?

A.    Yes.

Q.    And the dishwasher?

A.    Yes.

Q.    And in a normal shift, how many inmates would be working?

A.    In the Rincon kitchen, it could be anywhere from 18 to around 30 inmates.

Q.    Is that the whole time or just per -- per -- for one shift?

A.    It would -- the way the shifts worked, they -- the inmates would have their own shifts in there so the amount would fluctuate.

Q.    On -- you were working, what, 10:00 to 6:00 or



O.W. vs
State of Arizona

O.W.

40

Q.   And what would you do when they did one of these, stole product, back talked, didn't follow instruction? What would you do?

A.   I would speak to an officer about it.

Q.   Did Hines ever give you any problems before the incident?

A.   I don't remember.

Q.   Do you remember whether or not Trinity folks can do a write-up on a prisoner?

A.   We can do an information report.

Q.   And who do you give those to?

A.   It would depend.

Q.   What would it depend on?

A.   The -- it would depend on if it was needing to be -- like, if it needed to become a write-up or if it was just an information report and giving, passing information along.

Q.   Did you ever report something to an incident to a CO that resulted in a write-up?

A.   Yes.

Q.   Do you know how many times?

A.   I don't.

Q.   Did you ever tell anyone that Hines was giving you a hard time at any point?

A.   I don't remember.



O.W. vs
State of Arizona

O.W.

43

life things.  Like, I don't know if you have a child or not.  I don't know.  I know you had a boyfriend, now your husband.  Did you talk to them about those kind of things?

A.    Yes.

Q.    So more personal conversations than you would ever have with an inmate?

A.    Yes.

Q.    Did you trust her?

A.    I did.

Q.    Were you friends with her outside of prison?

A.    Not necessarily.  We were Facebook friends, but I would have considered her a friend, yes.

Q.    Same thing with Hanks?

A.    Yes.

Q.    You know they're both being sued in this case?

A.    Yes.

Q.    Was Hanks a Facebook friend?

A.    Yes.

Q.    Is he -- is either Nasta or Hanks still a Facebook friend?

A.    Yes.  Both of them.

Q.    Have you interacted with them on Facebook since the incident?

A.    Not on Facebook.

Q.    Any other way?



44

A.    Nasta and her husband visited me shortly after the attack.  Had dinner with me at my home.

Q.    And was that based on an invitation from you or did she ask to come over?  How did that come about?

A.    I believe she asked to come over, but I wanted her to.

Q.    Why did you want her to?

A.    I -- she was a friend to me.

Q.    Do we need to take a break?

A.    Yes, please.

Q.    Okay.  Thank you.

THE VIDEO SPECIALIST:  We're going off the record.  The time is 12:00 o'clock p.m.

(Recess taken, 12:00 p.m. - 12:17 p.m.)

THE VIDEO SPECIALIST:  We're back on the record.  The time is 12:17 p.m.

BY MR. LAMMERS:

Q.    Are you okay?

A.    Yes.

Q.    Could we go forward?  You feel like you can go forward?

A.    Yes.

Q.    Okay.  Again, if you need to take a break at any time, just let us know, please.

A.    Okay.

45

Q.    Okay.  When we broke, we took that break, I was asking questions about Nasta and her husband coming over to your home and having dinner.

A.    Yes.

Q.    All right.  And you said you wanted her to come over.

Why did you want her to come over?

A.    She comforted me.

Q.    She was in the ambulance with her -- with you.  Right?

A.    Yes.

Q.    We'll come to that.  Anything else after the incident did she comfort you?

A.    She texted me.

Q.    How many times?

A.    Several times.

Q.    What were the nature of the texts?

A.    Asking how I was doing.

Q.    And did you respond back?

A.    I did.

Q.    The text with her always seem like she was concerned about you?

A.    Yes.

Q.    Did she ever make suggestions about what you should do, like seek therapy?



52

Q.   Did you unlock the door to go into the dining area to go to the restroom?

A.   Yes.

Q.   And that door has a window in it --

A.   Yes.

Q.   -- right?

Did you look to see if anyone was in there before you open -- unlocked it?

A.   No.

Q.   Has there ever been an incident where you unlocked the door and there was an inmate in there?

A.   I don't recall.

Q.   As I understand it, Hines was alone in there. Right?

A.   Yes.

Q.   Wearing his normal orange jumpsuit.  Right?

A.   Yes.

Q.   And you saw him?

A.   Yes.

Q.   Did you see him when you immediately went into the DA?

A.   I did.

Q.   Did he say anything to you?

A.   No.  I spoke to him.

Q.   I think I know what you said, but tell me what you

O.W. vs
**State of Arizona**

O.W.

53

said to him.

A.   I said:  "Damn, they locked you in here?"

Q.   Did he respond to that at all?

A.   He probably, like, chuckled or something or said yeah.

Q.   So when you got -- you unlocked the door, you go in.  You see Hines is there.  Did you lock the door again behind you?

A.   I did.

Q.   And then you go to the restroom.  Is that right?

A.   Yes.

Q.   What was Hines doing when you first walked in?

A.   Sweeping.

Q.   Now, there's another door that leads to the outside.  You don't have a key for that.  Correct?

A.   Correct.

Q.   And Hines was in there by himself.  There was not a CO?

A.   That's right.

Q.   Do you have any idea who put Hines in there?

A.   I believe it was Nasta.

Q.   And why do you believe that?

A.   I saw footage of her putting him in there.

Q.   So other than the video, you -- on that day you didn't see her?

54

A.    No, I did not.

Q.    When you are going to use -- when you were going to use the restroom, was it the procedure that you would let some other worker, like a Trinity worker or a CO, know that you were going to use the restroom?

A.    Not necessarily.

Q.    Did you do that on occasion?

A.    I did.

Q.    Was that something regular you did or not?

A.    If there was an officer or Trinity around when I was going, I would tell them I'm going to the restroom.

Q.    Do you remember telling anyone that day you were going to the restroom?

A.    I don't remember.

Q.    And the Trinity worker -- workers that day, they were Amy Link and Rhonda Laner?

A.    Yes.

Q.    When you first -- sorry.  When you first entered the dining area and you saw Hines in there, did you feel -- did you feel unsafe?  Was it an unsafe situation in your mind at that time?

        MR. SHOWALTER:  Form and foundation.

        THE WITNESS:  No.  It striked me as odd, but I figured he was in there for a reason.

. . .



55

BY MR. LAMMERS:

Q.   But you weren't afraid just because he was in there?

A.   No.

Q.   So you go to the restroom, use the restroom.  And I'm not going to take you through everything, but you did see some shadows under the door of the restroom?

A.   Yes.

Q.   And just for this record, the restroom does have a lock?

A.   It does.

Q.   And you lock it with a key or does it automatically lock?

A.   I don't really remember.  I felt like it automatically locked upon being shut.

Q.   Did you need a key to get out?

A.   No.

Q.   Was it sort of like the lock you have in your house bathroom?  It's one of those type of locks?

A.   I don't really remember.

MR. SHOWALTER:  Form and foundation.

BY MR. LAMMERS:

Q.   Okay.  What did you think when you saw the shadows under the door?

A.   I wasn't sure if he was just sweeping.  I figured

he was just sweeping so I didn't want to open the door if he was sweeping right there.

Q.   Did you ever think, well, because he's sweeping and has a broom, that he could hurt you in any way?

A.   I didn't.

Q.   Did you think that was risky that he was sweeping and had a broom?

A.   Not necessarily.

Q.   What do you mean by "not necessarily"?

A.   I felt like it was odd for him to have the broom and be alone, but I'd figured he was in there for a reason.

Q.   All right.  And you -- did you feel like there was an increased risk, something could happen because he was alone in there with a broom?

A.   Yes.

Q.   Is there -- what was the procedure, if any, if you unlocked the DA door, you went in and you saw an inmate in there by themselves?  Was there a procedure that you should have -- that someone should follow?

MR. SHOWALTER:  Form.

THE WITNESS:  I had no specific procedure for that, no.

BY MR. LAMMERS:

Q.   Did you get any instruction or training about locking that door, keeping it locked?

62

BY MR. LAMMERS:

Q.   So you remember initiating the ICS?

A.   I do.

Q.   And did you hear the ICS go off or what did you -- what did you hear, if anything?

A.   So I had said:  "W███████ to Control."

And they said:  "Go ahead."

And I said:  "Initiating ICS.  Inmate Hines just raped me in the bathroom."

And he said -- the Control said:  "Inmate Hines?"

And I said:  "Yes."

And that's the last thing I remember hearing coming from the radio.

Q.   Did you ever hit what I call the panic button?

A.   No.  I only initiated.

Q.   What was that?

A.   I only initiated.

Q.   Other prison personnel show up, I assume --

A.   Yes.

Q.   -- is that right?

You probably don't remember who?

A.   I don't think -- even that day, I don't think I recognized any of the other people that showed up.

Q.   Okay.  My understanding, some Trinity folks showed

64

A.    I believe so.

Q.    Do you know whether he came to the Rincon kitchen to look at what was going on?

A.    I have no idea.

Q.    So at some point the ambulance -- 911 is called, and the ambulance shows up.  Right?

A.    Yes.

Q.    And I'm not going to hold you to the times, but can you give me kind of an estimate, how long it took from the time you initiated the ICS till the ambulance showed up?

A.    No more --

MR. SHOWALTER:  Form and foundation.

THE WITNESS:  No more than ten minutes.

BY MR. LAMMERS:

Q.    The EMTs probably checked you over?

A.    Yes.

Q.    Blood pressure, that sort of thing?

A.    Yes.

Q.    And then they put you on a stretcher and took you to TMC.  Right?

A.    Yes.

Q.    And Corporal Nasta was with you on that ride all the -- the whole ride she was with you?

A.    Yes.



O.W. vs
State of Arizona

O.W.

65

Q.   And was she comforting you during that whole ride?

A.   Yes.

Q.   In what way?

A.   She was telling me that I was strong and that I survived and she was -- we were like laughing together. Like, I cope with humor sometimes; we were cracking little jokes.

Q.   So you get to the hospital.  They put you in a room, I assume.

Did Nasta stay there while you were in the hospital?

A.   Yes.

Q.   The whole -- how long were you in the hospital that day, night?

A.   Probably like almost 12 hours, 13 hours.

Q.   Was she with you the whole time?

A.   She did leave at one point to go with my mother-in-law to get me clothing, but other than that, she was there the whole time.

Q.   Do you know what kind of clothing they got for you?

A.   Yes.  They got me like a pair of pajama pants and shirt.  Like a Winnie the Pooh shirt.

Q.   Would you like to take a break?  Okay?

A.   I only need a couple minutes.



66

THE VIDEO SPECIALIST:  We're going off the record.  The time is 12:48 p.m.

(Recess taken, 12:48 p.m. - 1:00 p.m.)

THE VIDEO SPECIALIST:  We're back on the record.  The time is 1:00 o'clock p.m.

BY MR. LAMMERS:

Q.   Prior to our break -- are you okay to go forward?

A.   Yes.

Q.   Prior to our break, we were talking about your mother-in-law and Corporal Nasta going to a store, getting you some clothes.

A.   Yes.

Q.   Is that because the investigative officer or the hospital took all your clothes as evidence?

A.   Yes.

Q.   Do you know, did anyone else go with the two of them to get you clothing?

A.   I don't know.

Q.   Do you know that Corporal Nasta paid for all that?

A.   I didn't know that.

Q.   Who else from your family was there?  Was your mother-in-law, fiancé?

A.   My mother-in-law, my fiancé, my father-in-law, and my aunt.

Q.   Okay.  And after the examination at the hospital

O.W. vs
State of Arizona

O.W.

68

A.   My psychiatrist.

Q.   Is that Fernanda Martinez?

A.   No.   She's my current psychologist.   At the time I believe her name was Christina something.

Q.   So you applied for workers' compensation --

A.   I did.

Q.   -- right?

And you received workers' compensation payments?

A.   I did.

Q.   And they provided healthcare to you.   Is that right?

A.   Yes.

Q.   Did they provide -- strike that.

Did you see a therapist, mental health expert, the psychiatrist, anyone like that after the incident?

A.   It took several months for workers' comp to give me one, but yes.

Q.   Did you try to seek out one on your own?

A.   I did.

Q.   Unsuccessfully, it sounds?

A.   Yes.

Q.   Are you on any medication today?

A.   I am.

83

Q.   Did you believe she was a good supervisor?

A.   Yes.

Q.   Did you ever have words with her?  I mean,
arguments, something, you know, you got in a little tit for
tat with?

A.   No.

Q.   Always got along with her?

A.   What's that?

Q.   You always got along with her?

A.   Yes.

Q.   Same thing with Hanks?

A.   Yes.

Q.   After the incident, you did text Hanks --

A.   Uh-huh.

Q.   -- correct?

A.   Yes.

Q.   For a period of time.  I don't -- I have some of
those texts.  I'm not going to go through them today.  But
did you stop texting him, communicating with him at some
point?

A.   Yes.

Q.   When was that?

A.   I'm not sure.

Q.   Why?

A.   I think I just stopped communicating with

87

THE WITNESS:  Yes.

BY MR. LAMMERS:

Q.   Tell me why you think that.

A.   We were understaffed.

Q.   Trinity was understaffed?

A.   Yes.

Q.   How many staff members were you supposed to have on a given shift?

A.   Typically, with proper staffing, there would have been a manager who would be like the supervisor of the unit and at least two Trinity workers at a time.  Kitchen supervisors, we were called.

Q.   And how often was there understaffing?

A.   Most of the time that I was with Trinity.

MR. SHOWALTER:  There's a weird rattling coming from over there that's making me go crazy.  Can anybody else hear it?

THE WITNESS:  I can.

MR. LAMMERS:  I can't.

MR. SHOWALTER:  Do you know if it -- I don't -- I can't figure out what it could possibly be, but it seems like it's coming from behind the backdrop.

THE VIDEO SPECIALIST:  Do you want me to go off the record?

MR. LAMMERS:  Yeah, let's go off.



O.W. vs
State of Arizona

O.W.

88

THE VIDEO SPECIALIST:  Going off the record, the time is 1:36 p.m.

(Discussion off the record.)

THE VIDEO SPECIALIST:  We're back on the record.  The time is 1:37 p.m.

BY MR. LAMMERS:

Q.   Ma'am, did you ever report the understaffing to Trinity?

A.   Yes.

MR. SHOWALTER:  Form and foundation.

BY MR. LAMMERS:

Q.   Yourself personally?

A.   Yes.

Q.   How many times?

A.   Most of the time, every day.

Q.   And who -- sorry.  What was the last part?

A.   Pretty much every time I worked.

Q.   And who did you report this to?

A.   Whoever was on shift, either Amy Link or sometimes there was an assistant director that I would speak to.

Q.   Did you ever report it in writing?

A.   No.

Q.   Did you ever have concerns that the prison was -- wasn't staffing the kitchen correctly, that it was understaffed?



89

A.   With which kinds of workers, inmates or officers?

Q.   Officers.

A.   Yes.

Q.   And did you report that to anybody?

A.   I would speak about it to them, but not a written report, no.

Q.   Who would be "them"?

A.   Any officer.

Q.   Did you talk to Nasta about it?

A.   Several times, yes.

Q.   Hanks?

A.   Yes.

Q.   You did say a manager from time to time would come to the kitchen.  Right?

A.   Yes.

Q.   Would you tell that manager that there's chronic understaffing in the kitchen?

A.   Yes.

Q.   Do you think Corporal Nasta did anything wrong that day?

A.   Yes.

        MR. SHOWALTER:  Form and foundation.

BY MR. LAMMERS:

Q.   What?

A.   Putting Inmate Hines in that room.



O.W. vs
State of Arizona                                                    O.W.

94

SIGNATURE PAGE


I, O.W., the deponent in the above deposition, do acknowledge that I have read the foregoing transcript of my testimony, and state under oath that it, together with any attached Amendment Sheet pages, constitutes my sworn statement.


____    I have made changes to my deposition.

____    I have NOT made any changes to my deposition.




                    _____

                              O.W.



95

CERTIFICATE OF CERTIFIED REPORTER


        BE IT KNOWN that the foregoing proceedings were taken before me; that the witness before testifying was duly sworn by me to testify to the whole truth; that the foregoing pages are a full, true, and accurate record of the proceedings, all done to the best of my skill and ability; that the proceedings were taken down by me in shorthand and thereafter reduced to print under my direction; that I have complied with the ethical obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206 J(1)(g)(1) and (2).

        I CERTIFY that I am in no way related to any of the parties hereto, nor am I in any way interested in the outcome hereof.


        [X]  Review and signature was requested; any changes made by the witness will be attached to the original transcript.
        [ ]  Review and signature was waived/not requested.
        [ ]  Review and signature not required.


        Dated at Phoenix, Arizona, this 12th day of March, 2026.



                    _____/s/ Pamela A. Griffin___ _
                    PAMELA A. GRIFFIN, RPR, CRR, CRC
                         Certified Reporter
                       Arizona CR No. 50010

            *      *      *      *      *

        I CERTIFY that GRIFFIN GROUP INTERNATIONAL, has complied with the ethical obligations set forth in ACJA 7-206 (J)(1)(g)(1) through (6).



                    _____/s/ Pamela A. Griffin_____
                    GRIFFIN GROUP INTERNATIONAL
                    Registered Reporting Firm
                       Arizona RRF No. R1005



# EXHIBIT 4

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF PIMA**


STATE OF ARIZONA,                        )
                                         )
                                         )
                                         )
            vs.                          ) No. CR2024-0753-001
                                         )
DEMARCO HINES,                           )
                                         )
            Defendant.                   )
                                         )


**BEFORE THE HONORABLE J. ALAN GOODWIN**

JUDGE OF THE SUPERIOR COURT

DIVISION 2


JURY TRIAL - DAY 1

(TESTIMONY OF O█████  W█████████)

February 10, 2026

Tucson, Arizona



Reported by:

R. Chris King, RPR
Certified Reporter # 50142

**P R O C E E D I N G S**

(PARTIAL TRANSCRIPT)

THE COURT:  Next witness?

MS. WATERS:  The State calls O███████ W████████.

THE COURT:  Good afternoon.  If you could please come stand right here and be sworn.

O███████   W████████,

having been duly sworn, was examined and testified on their oath as follows:

THE COURT:  If you'll come take a seat right here.

**DIRECT EXAMINATION**

BY MS. WATERS:

Q    O██████, will you please introduce yourself to the Jury?

A    My name is O██████ W████████.

Q    I'm going to ask you to tilt that mic just a little to your left so that it picks you up.  All right?

O██████, how old are you?

A    I'm 26 years old.

Q    Where do you live?

Q    What was your relationship at that time?  What was its status?

A    In April of 2023 we became engaged.

Q    Stayed engaged until you got married?

A    Yes.

Q    When you worked at DOC, did you work directly for the Department of Corrections, or did you work for some other company?

A    No, I was contracted by my employees, Trinity, to do their food service.

Q    What does doing food service through Trinity at DOC entail?

A    It entails working closely with the inmates to ensure food safety standards are met.  There's inventory that takes place, and you supervise the inmates while they cook, clean, all of that.

Q    Did you have a specific shift that you worked?

A    Yes, I worked the dinner shift.  Typically it would be either 10am to 6pm or after, or 12pm.

Q    Thank you for giving us the time, because when you said dinner shift, nothing about that would have suggested 10am to me.

A    Right.

Q    Were you assigned to a particular prison within the Department of Corrections?

there.

Q    Do you remember how long that training period lasted?

A    Probably two to three days.

Q    After that, did you start in the Whetstone Unit, you said?

A    Yes.

Q    This may seem like a silly question, but the different prison units, do they house both men and women?

A    No.  This was a male only prison.

Q    In addition to the inmates you would oversee, were there other people whom you worked with during the course of one of your shifts?

A    Yes.  There would be other Trinity personnel there and corrections officers as well.

Q    When you went through your training, did you receive any kind of training on the equipment that you would be issued?

A    Yes.

Q    Could you tell us what equipment you were issued to perform your job duties?

A    There were things such as like paddles that have different serving sizes to them.  As far as what would be on my person, there would be keys that could open particular doors in the kitchen area.  There would be a

radio, and then a small can of mace.

Q    Were you trained on how to open the doors within the prison?

A    Yes.

Q    Were you trained how to use the mace?

A    Yes.

Q    Were you trained how to use the radio?

A    Yes.

Q    Other than the can of mace, did you have any other kind of weapons or protective items that you were issued?

A    Occasionally there would be a body, like a -- not body armor, I guess.  Not as much like a bulletproof vest or anything, but a thin kind of body armor.

Q    Is that something that you typically utilized during your job?

A    There were times in the Rincon unit that we had to wear them, yes.

Q    How would you find out it was one of those times?

A    Normally a correction officer would tell me to put one on.

Q    Do you have any idea what the trigger was for asking people to put on the body armor?

A    I don't.

Q    You just did it when you were told to?

in the kitchen area in September of 2023?

A    Not explicitly.

Q    Had you had conversations with Mr. Hines about getting the work accomplished?

A    Yes.

Q    Did you know his name?

A    Yes.

Q    Would you have recognized him by sight when he walked in?

A    Yes.

Q    Was that true of most of the inmates inside the kitchen?

A    Yes.

Q    Had you and Mr. Hines ever had more personal kinds of conversations?

A    No.

Q    Had you talked with him about video games, or football, or the weather?

A    I'm sure.

Q    Anything you remember specifically?

A    No.

Q    I'd like to draw your attention to September 28th of 2023.  Is that okay?

A    Yes.

Q    Did you work that day?

A     I did.

Q     Do you remember what time you got to work?

A     10 in the morning.

Q     Was that typical?

A     Yes.

Q     Do you remember what you did after you first got there?

A     I went into the Trinity office and worked on that worksheet to try to figure out how much ingredients I would need, and then I went to the restroom.

Q     Between the time you worked in the Trinity office on the worksheets, and the time you went to the restroom, were you out and about in the kitchen area?

A     Yes.

Q     Did you encounter Mr. Hines at any point that morning prior to the restroom?

A     No.

Q     Were there other Trinity workers working on shift that day at the same time as you?

A     There was a Trinity worker, Ms. Lehner.  She was a morning shift person, but she was there when I arrived, and Amy Link was there.

Q     You indicated that Ms. Link had been your supervisor for some time, so you knew her reasonably well; right?

A   Yes.

Q   Did you know Ms. Lehner?

A   A decent amount.  She was a little bit newer, but I had worked with her multiple times.

Q   Did you guys ever work the same shift, or was it more a question of you sometimes overlapped?

A   Most of the time we overlapped, but I do believe that I did work the same shift as her occasionally.

Q   Did you guys know one another socially at all?

A   No.

Q   Just at work?

A   Yes.

Q   The morning of September 28, you said you filled out your worksheets, you'd been out and about in the kitchen a bit, and then at some point you had to use the restroom; is that right?

A   Yes.

Q   You said the staff bathroom, or you described the bathroom off the dining area as the staff bathroom; is that right?

A   Yes.

Q   Is that the only staff bathroom for Trinity workers in the kitchen area?

A   It is the only staff restroom we are supposed to use.  The other restroom in the kitchen is for inmates

A    No, it's like a round door handle.  So from the outside I would come and unlock it from the outside, open it, and then once it's shut, it's locked until the handle is turned from the inside.

Q    Let's talk about that trip to the bathroom. Okay?  Did you go to the bathroom from the Trinity office or from some other part of the kitchen area?

A    I was walking around handing out, like, numbers of all the servings I would need for the day.  And I believe at some point after I had given out all the notes I needed to give about, I went to the restroom.

Q    Did you have to walk through the dining area to get to that staff bathroom?

A    Yes.

Q    When you entered the dining area, was there anyone there?

A    Yes.

Q    Who was there?

A    Mr. Hines.

Q    Was he being supervised?

A    No.

Q    At the moment, at that particular time, did that give you any cause for concern?

A    I found it slightly odd, but he had a broom, so I figured somebody must have put him in there to clean.

Q   And said that an inmate is supposed to be supervised.  Did you do anything to alert staff that he was in there without somebody?

A   I did not.

Q   How come?

A   I just looked past it.

Q   You said it's something you'd seen happen before; right?

A   Yes.

Q   When you saw Mr. Hines with his broom, what was he doing?

A   Sweeping.

Q   Did he say anything to you?

A   No, I said something to him.

Q   What did you say?

A   I said, damn, they locked you in here.

Q   Did he say anything?

A   No.

Q   When you entered the DA, did you have to unlock the door to get in?

A   Yes.

Q   Do you know who let Mr. Hines in to the DA?

A   I believe Corporal Nasta put him in the DA.

Q   Did you see that happen?

A   Not that day.

A    No.

Q    Do you know whether there are cameras that show the dining area?

A    I don't believe that there were at that time.

Q    Do you know whether there are cameras that show the staff bathroom?

A    There are not.

Q    Would you expect there to be?

A    No.

Q    When you went into the bathroom, did you close the door?

A    I did.

Q    Did you lock the door?

A    It locked automatically as I closed it.

Q    What happened next?

A    I used the restroom, washed my hands.  And when I opened the door, Mr. Hines jumped into the room and started attacking me.

Q    So to be clear, while you were using the restroom, the door was closed and locked; is that right?

A    Yes.

Q    You said when you opened and Mr. Hines jumped in. Is that right?

A    Yes.

Q    Could you tell me what you mean by that?

A    He shoved the door in on me before I could get out of the room, came into the room, shut the door behind him, and began to punch me in my body.

Q    Do you remember where he punched you?

A    In my side, my right side.

Q    Your right side?

A    Yes.

Q    What did you do?

A    I fell to the ground.

Q    What happened next?

A    He jumped on top of me and put both of his hands on my neck and squeezed. And I was begging him, please stop, please stop, please stop. And he told me, I have to do this, I have to do this, I have to do this.

Q    You said you fell to the ground; is that right?

A    I did.

Q    Were you on your back, your side?

A    I was on my back at this time.

Q    You said Mr. Hines had his hands around your neck; is that right?

A    Yes.

Q    What did that feel like?

A    It was painful. I was losing some air, but he wasn't really quite yet choking me to where I was going unconscious. I was incredibly panicked.

Q    We talked earlier about the equipment that you're issued when you are employed by DOC; right?

A    Yes.

Q    Up to that point did you grab for your radio?

A    I wanted to.  I kept it in like a shirt pocket that I had here at the time.  But it was tossed out of that pocket, and Mr. Hines was on top of me, preventing me from getting it.

Q    When you say it was tossed out of that pocket, what do you mean?

A    It had fallen out of my pocket onto somewhere on the bathroom floor.

Q    Did you see it at that time?

A    No.

Q    What about the can of mace you talked about?

A    I did not have it that day.

Q    Do you know why?

A    I remember that it had expired, and I would have had to request another one, and I just hadn't gotten around to requesting another one yet.

Q    You said that Mr. Hines was on top of you choking you.  What happened next?

A    And then I believe he turned me over onto my stomach and attempted to pull down my pants.  And I just screamed very loudly, hoping that somebody would hear me.

PIMA COUNTY SUPERIOR COURT

Q    What happened next?

A    He ejaculated.

Q    What happened after that?

A    He began to profusely apologize and say he didn't know why he did it, or that he had to do it.  And he started to, like, clean me up and try to, like, re-button my shirt buttons.

And I had a cut on my arm that was bleeding, so he, like, wiped that off and put the hat back on my head.

Q    Do you know when your hat fell off?

A    I don't.

Q    You said that you started re-buttoning your shirt; is that right?

A    Yes.

Q    When you were face down on the ground, you said that the clothes on the upper half of your body were in place; right?

A    Yes.

Q    Did that change?

A    Yes.

Q    Tell me when that changed.

A    I believe before he forced me to perform oral sex on him, he ripped my shirt open.

Q    You said the shirt had buttons; right?

A    It did.

A    Yes.

Q    When Ms. Lehner opened the door, did you say anything to her?

A    No.

Q    Did she say anything to you?

A    No.

Q    What did you do after Ms. Lehner opened the door?

A    I ran towards the entrance to this dining area, and she had followed me, and I begged her to open the door, unlock the door and let me out.

Q    You begged who?

A    Ms. Lehner.

Q    Did she do that?

A    She did.

Q    Where did you go next?

A    I walked through the main kitchen area and kind of looked around, and then I went to the Trinity office area.  And I saw Ms. Amy Link in there.  And I asked her to lock the door.  And I told her that I was just raped in the bathroom.  And I initiated ICS on the radio.

Q    What is ICS?

A    The Incident Command System.

Q    Is that the panic button we talked about?

A    No, they're actually two separate things.  The panic button is a small red button on the radio that when

it's hit, it flashes like the radio number to everybody on that channel, and makes a loud sound.  Initiating ICS is when you speak to Control and say you're initiating ICS, and you tell them the incident, and then there's a response to the incident.

Q    Okay.  So it kind of triggers some kind of protocol within DOC; is that right?

A    Yes.

Q    Did you -- you said you went to Ms. Link's office, the Trinity office; right?

A    Yes.

Q    What did you do in there, other than initiate ICS?

A    There's like windows all around it.  So I got under like a desk, because I didn't want anybody to see me.  And I initiated ICS, and just waited for officers to come help me.

Q    Did you talk with Ms. Link while you were there?

A    I had said to her, like I was just raped in the bathroom.  And I remember her just being shocked.

Q    What happened after that?

A    And then a bunch of officers came into the room. I remember they gave me a phone that my husband was called on, and I told him what was going on.  And then I believe they called 911 and the fireman came, the

A    Yeah.

Q    To Detective Cooper?

A    Yes.

Q    On September 28th?

A    Yes.

Q    2023?

A    Correct.

Q    Nowhere in there do you mention this recollection you have now that Mr. Hines performed oral sex on you?

A    No.

Q    Now in there you do talk about how the assault began; right?

A    Yes.

Q    And looking through, you mentioned that as soon as you were about to exit the restroom, you could see shadows walking outside?

A    That's right.

Q    And that you knew someone was standing outside?

A    Yes.

Q    And that when you opened the door, you could tell that you were in for a fight?

A    Well, I had said that I had seen shadows moving around while I was using the restroom, but that I had waited for them to go away before I would open the door.

Q    And I'm moving beyond there.  You said that when

**C E R T I F I C A T E**

STATE OF ARIZONA   )
                   ) ss
COUNTY OF PIMA     )

I, R. Chris King, a Registered Professional Reporter, in and for the state of Arizona, do hereby certify that the foregoing transcript of the proceedings in Pima County Superior Court is full, true and accurate to the best of my knowledge, skill, and ability.

Signed and dated this 16th day of February, 2026.

_____

R. Chris King, RPR
Certified Reporter #50142

PIMA COUNTY SUPERIOR COURT

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| O.W. an individual, | ) No. 2:25-cv-00044-DWL |
| | ) |
| Plaintiff, | ) |
| vs. | ) |
| | ) |
| State of Arizona, a body | ) |
| politic; Ryan Thornell, an | )      VIDEOTAPED |
| individual, on his own behalf | ) |
| and on behalf of his marital | )   VIDEOCONFERENCE |
| community; Christopher | ) |
| Josefowicz, an individual, on | )    DEPOSITION OF |
| his own behalf and on behalf | ) |
| of his marital community; | )      AMY LINK |
| Kaylan Nasta, an individual, | ) |
| on her own behalf and on | ) |
| behalf of her marital | ) |
| community; Talon Hanks, an | ) |
| individual, on his own behalf | ) |
| and on behalf of his marital | )   October 16, 2025 |
| community; TKC Holdings, | )   Tucson, Arizona |
| Inc., a Missouri corporation; | )      1:36 p.m. |
| Trinity Services Group, Inc., | ) |
| a Florida corporation; and | ) |
| John and Jane Does 1-40, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

REPORTED STENOGRAPHICALLY BY:
MARY DAVIS, RPR
Certified Reporter No. 50271

PREPARED FOR:
ASCII/CONDENSED

(Certified Copy)



60

visible.

Q.   Okay.   Let me see if I can be a little more specific.

Was the kitchen staff in the Rincon kitchen trained that they should not go into the DA room if there was an inmate in there and no CO around?

A.   I wouldn't say it was specifically said that way.

Q.   How would you say it was said?

A.   Not to go into any secluded area where you would put yourself in an unsafe position.

Q.   Was there a policy or practice of the Trinity folks when they went to use that bathroom in the DA room, that they would tell one of the COs that they were going back there to use the facilities?

A.   Not until after the incident.

Q.   You talked about getting -- once you get to -- once you got -- you're not there anymore.   But when you would go to the facility out there, you would check the warehouse for food and then you would get your belongings you said; right?

A.   Yes.   I had an office in the warehouse.   And a lot of times, you know, I would leave my, you know, pens, paper, you know, water bottle, whatever, I needed to take with me to the unit.



deposition.  Off the record at 3:49

                THE COURT REPORTER:  Mark, do you want a copy of this one and the last one this morning?

                MR. LAMMERS:  Yes.

                MS. GULTZ:  I'd like copies as well. Thank you.

                (The deposition concluded at 3:49 p.m.)



                        _____

                                AMY LINK



**Griffin Group International**
**888.529.9990 | 602.264.2230**

82

CERTIFICATE OF CERTIFIED REPORTER

BE IT KNOWN that the foregoing proceedings were taken before me; that the witness before testifying was duly sworn by me to testify to the whole truth; that the foregoing pages are a full, true and accurate record of the proceedings, all done to the best of my skill and ability; that the proceedings were taken down by me in shorthand and thereafter reduced to print under my direction; that I have complied with the ethical obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206 J(1)(g)(1) and (2).

I CERTIFY that I am in no way related to any of the parties hereto, nor am I in any way interested in the outcome hereof.

{X}  Review and signature was requested; any changes made by the witness will be attached to the original hereof.
{ }  Review and signature was waived/not requested.
{ }  Review and signature not required.

Dated at Phoenix, Arizona, this 31st day of October, 2025.

/s/ Mary Davis

_____
MARY DAVIS, RPR
Certified Reporter
Arizona CR No. 50271

*       *       *       *       *

I CERTIFY that GRIFFIN GROUP INTERNATIONAL, has complied with the ethical obligations set forth in ACJA 7-206 (J)(1)(g)(1) through (6).

/s/ Pamela A. Griffin

_____
GRIFFIN GROUP INTERNATIONAL
Registered Reporting Firm
Arizona RRF No. R1005



# EXHIBIT 6





**C**orrectional

**E**nvironment

**A**wareness and

**S**afe

**E**mployment

TRINITY 001026

## Slide 1 Notes

Good (Morning/Afternoon) Everyone,

Welcome to Correctional Environment Awareness and Safe Employment Training.

Thank you all for attending. And now prepare yourself for an engaging and informative training session.

My name is (*Trainer Name*) , and I am one of your Regional Directors of People Development at TKC Holdings.

In this training we will be covering the following topics:

- Polices
- PREA
- Inmate Manipulation and
- Effective Inmate Management.

TRINITY 001027

**Slide 3 Notes**

We will cover topics to include

- Policies from our employee handbook pertaining to inmate management

TRINITY 001031

# Effective Supervision

- Be professional

- Be aware of blind spots

- Practice ongoing sanitation

- Wear approved uniform & Personal Protective Equipment (PPE)

- Train Inmate Workers



81

TRINITY 001186

**Slide 81 Notes**

When supervising inmates ensure that :

Be Professional and Respectful this goes for how you treat inmates and fellow team members. You can exchange common pleasantries like "Good Morning", "Have a great day" and "Goodbye" but keep conversations and interactions professional and about work. And hold inmates to this standard as well, if they are treating anyone else in the kitchen unprofessionally have them removed from the kitchen.

There will be blind spots in your kitchen, areas where there arnt cameras. Like inmate restrooms, coolers, freezers and even just random corners or hallways. Be aware of these blind spots. Limit inmate access to these area to one at a time, or avoid being in these areas with just one inmate (it could have the implication that you are trying to be "alone" with the inmate). Remember only one inmate in the inmate restroom at a time, they are prime locations for PREA violations.

Practice Ongoing Sanitation. Clean as you go. Make it a focus everyday.

Wear all Clothing and Personal Protective Equipment issued. Model this for your inmate work force.

Make sure that you are trained on the safe operation, maintenance, and cleaning of all the equipment as you are responsible for correctly training the inmate work force

- **Next Slide**

TRINITY 001187

## Conclusion



- Be Aware

- Follow the Rules

- Be Respectful

**We are TKC Strong!**

 83

TRINITY 001190

**Slide 83 Notes**

We hope that you found this training informative and useful. Working in correctional food service can be a fun and rewarding job and practicing what you have learned here can help keep you safe. In conclusion please bear in mind to:

- Often many of our team members get "comfortable" at work and forget about their surroundings. You can have fun at work, but always be aware and remember where you are.
- Always follow rules, policies, and procedures. Unlike other jobs, the failure to do so can have dire consequences.
- Treat EVERYONE with respect. This includes inmates, corrections staff, volunteers, and Trinity staff.
- Make every effort to keep your Trinity team strong and free of inmate manipulation. A strong Trinity team makes for a safe kitchen and safe facility.

TRINITY 001191

# EXHIBIT 7

**CHAPTER: 500**

**Administrative/Human Services**

**DEPARTMENT ORDER:**

**503 – Employee Grooming and Dress**

**OFFICE OF PRIMARY RESPONSIBILITY:**

**DD**

**Effective Date:**

**April 29, 2021**

**Amendment:**

**September 27, 2021**

**Supersedes:**

**DO 503 (11/1/19)**

**Scheduled Review Date:**

**January 1, 2024**

**ACCESS**

☐ **Contains Restricted Section(s)**

# Arizona Department of Corrections Rehabilitation and Reentry



## Department Order Manual

David Shinn, Director

# TABLE OF CONTENTS

**PURPOSE** ..................................................................................................................................1

**APPLICABILITY** .........................................................................................................................1

**RESPONSIBILITY** .....................................................................................................................1

**PROCEDURES** ...........................................................................................................................1

**1.0 GROOMING STANDARDS – ALL PERSONNEL**...........................................................1

**2.0 GROOMING AND DRESS STANDARDS – UNIFORMED STAFF** ..................................3

**3.0 DRESS STANDARDS - SPECIALTY UNIFORMED STAFF** ..........................................11

**4.0 GROOMING STANDARDS – NON-UNIFORMED STAFF**............................................15

**5.0 GROOMING AND DRESS COMMITTEE**.....................................................................20

**DEFINITIONS/GLOSSARY** ......................................................................................................22

**ATTACHMENTS**.......................................................................................................................22

**FORMS LIST** ...........................................................................................................................22

3.14 <u>Instructors</u> - Staff engaged in teaching curriculum which involves outdoor or physical activity are authorized to wear an instructor uniform during this assignment. The uniform shall consist of tan TDU-style trousers, tan web belt, polo shirt and tan desert style boots. The footwear may be replaced with athletic shoes for personnel involved in physical training. The polo shirt shall have accoutrements, appropriate to the task, unique to the subject matter or training discipline, such as:

    3.14.1 Firearms - Yellow shirt with black lettering

        3.14.1.1 Firearms Instructors and armorers may wear a yellow baseball cap or tan boonie cap.

    3.14.2 Correctional Officer Training Academy (COTA) – Green shirt with tan lettering

    3.14.3 Canine - Black shirt with gold lettering

    3.14.4 Honor Guard - Black shirt with gold lettering

3.15 <u>Jumpsuits/Coveralls</u> – Facilities will maintain an appropriate number of jumpsuits/coveralls for use by uniformed staff to aid in preventing damage and/or premature wear out of their uniform as a result of assignments determined to heighten the likelihood of damaging a uniform.

    3.15.1 Jumpsuits/coveralls are to be tan in color and are to be marked in such a way that the individual donning the jumpsuit/coverall is readily identifiable as a uniformed staff member (e.g., shoulder patches, cloth/embroider badges, etc.).

    3.15.2 Wardens shall:

        3.15.2.1 Ensure jumpsuits/coveralls are maintained in a secure location and issued in a manner providing for continuous accountability with a reconciled daily inventory. Jumpsuits/coveralls may be:

            3.15.2.1.1 Issued on a semi-continuous basis to staff members who may be engaged in protracted projects/assignments which increase the susceptibility of damaging their uniform.

            3.15.2.1.2 Temporarily issued to a staff member who has their uniform soiled as a result of an inmate assault. The staff member shall return the jumpsuit/coverall on their next workday.

        3.15.2.2 Provide a private location wherein personnel can change into the jumpsuit/coverall and a secure location for storage of a doffed uniform.

        3.15.2.3 Ensure jumpsuits/coveralls are laundered prior to reissuance.

## 4.0 GROOMING STANDARDS – NON-UNIFORMED STAFF

4.1 <u>Duty Requirements</u> - All employees are required to possess on their person an ADCRR identification card, and valid Arizona driver's license. Each person assigned OC spray is responsible to have it in his/her possession at all times while on duty. Issued OC spray shall not be left on or in a desk, office or elsewhere on Department property.

    4.1.1 The ADCRR identification card shall be worn either on a lanyard or in the upper chest area.  It is never to be worn on the belt.

4.2 <u>Non-Uniformed Staff Attire</u> – The Director, Deputy Directors, and Assistant Directors may authorize, at their discretion, the appropriate dress standard other than prescribed herein for staff attending scheduled meetings or Department functions on a case by case basis.

# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| O.W. an individual, | ) No. 2:25-cv-00044-DWL |
| Plaintiff, | ) |
| vs. | ) |
| | ) |
| State of Arizona, a body | ) |
| politic; Ryan Thornell, an | ) VIDEOTAPED |
| individual, on his own behalf | ) |
| and on behalf of his marital | ) VIDEOCONFERENCE |
| community; Christopher | ) |
| Josefowicz, an individual, on | ) DEPOSITION OF |
| his own behalf and on behalf | ) |
| of his marital community; | ) KAYLAN NASTA |
| Kaylan Nasta, an individual, | ) |
| on her own behalf and on | ) |
| behalf of her marital | ) |
| community; Talon Hanks, an | ) |
| individual, on his own behalf | ) |
| and on behalf of his marital | ) October 16, 2025 |
| community; TKC Holdings, | ) Tucson, Arizona |
| Inc., a Missouri corporation; | )     9:03 a.m. |
| Trinity Services Group, Inc., | ) |
| a Florida corporation; and | ) |
| John and Jane Does 1-40, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

**CONFIDENTIAL**

(Contains "Confidential" portions)

REPORTED STENOGRAPHICALLY BY:
MARY DAVIS, RPR
Certified Reporter No. 50271

PREPARED FOR:
ASCII/CONDENSED

(Certified Copy)



9

that there was an IR that indicated that Hines was being harassing or intimidating toward O.W. that somebody turned in.  Do you remember any other details of it?

MR. LAMMERS:  Foundation.  Speculation.

BY MR. SHOWALTER:

Q.   I don't want you to speculate.  I mean, this is something you were involved in, so it would be your memory.

What do you remember about the IR and the specifics of Inmate Hines's behavior?

A.   The IR specifics, I don't remember what would be in the IR.  I could not tell you.  I could tell you about Inmate Hines's behavior.

Q.   Yeah.

A.   And he acted like a typical normal inmate.

Q.   Okay.  So your testimony today under oath is that Hines acted like a typical normal inmate?

A.   Yes.

Q.   When you say "a typical normal inmate," what does that mean?

A.   So a typical normal inmate has bad days and good days, can be mouthy or cannot be mouthy, just -- he acted like a normal inmate.  And if -- I mean, he would be like any human being.

A.    I don't.

Q.    And in terms of -- do you remember who the deputy warden would have been for the -- for Rincon whose administrative assistant you would have gone and talked to?

A.    Jorge Martinez.

Q.    And that's J-O-R-G-E?

A.    Yes.

Q.    Okay.  So there's this room at the Rincon kitchen referred to as the DA room; correct?

A.    Correct.  Yes.

Q.    And my understanding is that that room is essentially a small lunch room where either staff -- a small dining room where either staff might dine or sometimes some of the smaller houses might dine there?

A.    That's incorrect.

Q.    What did I have wrong?

A.    The smaller houses.  It would be work crews, education, or kitchen workers would dine there.

Q.    Okay.  And when you say "work crews," you mean like prison -- work crews made up of prisoners?

A.    Of inmates, yes, sir.

Q.    And when you say education, what do you mean by that?

A.    They hold multiple different classes at the

spot; correct?

A.    Yes.

Q.    But the cameras, and visually, would allow the person in the bubble to potentially see inmates going to and from the DA room, entering that room without -- you know, because it was unlocked at that time; correct?

A.    Correct.

Q.    At the time -- do you recall where you were when you learned of the assault on O.W.?

A.    I was in the kitchen control room writing in the journal.

Q.    Was Sergeant Stein there with you?

A.    Sergeant Stein had just walked in.

Q.    Do you know why Sergeant Stein was there?

A.    He was the kitchen sergeant at the time.

Q.    And so you and Sergeant Stein are in the kitchen control room.  What happens next?

A.    He -- I was -- I was sitting at the chair. I was telling him, "Hey, this is what's going on," and then I heard a radio traffic about how she was raped by Inmate Hines in the small DA.

Q.    And that radio traffic, would that have been O.W. calling --

A.    Yes.



51

Q.    -- out?  She would have been initiating an ICS?

A.    Yes, sir.

Q.    And ICS stands for Incident Command System?

A.    Yes, sir.

Q.    And then did you and Sergeant Stein respond to the DA room?

A.    Yes, sir.

Q.    Okay.  And did O.W. go into the Trinity office?

A.    Yes.

Q.    And I'll just tell you -- I mean, the video and photo of O.W. that I've seen of this, just of her reaction after this and her face, is some of the most upsetting photo or videos that I've ever seen, just like the horror, fear, terror on her face.

Did you encounter her that day, and how did she appear to you?

A.    I did -- I did encounter her that day.  I went to the small DA because that's where she said she was at.  And I checked the bathroom, and she wasn't in there.

And then I heard -- I don't know who, but I heard somebody say she was in Trinity's office.  So I ran to Trinity's office to get to her because -- and

I -- I can't remember if I unlocked Trinity's door or if somebody -- or if Link let me in or somebody let me in. And I saw her under the table, and she was -- like she was huddled there.

So I went -- like I dropped to the ground with her. And I don't know if I grabbed her hand or she grabbed my hand, and her face looked -- she had a red mark like on the right side of her cheek. She had marks around her neck. Like, it looked like somebody had grabbed her. Her overshirt was ripped. And so that would have been like her white button-down shirt that she wore to work. And her undershirt had blood on it, and then her pants were undone.

So I remember what she looked like, and I remember how I acted when it happened.

Q. And how did you act when it happened?

A. I ran to the small DA, and then I ran to her to help her because it's a very traumatic incident. So if somebody says that to you, you need to be there to support them.

Q. After -- after all of this and after O.W. left Trinity, after she had gotten out of the hospital, did you go to have -- did you go to have dinner with her family?

A. With her and her -- it was her boyfriend at



there anything about this incident that occurred on September 28 of 2023, that we haven't discussed today?

A.   I don't think so.

Q.   Do you have any -- we've received -- or we have copies of text messages that you exchanged with O.W.  Separate from those text messages, did you have any other communications with her that you remember the substance of?

MR. LAMMERS:   Other than the dinner she talked about, Jesse?

MR. SHOWALTER:   Other than the dinner.

MR. LAMMERS:   Thank you.

A.   No.   There was no...

BY MR. SHOWALTER:

Q.   And with respect to Inmate Hines, do you have any other information about him that we haven't talked about today?

A.   No.

Q.   Somebody -- I heard somewhere -- it might have been in the text messages that CO Hanks had sent -- that people had requested additional officers for the kitchen after this incident?

A.   I don't know about that.

Q.   Okay.  Are you aware of any procedures that were implemented after this incident in order to

93

prevent future incidents like this?

A.    They put a camera in that DA.

Q.    Did they -- you talked about keys that -- do you know whether they instituted a policy or procedure that Trinity employees would not have their own keys?

A.    I don't know.

MR. SHOWALTER:  I have no further questions for you at this time.  Thank you, Corporal.

MS. GULTZ:  I don't have any questions. Thank you.

MR. LAMMERS:  I don't have any.

We will read and sign.

THE VIDEOGRAPHER:  This concludes today's deposition.  Off the record at 11:47 a.m.

(The deposition concluded at 11:47 a.m.)

_____
KAYLAN NASTA

O.W. vs
State of Arizona

Kaylan Nasta [Contains Confidential Portions]

94

CERTIFICATE OF CERTIFIED REPORTER

BE IT KNOWN that the foregoing proceedings were taken before me; that the witness before testifying was duly sworn by me to testify to the whole truth; that the foregoing pages are a full, true and accurate record of the proceedings, all done to the best of my skill and ability; that the proceedings were taken down by me in shorthand and thereafter reduced to print under my direction; that I have complied with the ethical obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206 J(1)(g)(1) and (2).

I CERTIFY that I am in no way related to any of the parties hereto, nor am I in any way interested in the outcome hereof.

{X}  Review and signature was requested; any changes made by the witness will be attached to the original hereof.
{ }  Review and signature was waived/not requested.
{ }  Review and signature not required.


Dated at Phoenix, Arizona, this 31st day of October, 2025.


/s/ Mary Davis
_____
MARY DAVIS, RPR
Certified Reporter
Arizona CR No. 50271

*      *      *      *      *


I CERTIFY that GRIFFIN GROUP INTERNATIONAL, has complied with the ethical obligations set forth in ACJA 7-206 (J)(1)(g)(1) through (6).


/s/ Pamela A. Griffin
_____
GRIFFIN GROUP INTERNATIONAL
Registered Reporting Firm
Arizona RRF No. R1005



**Griffin Group International**
**888.529.9990 | 602.264.2230**

# EXHIBIT 9

CONFIDENTIAL - FOR COUNSEL ONLY



# ARIZONA DEPARTMENT OF CORRECTIONS
# OFFICE OF THE INSPECTOR GENERAL
# INVESTIGATIVE REPORT



| DR. NO. 2023-040449 | Type | Sexual Assault / Aggravated Assault | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Date of Occurrence Thu, 09-28-2023 | Time 1100 | Reporting Criminal Investigator A.  Cooper #521 | | | | | Contact Number 520-574-0024  X  36126 | | |
| Location of Offense: | | ASPC-Tucson, Rincon Unit, 10000 S Wilmot Rd. Tucson, AZ 85734 | | | | | | | |

### Inmate(s) Involved

| First Name | Last Name | ADC # | DOB | Housing | Current Sentence | STG | Sentence Date | Release Date | ICode |
|---|---|---|---|---|---|---|---|---|---|
| Demarco | Hines | 340557 | ▮ | RIN | Armed Robbery / Theft Means of Transportation | No Info | 10/19/2017 | 06/17/2027 | SUS |

### Individual(s) Involved

| First Name, M.I. | Last Name | Badge/EIN or DOB | Title/Address | Contact Number | ICode |
|---|---|---|---|---|---|
| O.W. | ▮ | ▮ | ▮ | | VIC |
| Kaylan | Nasta | ▮ | Corporal / 10000 S Wilmot Rd. Tucson, AZ 85734 | 520-574-0024 | WIT |
| Talon | Hanks | ▮ | COII / 10000 S Wilmot Rd. Tucson, AZ 85734 | 520-574-0024 | WIT |
| Amy | Link | ▮ | Contractor / 10000 S Wilmot Rd. Tucson, AZ 85734 | 520-574-0024 | WIT |
| Ronda | Lehner | ▮ | Contractor / 10000 S Wilmot Rd. Tucson, AZ 85734 | 520-574-0024 | WIT |

## Summary

### Basis of Investigation:

On Thursday, September 28, 2023, at approximately 11:07 a.m., ASPC-Tucson CIU Detective Supervisor Dan Smith was notified by Rincon Deputy Warden Jorge Martinez that a Contract Employee (Trinity) O.W. ▮ had been sexually assaulted by Inmate Demarco Hines #340557. CIU Detectives responded immediately to the scene.

### Summary of Findings:

Inmate Demarco Hines was identified as the perpetrator in the sexual assault of O.W. who at the time of the assault was acting in the capacity of a contract employee at the prison. DNA from Demarco Hines was found to be on the surrounding area of O.W. O.W. 's mouth along with her breasts. Although the assault occurred outside of camera view Inmate Demarco Hines can be seen on camera entering the area of the assault. Staff secured the area directly after the assault locking only Demarco Hines in the immediate area.

This case fulfills the elements of Arizona Revised Statute (ARS) 13-1406 Sexual assault by intentionally or knowingly engaging in sexual intercourse or oral sexual contact with any person without the consent of such person, which is a class 2 felony. Demarco Hines also held O.W. in the bathroom where the sexual assault occurred fulfilling the elements of Arizona Revised Statute (ARS) 13-1304 Kidnapping, which is a class 2 felony.

CONFIDENTIAL - FOR COUNSEL ONLY

O.W.  000001

CONFIDENTIAL - FOR COUNSEL ONLY

   Case: 2023-040449

The sexual assault was initiated with the commission of an aggravated assault, Demarco Hines punched O.W. ████ several times knocking her to the ground. This fulfills the elements of Arizona Revised Statue (ARS) 13-1204 Aggravated Assault, which is a class 2 felony.

This case will be forwarded to ASPC-Tucson Criminal Investigation Unit (CIU) Detective Supervisor D. Smith #505 for review and disposition.

## Narrative

### Detail of Event:

On September 28, 2023, Detective Mange, Detective Supervisor Smith, Investigator Lopez and I responded to the Rincon Unit. Detective Mange and Supervisor Smith processed the crime scene (see supplemental report) while I gathered the facts of the assault and conducted interviews with involved parties. As I arrived on scene O.W. was being treated by Tucson Fire Department personnel in the Trinity office located in the Rincon kitchen. The decision to transport O.W. to the hospital via ambulance was made and she departed the unit. O.W. was taken to the Tucson Medical Center.

### Video Surveillance Rincon Kitchen Cameras:

**10:00:00am - 11:00:35am**

| | |
|---|---|
| 10:13:40- | Trinity Lehner opens DA door, letting Inmate Hines into DA (Inmate Hines has a broom with a partially missing handle). |
| 10:14:15- | DA door is closed. Trinity Lehner walks from the door into the kitchen area (flipping keys in hand). |
| 10:19:35- | Corporal Nasta enters DA (Believed to unlock the door due to the time it took). Stands briefly in the doorway until entering DA and closes the door. |
| 10:25:05- | Corporal Nasta returns from DA into the kitchen, leaving DA's door ajar. |
| 10:25:24- | Door Closes (Nobody seen on camera near the door on the kitchen side). |
| 10:25:46- | The inmate exits the DA into the kitchen outside of the camera view. |
| 10:26:37- | Corporal Nasta opens DA Door. Inmate Hines enters the door and closes with both inside DA. The Door is ajar. |
| 10:27:13- | Inmate Hines exits DA into the kitchen door is ajar. |
| 10:27:59- | Inmate Hines enters DA with a blue broom and shuts the door. |
| 10:28:39- | Trinity Link, Unidentified inmate, Corporal Nasta enters the kitchen from DA. The door is left open. |
| 10:29:15- | Inmate Hines comes from DA into the kitchen with a blue broom, and shuts DA's door. |
| 10:29:24- | Inmate Hines goes into DA with a blue broom closed door. |
| 10:34:06- | Inmate Hines exits DA with a broom and dustpan, shuts the door, dustpan appears empty, acts as though he dumps the dustpan into the trash can, and walks into the kitchen area. Inmate Hines walks through the grill area, through the cooking area, and towards the Trinity office (the camera doesn't show exactly where he goes, although he walks in the direction of the Trinity office door). Inmate Hines walks towards the kitchen's back door, walks to the cooking area (looking around), and waits in the cooking area. Trinity Link walks near him and moves to a different area within the cooking area; still looking around, he walks out of the cooking area while looking back in the direction of the Trinity office. Inmate Hines goes back into DA. |
| 10:36:03- | Someone enters DA broom can be seen on camera (presumed to be Hines based on him walking |

CONFIDENTIAL - FOR COUNSEL ONLY

O.W. 000002



Case: 2023-040449



| | | |
|---|---|---|
| | | towards the door in other camera views). |
| 10:37:50- | | Trinity O.W. enters DA. Door shuts. |
| 10:58:02- | | Trinity Lehner enters DA door. The door stays ajar. |
| 10:58:14- | | Door closes. |
| 10:59:24- | | DA Door opens. Trinity O.W. enters from DA. |
| 10:59:38- | | Trinity Lehner closes DA door. |
| 11:00:35- | | Door remains closed until Corporal Nasta runs to DA door, followed by COII Hanks and They enter DA. |

**Interview with Inmate Hines, Demarco # 340557:**

On September 28, 2023, an audio-recorded interview was conducted with Inmate Hines, Demarco at the Rincon unit. I introduced myself to Inmate Hines and had him identify himself by name and DOC number. I explained that he was the alleged suspect in the sexual assault of a Trinity worker and read him the Miranda Warning. He stated he understood his rights, and when he was asked if he was willing to answer my questions, he said to do whatever we were going to do, stating, "Do a blood test, DNA test," "I didn't do shit like that."

I told him I wanted to get his side of what happened in the DA, and part of it was to collect buccal swabs if he consented to the collection. He stated that he would consent to the collection of buccal swabs. I presented him with a consent to search form, and he read it. He asked what the second paragraph said, and I read the paragraph to him. I explained the paragraph, and he agreed to the collection. Two sets of buccal swabs were collected from him.

I asked Inmate Hines to explain to me how his day went at work today. He stated, "It was cool," and that he had just got to work. He said he walked around when he got there and ate some cookies and milk. He stated he told one of the white shirts (Trinity employee) "older lady" to let him in the small DA to clean, which she did. He stated he was in the DA by himself, sweeping and wiping down tables. I asked what happened then, and he said, "shit, nothing for real." He said he didn't understand how it was even being said like it was. I asked if anyone came into the DA while he was cleaning, and he said multiple people. When asked who, he said Nasta, the one that let him in, and O.W.

He said Nasta had walked through the double doors with cups in her hands. When asked if O.W. said anything to him when she came in, he said she said, "damn, they locked you in here. What are you doing cleaning". When asked what she did then, he said she went into the bathroom. She came out of the bathroom, and he was still cleaning. He said she asked him if he could empty the trash in the bathroom and when he stepped into the bathroom she "got to tweakin on me". He said that O.W. "is weird like that" and "she always trips for nothing". When asked what she said he said she was telling him he needed to hurry up because he wasn't supposed to be in there. He said that is when the "older lady" came and was looking at him funny because he was in the bathroom. Both Trinity workers left the kitchen and locked him in the DA so he continued to clean. He said two seconds later "They run down on me," told him to get on the ground and had the Taser on him.

I asked Inmate Hines what reason O.W. would have to say he raped her in the bathroom. He said he did not know and that he and O.W. had never seen eye to eye. He could not recall any specific incidents where they did not get along.

O.W. 000003

# EXHIBIT 10

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| O.W. an individual, | ) No. 2:25-cv-00044-DWL |
| | ) |
| Plaintiff, | ) |
| vs. | ) |
| | ) |
| State of Arizona, a body | ) |
| politic; Ryan Thornell, an | )    VIDEOTAPED |
| individual, on his own behalf | ) |
| and on behalf of his marital | )   VIDEOCONFERENCE |
| community; Christopher | ) |
| Josefowicz, an individual, on | )    DEPOSITION OF |
| his own behalf and on behalf | ) |
| of his marital community; | )   RHONDA LEHNER |
| Kaylan Nasta, an individual, | ) |
| on her own behalf and on | ) |
| behalf of her marital | ) |
| community; Talon Hanks, an | ) |
| individual, on his own behalf | ) |
| and on behalf of his marital | )   November 11, 2025 |
| community; TKC Holdings, | )   Tucson, Arizona |
| Inc., a Missouri corporation; | )      9:09 a.m. |
| Trinity Services Group, Inc., | ) |
| a Florida corporation; and | ) |
| John and Jane Does 1-40, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

(Contains "Confidential" portions)

REPORTED STENOGRAPHICALLY BY:
MARY DAVIS, RPR
Certified Reporter No. 50271

PREPARED FOR:
ASCII/Condensed

(Certified Copy)



That's hilarious.

So I assume that he was told by somebody else to go sweep because nobody took it upon themselves to do that.  So I was like, "All right.  Well, then come on if you want to go sweep."  So we walked -- me and Demarcus walked to this small DA, dining area.  It's locked.  I unlocked it.  Walked in.  There's nobody in there.  He went in with his broom, and I said, "All right.  Go ahead; start sweeping."

I locked the door because it shuts and locks.  I stood there for a minute.  It's got a little window in there, and I kind of watched him to make sure that's what he was doing.  I mean, there's really nothing else in there that -- I mean, the tables don't move.  Like, it's empty.  And he was sweeping.  And so he's locked in there, completely locked in there.  Unless you have a key, you can't get in there.  And then I walked away and I continued on whatever I was doing in the kitchen.

My shift was almost over, and I had to go to the bathroom so bad.  And in that DA -- you have to walk through that DA in order to get to our restroom.  So I opened the door.  I noticed he -- I didn't see Demarcus anywhere.  I just assumed someone let him out, another CO, another -- we were called "white shirts."  Another shirt could have let him out.  Any of those



15

things could have happened.

So I'm walking to the bathroom -- and you have to walk a little ways -- and I could hear something. But, mind you, that wall is the same wall that our kitchen dishwasher sits on on the other side. So noise is -- I don't know. It's normal. But still I'm cautious; I work in a prison.

So I get -- I kind of go out into the DA just a little bit, and the bathroom door is open. Again, that should never happen. The bathroom door locks when you shut it. Like, if it accidentally shuts, you know, like if you're in it, it will lock. The only way to open that door is with a key. The door was open. And when I came around, and I could see the full bathroom, Demarcus was standing there and O.W.

I'm sorry. I'm going to call her O.W. because that's what we call -- we only call by our last names.

O.W. was standing there. And they both fully had their clothes on. I mean, everything. Completely fully dressed, both of them. She was kind of like a little bit, like, slumped over the toilet. She wasn't on her knees, but just -- I don't know. Like -- so I said, "What's going on in here?" And he goes, "I think she is sick." I said, "She's sick?" He said, "Yeah, I think she's sick."



16

Well, then she kind of, like, stood up all the way, and her radio fell out of her pocket.  And when I say, "pocket," it was, like, her shirt pocket at the top, like right here.  And he picked it up.  And, you know, he knows he's not allowed to pick it up.  And she still -- she had a vape.  It was, like, pink.  I believe pink.  She had a vape in her other hand.  And she turned around and looked at me and said, "Get me out of here."  I said, "Absolutely."

So I took her by her arm and walked her out of the bathroom, walked her to the DA door that we came in, and she walked out.  And I told Demarcus, I said, "You better sit down because they're coming for you." He says, "I know," and he sat down.  And then I walked out and went and got my sergeant.

Q.   And your sergeant would have been Nasta?

A.   No.  She wasn't there that day.

Q.   Nasta wasn't there that day?

A.   No, she was not there that day.  And if she was there, she wasn't in our unit.  It was Stein, Sergeant Stein.

Q.   Okay.

A.   And then when I -- I don't know if you've seen cameras or pictures or whatever, but the CO's office kind of set up.  It was in the middle of our unit.  So



44

the attorney for Trinity may have questions for you and the attorney for the State may have questions for you, but we'll figure all that out when we get back.

THE WITNESS:  Okay.

MR. SHOWALTER:  So in 10 minutes, at 10:15, I'll be back.

THE WITNESS: Okay.  Perfect.  Thank you.

THE VIDEOGRAPHER:  We're off the record at 10:05 a.m.

(Recess from 10:05 a.m. to 10:18 a.m.)

THE VIDEOGRAPHER:  We're on the record at 10:18 a.m.

BY MR. SHOWALTER:

Q.  Okay.  One of the things that I've heard in the depositions of other people who were present that day is that anytime an inmate was in that DA, they were supposed to be directly supervised by a CO.

Have you ever heard that?

A.  I don't know if I have heard that before.  It could be.  I'm not saying it's not possible.

Q.  In other words, at the time this incident occurred, that DA did not have a video camera in it.

Are you --

A.  Correct.

Q.  -- aware of that?

45

A.    I am aware of it.  I'm aware of it after the fact.

Q.    And my understanding is, subsequently, a video camera was installed in that DA?

A.    The very next morning.

Q.    Okay.

A.    I mean, somewhere overnight.  The next day I came in, and there was one.

Q.    And what -- what that means is that if an inmate was in that room and they were not being observed by COs, they could potentially do things in violation of the law or prison rules; correctly -- or correct?

A.    Yeah.  I mean, absolutely.

Q.    But you don't know whether the rule was supposed to be that anytime an inmate was in that DA a CO was supposed to observe them?

A.    No.  I don't know that, per se.  No, I don't know.

Q.    What training did you receive about -- prior to this incident, did you receive any training about the DA and how staff were supposed to behave if they needed to use the restroom in there?

A.    Yes.  We were always told if you have to use the restroom, if there is inmates -- because there were



107

THE WITNESS:  It's -- so I guess I just have a question.  So if this ends up going to court, you'll send me some more -- different paperwork?

MR. SHOWALTER:  Yes.

THE WITNESS:  Okay.

MR. SHOWALTER:  So why don't we go off the record in terms of the deposition.  And then if you have any other questions and I can answer them, I will.

THE WITNESS:  Okay.

THE VIDEOGRAPHER:  This concludes today's deposition of Rhonda Lehner.  We are off the record at 11:42 a.m.

THE COURT REPORTER:  Just for my record, can I get your copy orders?

MR. LAMMERS:  Normal order, Mary.

(Ms. Gultz leaves the Zoom videoconference.)

MR. SHOWALTER:  Yes.

(The deposition concluded at 11:42 a.m.)

(Signature waived.)

_____

RHONDA LEHNER



108

CERTIFICATE OF CERTIFIED REPORTER

BE IT KNOWN that the foregoing proceedings were taken before me; that the witness before testifying was duly sworn by me to testify to the whole truth; that the foregoing pages are a full, true and accurate record of the proceedings, all done to the best of my skill and ability; that the proceedings were taken down by me in shorthand and thereafter reduced to print under my direction; that I have complied with the ethical obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206 J(1)(g)(1) and (2).

I CERTIFY that I am in no way related to any of the parties hereto, nor am I in any way interested in the outcome hereof.

{ }  Review and signature was requested; any changes made by the witness will be attached to the original hereof.
{X}  Review and signature was waived/not requested.
{ }  Review and signature not required.

Dated at Phoenix, Arizona, this 26th day of November, 2025.


                    /s/ Mary Davis
              _____
                    MARY DAVIS, RPR
                  Certified Reporter
                 Arizona CR No. 50271

         *      *      *      *      *


    I CERTIFY that GRIFFIN GROUP INTERNATIONAL, has complied with the ethical obligations set forth in ACJA 7-206 (J)(1)(g)(1) through (6).


                  /s/ Pamela A. Griffin
              _____
                GRIFFIN GROUP INTERNATIONAL
                 Registered Reporting Firm
                  Arizona RRF No. R1005



# EXHIBIT 11

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF PIMA

FILED
GARY L. HARRISON
CLERK, SUPERIOR COURT

2024 MAR -6  PM 4:08

D WANDELL, DEPUTY

| | |
|---|---|
| THE STATE OF ARIZONA, | Case No.: _____ |
| Plaintiff, | |
| vs. | **DIRECT INDICTMENT** |
| DEMARCO HINES, | 328-GJ-39 |
| Defendant. | |

CR20240753-001

The grand jurors of the County of Pima, in the name of the State of Arizona, and by its authority accuse DEMARCO HINES, and charge that in Pima County:

COUNT ONE: KIDNAP-INFLICT DEATH/INJURY/SEX OFFENSE/AID IN FELONY, A CLASS TWO FELONY

On or about September 28, 2023, DEMARCO HINES knowingly restrained O.W., with the intent to inflict death, physical injury or a sexual offense on him or her, or to otherwise aid in the commission of a felony, in violation of A.R.S. § 13-1304A3.

COUNT TWO: SEXUAL ASSAULT, A CLASS TWO FELONY

On or about September 28, 2023, DEMARCO HINES committed sexual assault by intentionally or knowingly engaging in sexual intercourse or oral sexual contact with O.W. to wit: BY PLACING HIS PENIS IN HER MOUTH, without her consent, in violation of A.R.S. 13-1406A.

COUNT THREE: SEXUAL ABUSE, A CLASS FIVE FELONY

On or about September 28, 2023, DEMARCO HINES committed sexual abuse by intentionally or knowingly engaging in sexual contact with O.W. to wit: BY TOUCHING HER BREASTS, without her consent, in violation of A.R.S. § 13-1404A.

COUNT FOUR: AGGRAVATED ASSAULT ON A CORRECTIONS EMPLOYEE, A CLASS FIVE FELONY

On or about September 28, 2023, DEMARCO HINES, a prisoner, assaulted O.W., an employee of the ARIZONA DEPARTMENT OF CORRECTIONS, in violation of A.R.S. § 13-1204A10.

BEST COPY

O.W. 000540

AZ Department of Corrections: 2023-040449

LAURA CONOVER
PIMA COUNTY ATTORNEY

By: _____

Dated: ___3-6-24___

CR20240753-001

True Bill

_____

Foreperson of the Grand Jury

- 2 -

O.W. 000541

# EXHIBIT 12

FILED
JAMES W. GIACOMINO
CLERK, SUPERIOR COURT
2/18/2026 2:14:26 PM
By: L. Wiktorek

ARIZONA SUPERIOR COURT, PIMA COUNTY

HON. CASEY F. MCGINLEY                          CASE NO.   CR20240753-001

COURT REPORTER:   Lauren Botti              DATE:      February 13, 2026
                  Courtroom - 675

STATE OF ARIZONA                            Renee J Waters, Esq.
                                            counsel for State
                                            appearing via Microsoft Teams and in person

VS.

DEMARCO HINES (-001)                        Trevor R Hill, Esq.
    Defendant                               counsel for Defendant

---

# M I N U T E   E N T R Y

**JURY TRIAL-- FINAL DAY**

9:00 AM   The jury resumes deliberations.

2:35 PM   Defendant present, in custody.  Same counsel present, counsel for State appearing via Microsoft Teams.

OUT OF THE PRESENCE OF THE JURY:

The Court and counsel discuss the answer to be provided to the jury regarding their questions submitted during deliberations.

IN THE PRESENCE OF THE JURY:

Renee Waters, Esq. now present.

The Court further instructs the jury with an impasse instruction.

The jury is excused for further deliberations.

3:51 PM  The jury announces through its foreperson that they have reached verdicts in this case.

The clerk is directed to read and enter the verdicts into the record.

The jury finds the Defendant GUILTY of the offense of KIDNAPPING, as alleged in COUNT ONE of the Indictment.

The jury finds the Defendant UNDECIDED as to the offense of SEXUAL ASSAULT, as alleged in COUNT TWO of the Indictment, and, therefore, the Court declares a MISTRIAL as to COUNT TWO of the

_____
      L. Wiktorek
      Deputy Clerk

**M I N U T E   E N T R Y**

Page  2                              Date:  February 13, 2026                              Case No.:   CR20240753-001

Indictment.

The jury finds the Defendant UNDECIDED as to the offense of SEXUAL ABUSE, as alleged in COUNT THREE of the Indictment, and, therefore, the Court declares a MISTRIAL as to COUNT THREE of the Indictment.

The jury finds the Defendant GUILTY of the offense of AGGRAVATED ASSAULT ON A CORRECTIONS OFFICER, as alleged in COUNT FOUR of the Indictment.

The clerk inquires of the jurors whether these are their verdicts and the verdicts of each of them, and so say they all.

At the request of Trevor Hill, Esq., the clerk polls the jury.

The admonishment is lifted and the jury is thanked for its services and discharged.

OUT OF THE PRESENCE OF THE JURY:

Upon inquiry of the Court, the State informs the parties that it intends to retry the Defendant on Count Two and Count Three.

IT IS ORDERED setting a Status Conference on February 17, 2026, at 9:00 AM, in Division 02.

3:55 PM    Court is adjourned.

FILED IN COURT:  Jury List; Preliminary Jury Instructions; Final Jury Instructions; Verdicts (2); Juror Questions Submitted During Trial; Juror Questions Submitted During Deliberations

cc:     Hon. Casey F McGinley
        Hon. J Alan Goodwin
        Renee J Waters, Esq.
        Trevor R Hill, Esq.
        Adult Probation
        Pretrial Services

_____L. Wiktorek_____
Deputy Clerk

# EXHIBIT 13

**Report:** 0460

**Run Date:** 12/02/2025 07:05

**Page:** 1 of 10

# ARIZONA DEPARTMENT OF CORRECTIONS
## INMATE RECORD
Public Report
including ALL episodes

ADC NO: 340557          Name: HINES, DEMARCO                    Status: Out to Court

Last DOC#: 001      LOC:

Sex: M                          Age: 26          Release Type   Release Date

Race: Black                     Custody: 5/5         CSBD   03/24/2028

                                                     CSED   09/24/2029

                                                     ERCD   03/26/2028

                                                      SED   10/18/2028

## Commitments

**Episode #001**

| Com | County | Sent. Begin | Sent. Imp. | Status |
|---|---|---|---|---|
| A | Maricopa | 10/19/2017 | 11Y | Imposed |

| # | Case Num | Offense Description | Felony | Concurrent | Consecutive | Status |
|---|---|---|---|---|---|---|
| 01 | 2017148317002 | ARMED ROBBERY | CL 2 D/NR | | | Active |

| Com | County | Sent. Begin | Sent. Imp. | Status |
|---|---|---|---|---|
| B | Maricopa | 08/14/2017 | 3Y 6M | Imposed |

| # | Case Num | Offense Description | Felony | Concurrent | Consecutive | Status |
|---|---|---|---|---|---|---|
| 01 | 2017137455001 | THFT MEANS OF TRNSPRTATION | CL 3 ND/NR | A01 A01 | | Expired |

## Movements

**Episode #001**

| Date | Type | Destination | Reason For | Orign |
|---|---|---|---|---|
| 12/10/2019 | New Commitment | | New Felony Conviction | |
| 12/10/2019 | | ASPC-PHX RECEPTION | Routine | |
| 12/16/2019 | Transfer Out - Unit Departure | ASPC-T WINCHESTER | Action/Work Completed | |
| 12/16/2019 | Transfer Out - Prison/CIP Departure | ASPC-T WINCHESTER | Action/Work Completed | |
| 12/16/2019 | Transfer In - Prison/CIP Arrival | | Action/Work Completed | ASPC-T WINCHESTER |
| 12/16/2019 | Transfer In - Unit Arrival | | Action/Work Completed | ASPC-T WINCHESTER |
| 12/16/2019 | | ASPC-T WINCHESTER | Routine | |
| 03/16/2020 | Transfer Out - Unit Departure | ASPC-T SANTA RITA | Lateral Transfer | ASPC-T WINCHESTER |
| 03/16/2020 | Transfer In - Unit Arrival | | Lateral Transfer | |
| 03/16/2020 | | ASPC-T SANTA RITA | Routine | |
| 05/14/2020 | Transfer Out - Unit Departure | ASPC-T RINCON MHW | Mental Health Watch | ASPC-T SANTA RITA |
| 05/14/2020 | Transfer In - Unit Arrival | | Mental Health Watch | |
| 05/14/2020 | | ASPC-T RINCON MHW | Routine | |
| 05/14/2020 | Transfer Out - Unit Departure | ASPC-T RINCON MHW | Mental Health Watch | ASPC-T RINCON MHW |
| 05/14/2020 | Transfer In - Unit Arrival | | Mental Health Watch | ASPC-T RINCON MHW |
| 05/14/2020 | | ASPC-T RINCON MHW | Routine | |
| 05/16/2020 | | ASPC-T RINCON MHW | Unassigned from bed | |
| 05/16/2020 | | ASPC-T RINCON MHW | Routine | |
| 05/17/2020 | | ASPC-T RINCON MHW | Unassigned from bed | |
| 05/17/2020 | | ASPC-T RINCON MHW | Routine | |
| 05/17/2020 | | ASPC-T RINCON MHW | Unassigned from bed | |
| 05/17/2020 | | ASPC-T RINCON MHW | Routine | |
| 05/18/2020 | Transfer Out - Unit Departure | ASPC-T SANTA RITA | Completed Treatment | ASPC-T RINCON MHW |
| 05/18/2020 | Transfer In - Unit Arrival | | Completed Treatment | ASPC-T SANTA RITA |
| 05/18/2020 | | ASPC-T SANTA RITA | Routine | |
| 09/05/2020 | Out to Hospital | | Medical Needs | ASPC-T SANTA RITA |
| 09/05/2020 | Return from Hospital | ASPC-T SANTA RITA | Medical Needs | ASPC-T SANTA RITA |
| 09/05/2020 | | ASPC-T SANTA RITA | Unassigned from bed | |
| 09/05/2020 | | ASPC-T SANTA RITA | Routine | |

O.W. 002184

**Report:** 0460

**Run Date:** 12/02/2025 07:05

**Page:** 5 of 10

# ARIZONA DEPARTMENT OF CORRECTIONS
## INMATE RECORD
Public Report
including ALL episodes



ADC NO: 340557          Name: HINES, DEMARCO          Status: Out to Court



# Housing History

## Episode #001

| Date | Location | Type |
|---|---|---|
| 01/16/2025 | A33-WG2F045B | Detention |
| 01/21/2025 | L21-HU3A211L | Maximum |
| 03/24/2025 | L77-HU3A513L | Maximum |
| 03/24/2025 | L77-HU3A517L | Maximum |
| 03/24/2025 | L77-HU3A509L | Maximum |

# Discipline Violations

## Episode #001

| Date | Case | Type | Verdict | Disposition | Status |
|---|---|---|---|---|---|
| 02/03/2020 | 20-TC5-000284 | Aggravated Refusal of an Assignment | Dismiss | | Closed |
| 02/05/2020 | 20-TC5-000285 | Aggravated Refusal of an Assignment | Dismiss | | Closed |
| 02/06/2020 | 20-TC5-000286 | Resisting or Disobeying a Verbal or Written Order | Guilty-Minor | Loss of Privilege | Closed |
| 02/08/2020 | 20-TC5-000300 | Disrupting an Institution Count and/or Being Out of Place | Guilty-Minor | Loss of Privilege | Closed |
| 02/09/2020 | 20-TC5-000287 | Disrupting an Institution Count and/or Being Out of Place | Guilty-Minor | Loss of Privilege | Closed |
| 02/12/2020 | 20-TC5-000315 | Positive Test or Refusal of UA | Guilty-Major | Non-Contact Parole Class III Restitution Loss of Visits Loss of Privilege Earned Release Credits | Closed |
| 03/04/2020 | 20-TC5-000479 | Stalking (Inmate to Staff) | Uphold | Parole Class III Loss of Privilege Earned Release Credits | Closed |
| 03/18/2020 | 20-TC2-000440 | Disrupting an Institution Count and/or Being Out of Place | Guilty-Minor | | Closed |
| 04/15/2020 | 20-TC2-000566 | Disrupting an Institution Count and/or Being Out of Place | Informal Resolution | | Closed |
| 05/14/2020 | 20-TC2-000697 | Positive Test or Refusal of UA | Dismiss | | Closed |
| 07/20/2020 | 20-TC2-000975 | Disrupting an Institution Count and/or Being Out of Place | Guilty-Minor | Loss of Privilege | Closed |
| 07/20/2020 | 20-TC2-000970 | Aggravated Refusal of an Assignment | Guilty-Minor | | Closed |
| 07/21/2020 | 20-TC2-000979 | Resisting or Disobeying a Verbal or Written Order | Informal Resolution | | Closed |
| 07/30/2020 | 20-TC2-000998 | Disorderly Conduct | Guilty-Major | Loss of Privilege | Closed |
| 08/15/2020 | 20-TC2-001096 | Tattooing, Brands, Scarifications and Piercing | Guilty-Major | Parole Class III Loss of Privilege Earned Release Credits | Closed |
| 09/08/2020 | 20-TC2-001164 | Possession of Drugs or Narcotics | Guilty-Major | Parole Class III Restitution Loss of Visits Non-Contact Loss of Privilege Earned Release Credits | Closed |
| 09/16/2020 | 20-TC2-001210 | Resisting or Disobeying a Verbal or Written Order | Guilty-Minor | Loss of Privilege | Closed |

O.W. 002188

**Report:** 0460

**Run Date:** 12/02/2025 07:05

**Page:** 6 of 10

# ARIZONA DEPARTMENT OF CORRECTIONS
## INMATE RECORD
Public Report
including ALL episodes



ADC NO: 340557          Name: HINES, DEMARCO                      Status: Out to Court

## Discipline Violations

### Episode #001

| Date | Case | Type | Verdict | Disposition | Status |
|------|------|------|---------|-------------|--------|
| 10/10/2020 | 20-TC6-002442 | Disrupting an Institution Count and/or Being Out of Place | Guilty-Major | Parole Class III<br><br>Loss of Privilege<br>Earned Release Credits | Closed |
| 10/13/2020 | 20-TC6-002460 | Aggravated Refusal of an Assignment | Guilty-Minor | | Closed |
| 10/24/2020 | 20-TC6-002576 | Resisting or Disobeying a Verbal or Written Order | Guilty-Minor | Loss of Privilege | Closed |
| 11/14/2020 | 20-TC6-002654 | Resisting or Disobeying a Verbal or Written Order | Guilty-Minor | | Closed |
| 01/29/2021 | 21-TC6-000244 | Smoking or Use of Tobacco in an Unauthorized Area | Guilty-Minor | Loss of Privilege | Closed |
| 02/05/2021 | 21-TC1-000162 | Disrespect to Staff | Guilty-Minor | Loss of Privilege | Closed |
| 02/09/2021 | 21-TC1-000236 | Fighting | Guilty-Major | Parole Class III<br>Earned Release Credits | Closed |
| 02/09/2021 | 21-TC1-000194 | Positive Test or Refusal of UA | Guilty-Major | Parole Class III<br>Loss of Visits<br>Loss of Privilege<br>Earned Release Credits | Closed |
| 02/21/2021 | 21-TC6-000397 | Indecent Exposure | Guilty-Major | Parole Class III<br>Loss of Privilege<br>Earned Release Credits | Closed |
| 02/24/2021 | 21-TC6-000395 | Criminal Damage | Guilty-Major | Parole Class III<br>Restitution<br>Loss of Privilege<br>Earned Release Credits | Closed |
| 02/25/2021 | 21-TC6-000398 | Possession of Minor or Nuisance Contraband | Guilty-Minor | Loss of Privilege | Closed |
| 03/03/2021 | 21-TC6-000502 | Disrespect to Staff | Guilty-Minor | Loss of Privilege | Closed |
| 09/09/2021 | 21-EY1-001346 | Fighting | Guilty-Major | Parole Class III<br>Loss of Privilege<br>Earned Release Credits | Closed |
| 02/21/2022 | 22-EY1-000235 | Obstructing Staff | Informal Resolution | | Closed |
| 05/09/2022 | 22-EY1-000640 | Violation of any Published Department or Institution Rule | Informal Resolution | | Closed |
| 11/02/2022 | 22-TC6-001056 | Disrupting an Institution Count and/or Being Out of Place | Dismiss | | Closed |
| 11/07/2022 | 22-TC6-001062 | Resisting or Disobeying a Verbal or Written Order | Guilty-Minor | Loss of Privilege | Closed |
| 11/21/2022 | 22-TC6-001092 | Criminal Damage | Dismiss | | Closed |
| 01/07/2023 | 23-TC6-000025 | Resisting or Disobeying a Verbal or Written Order | Guilty-Minor | Loss of Privilege | Closed |
| 01/08/2023 | 23-TC6-000033 | Threatening or Intimidating | Guilty-Major | Loss of Privilege | Closed |
| 03/15/2023 | 23-TC6-000207 | Resisting or Disobeying a Verbal or Written Order | Guilty-Minor | Loss of Privilege | Closed |
| 04/04/2023 | 23-TC6-000270 | Disorderly Conduct | Guilty-Minor | | Closed |
| 04/05/2023 | 23-TC6-000280 | Disorderly Conduct | Guilty-Minor | Loss of Privilege | Closed |
| 04/06/2023 | 23-TC6-000282 | Aggravated Refusal of an Assignment | Guilty-Minor | | Closed |
| 04/09/2023 | 23-TC6-000300 | Indecent Exposure | Guilty-Major | Parole Class III<br>Loss of Privilege<br>Earned Release Credits | Closed |
| 04/11/2023 | 23-TC6-000311 | Aggravated Refusal of an Assignment | Guilty-Minor | Loss of Privilege | Closed |
| 04/13/2023 | 23-TC6-000344 | Aggravated Refusal of an Assignment | Guilty-Minor | Loss of Privilege | Closed |
| 04/19/2023 | 23-TC6-000365 | Aggravated Refusal of an Assignment | Guilty-Major | Parole Class III | Closed |

**Report:** 0460

**Run Date:** 12/02/2025 07:05

**Page:** 7 of 10

# ARIZONA DEPARTMENT OF CORRECTIONS
## INMATE RECORD
Public Report
including ALL episodes



ADC NO: 340557          Name: HINES, DEMARCO                    Status: Out to Court

## Discipline Violations

**Episode #001**

| Date | Case | Type | Verdict | Disposition | Status |
|------|------|------|---------|-------------|--------|
| 04/21/2023 | 23-TC6-000383 | Aggravated Refusal of an Assignment | Guilty-Major | Loss of Privilege<br>Earned Release Credits<br>Parole Class III | Closed |
| 04/22/2023 | 23-TC6-000374 | Disrupting an Institution Count and/or Being Out of Place | Guilty-Minor | Loss of Privilege<br>Earned Release Credits | Closed |
| 08/24/2023 | 23-TC1-001568 | Disrupting an Institution Count and/or Being Out of Place | Guilty-Minor | | Closed |
| 08/25/2023 | 23-TC1-001577 | Resisting or Disobeying a Verbal or Written Order | Guilty-Minor | | Closed |
| 08/28/2023 | 23-TC1-001580 | Aggravated Refusal of an Assignment | Guilty-Major | Parole Class III<br>Loss of Privilege<br>Earned Release Credits | Closed |
| 08/28/2023 | 23-TC1-001585 | Resisting or Disobeying a Verbal or Written Order | Dismiss | | Closed |
| 08/29/2023 | 23-TC1-001594 | Aggravated Refusal of an Assignment | Guilty-Minor | | Closed |
| 08/29/2023 | 23-TC1-001581 | Promoting Prison Contraband | Guilty-Major | Parole Class III<br>Loss of Privilege<br>Earned Release Credits | Closed |
| 09/21/2023 | 23-TC1-001768 | Positive Test or Refusal of UA | Guilty-Major | Parole Class III<br>Loss of Visits<br>Loss of Privilege<br>Earned Release Credits | Closed |
| 09/25/2023 | 23-EY5-000584 | Aggravated Refusal of an Assignment | Guilty-Major | Parole Class III<br>Loss of Privilege<br>Earned Release Credits | Closed |
| 09/28/2023 | 23-TC1-001803 | Assault (Sexual) | Guilty-Major | Parole Class III<br>Earned Release Credits<br>Loss of Privilege<br>Loss of Visits | Closed |
| 09/28/2023 | 23-TC1-001802 | Assault on Staff (that involved Serious Injury) | Guilty-Major | Loss of Visits | Closed |
| 01/25/2024 | 24-EY5-000091 | Promoting Prison Contraband | Guilty-Major | Parole Class III<br>Loss of Privilege<br>Earned Release Credits<br>Loss of Visits<br>Parole Class III<br>Loss of Privilege<br>Earned Release Credits | Closed |

## Parole Board Hearing

## Classification

**Episode #001**

| Date | Type | CU Score | IR Score | LOC | APVD |
|------|------|----------|----------|-----|------|
| 12/13/2019 | Initial Classification | 3 | 3 | | CFZ1 |
| 03/12/2020 | Reclassification | 3 | 4 | | RJJ9 |
| 09/17/2020 | Reclassification | 4 | 4 | | RJJ9 |

O.W. 002190

# EXHIBIT 14

CONFIDENTIAL
Pursuant to 4/21/2025 Protective Order



Arizona Department of Corrections

## Result of Disciplinary Hearing

| Name | DEMARCO HINES | Location | TUCSON, TUCSON WINCHESTER ▇ ▇ | ADC | 340557 |
|------|---------------|----------|------|-----|--------|

| Date | 3/4/2020 9:04:00 AM | Case # | 20-TC5-000479 | Violation | 29B - Stalking (Inmate to Staff) |
|------|---------------------|--------|---------------|-----------|--------|

Hearing Officer Name:                                   Inmate Plea: Not guilty
Staff Assistant Assigned: No                            Name of Staff Assistant Provided:
Findings of DHO: Guilty

Penalty Assessed for Felony Violation

| Penalty | Amount | Penalty to Run | Suspension | Case # |
|---------|--------|----------------|------------|--------|
| Earned Release Credits | 60 Credit(s) | N/A | N | 20-TC5-000479 |
| Loss of Privilege | 30 Days | Consecutive | N | 20-TC5-000479 |
| Parole Class III | 60 Days | Concurrent | N | 20-TC5-000479 |

Specific Evidence Considered in Finding Of Guilt Which Meets the Established Standard of Proof. I am persuaded by the evidence that is more probably true than not that you committed the disciplinary violation based on the following:
Disciplinary Report

Additional Comments:

Disciplinary Hearing Officer Signature                  Date

*[signature]*                                            3/12/2020 1:35:22 PM

I have received a copy of the decision of the Disciplinary Hearing Officer. I understand that I may appeal this decision within 5 (five) calendar days through the Disciplinary Appeal process.

ADCRR_003859

**Arizona Department of Corrections**

## Result of Disciplinary Hearing

Inmate Signature

Date

3/12/2020 1:35:22 PM

Warden/Deputy Warden's Signature

Date

3/12/20

Generated Date: 03/12/2020 13:35

ADCRR_003860

CONFIDENTIAL
Pursuant to 4/21/2025 Protective Order



# ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Disciplinary Report

Date example: (mm/dd/yyyy)

Case Number **20-TC5-000479**

| INMATE'S NAME (Last, First M.I.) (Please print) | ADC NUMBER | INSTITUTION/UNIT |
|---|---|---|
| ~~Hiens, D~~ HINES, D. | 340557 | ASPC-TUCSON-Whetstone |

CHARGE: GROUP NUMBER AND TITLE

~~25B Resisting or Disobeying a Verbal or Written Order~~ 29B STALKING (I/M to staff)

**I.** Statement of *Violation (State fully the facts and circumstances of the violation including the means by which the inmate was advised of the charge(s)).*

On 03/04/2020 at approximately 0904 hours Inmate ~~Hein~~ HINES #340557 refused a directive to leave my classroom multiple times. He was verbally placed on report by CEPT Turnbull at approximately 0904 hours on 03/04/2020. This report was written by CEPT Turnbull on 03/04/2020 at 1032 hours. End of report.

| DATE / TIME OF VIOLATION | REPORTING STAFF NAME (Last, First M.I.) (Please print) | SID NUMBER |
|---|---|---|
| 03/04/2020 / 0904 hrs | Turnbull, Jayne | HJZ3 |

| SIGNATURE | DATE / TIME COMPLETED |
|---|---|
| | 03/04/2020 / 1032 hrs |

| DISPOSITION | DATE / TIME REVIEWED |
|---|---|
| Formal | 3/4/2020 / 115 |

| SHIFT SUPERVISOR REVIEW BY (Last, First M.I.) (Please print) | SIGNATURE | DATE |
|---|---|---|
| MARTINEZ, D | | 3/4/2020 |

**II. Delivery of Charge:** I hereby certify that on **3/10/20** at **1101** hours, I have served notice on this inmate for a hearing on the charge before the Disciplinary Hearing Officer as a Felony Violation. The inmate has received a copy of the disciplinary charge. The hearing is scheduled on or after 48 hours from delivery of charge. @ CHI.

INMATE WAS OFFERED STAFF ASSISTANCE AND IT WAS:

☐ Accepted   ☑ Declined

| INMATE SIGNATURE | DELIVERING OFFICER SIGNATURE |
|---|---|
| X | SC |

---

**III. Report of Investigation**

FELONY VIOLATIONS ONLY -- SEE ATTACHED (Use form #803-8)

| INVESTIGATING OFFICER (Last, First M.I.) (Please print) | SIGNATURE | DATE INVESTIGATION COMPLETED |
|---|---|---|
| Barram, V. | | 3/10/20 |

**IV. Disposition:** This case was handled as:

☐ Misdemeanor Violation: Reason for finding of guilt:

☑ Felony Violation: Refer to Disciplinary Hearing Officer _____

☐ Informal Resolution   ☐ Dismissed/Not Guilty _____

Penalty Assessed For A Minor Violation

☐ _____ Hours Extra Duty   ☐ Reprimand          ☐ Other _____

☐ Return/Forfeit Contraband Items _____

☐ _____ Days Loss of Privilege

*For Misdemeanor Violations Only: Inmate was given a copy of the results and advised that effective this date, he/she has five calendar days to appeal.*

| INMATE SIGNATURE | DATE / TIME |
|---|---|
| | / |

| COORDINATOR'S SIGNATURE | DATE / TIME |
|---|---|
| | / |

Distribution:  Coordinator to make two copies of form; Original to Master Record
File Copy to Institutional File
Copy to Inmate

ADCRR_003861

803-1(e)
1/21/16

CONFIDENTIAL
Pursuant to 4/21/2025 Protective Order



## Result of Disciplinary Hearing

| Name | DEMARCO HINES | Location | TUCSON, TUCSON CIMARRON ▮ | ADC | 340557 |
|---|---|---|---|---|---|

| Date | 2/21/2021 2:45:00 PM | Case # | 21-TC6-000397 | Violation | 18B - Indecent Exposure |
|---|---|---|---|---|---|

Hearing Officer Name: Alt, Jennifer COIV

Staff Assistant Assigned: No

Findings of DHO: Guilty

Inmate Plea: Not guilty

Name of Staff Assistant Provided:

Penalty Assessed for Felony Violation

| Penalty | Amount | Penalty to Run | Suspension | Case # |
|---|---|---|---|---|
| Earned Release Credits | 20 Credit(s) | N/A | N | 21-TC6-000397 |
| Loss of Privilege | 30 Days | Consecutive | N | 21-TC6-000397 |
| Parole Class III | 30 Days | Concurrent | N | 21-TC6-000397 |

Specific Evidence Considered in Finding Of Guilt Which Meets the Established Standard of Proof. I am persuaded by the evidence that is more probably true than not that you committed the disciplinary violation based on the following:

Disciplinary Report, Information Report

Additional Comments:

Disciplinary Hearing Officer Signature

Date
4/22/2021 12:33:30 PM

I have received a copy of the decision of the Disciplinary Hearing Officer. I understand that I may appeal this decision within 5 (five) calendar days through the Disciplinary Appeal process.

ADCRR_003691

CONFIDENTIAL
Pursuant to 4/21/2025 Protective Order



Arizona Department of Corrections

**Result of Disciplinary Hearing**

Inmate Signature

Date

4/22/2021 12:33:31 PM

Warden/Deputy Warden's Signature          Date

Generated Date: 04/22/2021 12:33

ADCRR_003692

CONFIDENTIAL
Pursuant to 4/21/2025 Protective Order



# Arizona Department of Corrections
## Rehabilitation and Reentry
### Inmate Disciplinary Report

Date example: (mm/dd/yyyy)

Case Number  21-TC6-000397

| INMATE NAME (Last, First M.I.) (Please print) | ADCRR NUMBER | INSTITUTION/UNIT |
|---|---|---|
| Hines | 340557 | ASPC/tucson/CDU |

**CHARGE: GROUP NUMBER AND TITLE**

~~27B Sexual Contact~~  18B Indecent Exposure

**I. Statement of Violation** (State fully the facts and circumstances of the violation including the means by which the inmate was advised of the charge(s)).

On 02-21-2021 at 1445 hours. I COII De La Rosa #13147 observed inmate Hines ADC: 340557 making eye contact with me while making sexual advances and masturbating directly towards me. COII Castro #9146 verbally placed inmate Hines #340557 on report 02-21-21 at 1450 hours. This report was completed by COII De La Rosa on 02-21-21 at 1500 hours. End of report.

| DATE/TIME OF VIOLATION | REPORTING STAFF NAME (Last, First M.I.) (Please print) | SID NUMBER |
|---|---|---|
| 02/21/2021    / 1445 | De La Rosa #13147 | |

| SIGNATURE | DATE/TIME COMPLETED |
|---|---|
| | 02/21/2021    / 1500 |

| DISPOSITION | DATE/TIME REVIEWED |
|---|---|
| Formal | 03-01-2021    1210 |

| SHIFT SUPERVISOR REVIEW BY (Last, First M I) (Please print) | SIGNATURE | DATE |
|---|---|---|
| Sgt. Tetsou R. #11498 | 11498 | 03-01-2021 |

**II. Delivery of Charge:** I hereby certify that on 3/5/21 at 1320 hours, I have served notice on this inmate for a hearing on the charge before the Disciplinary Hearing Officer as a Felony Violation. The inmate has received a copy of the disciplinary charge. The hearing is scheduled on or after 48 hours from delivery of charge.

a613 notified

Inmate was offered staff assistance and it was:

☐ Accepted   ☑ Declined

| INMATE SIGNATURE | DATE | DELIVERING OFFICER SIGNATURE | DATE |
|---|---|---|---|
| X | 3/5/21 | | 3/5/21 |

**III. Report of Investigation**

FELONY VIOLATIONS ONLY – SEE ATTACHED (Use form #803-8)

| INVESTIGATING OFFICER (Last, First M I.) (Please print) | SIGNATURE | DATE INVESTIGATION COMPLETED |
|---|---|---|
| | | 3/5/21 |

**IV. Disposition:** This case was handled as:   ☐ Misdemeanor Violation: Reason for finding of guilt:

☑ Felony Violation: Refer to Disciplinary Hearing Officer

☐ Informal Resolution   ☐ Dismissed/Not Guilty

**Penalty Assessed For A Minor Violation**

☐ ____ Hours Extra Duty   ☐ Reprimand         Other

☐ Return/Forfeit Contraband Items  _____

☐ ____ Days Loss of Privilege  _____

*For Misdemeanor Violations Only:* Inmate was given a copy of the results and advised that effective date, he/she has five calendar days to appeal.

| INMATE SIGNATURE | DATE/TIME |
|---|---|
| | / |

| COORDINATOR'S NAME (Last, First M.I.) (Please print) | SIGNATURE | DATE/TIME |
|---|---|---|
| | | / |

Distribution:   Coordinator to make two copies of form; Original to Master Record
Copy- Institutional File
Copy- Inmate

803-1
12/10/20

ADCRR_003693

CONFIDENTIAL
Pursuant to 4/21/2025 Protective Order

*COPY !*

## Arizona Department of Corrections
## Rehabilitation and Reentry
### Information Report

| | |
|---|---|
| Report Number | 21-C90-0811 |
| Report Date | 02/21/2021 |
| Page | 1 of 2 |

| To | Title | Unit |
|---|---|---|
| Tebou | Sgt. | ASPC-T-CDU |
| **From** | **Title** | **Unit** |
| De La Rosa | COII | ASPC-Tucson-CDU |

**Subject**

Inmate Behavior

### Staff Involved

| Employee Name (Last, First M I) | Title | Badge Number |
|---|---|---|
| De La Rosa | COII | 13147 |
| Employee Name (Last, First M I) | Title | Badge Number |

### Intel

| Intelligence Category 1 | Intelligence Category 2 |
|---|---|
| | |

| Source Type | Source's Last Name | Source's ADCRR Number |
|---|---|---|
| | | |

**Inmates Involved**

| Inmate Name (Last, First M.I) | ADCRR Number | Unit | HU/BED | Involved As |
|---|---|---|---|---|
| Hines | 340557 | ASPC-T-CDU | ███ | Subject |
| Inmate Name (Last, First M.I) | ADCRR Number | Unit | HU/BED | Involved As |

| Time | Date | Location |
|---|---|---|
| 1445 | 02/21/2021 | CDU |

### Summary

**Summary**

On 02-21-2021 at 1445 hours, I COII De la Rosa #13147 was conducting a security check when I approached cell ███ I COII De La Rosa #13147 observed inmate Hines ADC: 340557 making eye contact with me while making sexual advances and masturbating directly towards me. Inmate Hines ADC: 340557 did not stop masturbating until I got over the radio and advised the male staff to provide assistance and advice inmate Hines ADC: 340557 that he needs to stop. COII Castro #9146 verbally placed inmate Hines #340557 02-21-21 1450 hours. This report was completed on 02-21-2021 at 1500 hours. End of report

| Employee's Signature | Title |
|---|---|
| *[signature]* | COII |

### Action Taken

| Comments/Action Taken |
|---|
| |

| Employee's Signature | Title |
|---|---|
| | |

| Distribution (Check all that apply) | Entered into Database |
|---|---|
| ☐ _____ | By _____ |
| ☐ _____ | Date _____ |

ADCRR_003695

CONFIDENTIAL
Pursuant to 4/21/2025 Protective Order



Arizona Department of Corrections, Rehabilitation & Reentry

## Result of Disciplinary Hearing



| | | |
|---|---|---|
| Name | DEMARCO HINES | Location TUCSON, TUCSON CIMARRON ███ ███ | ADCRR#340557 |

| | | | |
|---|---|---|---|
| Date | 4/9/2023 4:08:00 PM | Case # | 23-TC6-000300 | Violation 18B - Indecent Exposure |

Hearing Officer Name:

Staff Assistant Assigned: No

Findings of DHO: Guilty

Inmate Plea: Not guilty

Name of Staff Assistant Provided:

### Penalty Assessed for Felony Violation

| Penalty | Amount | Penalty to Run | Suspension | Case # |
|---|---|---|---|---|
| Earned Release Credits | 30 Credit(s) | N/A | N | 23-TC6-000300 |
| Loss of Privilege | 30 Days | Concurrent | N | 23-TC6-000300 |
| Parole Class III | 30 Days | Consecutive | N | 23-TC6-000300 |

Specific Evidence Considered in Finding Of Guilt Which Meets the Established Standard of Proof. I am persuaded by the evidence that is more probably true than not that you committed the disciplinary violation based on the following:

Disciplinary Report, Investigative Reports, Staff Testimony, Information Report, Based on the disciplinary report, IR, Witness statement and investigative report. I find it more true than not the inmate committed the violation.

Additional Comments:

Disciplinary Hearing Officer Signature

Date
4/14/2023 10:27:32 AM

ADCRR_003604

CONFIDENTIAL
Pursuant to 4/21/2025 Protective Order



Arizona Department of Corrections, Rehabilitation & Reentry

## Result of Disciplinary Hearing

I have received a copy of the decision of the Disciplinary Hearing Officer. I understand that I may appeal this decision within 5 (five) calendar days through the Disciplinary Appeal process.

Inmate Signature                                            Date

                                                           4/14/2023 10:27:32 AM


Warden/Deputy Warden's Signature                           Date


Generated Date: 04/14/2023 10:27

ADCRR_003605



CONFIDENTIAL
Pursuant to 4/21/2025 Protective Order

**Arizona Department of Corrections**
**Rehabilitation and Reentry**

**Inmate Disciplinary Report**



*Date example: (mm/dd/yyyy)*

Case Number 23-TC6-000300

| INMATE NAME (Last, First M.I.) (Please print) | ADCRR NUMBER | INSTITUTION/UNIT |
|---|---|---|
| Hines, D. | 340557 | ASPC-T / Cimarron |

**CHARGE: GROUP NUMBER AND TITLE**
18B - Indecent Exposure

**I. Statement of Violation** *(State fully the facts and circumstances of the violation including the means by which the inmate was advised of the charge(s)).*

On 04/09/2023 at 1608, while I COII MacIntire #1069 was conducting formal count and looked into inmate Hines #340557 cell I COII MacIntire #1069 noticed inmate Hines #340557 masturbating in the wide open. while facing the cell door. On 04/09/2023 at 1613, I COII MacIntire #1069 at SM verbally placed inmate Hines #340557 on report. On 04/09/2023 at 1657 hours, I COII MacIntire completed the report. End of report.

| DATE/TIME OF VIOLATION | REPORTING STAFF NAME (Last, First M.I.) (Please print) | SID NUMBER |
|---|---|---|
| 04/09/2023 1608 | MacIntire, S. | GMACINTIRE |

| SIGNATURE | | DATE/TIME COMPLETED |
|---|---|---|
| #1069 | | 04/09/2023 1657 |

| DISPOSITION | DATE/TIME REVIEWED |
|---|---|
| Formal | 4/11/23 / 0830 |

| SHIFT SUPERVISOR REVIEW BY (Last, First, M.I.) (Please print) | SIGNATURE | DATE |
|---|---|---|
| Sergeant Cord | | 4/11/23 |

**II. Delivery of Charge:** I hereby certify that on 4/11/23 at 1457 hours, I have served notice on this inmate for a hearing on the charge before the Disciplinary Hearing Officer as a Felony Violation. The inmate has received a copy of the disciplinary charge. The hearing is scheduled on or after 48 hours from delivery of charge. UC11  A1/2

Inmate was offered staff assistance and it was:

☐ Accepted    ☑ Declined

| INMATE SIGNATURE | DATE | DELIVERING OFFICER SIGNATURE | DATE |
|---|---|---|---|
| X | 4/11/23 | | 4/11/23 |

**III. Report of Investigation**

FELONY VIOLATIONS ONLY – SEE ATTACHED *(Use form #803-8)*

| INVESTIGATING OFFICER (Last, First M.I.) (Please print) | SIGNATURE | DATE INVESTIGATION COMPLETED |
|---|---|---|
| AMUNDSEN | | 4/11/23 |

**IV. Disposition:** This case was handled as:    ☐ Misdemeanor Violation: Reason for finding of guilt:

☑ Felony Violation: Refer to Disciplinary Hearing Officer

☐ Informal Resolution    ☐ Dismissed/Not Guilty

**Penalty Assessed For A Minor Violation**

☐ _____ Hours Extra Duty    ☐ Reprimand            Other

☐ _____ Days Loss of Privilege    ☐ Return/Forfeit Contraband Items _____

*For Misdemeanor Violations Only: Inmate was given a copy of the results and advised that effective date, he/she has 15 (fifteen) calendar days to appeal.*

| INMATE SIGNATURE | DATE/TIME |
|---|---|
| | / |

| COORDINATOR'S NAME (Last, First M.I.) (Please print) | SIGNATURE | DATE/TIME |
|---|---|---|
| | | / |

Distribution:    Coordinator to make two copies of form; Original to Master Record
Copy- Institutional File
Copy-Inmate

803-1
10/28/21

ADCRR_003606

# EXHIBIT 15

**RUSING LOPEZ LIZARDI & SAFFER, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800
Facsimile: (520) 529-4262
mdlammers@rllsaz.com
zkotzambasis@rllsaz.com

Mark D. Lammers
State Bar No. 010335
Zoey Kotzambasis
State Bar No. 034607
*Attorneys for Defendants State of Arizona, Ryan Thornell,*
*Christopher Josefowicz, Kaylan Nasta, and Talon Hanks*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| O.W., an individual, | No. 2:25-cv-00044-DWL |
| Plaintiff, | **Declaration of Christopher Josefowicz** |
| vs. | |
| State of Arizona, et al., | (Assigned to Hon. Dominic W. Lanza) |
| Defendants. | |

I, Christopher Josefowicz, declare as follows:

1. I was the warden of the Arizona State Prison Complex-Tucson ("ASPC-Tucson") starting in December 2021 until I retired from ADCRR at the end of November 2023.

2. I am over the age of 18 years and am, in all respects, competent to make this Declaration.

3. This Declaration is based upon my personal knowledge and, if called upon to testify, I could and would truthfully and competently testify to the following.

4. I submit this Declaration in support of the Individual State Defendants' (Ryan Thornell, myself, Kaylan Nasta, and Talon Hanks) Motion for Summary Judgment.

63882728.2

**Rusing Lopez Lizardi & Saffer, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

5.    In 2023, the Rincon unit at ASPC-Tucson housed only inmates held in close custody and classified as Internal Risk Level 4. At that time, the Rincon unit was a mental health unit, so it housed inmates who required mental health treatment.

6.    ADCRR prisons use a collapsible post system that outlines the minimum staffing levels required for the prison complex as a whole and for the individual units. That staffing level is based on the custody level of the inmates. To the best of my knowledge, when I was Warden of ASPC-Tucson, the minimum staffing level for ASPC-Tucson was approximately 171 corrections officers.

7.    At times, not all units at ASPC-Tucson were fully staffed by corrections officers due to a variety of reasons, including corrections officers calling out sick. However, the Rincon unit was always staffed with the required number of corrections officers in accordance with the collapsible post system.

8.    At times, when there were not enough corrections officers to cover all posts at all times at ASPC-Tucson, we were required to collapse and reassign duty posts temporarily. In so doing, as always, the safety and security of inmates and staff were the top priority.

9.    Because the Rincon unit housed close custody inmates, the Rincon unit received more resources and higher levels of staffing to maintain safety and security than other units at ASPC-Tucson that housed lower custody level inmates. The Rincon unit (and Cimarron unit, also a close custody unit) was always a priority for staffing.

10.    During my tenure as Warden, the Rincon unit was never critically understaffed by corrections officers.

11.    During my tenure as Warden, there was no unofficial policy of condoning or otherwise allowing inmates to maintain and enforce order at ASPC-Tucson.

2

63882728.2

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____

Christopher Josefowicz

Rusing Lopez Lizardi & Saffer, P.L.L.C.
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

3

63882728.2

# EXHIBIT 16

**RUSING LOPEZ & LIZARDI, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800
Facsimile: (520) 529-4262
mdlammers@rllaz.com
zkotzambasis@rllaz.com

Mark D. Lammers
State Bar No. 010335
Zoey Kotzambasis
State Bar No. 034607
*Attorneys for Defendants State of Arizona, Ryan Thornell,*
*Christopher Josefowicz, Kaylan Nasta, and Talon Hanks*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| O.W., an individual,<br><br>                              Plaintiff,<br><br>vs.<br><br>State of Arizona, et al.,<br><br>                              Defendants. | No. 2:25-cv-00044-DWL<br><br>**DEFENDANT RYAN THORNELL'S RESPONSES TO PLAINTIFF'S FIRST SET OF DISCOVERY REQUESTS**<br><br>(Assigned to Hon. Dominic W. Lanza) |

Defendant Ryan Thornell, PhD hereby responds to Plaintiff's First Set of Discovery Requests as follows:

## REQUESTS FOR ADMISSION

**1.** As the Director of the Arizona Department of Corrections ("ADC"), you were responsible for promulgating and maintaining policies and procedures for state-run prisons in Arizona in September 2023.

Admit_____ Deny___**X**___

**RESPONSE:** **Defendant objects to this request as vague as to what "promulgating" means. Defendant admits that that as the Director of the Arizona Department of Corrections, Rehabilitation & Reentry ("ADCRR"), he was responsible**

**8.** In September 2023, inmate DeMarco Hines was classified as a high security risk and was held in close custody.

Admit_____ Deny___**X**

**RESPONSE:** **This request is vague as to what "high security risk" means. Defendant admits that on September 28, 2023, Demarco Hines was classified as "close custody," which describes "Inmates who represent a high risk to the public and staff. These inmates shall not be assigned to work outside the secure perimeter of an institution. These inmates require controlled movement within the institution," as defined in Department Order 801.**

**9.** Prior to the subject incident, inmate DeMarco Hines was classified, approved, and assigned to a work assignment within the Rincon Unit kitchen pursuant to the prisoner labor classification system that you promulgated and maintained as the Director of ADC.

Admit_____ Deny___**X**

**RESPONSE:** **Defendant objects to this request as vague as to what "promulgated" means. Defendant admits that before the subject incident, Demarco Hines was assigned to a work assignment within the Rincon Unit kitchen pursuant to the prisoner labor classification system that was in place at the time.**

**10.** You were personally involved in assigning inmate DeMarco Hines to a work assignment within the Rincon Unit kitchen.

Admit_____ Deny___**X**

**RESPONSE:** **Defendant was not personally involved in assigning Hines to a work assignment within the Rincon Unit kitchen and is not personally involved in assigning any inmates to any work assignments within any units.**

**Rusing Lopez & Lizardi, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

Thornell's Responses to PL's 1st Set of Discovery Requests(63639497.2)  4

(d) Defendant Thornell objects to this request as overly broad and unduly burdensome and not proportional to the needs of the case, as it is unlimited in time and too broad in scope, and irrelevant.

(e) Defendant Thornell objects to this request as overly broad and unduly burdensome and not proportional to the needs of the case, as it is unlimited in time and too broad in scope, and irrelevant.

DATED this June 20, 2025.

**RUSING LOPEZ & LIZARDI, P.L.L.C.**

*/s/ Mark D. Lammers*
Mark D. Lammers
Zoey Kotzambasis
*Attorneys for Defendants State of Arizona,
Ryan Thornell, Christopher Josefowicz,
Kaylan Nasta, and Talon Hanks*

## CERTIFICATE OF SERVICE

I certify that on June 20, 2025, I electronically transmitted the attached document to following counsel of record:

Jesse M. Showalter
Lauren E. Channell
ROBBINS CURTIN MILLEA & SHOWALTER, LLC
301 East Bethany Home, #B-100
Phoenix, Arizona 85012
jesse@rcmslaw.com
lauren@rcmslaw.com
*Attorneys for Plaintiff*

R. Shawn Oller
Chrisanne M. Gultz
LITTLER MENDELSON, P.C.
Camelback Esplanade
2425 East Camelback Road, Suite 900
Phoenix, Arizona 85016
soller@littler.com
cgultz@littler.com

Thornell's Responses to PL's 1st Set of Discovery Requests(63639497.2)  13

Rusing Lopez & Lizardi, P.L.L.C.
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

*Attorneys for Defendants*
*TKC Holdings, Inc. and Trinity Services Group, Inc.*

By:      */s/ Aneta Wrzeszcz*

**Rusing Lopez & Lizardi, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

# EXHIBIT 17

**RUSING LOPEZ & LIZARDI, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800
Facsimile: (520) 529-4262
mdlammers@rllaz.com
zkotzambasis@rllaz.com

Mark D. Lammers
State Bar No. 010335
Zoey Kotzambasis
State Bar No. 034607
*Attorneys for Defendants State of Arizona, Ryan Thornell,*
*Christopher Josefowicz, Kaylan Nasta, and Talon Hanks*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| O.W., an individual,<br><br>                              Plaintiff,<br><br>vs.<br><br>State of Arizona, et al.,<br><br>                              Defendants. | No. 2:25-cv-00044-DWL<br><br>**DEFENDANT CHRISTOPHER JOSEFOWICZ'S RESPONSES TO PLAINTIFF'S FIRST SET OF DISCOVERY REQUESTS**<br><br>(Assigned to Hon. Dominic W. Lanza) |

Defendant Christopher Jozefowicz hereby responds to Plaintiff's First Set of Discovery Requests as follows:

## REQUESTS FOR ADMISSION

**1.**     As the Warden of ASPC-Tucson, you were responsible for the care, custody, and control of inmates within that prison in September 2023.

Admit___**X**____ Deny_____

**2.**     In September 2023, you were aware of understaffing within ASPC-Tucson.

Admit_____ Deny___**X**___

**RESPONSE:**        **This request is vague as to what "understaffing" means.**

**Rusing Lopez & Lizardi, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

3.      In September 2023, you were aware that understaffing within ASPC-Tucson resulted in the inadequate supervision of inmates and placed civilian workers at risk.

Admit_____ Deny___**X**___

**RESPONSE:        This request is vague as to what "understaffing" and "at risk" mean. In September 2023, ADCRR provided adequate supervision of inmates and no staffing issues ever placed civilian workers at risk in the Rincon Unit kitchen.**

4.      In September 2023, you were aware that ADC's prisoner labor classification system resulted in inmates in close custody being assigned to work assignments with civilian workers.

Admit____**X**___ Deny_____

5.      In September 2023, you were aware that inmates classified as high security risk presented a high risk to the public, staff, and other inmates, as well as a high risk of escape or committing violence within the perimeter and/or under the direct supervision of Department staff.

Admit_____ Deny___**X**___

**RESPONSE:        This request is vague as to what "high security risk" and "high risk" mean. Defendant admits that inmates classified as Internal Risk Level 4 are "high risk to the public, staff, and other inmates, of escape or committing violence within the perimeter and/or under the direct supervision of Department staff," as defined in Department Order 801.**

6.      In September 2023, you were aware that inmates held in close custody presented a high risk to the public and staff.

Admit_____ Deny___**X**___

**RESPONSE:        This request is vague as to what "high security risk" and "high risk" mean. This request is vague as to what "high security risk" means. Defendant admits that inmates classified as Internal Risk Level 4 are "high risk to the public, staff, and**

Josefowicz's Responses to PL's 1st Set of Discovery Requests(63639445.1)2

Rusing Lopez & Lizardi, P.L.L.C.
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

**other inmates, of escape or committing violence within the perimeter and/or under the direct supervision of Department staff," as defined in Department Order 801.**

7. In September 2023, inmate DeMarco Hines was classified as a high security risk and was held in close custody.

Admit_____ Deny___**X**___

**RESPONSE:      This request is vague as to what "high security risk" means. Defendant admits that on September 28, 2023, Demarco Hines was classified as "close custody," which describes "Inmates who represent a high risk to the public and staff. These inmates shall not be assigned to work outside the secure perimeter of an institution. These inmates require controlled movement within the institution," as defined in Department Order 801.**

8. In September 2023, you were aware that inmate DeMarco Hines was assigned to work with civilian workers in the Rincon Unit kitchen.

Admit_____ Deny___**X**___

**RESPONSE:      Defendant Josefowicz has no knowledge of any specific inmate's work assignment and had no knowledge of Hines's work assignment in the Rincon Kitchen Unit.**

9. In September 2023, you were aware of inmate DeMarco Hines' disciplinary history and infractions within ADC.

Admit_____ Deny___**X**___

**RESPONSE:      Defendant Josefowicz has no knowledge of any specific inmate's disciplinary history and infractions, and he had no knowledge of Hines's disciplinary history and infractions.**

10. You were personally involved in assigning inmate DeMarco Hines to a work assignment within the Rincon Unit kitchen.

Admit_____ Deny___**X**___

Rusing Lopez & Lizardi, P.L.L.C.
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

**RESPONSE:        Defendant Josefowicz was not personally involved in any inmate's work assignment and he was not personally involved in Hines's work assignment within the Rincon Kitchen Unit.**

### INTERROGATORIES

1.      If your response to any Request for Admission is anything other than an unqualified admission, please provide the complete factual and legal basis for your response.

**RESPONSE:        See above.**

2.      If you did not admit to having personal involvement in assigning inmate DeMarco Hines to work in the Rincon Unit in your response to Plaintiff's Request for Admission No. 10, above, please identify the person or persons you claim assigned or approved Hines to that work assignment, including each person's name, contact information, position/title, and employer.

**RESPONSE:        Please see the State of Arizona's Responses to Plaintiff's First Set of Discovery Requests, Interrogatory No. 3.**

3.      Please state, with specificity, the complete factual and legal basis for your affirmative defense that "Plaintiff's First Amended Complaint fails to state a claim upon which relief can be granted," as set forth in paragraph 173 of your Answer (Doc. 16). Where applicable, your response should include references to relevant evidence, exhibits, documents, and materials which you claim support your position.

**RESPONSE:        Defendant objects to the request for "the complete factual and legal basis for your affirmative defense" is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Affirmative defenses such as "failure to state a claim upon which relief may be granted" are legal conclusions that are more appropriately addressed through motions practice, not factual discovery. Defendant further objects because this interrogatory seeks premature privileged legal analysis, and legal analysis and conclusions, which are protected by the**

Josefowicz's Responses to PL's 1st Set of Discovery Requests(63639445.1)4

**Rusing Lopez & Lizardi, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

**attorney work product doctrine. Defendant is not required to provide detailed legal arguments or analysis in response to discovery requests.**

**Subject to and without waiving the foregoing objections, Defendant states its defense is based on the following. O.W. alleges one count of violation of due process–state-created danger under § 1983. O.W. cannot satisfy the elements of that claim. Specifically, O.W. cannot show: (1) that Defendant Josefowicz committed an affirmative act; (2) that such affirmative act placed O.W. in a position of an actual, particularized danger by creating or exposing O.W. to a danger that she would not have otherwise faced; (3) that Defendant Josefowicz acted with deliberate indifference to a known or obvious danger; and (4) that the affirmative act that created the actual, particularized danger caused injury to O.W. that was foreseeable.**

4.      Please state, with specificity, the complete factual and legal basis for your affirmative defense that "Plaintiff's claims are barred, in whole or in part, by the statute of limitations," as set forth in paragraph 174 of your Answer (Doc. 16). Where applicable, your response should include references to relevant evidence, exhibits, documents, and materials which you claim support your position.

**RESPONSE:      Upon further factual investigation, Defendant Josefowicz withdraws this defense.**

5.      Please state, with specificity, the complete factual and legal basis for your affirmative defense that you "may be immune pursuant to A.R.S. §§ 41-621, 12-821, 12-820.01, 12-820.02, 12-820.05, 12-820.04, quasi-judicial immunity, and other statutory and common law absolute and qualified immunities under state and federal law," as set forth in paragraph 175 of your Answer (Doc. 16). Where applicable, your response should include references to relevant evidence, exhibits, documents, and materials which you claim support your position.

**RESPONSE:        Defendant incorporates by reference the objections stated in response to Interrogatory No. 3. Subject to and without waiving the foregoing objections, Defendant states its defense is based on the following. O.W.'s alleged injuries occurred in the course of her employment at an ADCRR facility and she has asserted a § 1983 claim against Defendant Josefowicz, who is a state employee. Therefore, he is entitled to qualified immunity and may be entitled to other immunity under other theories. This case remains in the early stages of discovery and the Defendant is continuing to evaluate which immunity defenses may apply. Defendant reserves the right to supplement this response.**

6.    Please state, with specificity, the complete factual and legal basis for your affirmative defense that you "properly delegated [your] relevant duties to TKC Holdings, Inc. and/or Trinity Services Group, Inc.," as set forth in paragraph 176 of your Answer (Doc. 16). Where applicable, your response should include references to relevant evidence, exhibits, documents, and materials which you claim support your position.

**RESPONSE:        Defendant incorporates by reference the objections stated in response to Interrogatory No. 3. Subject to and without waiving the foregoing objections, Defendant states its defense is based on the following. ADCRR contracted with Trinity/TKC Holdings to provide food services in the Rincon Unit, thus delegating some of its duties to Trinity/TKC Holdings. This case remains in the early stages of discovery. Defendant reserves the right to supplement this response.**

7.    Please state, with specificity, the complete factual and legal basis for your affirmative defense that you "are not liable for the alleged acts or omissions of any other Defendant in this action," as set forth in paragraph 177 of your Answer (Doc. 16). Where applicable, your response should include references to relevant evidence, exhibits, documents, and materials which you claim support your position.

**Rusing Lopez & Lizardi, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

**RESPONSE:**        **Defendant incorporates by reference the objections stated in response to Interrogatory No. 3. Subject to and without waiving the foregoing objections, Defendant states its defense is based on the following. Trinity/TKC Holdings may have inadequately trained and/or supervised O.W. and a Trinity employee may have improperly allowed Demarco Hines to enter and remain alone in the small dining area. This case remains in the early stages of discovery. Defendant reserves the right to supplement this response.**

8.    Please state, with specificity, the complete factual and legal basis for your affirmative defense that you "performed each and every duty to which [you] owed Plaintiff," as set forth in paragraph 178 of your Answer (Doc. 16). Where applicable, your response should include references to relevant evidence, exhibits, documents, and materials which you claim support your position.

**RESPONSE:**        **Defendant incorporates by reference the objections stated in response to Interrogatory No. 3. Subject to and without waiving the foregoing objections, Defendant states its defense is based on the following. This defense is asserted by the State in relation to O.W.'s tort claims. Nonetheless, to the extent duty becomes an issue in O.W.'s claim against Defendant Josefowicz, he performed each and every duty that he owed to Plaintiff.  This case remains in the early stages of discovery. Defendant reserves the right to supplement this response.**

9.    Please state, with specificity, the complete factual and legal basis for your affirmative defense that you "did not breach any alleged duty or obligation owed to Plaintiff," as set forth in paragraph 179 of your Answer (Doc. 16). Where applicable, your response should include references to relevant evidence, exhibits, documents, and materials which you claim support your position.

**RESPONSE:**        **Defendant incorporates by reference the objections stated in response to Interrogatory No. 3. Subject to and without waiving the foregoing**

**Rusing Lopez & Lizardi, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

**objections, Defendant states its defense is based on the following. This defense is asserted by the State in relation to O.W.'s tort claims. Nonetheless, to the extent duty becomes an issue in O.W.'s claim against Defendant Josefowicz, he performed each and every duty that he owed to Plaintiff.  This case remains in the early stages of discovery. Defendant reserves the right to supplement this response.**

**10.** Please state, with specificity, the complete factual and legal basis for your affirmative defense that "[n]o action or inaction on the part of [you] and/or [your] agents, ervants, employees, or representatives caused or contributed in any manner to the injuries alleged in Plaintiff's First Amended Complaint," as set forth in paragraph 180 of your Answer (Doc. 16). Where applicable, your response should include references to relevant evidence, exhibits, documents, and materials which you claim support your position.

**RESPONSE:         See response and objections to Interrogatory No. 3. All injuries alleged by O.W. were caused by Demarco Hines.**

**11.** Please state, with specificity, the complete factual and legal basis for your affirmative defense that you "deny that any of [your] alleged acts or omissions were the proximate cause of Plaintiff's alleged injuries," as set forth in paragraph 181 of your Answer (Doc. 16). Where applicable, your response should include references to relevant evidence, exhibits, documents, and materials which you claim support your position.

**RESPONSE:         See response and objections to Interrogatory No. 3. All injuries alleged by O.W. were caused by Demarco Hines.**

**12.** Please state, with specificity, the complete factual and legal basis for your affirmative defense that "Plaintiff's alleged injuries were the result of one or more intervening and superseding causes," as set forth in paragraph 182 of your Answer (Doc. 16). Where applicable, your response should include references to relevant evidence, exhibits, documents, and materials which you claim support your position.

Josefowicz's Responses to PL's 1st Set of Discovery Requests(63639445.1)8

*Rusing Lopez & Lizardi, P.L.L.C.*
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

**RESPONSE:        Defendant incorporates by reference the objections stated in response to Interrogatory No. 3. Subject to and without waiving the foregoing objections, Defendant states its defense is based on the following. All injuries alleged by O.W. were caused by Demarco Hines. O.W. failed to notify corrections staff she was going to the restroom by herself as instructed, she failed to use her radio to ask corrections staff to remove Demarco Hines from the small dining area when she saw him there through the window before she entered the small dining area, when she was in the small dining area, or when she saw his shadow through the crack under the restroom door. O.W. also failed to follow her training and failed to carry her ADCRR-issued pepper spray and employ defensive tactics consistent with her training. Additionally, Trinity/TKC Holdings may have failed to adequately train and/or supervise O.W. These actions and failures may constitute intervening and superseding causes.**

13.    Please state, with specificity, the complete factual and legal basis for your affirmative defense that "Plaintiff's alleged injuries resulted from persons, entities, conditions, and/or circumstances over which [you] had no control and no right to control and for which [you] had no responsibility," as set forth in paragraph 183 of your Answer (Doc. 16). Where applicable, your response should include references to relevant evidence, exhibits, documents, and materials which you claim support your position.

**RESPONSE:        Defendant incorporates by reference the objections stated in response to Interrogatory No. 3. Subject to and without waiving the foregoing objections, Defendant states its defense is based on the following. O.W.'s injuries were caused by Demarco Hines. To the extent any of her injuries resulted from persons, entities, conditions, or circumstances over which Defendant Josefowicz had no control or no right to control, he has no responsibility for those persons, entities, conditions, or**

Rusing Lopez & Lizardi, P.L.L.C.
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

**Rusing Lopez & Lizardi, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

**circumstances. This case remains in the early stages of discovery. Defendant reserves the right to supplement this response.**

14. Please state, with specificity, the complete factual and legal basis for your affirmative defense that you "at all times relevant to Plaintiff's First Amended Complaint, acted in good faith," as set forth in paragraph 184 of your Answer (Doc. 16). Where applicable, your response should include references to relevant evidence, exhibits, documents, and materials which you claim support your position.

**RESPONSE:         Defendant Josefowicz did nothing in bad faith. Please see response and objections to Interrogatory No. 8.**

15. Please state, with specificity, the complete factual and legal basis for your affirmative defense that Plaintiff is not entitled to punitive damages under § 1983, as set forth in paragraph 186 of your Answer (Doc. 16). Where applicable, your response should include references to relevant evidence, exhibits, documents, and materials which you claim support your position.

**RESPONSE:         Defendant incorporates by reference the objections stated in response to Interrogatory No. 3. Subject to and without waiving the foregoing objections, Defendant states its defense is based on the following. O.W. will not be able to show that Defendant Josefowicz violated her constitutional rights, much less that his conduct was malicious, oppressive, or in reckless disregard of her rights.**

16. Please state, with specificity, the complete factual and legal basis for your affirmative defense that "Plaintiff failed to mitigate damages," as set forth in paragraph 186 of your Answer (Doc. 16). Where applicable, your response should include references to relevant evidence, exhibits, documents, and materials which you claim support your position.

**RESPONSE:         Defendant incorporates by reference the objections stated in response to Interrogatory No. 3. Subject to and without waiving the foregoing objections, Defendant states its defense is based on the following. O.W. failed to notify**

**corrections staff she was going to the restroom by herself as instructed, she failed to use her radio to ask corrections staff to remove Demarco Hines from the small dining area when she saw him there through the window before she entered the small dining area, when she was in the small dining area, or when she saw his shadow through the crack under the restroom door. O.W. also failed to follow her training and failed to appropriately carry her ADCRR-issued pepper spray and employ defensive tactics consistent with her training. Additionally, this case is in the early stages of discovery and review of O.W.'s medical records and further discovery may reveal that O.W. failed to mitigate her emotional distress and other damages after the incident. Defendant reserves the right to supplement this response.**

## REQUESTS FOR PRODUCTION

**1.** Please produce a copy of all documents that you referred to or relied upon in your responses to any Request for Admission or Interrogatory.

**RESPONSE:** **None.**

**2.** Produce all non-privileged emails, correspondence, communications, memoranda (including CIU or AIU memoranda), or other documents you sent or received related to (a) the subject incident; (b) O.W.; (c) inmate DeMarco Hines; (d) safety concerns among ADC staff or civilian workers at ASPC-Tucson; and/or (e) reports of sexual harassment, insubordination, and/or inappropriate conduct by inmates toward ADC staff or civilian workers at ASPC-Tucson.

**RESPONSE:**

**(a) Please see ADCRR_000473–855.**

**(b) Please see ADCRR_000473–855.**

**(c) Please see ADCRR_000473–855.**

Josefowicz's Responses to PL's 1st Set of Discovery Requests(63639445.1) 11

**(d) Defendant Josefowicz objects to this request as overly broad and unduly burdensome and not proportional to the needs of the case, as it is unlimited in time and too broad in scope.**

**(e) Defendant Josefowicz objects to this request as overly broad and unduly burdensome and not proportional to the needs of the case, as it is unlimited in time and too broad in scope.**

DATED this June 20, 2025.

RUSING LOPEZ & LIZARDI, P.L.L.C.

/s/ *Mark D. Lammers*

Mark D. Lammers
Zoey Kotzambasis
*Attorneys for Defendants State of Arizona,*
*Ryan Thornell, Christopher Josefowicz,*
*Kaylan Nasta, and Talon Hanks*

## CERTIFICATE OF SERVICE

I certify that on June 20, 2025, I electronically transmitted the attached document to following counsel of record:

Jesse M. Showalter
Lauren E. Channell
ROBBINS CURTIN MILLEA & SHOWALTER, LLC
301 East Bethany Home, #B-100
Phoenix, Arizona 85012
jesse@rcmslaw.com
lauren@rcmslaw.com
*Attorneys for Plaintiff*

R. Shawn Oller
Chrisanne M. Gultz
LITTLER MENDELSON, P.C.
Camelback Esplanade
2425 East Camelback Road, Suite 900
Phoenix, Arizona 85016
soller@littler.com

Josefowicz's Responses to PL's 1st Set of Discovery Requests(63639445.1)12

*Rusing Lopez & Lizardi, P.L.L.C.*
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

cgultz@littler.com
*Attorneys for Defendants*
*TKC Holdings, Inc. and Trinity Services Group, Inc.*

By:      */s/ Aneta Wrzeszcz*

**Rusing Lopez & Lizardi, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

Josefowicz's Responses to PL's 1st Set of Discovery Requests(63639445.1)13

# EXHIBIT 18

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| O.W. an individual, | ) No. 2:25-cv-00044-DWL |
| | ) |
| Plaintiff, | ) **ATTORNEYS' EYES ONLY** |
| vs. | ) |
| | ) |
| State of Arizona, a body | ) |
| politic; Ryan Thornell, an | ) VIDEOTAPED |
| individual, on his own behalf | ) |
| and on behalf of his marital | ) VIDEOCONFERENCE |
| community; Christopher | ) |
| Josefowicz, an individual, on | ) DEPOSITION OF |
| his own behalf and on behalf | ) |
| of his marital community; | ) TALON HANKS |
| Kaylan Nasta, an individual, | ) |
| on her own behalf and on | ) |
| behalf of her marital | ) |
| community; Talon Hanks, an | ) October 15, 2025 |
| individual, on his own behalf | ) Tucson, Arizona |
| and on behalf of his marital | ) 9:01 a.m. |
| community; TKC Holdings, Inc., | ) |
| a Missouri corporation; | ) |
| Trinity Services Group, Inc., | ) |
| a Florida corporation; and | ) |
| John and Jane Does 1-40, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

(Contains "Attorneys' Eyes Only")

REPORTED STENOGRAPHICALLY BY:
MARY DAVIS, RPR
Certified Reporter No. 50271

PREPARED FOR:
ASCII/CONDENSED

(Certified Copy)



**Griffin Group International**
**888.529.9990 | 602.264.2230**

O.W. vs
State of Arizona

Talon Hanks [Contains Attorneys' Eyes Only]

12

A.    That's correct.

Q.    Now, prior -- my understanding, based on text messages that you sent to O.W., is that prior to this incident there had been a prior incident in which a -- some either civilian employee or DOC employee was the victim of an attempted assault of some kind in that DA room.

Are you aware of that?

A.    Absolutely.  So at the time -- I don't exactly remember the date or the time that it happened.  I do remember that I was still over in Cimarron kitchen, which is completely different unit.  The radio traffic went out that she needed a response to the small DA, that an inmate was attempting to gain access to that door.

Q.    And when you say "that door," do you mean the bathroom door?

A.    Yes.  He was actively at the bathroom door, and she was requesting immediate assistance.

Q.    Okay.  And do you have a -- I mean, you just testified you don't remember the date.  I understand that.

A.    Yeah.

Q.    Do you have a rough idea of the time frame when that occurred?



**Griffin Group International**
888.529.9990 | 602.264.2230

13

A.    Honestly, I -- I was on p.m. shift at the time, so it would have to be after 11:00.

Q.    Okay.

A.    Once again, I don't exactly know the time -- the times, unfortunately, but...

Q.    And -- and, you know, based on that -- from time to time, would you work either a.m. or p.m. shift, or was there a time in your career earlier where you were tending to work the p.m. shift that we might be able to use to narrow down the time frame of that prior attack?

A.    So at the time, I was only working p.m. shift and Cimarron kitchen at the time.

Q.    Yeah.  Do you remember when roughly that was when you were working the Cimarron kitchen?

A.    Honestly, I don't want to speculate on the dates because I've -- I've had a long career with DOC, so I couldn't exactly, like, narrow down the dates and times.

Q.    Is that something that, if we looked at your personnel file, we might be able to figure out a time frame more -- maybe not perfectly, but just more generally, that it was probably around this time?

A.    I'm absolutely sure that they would have that kind of documentation.  Once again, like I said, I

14

==personally don't keep that type of documentation on==

==myself so...==

Q.    I understand.

Tell me generally about when you were working the Rincon kitchen on the a.m. shift, how were responsibilities divided between you and the other officer working that unit?

A.    The other officer, as in my partner, or my supervisors that would come in to help assist?

Q.    Let's -- let's start with your partner as you understand that.  In other words -- well, let me back it up.

Was it standard that when you would work the Rincon kitchen in the a.m., that there would be two officers assigned to the Rincon kitchen on that shift?

A.    What I'm understanding is I would have -- from when I would come in, I would have Corporal Nasta.  And I would have a partner that would come in at the same time that I would come in, at 0200 to the morning.  I don't know what exactly happened to him that day.  That -- once again, that's beyond my, obviously, scope of job.

Yeah.  My job at that time was to work the floor and to ensure safety and accountability of tools, staff, and the inmates.



56

**THE WITNESS:  Thank you.**

MR. SHOWALTER:  I have no follow-ups.

MR. LAMMERS:  Okay.  Now we'll read and sign.

THE VIDEOGRAPHER:  This concludes the deposition of Corrections Officer Talon Hanks.  We are off the record at 10:22 a.m.

THE COURT REPORTER:  Mark, do you want a copy?

MR. LAMMERS:  Yes.

THE COURT REPORTER:  Chrisanne, do you want a copy?

MS. GULTZ:  Yes, I do as well.

(The deposition concluded at 10:22 a.m.)

_____

TALON HANKS

O.W. vs
State of Arizona

Talon Hanks [Contains Attorneys' Eyes Only]

57

CERTIFICATE OF CERTIFIED REPORTER

BE IT KNOWN that the foregoing proceedings were taken before me; that the witness before testifying was duly sworn by me to testify to the whole truth; that the foregoing pages are a full, true and accurate record of the proceedings, all done to the best of my skill and ability; that the proceedings were taken down by me in shorthand and thereafter reduced to print under my direction; that I have complied with the ethical obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206 J(1)(g)(1) and (2).

I CERTIFY that I am in no way related to any of the parties hereto, nor am I in any way interested in the outcome hereof.

{X}  Review and signature was requested; any changes made by the witness will be attached to the original hereof.
{ }  Review and signature was waived/not requested.
{ }  Review and signature not required.


Dated at Phoenix, Arizona, this 29th day of October, 2025.


/s/ Mary Davis
_____
MARY DAVIS, RPR
Certified Reporter
Arizona CR No. 50271

*       *       *       *       *


I CERTIFY that GRIFFIN GROUP INTERNATIONAL, has complied with the ethical obligations set forth in ACJA 7-206 (J)(1)(g)(1) through (6).


/s/ Pamela A. Griffin
_____
GRIFFIN GROUP INTERNATIONAL
Registered Reporting Firm
Arizona RRF No. R1005



**Griffin Group International**
**888.529.9990 | 602.264.2230**

# EXHIBIT 19

**RUSING LOPEZ & LIZARDI, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800
Facsimile: (520) 529-4262
mdlammers@rllaz.com
zkotzambasis@rllaz.com

Mark D. Lammers
State Bar No. 010335
Zoey Kotzambasis
State Bar No. 034607
*Attorneys for Defendants State of Arizona, Ryan Thornell,*
*Christopher Josefowicz, Kaylan Nasta, and Talon Hanks*

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| O.W., an individual,<br><br>                    Plaintiff,<br><br>vs.<br><br>State of Arizona, et al.,<br><br>                    Defendants. | No. 2:25-cv-00044-DWL<br><br>**DEFENDANT TALON HANKS'S RESPONSES TO PLAINTIFF'S FIRST SET OF DISCOVERY REQUESTS**<br><br>(Assigned to Hon. Dominic W. Lanza) |

Defendant Talon Hanks hereby responds to Plaintiff's First Set of Discovery Requests as follows:

**REQUESTS FOR ADMISSION**

1.      On September 28, 2023, you were assigned to supervise inmates working in the Rincon Unit kitchen, including inmate DeMarco Hines.

            Admit_____ Deny___**X**___

**RESPONSE:        This request is vague as to what "supervise" means. Defendant Hanks admits that on September 28, 2023, he was assigned as a COII to the Rincon Unit kitchen and that inmate Demarco Hines was assigned to work in the kitchen that day.**

**Rusing Lopez & Lizardi, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

2. In September 2023, you were aware that inmates classified as high security risk presented a high risk to the public, staff, and other inmates, as well as a high risk of escape or committing violence within the perimeter and/or under the direct supervision of Department staff.

Admit_____ Deny___**X**

**RESPONSE:** **Defendant objects to this request as compound. This request is vague as to what "high security risk" and "high risk" mean. Defendant admits that inmates classified as Internal Risk level 4 present a "high risk to the public, staff, and other inmates, of escape or committing violence within the perimeter and/or under the direct supervision of Department staff" as defined by Department Order 801.**

3. In September 2023, you were aware that inmates held in close custody presented a high risk to the public and staff.

Admit_____ Deny___**X**

**RESPONSE:** **Defendant objects to this request as compound. This request is vague as to what "high risk" means. Defendant admits that inmates classified as Internal Risk level 4 present a "high risk to the public, staff, and other inmates, of escape or committing violence within the perimeter and/or under the direct supervision of Department staff" as defined by Department Order 801.**

4. On September 28, 2023, you were aware that inmate DeMarco Hines was classified as a high security risk and was held in close custody.

Admit_____ Deny___**X**

**RESPONSE:** **Defendant objects to this request as vague as to what "high security risk" means. Defendant admits that inmates classified as Internal Risk level 4 present a "high risk to the public, staff, and other inmates, of escape or committing violence within the perimeter and/or under the direct supervision of Department staff" as defined by Department Order 801. <mark>Defendant Hanks admits that on September 28,</mark>**

**2023, he was aware Demarco Hines was classified as close custody only because all inmates in the Rincon Unit at the time were classified as close custody. Thus, if an inmate was in the Rincon Unit at the time, that means he was classified as close custody. Otherwise, Defendant Hanks had no knowledge of Hines's or any other inmate's "risk" status.**

5.    On September 28, 2023, you were aware that inmate DeMarco Hines presented a high risk to the public and staff, including civilian workers such as O.W.

Admit_____ Deny___**X**

**RESPONSE:    Defendant objects to this request as compound. This request is also vague as to what "high risk" means. Defendant admits that inmates classified as Internal Risk level 4 present a "high risk to the public, staff, and other inmates, of escape or committing violence within the perimeter and/or under the direct supervision of Department staff" as defined by Department Order 801.**

6.    In September 2023, you were aware of inmate DeMarco Hines' disciplinary history and infractions within ADC.

Admit_____ Deny___**X**

**RESPONSE:  Defendant Hanks was not aware of inmate Demarco Hines's disciplinary history or infractions with the Arizona Department of Corrections, Rehabilitation & Reentry ("ADCRR"). Defendant Hanks is not aware of any inmate's disciplinary history or infractions with the ADCRR except for the infractions in which he personally writes the inmate a ticket for or otherwise witnessed. Defendant Hanks had not written a ticket or witnessed a disciplinary infraction for Demarco Hines before September 28, 2023.**

7.    On September 28, 2023, prior to the subject incident, you were aware that DeMarco Hines was working by himself in a small dining area with access to the staff restroom.

Hanks's Responses to PL's 1st Set of Discovery Requests(63639395.1)    3

Rusing Lopez & Lizardi, P.L.L.C.
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

Rusing Lopez & Lizardi, P.L.L.C.
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

**(d) Defendant Hanks objects to this request as overly broad, as it is unlimited in time and too broad in scope. Further, Defendant Hanks does not have any such communications within her custody or control.**

**(e) Defendant Hanks objects to this request as overly broad, as it is unlimited in time and too broad in scope. Further, Defendant Hanks does not have any such communications within her custody or control.**

DATED this June 20, 2025.

**RUSING LOPEZ & LIZARDI, P.L.L.C.**

*/s/ Mark D. Lammers*

Mark D. Lammers
Zoey Kotzambasis
*Attorneys for Defendants State of Arizona, Ryan Thornell, Christopher Josefowicz, Kaylan Nasta, and Talon Hanks*

## CERTIFICATE OF SERVICE

I certify that on June 20, 2025, I electronically transmitted the attached document to following counsel of record:

Jesse M. Showalter
Lauren E. Channell
ROBBINS CURTIN MILLEA & SHOWALTER, LLC
301 East Bethany Home, #B-100
Phoenix, Arizona 85012
jesse@rcmslaw.com
lauren@rcmslaw.com
*Attorneys for Plaintiff*

R. Shawn Oller
Chrisanne M. Gultz
LITTLER MENDELSON, P.C.
Camelback Esplanade
2425 East Camelback Road, Suite 900
Phoenix, Arizona 85016
soller@littler.com
cgultz@littler.com

Hanks's Responses to PL's 1st Set of Discovery Requests(63639395.1)   12

*Attorneys for Defendants*
*TKC Holdings, Inc. and Trinity Services Group, Inc.*

By:      */s/ Aneta Wrzeszcz*

**Rusing Lopez & Lizardi, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona  85718
Telephone: (520) 792-4800

# EXHIBIT 20

**RUSING LOPEZ & LIZARDI, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800
Facsimile: (520) 529-4262
mdlammers@rllaz.com
zkotzambasis@rllaz.com

Mark D. Lammers
State Bar No. 010335
Zoey Kotzambasis
State Bar No. 034607
*Attorneys for Defendants State of Arizona, Ryan Thornell,*
*Christopher Josefowicz, Kaylan Nasta, and Talon Hanks*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| O.W., an individual, | No. 2:25-cv-00044-DWL |
| Plaintiff, | |
| vs. | **DEFENDANT KAYLAN NASTA'S RESPONSES TO PLAINTIFF'S FIRST SET OF DISCOVERY REQUESTS** |
| State of Arizona, et al., | |
| Defendants. | (Assigned to Hon. Dominic W. Lanza) |

Defendant Kaylan Nasta hereby responds to Plaintiff's First Set of Discovery Requests as follows:

## REQUESTS FOR ADMISSION

1.      On September 28, 2023, you were assigned to supervise inmates working in the Rincon Unit kitchen, including inmate DeMarco Hines.

Admit_____ Deny___**X**___

**RESPONSE:        This request is vague as to what "supervise" means. Defendant Nasta admits that on September 28, 2023, she was assigned as a Corporal to the Rincon Unit kitchen and that inmate Demarco Hines was assigned to work in the kitchen that day.**

**Rusing Lopez & Lizardi, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792–4800

**2.** In September 2023, you were aware that inmates classified as high security risk presented a high risk to the public, staff, and other inmates, as well as a high risk of escape or committing violence within the perimeter and/or under the direct supervision of Department staff.

Admit_____ Deny___**X**

**RESPONSE:** **This request is vague as to what "high security risk" and "high risk" mean. Defendant admits that inmates classified as Internal Risk Level 4 are "high risk to the public, staff, and other inmates, of escape or committing violence within the perimeter and/or under the direct supervision of Department staff," as defined in Department Order 801.**

**3.** In September 2023, you were aware that inmates held in close custody presented a high risk to the public and staff.

Admit_____ Deny___**X**

**RESPONSE:** **This request is vague as to what "high security risk" and "high risk" mean. This request is vague as to what "high security risk" means. Defendant admits that inmates classified as Internal Risk Level 4 are "high risk to the public, staff, and other inmates, of escape or committing violence within the perimeter and/or under the direct supervision of Department staff," as defined in Department Order 801.**

**4.** On September 28, 2023, you were aware that inmate DeMarco Hines was classified as a high security risk and was held in close custody.

Admit_____ Deny___**X**

**RESPONSE:** **This request is vague as to what "high security risk" means. Defendant admits that on September 28, 2023, Demarco Hines was classified as "close custody," which describes "Inmates who represent a high risk to the public and staff. These inmates shall not be assigned to work outside the secure perimeter of an**

Nasta's Responses to PL's 1st Set of Discovery Requests(63639479.1)   2

**institution. These inmates require controlled movement within the institution," as defined in Department Order 801.**

5. On September 28, 2023, you were aware that inmate DeMarco Hines presented a high risk to the public and staff, including civilian workers such as O.W.

Admit_____ Deny___**X**

**RESPONSE:** **This request is vague as to what "high risk" means. Defendant admits that inmates classified as Internal Risk level 4 present a "high risk to the public, staff, and other inmates, of escape or committing violence within the perimeter and/or under the direct supervision of Department staff" as defined by Department Order 801.**

6. In September 2023, you were aware of inmate DeMarco Hines' disciplinary history and infractions within ADC.

Admit_____ Deny___**X**

**RESPONSE:** **Defendant Nasta is not aware of any inmate's disciplinary history or infractions with the ADCRR except for the infractions in which she personally writes the inmate a ticket for or otherwise witnesses. On August 29, 2023, Defendant Nasta wrote Hines a ticket for disobeying/refusing an order to return to work on August 28, 2023. Defendant Nasta was not otherwise of Hines's disciplinary history.**

7. On September 28, 2023, prior to the subject incident, you were aware that DeMarco Hines was working by himself in a small dining area with access to the staff restroom.

Admit_____ Deny___**X**

**RESPONSE:** **Defendant Nasta was aware that inmate Demarco Hines's was sweeping by himself in the small dining area on September 28, 2023. Inmate Hines was secured in the small dining area by himself, as he had no access to anyone else when he was locked inside the small dining room. Hines did not have access to the staff restroom. The door to the staff restroom remained locked at all times.**

**Rusing Lopez & Lizardi, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

**(d) Defendant Nasta objects to this request as overly broad, as it is unlimited in time and too broad in scope. Further, Defendant Nasta does not have any such communications within her custody or control.**

**(e) Defendant Nasta objects to this request as overly broad, as it is unlimited in time and too broad in scope. Further, Defendant Nasta does not have any such communications within her custody or control.**

DATED this June 20, 2025.

**RUSING LOPEZ & LIZARDI, P.L.L.C.**

*/s/ Mark D. Lammers*
Mark D. Lammers
Zoey Kotzambasis
*Attorneys for Defendants State of Arizona, Ryan Thornell, Christopher Josefowicz, Kaylan Nasta, and Talon Hanks*

## CERTIFICATE OF SERVICE

I certify that on June 20, 2025, I electronically transmitted the attached document to following counsel of record:

Jesse M. Showalter
Lauren E. Channell
ROBBINS CURTIN MILLEA & SHOWALTER, LLC
301 East Bethany Home, #B-100
Phoenix, Arizona 85012
jesse@rcmslaw.com
lauren@rcmslaw.com
*Attorneys for Plaintiff*

R. Shawn Oller
Chrisanne M. Gultz
LITTLER MENDELSON, P.C.
Camelback Esplanade
2425 East Camelback Road, Suite 900
Phoenix, Arizona 85016
soller@littler.com
cgultz@littler.com

Nasta's Responses to PL's 1st Set of Discovery Requests(63639479.1)    12

**Rusing Lopez & Lizardi, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

*Attorneys for Defendants*
*TKC Holdings, Inc. and Trinity Services Group, Inc.*

By:      */s/ Aneta Wrzeszcz*

**Rusing Lopez & Lizardi, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

Nasta's Responses to PL's 1st Set of Discovery Requests(63639479.1)    13

# EXHIBIT 21

**CHAPTER: 800**

**Inmate Management**

**DEPARTMENT ORDER:**

**801 – Inmate Classification**

**OFFICE OF PRIMARY RESPONSIBILITY:**

**OPS**

**OSB**

**Effective Date:**

**April 1, 2022**

**Amendment:**

**June 14, 2023**

**Supersedes:**

**DO 801 (7/21/17)**

**Scheduled Review Date:**

**July 1, 2024**

**ACCESS**

☐ **Contains Restricted Section(s)**

# Arizona Department of Corrections Rehabilitation and Reentry



Department Order Manual

Ryan Thornell, Director

ADCRR_003073

5.6.1.1 Custody level with finalized discretionary overrides shall be reviewed every six months. At any time staff may initiate an administrative review if they determine that the inmate's custody and/or internal risk levels need to be reviewed prior to the six month time frame.

5.6.2 Inmates placed in Maximum Custody as a result of a facility override shall be classified in accordance with the Maximum Custody procedures outlined in this policy.

5.7 <u>Use of Confidential Informant Information</u>

5.7.1 When information from a confidential source is used, the confidential source shall be protected without possible compromise, and the Confidential Informant Reliability Assessment Questionnaire (CIRAQ), Form 801-3, shall be completed accurately to document the evaluation of the confidential informant's reliability and reviewed by the unit's SSU Officer.

5.7.2 Custody overrides shall not be based solely on confidential information. Additional documentation shall be provided fully explaining why the inmate requires increased supervision to support the need for a recommended custody override.

**6.0 INTERNAL RISK LEVEL – PURPOSE AND DESCRIPTIONS** – The internal risk level provides the minimum basis for classifying inmates for internal purposes such as levels of supervision for work assignments, program, and housing decisions. The inmate classification internal risk system consists of five internal risk (IR) levels:

6.1 IR 5 is the highest risk to the public, staff, and other inmates of escape or committing violence within the perimeter and/or under the direct supervision of Department staff.

6.2 IR 4 is a high risk to the public, staff, and other inmates, of escape or committing violence within the perimeter and/or under the direct supervision of Department staff.

6.3 IR 3 is a moderate risk to the public, staff, and other inmates, of escape or committing violence within the perimeter or institutional grounds, and/or under the direct supervision of Department employees or contract staff.

6.4 IR 2 is a low risk to the public, staff, and other inmates, of escape or committing violence within the perimeter, on institutional grounds, or in the community and/or under the direct supervision of Department employees or contract staff.

6.5 IR 1 is the lowest risk to the public, staff, and other inmates of escapes or committing violence within the perimeter, on institutional grounds, or in the community and/or under the direct supervision of Department employees or contract staff.

**7.0 INITIAL AND RECLASSIFICATION – INTERNAL RISK OBJECTIVE SCORING CRITERIA**

7.1 The following risk criteria shall be used to determine the internal risk levels for initial and reclassifications:

7.1.1 Most serious current offense

7.1.2 Most serious prior offense

# EXHIBIT 22



# ARIZONA DEPARTMENT OF CORRECTIONS

### Personnel Action Transmittal

| Note: All required signatures must be obtained prior to submission. |
| --- |

| Effective Date | Last Name | First Name, M.I. | EIN |
| --- | --- | --- | --- |
| 06/06/2020 | HANKS | TALON C. | 158456 |

| Division or Institution | Section/Unit | Process Level | Department Level | User Level |
| --- | --- | --- | --- | --- |
| ASPC-TUCSON | RINCON | DC24T | 24TK0 | DCTA-24 |

| Hourly Rate | Position Number | Job Code | Classification Title | Grade |
| --- | --- | --- | --- | --- |
| $19.8091 | SDC 000004047 | ACV39003 | CORRL OFFICER II | 16 |

| FLSA Status | ☐ Exempt  ☒ Non-exempt | CO II Step 6 | Badge # 11698 | Supervisor Code DC24T90077 | Work Telephone/Ext. ( 520 ) 574-0024X38299 |
| --- | --- | --- | --- | --- | --- |

## PREVIOUS INFORMATION

| Division or Institution | Section/Unit | Process Level | Department Level | User Level |
| --- | --- | --- | --- | --- |
| ASPC-TUCSON | CIMARRON | DC24T | 24TR0 | DCTA-24 |

| Hourly Rate | Position Number | Job Code | Classification Title | CO II Step | Badge # |
| --- | --- | --- | --- | --- | --- |
| $19.8091 | SDC 000001135 | ACV39003 | CORRL OFFICER II | 6 | 11698 |

## EMPLOYEE ACTION

**New Hire/Rehire**
- ☐ Covered
- ☐ Uncovered
- ☐ Regular
- ☐ Temporary
- ☐ Return Retiree

**Transfer**
- ☐ Administrative Transfer
- ☐ COTA Transfer
- ☐ Hardship Transfer
- ☒ Lateral Transfer
- ☐ Transfer from
  Agency: _____

**Other Job Change**
- ☐ Special Assignment
- ☐ RIF Job Change

**Status Change**
- ☐ Covered to Uncovered
- ☐ FTE Change
- ☐ FLSA Exempt to FLSA Non-exempt
- ☐ FLSA Non-exempt to FLSA Exempt

**Miscellaneous Actions**
- ☐ Place on Leave Without Pay End
  Date: _____
- ☐ Place Military Leave Without Pay
  Date: _____
- ☐ Return from Leave Without Pay
  Date: _____
- ☐ Other: _____

**Miscellaneous Salary Actions**
- ☐ Uncovered Salary Change
- ☐ Reversion (covered only)
- ☐ Demotion
- ☐ Voluntary  ☐ Involuntary

**Salary Adjustment/Change**
- ☐ Base Pay
- ☐ Variable Pay
- ☐ Special Assignment

**Status Date Extension**
- ☐ Leave Without Pay
  End Date: _____
- ☐ Probation End Date: _____

**Separation/Termination**
- ☐ Dismissal on Original Probation
- ☐ Dismissal on Permanent Status
- ☐ Uncovered Separation
- ☐ Separation without Prejudice
- ☐ Resignation
- ☐ Retirement
- ☐ Appointment Expiration
- ☐ RIF/Layoff
- ☐ Death
- ☐ Transfer to another State
  Agency: _____

**Comments:**

LATERAL TRANSFER EFFECTIVE 06/06/2020

| Prepared By *(Print Full Name)* | Date | HR Liaison Signature | Date |
| --- | --- | --- | --- |
| Julie Kellison | 06/02/2020 | *Michelle Ann King (MAK)* | 06/03/2020 |
| Phone Number/Ext. | Division or Institution | Section/Unit | |
| 520-574-0024 x36002 | ASPC-TUCSON | HUMAN RESOURCES | |

## APPROVAL (S)

| Warden/Administrator's Signature | Printed Name *Imbroco, C.* | Date 06/03/2021 |
| --- | --- | --- |
| Bureau Administrator | Printed Name | Date |
| Division Director | Printed Name | Date |
| Planning, Budget and Research Signature *David H. Zahniser* | Printed Name David H. Zahniser | Date 06/05/2020 |
| Director | Printed Name | Date |

504-5
1/8/17

ADCRR_000012

*05/27/2020*  *NRap*

# Arizona Department of Corrections
# Rehabilitation & Reentry
### Arizona State Prison Complex-Tucson

## MEMORDANDUM

**TO:**        Talon Hanks, COII, EIN # 158~~223~~ 456

**FROM:**     Glenn Pacheco, Warden

**DATE:**      May 20, 2020

**SUBJECT:**  Administrative Transfer Memo

Effective June 06, 2020, you are being transferred from Cimarron to Rincon. Please report to Captain Trausch.


cc: Benjamin Gieron, Deputy Warden, Rincon
     Cathryn Squires, Deputy Warden, Cimarron
     Jennifer Merten, Human Resources



GP/da

Cim: 1135
Rim: 4047
Super: 90077
12 HRBKWED
✓ Need 12-hr shift memo

ADCRR_000013

## ARIZONA DEPARTMENT OF CORRECTIONS

### HRIS – Input Document

Date: *(mm/dd/yyyy)*

| DIVISION/INSTITUTION | PROCESS LEVEL | UNIT | DEPT. LEVEL | USER LEVEL | EFFECTIVE DATE |
|---|---|---|---|---|---|
| ASPC-TUCSON | DC24T | CIMARRON | 24TR0 | DCTA-24 | 09/13/2014 |

| EMPLOYEE NAME *(Last, First M.I.) (Please print)* | | EIN | STATUS CODE |
|---|---|---|---|
| HANKS, TALON C. | | 158456 | A7 |

| POSITION NUMBER | POSITION DESCRIPTION | JOB CODE | NEW/CURRENT RATE OF PAY | CO II STEP |
|---|---|---|---|---|
| SDC000001135 | CORRL OFFICER II | ACV39003 | $ 15.8250 | 1 |

ACTION TO BE ADDED TO HRIS:

ACTION:  JOB CHANGE          REASON 1: JC-COTAGRAD          REASON 2: JC-PROMO

### JOB CHANGES

| ☒ Original Probation | ☐ Lateral Transfer | ☐ Uncovered | ☐ Promotion | ☐ Special Detail | ☐ Other _____ |
|---|---|---|---|---|---|

| SCHEDULE / GRADE | ANNUAL LEAVE PLAN | SICK LEAVE PLAN | RETIREMENT PLAN | ADDITIONAL BASE PAY ADD/REMOVE |
|---|---|---|---|---|
| AC0/01 | | | | A☐ R☐ Geographical<br>A☐ R☐ Retention<br>A☐ R☐ Uniform<br>A☐ R☐ High Risk<br>A☐ R☐ Education |

| EMAIL ADDRESS | WORK TELEPHONE / EXTENSION | WORK SCHEDULE | |
|---|---|---|---|
| No Email Address@azcorrections.gov | 520-574-0024 x37199 | 8 HR M-FR | |

| OLD RATE OF PAY | SENIORITY DATE | BADGE NUMBER | JOB CODE HIRE DATE | STATUS TERM DATE | OVERTIME ELECTION |
|---|---|---|---|---|---|
| $ 15.3297 | 09/13/2014 | 11698 | 09/13/2014 | 09/13/2015 | ☐ Comp  ☐ Either<br>☐ Cash  ☐ None |

### HIRES

| ☐ Original Probation | ☐ Limited | ☐ Temporary | ☐ Uncovered | ☐ Rehire | ☐ Reinstate | ☐ Retiree Return To Work |
|---|---|---|---|---|---|---|

| SOCIAL SECURITY NUMBER | AGENCY HIRE DATE | ORIGINAL STATE HIRE DATE | ADJUSTED HIRE DATE |
|---|---|---|---|
| | | | |

| FEDERAL TAXES | | STATE TAX CODE (BSI FORMULA) | |
|---|---|---|---|
| ☐ Single  Allowances: _____  ☐ Married  ☐ Exempt | Additional Amount $ _____ | ☐ 10 = 5.1%  ☐ 13 = 2.7%  ☐ 15 = 0.8%<br>☐ 11 = 4.2%  ☐ 14 = 1.8%  ☐ 8 = 0% (Exempt)<br>☐ 12 = 3.6%  ☐ 9 = 1.3% | Additional Amount $ _____ |

### MISCELLANEOUS ACTIONS

| ☐ Salary Action | ☐ Status Change | ☐ Personal | ☐ Separation | ☐ Other _____ | ☐ Userfield Change |
|---|---|---|---|---|---|

| Comments | Missing Document / Comments | | |
|---|---|---|---|
| *COTA transfer - COTA Class 1006 transfer effective 09/13/2014<br>*From COTA Unit to Cimarron Unit @ ASPC-Tucson<br>*Change base salary from $15.3297 to $15.8250 Step 1 COII Pay Plan<br>*Change status to A7(original probation) with an end date of 09/13/2015<br>*No change to retirement<br>*Update work telephone and extension | Document Title | Received | Initials |
| | | | |
| | | | |
| | RECEIVED | | |
| | CENTRAL OFFICE USE ONLY   SEP 16 2014   ADC HR OPERATIONS | | |

| HR INITIATOR | DATE | HR APPROVER LIAISON | DATE |
|---|---|---|---|
| Jennifer Merten | 09/12/2014 | | |
| HR UNIT MANAGER | 9/15/14 | HRIS INPUT COMPLETED BY CENTRAL OFFICE | 9/17/14 |
| HR MANAGER | DATE | HR AUDITOR CENTRAL OFFICE | 9-30-14 |

504-1(e)
5/23/14

ADCRR_000017

# EXHIBIT 23

ATTORNEYS' EYES ONLY

Pursuant to 4/21/2025 Protective Order

04    04

██████████████████████
██████████████████████
█████████████

██████████████████████
██████████████████████
██████████████████
██████████████████████
██████████████████████
██████████████

**2022040348** Pending    S DAYS, STANWYN # ████████    On September 13, 2022 I was contacted by Supervisor R.    SUSTAINED    T/RINCON UNIT    9/11/2022   9/11/2022   10/13/2022    Other Object
V LOPEZ, MARIA # ████████████████    Zormeier that there was a Correctional staff member who
██████████    had been assaulted by a contract employee in the kitchen
by being struck in the head with a mob handle.

On September 13, 2022, an interview was conducted with
COII Maria Lopez EIN #42425. Officer Lopez said right
before the incident she had been shoulder bumped two
times by Mr. Days in an aggressive manner and when she
addressed the issue he did not say anything to her.
Officer Lopez said that is when inmate ██████ turned
towards Mr. Days and punched him. Officer Lopez said
during this she was struck in the head by Mr. Days with a
mop causing her injury.

04    04
64    06    On September 13, 2022, inmate ████████████████
04    07    was interviewed and admitted to hitting Mr. Days
but was only after he had seen Officer Lopez start crying
when Mr. Days hit her hard with his shoulder. Inmate
Shivers said he did not hit Mr. Days to just assault him.

On September 13, 2022, Mr. Stanwyn Days was
interviewed due to hitting Officer Lopez with a mop
handle. Mr. Days said he did not hit Officer Lopez and
said he believed it was due to the mop flying out of his
hands. Mr. Days said he did bump officer Lopez but that it
was an accident and not intentional.

On September 13, 2022, Inmate ████████████████
was interviewed due to being seeing in the video
as a possible witness to the incident. Inmate ██████ said
he did not see inmate ██████ hit Mr. Days but did see Mr.
days getting up off the ground and appeared to be dazed.
Inmate ██████ said he did see Mr. days take possession
of the mop and saw when Officer Lopez was hit with the
mop handle to her head.

During this investigation and through the video footage
and interviews of all involved, it was determined that
Officer Lopez was bumped by Mr. Days with his shoulder.
As a result, inmate ██████ got into a verbal argument
with Mr. Days that turned into a physical altercation and
inmate ██████ punched Mr. Days. Mr. Days then got up
off the floor to pick the mop back up, and in attempting to
get to inmate ██████, Officer Lopez was struck in the
head causing injury and swelling to her head.

**2022040376** Pending    ████████████████ ████████    On September 13, 2022 I was contacted by Supervisor R.    SUSTAINED    T/RINCON UNIT    9/13/2022   9/13/2022   11/2/2022
V Days, Stanwyn #    Zormeier that there was a Correctional staff member who
had been assaulted by a contract employee in the kitchen

ADCRR_004905

ATTORNEYS' EYES ONLY

Pursuant to 4/21/2025 Protective Order

by being struck in the head with a mop handle. During the initial process of gathering more information it was learned that Mr. Stanwyn Days had been struck in the face 2 times by inmate ███ causing him to fall to the ground.

On September 13, 2022 Mr. Stanwyn Days was interviewed due to an incident that had occurred in the kitchen. Mr. Days said he had been assaulted by inmate ████████████ by being punched in the face 2 times and then falling down to the ground dazed.

On September 13, 2022, inmate ████████ ███ was interviewed and admitted to hitting Mr. Days but was only after he had seen Officer Lopez start crying when Mr. Days hit her hard with his shoulder. Inmate ███ said he did not hit Mr. Days to just assault him.

During the course of this investigation and through the interviews it was determined that Mr. Days was struck in the face by inmate ███ causing him to fall to ground. This case will be submitted to the Pima County Attorney's Office for review.



ADCRR_004906

# EXHIBIT 24

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

O.W., an individual,          )
                              )
     Plaintiff,               )
                              )
          vs.                 ) No. 2:25-cv-00044-DWL
                              )
State of Arizona, et al.,     )
                              )
     Defendants.              )
                              )


VIDEO RECORDED VIDEOCONFERENCE DEPOSITION
                 OF
       AUBREY PERRY LAND, SR.

            Alachua, Florida
            March 31, 2026
        9:04 a.m. Arizona Time


REPORTED BY:
WILMA A. WEINREICH, CSR, RPR
Certified Stenographer
Certificate No. 50976

PREPARED FOR:


(ASCII/COPY)



80

displayed an intentional willingness to violate female staff members.

Q.    Do you know what he was in prison for?

A.    I didn't look up to see.  I know that he said he had 15 years but I didn't look up his --

Q.    Did you read the two write-ups on those two incidents?

A.    I remember reading the disciplinary.

Q.    And you say it was intentional.  Did it say intentional in those disciplinary write-ups?

A.    Doing it right in the open in front of female staff members, yes, I would say that's an intentional act.

Q.    And that's the way you understand it happened?

A.    My understanding, yes.

Q.    But prisoners masturbating in prison is a very common thing, right?

A.    It happens every day in every institution.

Q.    And they lack privacy in their cells, correct?

A.    They do.

Q.    Though if someone is masturbating while a female guard walks by, a CO walks by, that is a violation of the policy, right?

MR. SHOWALTER:  Form and foundation.

THE WITNESS:  It is.  But everybody knows when staff members are on the wing.



and that's intended that way, correct, so you keep an eye on them?

A.    That is the whole point.  We try and keep our eye on convicts.

Q.    Because prisons are dangerous places?

A.    They are extremely dangerous places.

Q.    Do you know whether or not sex offenders are assigned to work, work assignments?

MR. SHOWALTER:  Foundation.

THE WITNESS:  I think you asked do I know if sex offenders are allowed to work at the prison?

BY MR. LAMMERS:

Q.    Yes.

MR. SHOWALTER:  Form and foundation.

THE WITNESS:  We are talking by an inmate sex offender?

BY MR. LAMMERS:

Q.    Yes.

A.    I don't know if they are allowed or not.  Their custody levels would determine that.  Their housing assignment would determine that.  And then their institutional conduct would determine what type of jobs that they could work inside of a prison.

Q.    But even murderers are given work assignments, right?



83

A.    Absolutely.   Every day.

Q.    Three.   I think we have covered this to a certain extent but I have a couple of questions:   I further opine the lack of camera coverage and presence of known blind spots in the CO dining and staff restroom areas constituted a critical security deficiency that -- I'm going to say DOC -- failed to mitigate, that DOC failed to mitigate.

Do you see that?   We covered that by your belief that there should have been a camera in the DA room.

A.    Not only I believe there should have been a camera in there, but in the PREA audit those were some of the things that were discussed, not necessarily that particular room, but the need for monitoring inmates in areas where blind spots and no cameras are located.

Q.    Have you ever seen any PREA audits of other prisons where there's criticism that there are blind spots and cameras should be placed there?

A.    I have seen violations in prisons all across this country.

Q.    But my question was specific.   Other prisons having blind spots, and the criticism is they should have cameras there?

A.    Yes.



135

or saying that it means multiple things according to the standard that we are applying it to, and it's without hindsight, so -- in the standard that you just mentioned.

Q.   And in your report and in your testimony when you use it, that's the standard that you are applying, correct?

A.   Correct.

MR. SHOWALTER:  No further questions.

MR. LAMMERS:  I don't have any.  Do you want to go off camera?

THE WITNESS:  One housekeeping question before we all leave.  It doesn't have to be recorded.

THE VIDEOGRAPHER:  Let me go off then.

This concludes the video recorded deposition of Aubrey Land.  The time is 2:39 p.m.

(Deposition concluded at 2:39 p.m.)

MR. SHOWALTER:  Mr. Land will read and sign.

_____
AUBREY PERRY LAND, SR.



136

SIGNATURE PAGE


I, AUBREY PERRY LAND, SR., the deponent in the above deposition, do acknowledge that I have read the foregoing transcript of my testimony, and state under oath that it, together with any attached Amendment Sheet pages, constitutes my sworn statement.


\_\_\_\_   I have made changes to my deposition

\_\_\_\_   I have NOT made any changes to my deposition


                          _____

                               AUBREY PERRY LAND, SR.



137

STATE OF ARIZONA    )
                    )       ss.
COUNTY OF MARICOPA  )

        BE IT KNOWN that the foregoing proceedings were taken before me; that the witness before testifying was duly sworn by me to testify to the whole truth; that the foregoing pages are a full, true, and accurate record of the proceedings, all done to the best of my skill and ability; that the proceedings were taken down by me in shorthand and thereafter reduced to print under my direction.

        I CERTIFY that I am in no way related to any of the parties hereto, nor am I in any way interested in the outcome hereof.


        [X]  Review and signature was requested; any changes made by the witness will be attached to the original transcript.
        [ ]  Review and signature was waived/not requested.
        [ ]  Review and signature not required.

        I CERTIFY that I have complied with the ethical obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206 J(1)(g)(1) and (2).

        DATED at Phoenix, Arizona, this 9th day of April, 2026.


                    /s/ Wilma A. Weinreich_
                       WILMA A. WEINREICH
                    Certified Stenographer
                     Arizona CR No. 50976


            *         *      *         *      *

        I CERTIFY that GRIFFIN GROUP INTERNATIONAL has complied with the ethical obligations set forth in ACJA 7-206 (J)(1)(g)(1) through (6).


                    /s/ Pamela A. Griffin_
                  GRIFFIN GROUP INTERNATIONAL
                   Registered Reporting Firm
                    Arizona RRF No. R1005

# EXHIBIT 25

**RUSING LOPEZ & LIZARDI, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800
Facsimile: (520) 529-4262
mdlammers@rllaz.com
zkotzambasis@rllaz.com

Mark D. Lammers
State Bar No. 010335
Zoey Kotzambasis
State Bar No. 034607
*Attorneys for Defendants State of Arizona, Ryan Thornell,*
*Christopher Josefowicz, Kaylan Nasta, and Talon Hanks*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| O.W., an individual, | No. 2:25-cv-00044-DWL |
| Plaintiff, | |
| vs. | **DEFENDANT STATE OF ARIZONA'S RESPONSES TO PLAINTIFF'S FIRST SET OF DISCOVERY REQUESTS** |
| State of Arizona, et al., | |
| Defendants. | (Assigned to Hon. Dominic W. Lanza) |

Defendant State of Arizona hereby responds to Plaintiff's First Set of Discovery Requests as follows:

## REQUESTS FOR ADMISSION

**1.** Plaintiff's exhibits 47, 48, and 49 include the entire contract and bid between Trinity Services Group and the Arizona Department of Corrections (aka Arizona Department of Corrections Rehabilitation and Reentry) and/or the State of Arizona.

Admit___**X**____ Deny_____

## INTERROGATORIES

**1.** If your response to any Request for Admission is anything other than an unqualified admission, please provide the complete factual and legal basis for your response.

**RESPONSE:**      **Not applicable.**

Rusing Lopez & Lizardi, P.L.L.C.
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792–4800

**2.**     Identify the name, contact information, and title or position of all ADC employees who were working in the Rincon Unit at the time of the subject incident.

**RESPONSE:          Please see ADCRR_000938–945. The State has redacted shift information consistent with its employment and privacy policies. The listed employees can be reached through undersigned as counsel for the State.**

**3.**     Identify the individual who assigned inmate DeMarco Hines to his work assignment in the Rincon Unit kitchen, including the individual's name, contact information, position, and employer.

**RESPONSE:          COIII Jennifer Valenzuela was the WIPP officer who approved the work assignment. She is employed by ADCRR and can be reached through undersigned as counsel for the State.**

**4.**     Identify the individual who reclassified inmate DeMarco Hines from maximum custody to close custody in approximately August 2022, including the individual's name, contact information, position, and employer.

**RESPONSE:          COIII Kenneth Kaminski and COIV Brendan Monaghan. They are employed by ADCRR and can be reached through undersigned as counsel for the State.**

**5.**     Please state, with specificity, the complete factual and legal basis for your affirmative defense that "Plaintiff's First Amended Complaint fails to state a claim upon which relief can be granted," as set forth in paragraph 173 of your Answer (Doc. 16). Where applicable, your response should include references to relevant evidence, exhibits, documents, and materials which you claim support your position.

**RESPONSE:          Defendant objects to the request for "the complete factual and legal basis for your affirmative defense" is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Affirmative defenses such as "failure to state a claim upon which relief may be granted" are legal conclusions that are more appropriately addressed through motions practice, not**

**Rusing Lopez & Lizardi, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

factual discovery. Defendant further objects because this interrogatory seeks premature privileged legal analysis, and legal analysis and conclusions, which are protected by the attorney work product doctrine. Defendant is not required to provide detailed legal arguments or analysis in response to discovery requests.

Subject to and without waiving the foregoing objections, Defendant states its defense is based on the following. O.W. alleges Intentional Infliction of Emotional Distress (Count Two), "Negligence/Gross Negligence – Failure to Adequately Staff, Train, Supervise, and Monitor" (Count Three), "Negligence/Gross Negligence – Vicarious Liability" (Count Four), and "Sex Discrimination, Hostile Work Environment" in violation of Title VII of the Civil Rights Act of 1964 against the State. O.W. cannot maintain both tort and employment claims against the State because if the State is her statutory employer, then worker's compensation is her sole remedy, which she has pursued. This case remains in the early stages of discovery and Defendant reserves the right to supplement this response.

**6.**    Please state, with specificity, the complete factual and legal basis for your affirmative defense that "Plaintiff's claims are barred, in whole or in part, by the statute of limitations," as set forth in paragraph 174 of your Answer (Doc. 16). Where applicable, your response should include references to relevant evidence, exhibits, documents, and materials which you claim support your position.

**RESPONSE:**    Upon further factual investigation, the State withdraws this defense.

**7.**    Please state, with specificity, the complete factual and legal basis for your affirmative defense that you "may be immune pursuant to A.R.S. §§ 41-621, 12-821, 12-820.01, 12-820.02, 12-820.05, 12-820.04, quasi-judicial immunity, and other statutory and common law absolute and qualified immunities under state and federal law," as set forth in paragraph 175 of your Answer (Doc. 16). Where applicable, your response should include

State of Arizona's Responses to PL's 1st Set of Discovery Requests(63639486.2)    3

**21.** For any documents that you are not producing based on claims of confidentiality or privilege, produce a privilege log that fully identifies the documents, a fair description of their subject matter, their date of creation, and the basis for withholding the documents.

**RESPONSE:** Not applicable.

DATED this June 20, 2025.

RUSING LOPEZ & LIZARDI, P.L.L.C.

*/s/ Mark D. Lammers*
Mark D. Lammers
Zoey Kotzambasis
*Attorneys for Defendants State of Arizona,*
*Ryan Thornell, Christopher Josefowicz,*
*Kaylan Nasta, and Talon Hanks*

## CERTIFICATE OF SERVICE

I certify that on June 20, 2025, I electronically transmitted the attached document to following counsel of record:

Jesse M. Showalter
Lauren E. Channell
ROBBINS CURTIN MILLEA & SHOWALTER, LLC
301 East Bethany Home, #B-100
Phoenix, Arizona 85012
jesse@rcmslaw.com
lauren@rcmslaw.com
*Attorneys for Plaintiff*

R. Shawn Oller
Chrisanne M. Gultz
LITTLER MENDELSON, P.C.
Camelback Esplanade
2425 East Camelback Road, Suite 900
Phoenix, Arizona 85016
soller@littler.com
cgultz@littler.com

State of Arizona's Responses to PL's 1st Set of Discovery Requests(63639486.2)    15

*Attorneys for Defendants*
*TKC Holdings, Inc. and Trinity Services Group, Inc.*

By:      */s/ Aneta Wrzeszcz*

**Rusing Lopez & Lizardi, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

State of Arizona's Responses to PL's 1st Set of Discovery Requests(63639486.2)

16