Jesse Showalter (026628)
Lauren E. Channell (033484)
**ROBBINS CURTIN MILLEA & SHOWALTER, LLC**
301 East Bethany Home, Suite B-100
Phoenix, Arizona 85012
Tel: 602-400-4400
Fax: 602-265-0267
jesse@rcmslaw.com
lauren@rcmslaw.com
*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| O.W., an individual, | No. 2:25-cv-00044-DWL |
| Plaintiff, | **PLAINTIFF'S RESPONSE TO STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. 69)** |
| vs. | |
| State of Arizona, et al., | **Oral Argument Requested** |
| Defendants. | |

In 2023, the Arizona Department of Corrections ("ADC") assigned a violent, high security risk inmate to work in the kitchen of the Rincon Unit at Arizona State Prison Complex—Tucson (hereafter, "Rincon"). ADC assigned this inmate to the kitchen despite knowledge that the inmate had more than fifty (50) disciplinary charges in three years, including three instances of sexual harassment and misconduct toward female staff, and that he would be working with female civilians employed by the food service contractor. ADC allowed the inmate to remain assigned to the kitchen even after 23-year-old O.W., a civilian worker, reported to the kitchen corrections supervisor that the inmate made her uncomfortable and she wanted him moved.

In the Rincon kitchen, the only staff restroom was located inside a small, isolated dining room. Corrections officers in the kitchen knew that the small dining area was a particularly dangerous place for staff because there were no surveillance cameras, making it a "blind spot" where inmates were more likely to commit crimes. For that reason, they were

ROBBINS CURTIN MILLEA & SHOWALTER, LLC
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

required under policy to continuously supervise any inmate in that room. On the morning of September 28, 2023, corrections staff placed the inmate alone and unsupervised in the small dining area, providing him with the opportunity to violently sexually assault O.W.

Defendants are not entitled to summary judgment on any count in Plaintiff's First Amended Complaint. Defendants Kaylan Nasta, Talon Hanks, Christopher Josefowicz, and Ryan Thornell ("the Individual Defendants") are not entitled to qualified immunity on Plaintiff's § 1983 state-created-danger claim because each of them engaged in affirmative conduct that exposed the kitchen's civilian workers to danger they would not otherwise have faced and were deliberately indifferent to the obvious danger. The Individual Defendants' conduct deprived O.W. of her due process right to be free from state-created danger in a workplace setting—a right which has been clearly established for more than three decades.

The State of Arizona is not entitled to summary judgment on Plaintiff's negligence claims for two reasons. First, the State waived its affirmative statutory employer defense when it expressly denied that it was O.W.'s statutory employer and failed to allege this immunity or the worker's compensation bar as affirmative defenses in its answer as required by Rule 12. Second, the violent sexual assault on O.W. is outside the scope of Arizona's Worker's Compensation Act because it was not an "accident" or a risk inherent in her employment. *See Ford v. Revlon,* 153 Ariz. 38, 44, 734 P.2d 580, 586 (1987) (holding that an assailant's sexual assault of the plaintiff was not an "accident" within the meaning of Arizona's workers' compensation scheme).

Disputed issues of material fact preclude summary judgment for the State on Plaintiff's state law intentional infliction of emotional distress claim and her Title VII hostile work environment claim.

## I.      Plaintiff's Controverting Statement of Material Facts

### A. ADC assigns Inmate DeMarco Hines to work alongside civilians in the Rincon kitchen despite his known history of violence, disciplinary charges, and sexual misconduct toward female staff.

DeMarco Hines was admitted to ADC on December 10, 2019, to serve a sentence for

convictions of armed robbery and theft of means of transportation. (**Ex. A** at 1.) He was housed at Arizona State Prison Complex ("ASPC")—Tucson. *Id.*

Between February 3, 2020 and September 25, 2023, Hines received **fifty-five (55) disciplinary charges**, including stalking a staff member, two instances of indecent exposure, disorderly conduct, disrupting an institution, fighting, criminal damage, threatening or intimidating, and many instances of disobeying orders and aggravated refusal of assignments. (**Ex. A** at 5-7.)

Hines' disciplinary charges involved instances of sexual harassment and abuse toward female staff. Hines' stalking charge arose from a March 4, 2020 incident[1] where he entered a female teacher's classroom, blocked the door with his body, and refused to leave. (**Ex. B**, at 4, 6.) Hines persistently refused to move until the teacher pushed past him and left the room. *Id.* The teacher reported that the situation made her feel uncomfortable "especially given that he had been told so many different times that he should not be in [her] classroom." *Id.*

Hines' first charge of indecent exposure arose on February 21, 2021, when he made eye contact and sexual advances while masturbating directly toward a female corrections officer. (**Ex. C**.) The second charge of indecent exposure arose on April 9, 2023, when he again exposed himself and masturbated toward another female officer during a formal count. (**Ex. D**.)

Pursuant to ADC policy, ADC staff assigned Hines a classification score and custody class. (**Ex. A** at 7-10.) Except for a brief period at the beginning of his incarceration, ADC staff consistently classified Hines as a security risk level IR 4 or IR 5, and he was held in either close custody or maximum custody. *Id.*

ADC Department Order 801 defines security risk level "IR 4" as a "high risk" and "IR 5" as the "highest risk to the public, staff, and other inmates, of escape or committing

_____

[1] Defendants characterize this incident as Hines wanting to stay and "chat with his friends" (Doc. 69 at 6), an extreme departure from the teacher's description of the event.

ROBBINS CURTIN MILLEA & SHOWALTER, LLC
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

ROBBINS CURTIN MILLEA & SHOWALTER, LLC
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ◆ Fax: (602) 265-0267

violence within the perimeter and/or under the direct supervision of Department staff." (**Ex. E** at 6.1, 6.2). Department Order 801 also defines inmates in close or "high custody" as "[i]nmates who represent a high risk to the public and staff. These inmates shall not be assigned to work outside the secure perimeter of an institution. These inmates require controlled movement within the institution." (**Ex. E** at 2.3.2.) "Maximum custody" inmates "represent the highest risk to the public and staff and require housing in a single cell or double cell environment. These inmates have limited work opportunities within the secure perimeter and require frequent monitoring. These inmates require controlled movement within the institution." (**Ex. E** at 2.3.1.)

In May 2023, Hines was transferred from the Cimarron Unit at ASPC-Tucson to Rincon. (**Ex. A** at 3.) In July 2023, he spent a brief time in the mental health ward but thereafter remained in general population at Rincon. *Id.*

On August 31, 2023, ADC staff reclassified Hines from close custody to maximum custody. (**Ex. A** at 9.) However, Rincon was not a maximum custody unit. (**Ex. F** at 61:18-22.) In order for Hines to remain in Rincon, ADC staff provided an "override" and placed Hines back in close custody. (*See* **Ex. A** at 9; **Ex. F** at 61:18-62:4; **Ex. G** at 22:8-23:3, 23:6.) At this time, Hines was also classified as IR 4, a high internal security risk. (**Ex. A** at 8.)

In 2023, Correctional Officer III ("COIII") Jennifer Valenzuela was the Work Incentive Pay Plan ("WIPP") officer for the Rincon Unit. (**Ex. F** at 6:2-21.) The WIPP officer's role was to review vacancies for work and assign inmates to jobs within the prison. (**Ex. F** at 12:15-17, 13:23-14:11, 17:19-18:7).

WIPP Officer Valenzuela assigned Hines to work as a kitchen helper in the Rincon kitchen. (**Ex. A** at 10; **Ex. F** at 34:24-35:5.) When she made the assignment, WIPP Officer Valenzuela reviewed Hines' classification status, medical clearance, and lengthy disciplinary history. (**Ex. F** at 40:3-25, 46:9-12.) She knew that he had previously been in maximum custody and that he had received discipline for indecent exposure for masturbating in front of an officer. (**Ex. F** at 45:10-46:5, 46:9-12, 46:20-47:1, 48:6-49:20.) She was also aware that he would be working in the kitchen with civilian workers, including

ROBBINS CURTIN MILLEA & SHOWALTER, LLC
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ◆ Fax: (602) 265-0267

women. (**Ex. F** at 47:9-16.) Nonetheless, according to WIPP Officer Valenzuela, Hines met the criteria for the kitchen work assignment. (**Ex. F** at 40:3-5.)

Under ADC Department Order 903, a "special assessment" was required for any maximum custody inmate to be given a kitchen work assignment, regardless of the inmate's internal risk level. (**Ex. H** at 4.1.1; **Ex. F** at 63:24-64:5.) However, Hines' work assignment was not affected when he was reclassified to maximum custody in August 2023 then given an override so he could remain in close custody. (**Ex. F** at 62:10-13, 62:21-23.)  Hines never received a "special assessment" to ensure he was an appropriate fit for the kitchen work assignment. (**Ex. F** at 64:8-15.)

Hines' behavior in the Rincon kitchen clearly escalated in September 2023. On September 11, 2023, Hines received an evaluation of "U" for "unsatisfactory" from a corrections officer assigned to supervise the kitchen. (**Ex. A** at 10; **Ex. F** at 53:12-15, 54:17-25.) Because evaluations were done on a bi-weekly basis, the next evaluation should have been on September 25, 2023, but no evaluation took place. (**Ex. F** at 53:16-24, 55:14-25.) If Hines had received a second "unsatisfactory" evaluation, his work assignment would have been reviewed. (**Ex. F** at 56:1-14.)

Hines also received disciplinary charges on September 21, 2023, for a positive drug test or refusal of UA, and on September 25, 2023, for aggravated refusal of an assignment when he refused education that day. (**Ex. I** at ADCRR 3584-85). During the same week, a kitchen supervisor, Defendant Corporal Kaylan Nasta, wrote Hines a ticket for failing to show up for work. (**Ex. J** at 35:24-36:17.)

**B. Defendants Nasta and Hanks leave Hines unsupervised and unmonitored in a restricted space, allowing him the opportunity to violently sexually assault O.W.**

In September 2023, then 23-year-old Plaintiff O.W. was an employee of TKC Holdings and its subsidiary, Trinity Services Group ("Trinity"), the contracted food service provider at ASPC-Tucson. (**Ex. K**, 7:9-15, 8:3-4.) O.W. was assigned to work in the Rincon kitchen. (**Ex. K**, 35:3-5.)

ROBBINS CURTIN MILLEA & SHOWALTER, LLC
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

Cpl. Nasta knew that Hines was "very mouthy" with O.W. (**Ex. J** at 18:21-19:8.) She also knew that Hines did not like to follow orders and would often wander off or go into other houses where he was not supposed to be. (**Ex. L** at 12:14-25). In August or September 2023, either O.W. or Cpl. Nasta submitted an Information Report ("IR")[2] about Hines' behavior after O.W. told Cpl. Nasta that Hines gave her a "weird feeling" and she wanted him out of the kitchen.[3] (**Ex. J** at 19:9-20:3.)

On the morning of September 28, 2023, O.W. was working in the Rincon kitchen along with two other Trinity employees, Amy Link and Rhonda Lehner.[4] (*See* **Ex. K** at 16:5-6, 54:15-17; **Ex. J** at 6:20-23.) Defendants Cpl. Nasta and COII Talon Hanks were the corrections staff assigned to the Rincon kitchen that day and were responsible for supervising, monitoring, and controlling[5] the inmate workers, including Hines.[6] (**Ex. J** at 44:16-45:3; **Ex. G** at 21:9-21, 24:21-25.)

At approximately 10:13 a.m., Hines was working in the Rincon kitchen and asked a Trinity employee, Ms. Lehner, to let him into a small, locked dining area ("the DA") so he could sweep. (**Ex. M** at p. 2; **Ex. N** at 13:13-14:18.) The DA was sometimes used to allow staff or small groups of inmates to eat, but it was also the location of the only staff restroom in the Rincon kitchen. (**Ex. J** at 30:9-31:4; **Ex. G** at 36:24-37:6.)

Ms. Lehner thought Hines' request was unusual and "hilarious" because he had only a small, broken broom and because inmates "never volunteer to do anything, especially

---

[2] Trinity employees could not "do a write-up" on an inmate (*i.e.*, write a disciplinary ticket), but they could submit an Information Report. (**Ex. K** at 40:8-10.)

[3] At her deposition, O.W. testified that she could not recall if Hines had given her problems before the assault or if she had reported her concerns about him. (**Ex. K** at 40:5-7, 40:23-25.)

[4] The Rincon kitchen was often understaffed with both Trinity and corrections personnel. Understaffing was a concern for O.W., and she reported this concern to her Trinity supervisors as well as corrections personnel on numerous occasions. (**Ex. K** at 86:23-87:14, 88:7-89:18.)

[5] The corrections officers, not Trinity staff, were responsible for the supervision and control of inmates. (*See* **Ex. G** at 54:22-24.)

[6] The normal staffing for Rincon kitchen included a second COII, but the other COII assigned to the kitchen called in sick that day. (**Ex. J** at 44:19-45:3; **Ex. G** at 19:9-21.)

clean." (**Ex. N** at 13:13-14:1.) Nevertheless, Ms. Lehner unlocked the door to the DA, let Hines into the room, which was empty, and watched him briefly through the window before she walked away. (**Ex. N** at 13:13-14:18.)

Cpl. Nasta was aware that Hines was alone and unsupervised in the DA. (*See* **Ex. J** at 64:21-65:18, 71:8-20; **Ex. M** at p. 2.) Cpl. Nasta briefly entered the DA two times between 10:19 and 10:28 a.m., possibly to check on Hines. (**Ex. J** at 64:21-65:18, 71:8-20; **Ex. M** at p. 2.)

Cpl. Nasta and COII Hanks knew that the inmates housed in Rincon, including Hines, were dangerous and posed a threat to staff and the public. (**Ex. J** at 77:11-21, 78:2-6; **Ex. G** at 43:16-21, 45:2-4, 46:18-19; 46:22-23.) They also knew that the only staff restroom in the Rincon kitchen was in the DA and that staff would have to go into the DA to access the restroom. (**Ex. G** at 36:24-37:6.) Cpl. Nasta and COII Hanks, as well as prison administrators, knew that, within the Rincon kitchen, the DA was particularly dangerous and presented a security concern because it was a "blind spot" with no camera surveillance, which made it more likely that inmates would engage in criminal activity in that space. (**Ex. J** at 41:14-42:24, 49:14-50:8; **Ex. G** at 7:18-20; 28:17-29:7; 36:13-17.) Prison administrators were aware that an inmate had attempted to assault a female staff member inside the DA on at least one prior occasion. (*See* **Ex. G** at 12:2-19, 36:13-17.) There was also an incident in the DA in October 2022 where an inmate verbally and physically assaulted a male Trinity employee after the Trinity employee bumped a female corrections officer in the shoulder. (**Ex. O**.)

Because of the danger involved, there was a policy or "standard operating procedure" that the DA door was to remain locked and that a corrections officer was to directly supervise and maintain visual contact on any inmate within the DA. (**Ex. J** at 38:17-22, 41:9-13, 45:11-46:5, 62:12-25, 63:22-25, 81:8-12; **Ex. G** at 9:4-6, 9:14-10:3, 29:9-11, 35:11-13, 42:14-18.) Cpl. Nasta and COII Hanks knew these policies were designed to protect civilian workers within the prison and that failing to follow those policies placed those civilians in danger.

(**Ex. J** at 80:12-16; **Ex. G** at 9:14-10:3, 30:11-13; 30:15-16.) In her deposition, Cpl. Nasta testified about the threat to staff working in the kitchen and the significance of the policies:

> Q. And that's why it's so important – because you know how dangerous these people are, that's why it's so important for you guys to follow policies that are designed to protect you and the Trinity employees; correct?
>
> A. Correct.
>
> Q. That's why that door -- because it is so dangerous, that's why that door is supposed to be locked; correct?
>
> A. Correct.
>
> Q. That's why when there is an inmate in that room, there is supposed to be a COII directly monitoring them; correct?
>
> A. Correct.
>
> Q. And because those inmates are so dangerous and this job is inherently dangerous, you understand that you've been trained to follow specific policies to mitigate that danger and to protect yourself, to protect the other inmates, and to protect the civilian staff; correct?
>
> A. Correct.
>
> Q. And on this day, those policies broke down; correct?
>
> A. Correct.

(**Ex. J** at 62:12-63:10.)

However, in violation of policy and despite her awareness of the danger involved, Cpl. Nasta left Hines alone in the DA, ceased visual contact on Hines, and left the DA door unlocked with Hines inside. (**Ex. J** at 65:23-66:8.)

After 10:29 a.m., Hines was alone and unsupervised in the DA. (**Ex. M** at p. 2.) Cpl. Nasta then went to the control room where she made notes in a journal and spoke with a sergeant. (**Ex. J** at 50:9-22.)

Meanwhile, COII Hanks took the rest of the inmate workers outside for a smoke break. (**Ex. G** at 23:11-20.) COII Hanks made a call to pull all the inmates from the kitchen for their break because they had just finished a meal, and all of the inmates were supposed to go outside. (**Ex. G** at 23:21-24:3.) COII Hanks kept a "loose count" of the inmates

ROBBINS CURTIN MILLEA & SHOWALTER, LLC
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ◆ Fax: (602) 265-0267

working in the kitchen. (**Ex. G** at 24:4-15.) But no one pulled Hines out for his break, and he remained alone in the DA. (*See* **Ex. M** at pp. 2-3.)

Because Cpl. Nasta had left the DA door unlocked, Hines was able to leave the DA and roam around the kitchen several times, unsupervised and unmonitored by corrections staff. (**Ex. J** at 45:11-46:5, 75:4-11, 85:14-18; **Ex. M** at pp. 2-3.) Hines re-entered the DA for the last time at 10:36 a.m. (**Ex. M** at pp. 2-3.)

At 10:37 a.m., O.W. entered the DA to use the staff restroom. (**Ex. M** at p. 3; **Ex. K** at 53:10-11.) O.W. saw Hines sweeping inside the DA. (**Ex. K** at 53:12-13, 53:17-19.) While she was in the restroom, O.W. saw a shadow under the door, which she believed was Inmate Hines walking around and sweeping. (**Ex. K** at 55:5-8, 55:23-56:2.) As O.W. began to exit the restroom, Hines forcibly pushed the door open, knocked her radio out of her shirt pocket, and attacked her. (**Ex. K** at 57:11-14; **Ex. M** at pp. 5-6.) For approximately 20 minutes, Hines violently sexually assaulted O.W. (*See* **Ex. M** at p. 3.)

At 10:58 a.m., Ms. Lehner opened the door to the DA, saw that the staff restroom door was open, and found O.W. and Hines inside the restroom. (*See* **Ex. M** at p. 3; **Ex. N** at 81:12-25.) O.W. appeared upset and disheveled and told Ms. Lehner something to the effect of "Get me out of here." (**Ex. N** at 82:12-14, 82:19-20, 83:4-14.)

O.W. quickly left the restroom and DA and went directly to the Trinity office, where she initiated an "ICS," an internal prison emergency. (**Ex. K** at 59:3-6, 62:2-14.) Shortly thereafter, O.W. was transported by ambulance to Tucson Medical Center where her injuries were evaluated and forensic evidence was obtained. (*See* **Ex. K** at 64:5-22; **Ex. M** at p. 8.) As a result of the assault, O.W. has been diagnosed with post-traumatic stress disorder and has experienced an exacerbation in depression and anxiety that has been intermittently present throughout her life. (**Ex. P**, pp. 10-11.)

Investigators with ADC's Criminal Investigations Unit ("CIU") later interviewed an inmate who reported that, before the assault, Hines got high on spice (synthetic marijuana) and stated, "Today's the day, I'm gonna get that, that bitch is mine, I'm getting that." (**Ex.**

ROBBINS CURTIN MILLEA & SHOWALTER, LLC
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

**M** at pp. 6-7.) The inmate also reported that he had overheard Hines speaking with another inmate about sexually assaulting female staff members. *Id.*

On March 6, 2024, Hines was indicted on felony charges of kidnapping, sexual assault, sexual abuse, and aggravated assault on a corrections officer. On February 13, 2026, he was convicted of kidnapping and aggravated assault on a corrections officer, but the jury hung on the counts of sexual assault and sexual abuse. (Doc. 69 at 150-51.) The counts of sexual assault and sexual abuse were re-tried the week of June 8, 2026, but the jury was again deadlocked on those counts, and the court declared another mistrial.

### C. Policy failures and operational practices in the Rincon kitchen facilitated and enabled the assault.

Plaintiff's correctional practices expert, Aubrey Land, has worked in corrections for the past 33 years, serving as a corrections officer, sergeant, correctional law enforcement inspector, and senior law enforcement inspector at six major close/maximum custody prisons in Florida. (**Ex. Q** at p. 2.)

Mr. Land has identified several failures of prison staff and administration that increased the risk of harm to O.W. and placed her in an environment that enabled an inmate to sexually assault her. First, staff practices at the time allowed an inmate worker to be present in the DA without continuous, direct supervision by a correctional officer, despite the "known security sensitivity of the space." (**Ex. Q** at p. 4.) Second, corrections staff and prison officials knew the DA lacked camera surveillance,[7] yet "no policy-required adjustment in staffing or supervision occurred to mitigate the associated risk." (**Ex. Q** at p. 4.) Third, the DA and staff restroom had no fixed duress alarms or emergency alert system, so when O.W's radio was dislodged she had no way to summon help. (**Ex. Q** at p. 4.) In Mr. Land's opinion:

---

[7] A surveillance camera was installed in the DA the day after the assault on O.W. (Hanks Dep., **Ex. G** at 26:1-15.) This remedial measure is admissible to prove that (1) prison administrators knew there was no camera in the DA on or before September 28, 2023, thus creating a "blind spot" in the space where the only staff restroom was located, and (2) the installation of a camera was a feasible precautionary measure. *See* Fed. R. Evid. 407.

The circumstances surrounding the assault demonstrate that [O.W.] was placed in a position of extreme vulnerability as a result of institutional practices that permitted an inmate to occupy a restricted staff space without continuous supervision, without camera coverage, and without reliable emergency signaling capability. The conditions were known, observable, and correctable prior to the incident.

The assault was therefore not the product of an unforeseeable or sudden deviation from normal operations but rather occurred within the scope of routine practices that failed to adequately protect staff from known risks.

(**Ex. Q** at p. 5.)

### D. Procedural History

Plaintiff initiated her lawsuit in state court on September 27, 2024, and filed her First Amended Complaint ("FAC") on December 16, 2024. Plaintiff served all Defendants with the FAC between December 16, 2024 and December 31, 2024. In the FAC, Plaintiff specifically raised the issue of whether or not the State was O.W.'s statutory employer:

157. Should Defendant State of Arizona assert that it is Plaintiff's statutory employer or that Plaintiff is its statutory employee, Defendant State of Arizona is liable as Plaintiff's joint employer under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., as amended.

158. At all times alleged herein, Defendant State of Arizona is and was a "person" and "employer" as defined under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. et seq., as amended.

159. Defendant State of Arizona, through its agents and employees, subjected Plaintiff to a hostile work environment and discrimination based on her sex and gender.

(Doc. 12, p. 21.)

On January 6, 2025, Defendants removed this matter from state court to this Court. On January 24, 2025, Defendant State of Arizona filed its answer. In its Answer, the State denied paragraphs 157-159 of Plaintiff's Complaint, taking the express position that it was not O.W.'s statutory employer. (Doc 16, p. 14.) Moreover, the State's Answer did not assert that it was Plaintiff's statutory employer or raise the worker's compensation bar as an affirmative defense. (*See* Doc. 16, pp. 15-16.) On February 26, 2025, the Court entered its

ROBBINS CURTIN MILLEA & SHOWALTER, LLC
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

ROBBINS CURTIN MILLEA & SHOWALTER, LLC
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

scheduling order in this matter. (Doc. 20.) The Court noted in its scheduling order that "the deadline for joining parties, amending pleadings, and filing supplemental pleadings has expired." (Doc. 20.)

During discovery, Plaintiff served contention interrogatories on the State which were aimed at understanding the affirmative defenses the State intended to assert and the facts and evidence that purportedly supported those defenses. In response to an interrogatory about the State's defense that Plaintiff's FAC failed to state a claim, the State still did not assert that it was Plaintiff's statutory employer. (**Ex. R** at pp. 3, 9.) Instead, the State claimed that Plaintiff could not maintain both tort and federal employment claims against the State because "*if* the State is her statutory employer, *then* worker's compensation is her sole remedy . . ." (**Ex. R** at p. 3 (emphasis added).) The State also stated that the case "remains in the early stages of discovery" and reserved the right to supplement the response. *Id.* The State never supplemented the response.

The State filed a motion to dismiss for lack of subject-matter jurisdiction on November 3, 2025, in which it asserted, for the first time, that the State was O.W.'s statutory employer and that her exclusive remedy against the State is through Arizona's worker's compensation scheme. (Doc. 53 at p. 1.) In her response to the motion, Plaintiff argued, in part, that the State has waived this affirmative defense. (Doc. 56 at pp. 6-7.) The Court determined that it had subject matter jurisdiction and denied the motion. (Doc. 66.)

## II. Legal Discussion

### A. The Individual Defendants are not entitled to summary judgment on O.W.'s § 1983 state-created-danger claim (Count One).

The substantive component of the Fourteenth Amendment's Due Process Clause "protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'" *Polanco v. Diaz*, 76 F.4th 918, 925 (9th Cir. 2023) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)). The Due Process Clause serves as a "limitation on the State's power to act" rather than a "guarantee of certain minimal levels of safety and security." *Id.* at 926 (quoting *DeShaney v. Winnebago Cnty.*

ROBBINS CURTIN MILLEA & SHOWALTER, LLC
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

*Dept. of Soc. Services*, 489 U.S. 189, 195 (1989)). Therefore, a state actor is generally not liable under the Due Process Clause for his or her omissions, unless an exception applies. *Id.*

Under the state-created-danger doctrine, a state actor may be liable for his or her role "in creating or exposing individuals to danger they otherwise would not have faced." *Id.* (quoting *Pauluk v. Savage*, 836 F.3d 1117, 1122 (9th Cir. 2016)). In the public employment context, the state-created-danger doctrine holds state actors liable when they "affirmatively, and with deliberate indifference, create or expose their employees to a dangerous working environment." *Id.* The Ninth Circuit has recognized that state actors are liable under the state-created-danger doctrine for requiring a prison nurse to work alone with an inmate who was likely to cause a woman serious harm, *see L.W. v. Grubbs (Grubbs I)*, 974 F.2d 119, 123 (9th Cir. 1992), and for knowingly assigning an employee to work in a building infected with toxic mold, *see Pauluk*, 836 F.3d at 1122. Most recently, in 2023, the Ninth Circuit held that the surviving family members of a deceased prison guard stated a claim under the state-created-danger doctrine where prison officials transferred inmates from a prison experiencing a COVID-19 outbreak to the prison where the guard worked, ultimately resulting in the guard's death from complications of COVID-19. *Polanco*, 76 F.4th at 926–28. *See also Coby v. City of Tombstone*, 2025 WL 3267904, at *8 (D. Ariz. Nov. 24, 2025) (denying a motion to dismiss a police officer's state-created-danger claim where the officer alleged that other city employees had assigned him canine police dogs that were known to be aggressive and had attacked and seriously injured the officer).

To prevail on a due process claim under the state-created-danger doctrine, a plaintiff must establish (1) "affirmative conduct on the part of the state" that exposed her to "an actual, particularized danger that [she] would not otherwise have faced" and (2) that the state official acted with "deliberate indifference" to that "known or obvious danger." *Id.* at 926 (citations omitted).

The "affirmative conduct" requirement has three components. First, the state actor must have taken actions that placed the plaintiff in a "worse position" than she would have

been in had the state actor not acted at all. *Id.* (quoting *Pauluk*, 836 F.3d at 1124). Second, the act must have exposed the plaintiff to an "actual, particularized danger[.]" *Id.* (quoting *Pauluk*, 836 F.3d at 1125). Third, the resulting harm must have been foreseeable. *Id.*

The requirement to prove an "actual, particularized danger" does not require the plaintiff to show that the danger was specifically directed at her as an individual. Affirmative state action that exposes "a broad swath of the public to 'generalized dangers'" cannot support a state-created-danger claim. *Id.* at 927 (quoting *Sinclair v. City of Seattle*, 61 F.4th 674, 676, 683 (9th Cir. 2023)). However, a danger can be "particularized" if it is directed at a "discrete and identifiable group" rather than a single individual. *Id.* (finding that the plaintiffs had alleged that the state actions (i.e., the transfer of inmates) exposed a "discrete and identifiable group"—prison guards and inmates at San Quentin prison—to the dangers of COVID-19).

**1. The Individual Defendants engaged in affirmative conduct that placed O.W. in a worse position and exposed her to the particularized and foreseeable danger of being assaulted by an inmate.**

**a. The Individual Defendants' Affirmative Conduct**

**i. Cpl. Nasta and COII Hanks**

Cpl. Nasta engaged in affirmative conduct that placed O.W. in a "worse position" because Cpl. Nasta knew that Hines was alone in the DA, checked on him at 10:19 and 10:28 a.m., and affirmatively walked away and left him unmonitored and unsupervised in the DA. (**Ex. J** at 64:21-65:18, 65:23-66:8. 71:8-20; **Ex. M** at p. 2.) Had Nasta "not acted at all," *see Polanco*, 76 F.4th at 926, she would have simply remained in the DA with Hines when she initially entered to check on him, as she knew that inmates were not permitted in the DA without direct and continuous supervision because they were so dangerous and the DA was a "blind spot" in camera surveillance. (**Ex. J** at 41:14-42:24, 49:14-50:8, 62:12-63:10.)

Likewise, COII Hanks placed O.W. in a "worse position" by taking all but one inmate outside for their break. (**Ex. G** at 23:11-20.) Although COII Hanks testified that he did not know an inmate was in the DA (**Ex. G** at 35:18:36:1.), he only kept a "loose count" of the

ROBBINS CURTIN MILLEA & SHOWALTER, LLC
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

ROBBINS CURTIN MILLEA & SHOWALTER, LLC
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

inmates working in the kitchen. (**Ex. G** at 24:4-15.) This placed O.W. in a worse position than if COII Hanks had not acted at all because if COII Hanks had done nothing, he would have remained in the kitchen with the rest of the inmates. In all likelihood, the presence of a corrections officer and other inmate workers in the kitchen area just outside the DA would have deterred Hines from committing a sexual assault.

Defendants inject irrelevant facts about the actions of Trinity employees into their motion. (*See* Doc. 69, p. 10.) Evidence that Ms. Lehner was the person who initially let Hines into the DA or that Hines at one point "walked near Trinity employee Amy Link" are not relevant to whether Cpl. Nasta or COII Hanks engaged in affirmative conduct that exposed O.W. to an actual, particularized danger she otherwise would not have faced. *Polanco*, 76 F.4th at 926. There is no dispute that the corrections officers, not Trinity staff, were responsible for the supervision and control of inmates in the kitchen. (**Ex. G** at 54:22-24.)

There is also no dispute that Cpl. Nasta was aware that Hines was alone in the DA and that she affirmatively left him there unsupervised for a significant time. (**Ex. J** at 64:21-65:18, 71:8-20; **Ex. M** at pp. 2-3.) Defendants attempt to minimize their culpability by claiming "Hines was secured in a room in which he could not harm anyone" until O.W. let herself into the DA. (*See* Doc. 69, p. 11.) However, Cpl. Nasta left the DA door unlocked[8] after she checked on Hines, which allowed Hines to exit the DA and roam around the kitchen, unmonitored by corrections staff, several times before he entered the DA for the final time. (**Ex. J** at 45:11-46:5, 75:4-11, 85:14-18; **Ex. M** at pp. 2-3.)

Moreover, any attempt to blame O.W. for choosing to enter the DA, not asking an officer to remove Hines, not carrying her pepper spray, or having her radio in her shirt pocket does not relieve Defendants from liability under a state-created-danger theory. The Ninth

---

[8] Defendants claim the DA door was locked; however, Cpl. Nasta's deposition testimony and the video surveillance footage reviewed by investigators proves the door was not locked. (**Ex. J** at 45:11-46:5, 75:4-11, 85:14-18; **Ex. M** at pp. 2-3.) If the door had been locked, Hines would not have been able to exit the DA and walk around the kitchen unsupervised. (*See* **Ex. M** at pp. 2-3.)

Circuit has instructed that when "examining whether an officer affirmatively places an individual in danger, we do not look solely to the agency of the individual, nor do we rest our opinion on what options may or may not have been available to the individual. Instead, we examine whether the officers left the person in a situation that was more dangerous than the one in which they found him." *Munger v. City of Glasgow Police Dept.*, 227 F.3d 1082, 1086 (9th Cir. 2000); *see also Mathis v. Cnty. of Siskiyou*, 2025 WL 3078205, at *7 (E.D. Cal. Nov. 4, 2025) (explaining that evidence that the plaintiffs contributed to their "precarious circumstances" by choosing to live on land without a reliable source of water was not relevant to whether the defendants' actions created an actual, particularized danger the plaintiffs would not otherwise have faced by cutting off the residents' supply of trucked water).

### ii.   Warden Josefowicz and Director Thornell

As prison administrators, Warden Josefowicz and Director Thornell were responsible for implementing and enforcing policies and procedures. In their motion, Warden Josefowicz and Director Thornell admit they knew that the prisoner classification system resulted in close-custody inmates being assigned to work with civilians. (*See* Doc. 69, p. 14.) They presumably also knew that maximum custody inmates at ASPC-Tucson were being given "overrides" to close custody and that ADC policy permitted those inmates to be assigned to work in the kitchen without any "special assessment" that would otherwise be required before a maximum custody inmate could work in the kitchen. (*See* **Ex. A** at 9; **Ex. H** at 4.1.1; **Ex. F** at 61:18-62:4, 62:10-13, 62:21-23, 63:24-64:5, 64:8-15; **Ex. G** at 22:8-23:3, 23:6.) Warden Josefowicz and Director Thornell allowed these flawed policies to remain in place and also allowed environmental factors to exist within the DA—namely, the absence of camera surveillance and an emergency alert or panic button—which placed O.W. in a position of extreme vulnerability. (**Ex. Q** at pp. 4-5.)

### b. Actual, Particularized Danger

The Individual Defendants' affirmative conduct exposed a "discrete and identifiable group"—corrections and civilian staff in the Rincon kitchen, including O.W.—to the actual,

ROBBINS CURTIN MILLEA & SHOWALTER, LLC
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

ROBBINS CURTIN MILLEA & SHOWALTER, LLC
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

particularized danger of being assaulted by an inmate in the DA. *See Polanco*, 76 F.4th at 927 (quoting *Sinclair*, 61 F.4th at 683). By leaving Hines alone and unsupervised in the DA, Cpl. Nasta and COII Hanks exposed other staff to the danger that Hines would engage in misconduct or criminal activity in a secluded, restricted space where there was no camera surveillance. And by implementing and establishing deficient policies and inadequate safeguards like the lack of video surveillance, Warden Josefowicz and Director Thornell created a situation where civilian kitchen staff were working with highly dangerous inmates who should have been in maximum custody, without any safeguards for the "blind spot" where the staff restroom was located.

Defendants attempt to claim that they did not expose O.W. to an actual, particularized danger because they did not force her to enter the DA by herself and she had training on how to use her OC spray and radio. Defendants' argument fails because it is analogous to the defendants' argument in *Polanco*, where prison officials argued that the decedent did not have to work as a prison guard and could have simply quit his job if he did not want to be exposed to COVID-19. *Polanco*, 76 F.4th at 927. The Ninth Circuit rejected that argument, explaining that a plaintiff's ability to leave his post does not defeat a state-created-danger claim. *Id.*; *see also Munger*, 227 F.3d at 1086.

### c.  Foreseeability

The harm that resulted from the Individual Defendants' affirmative conduct—an inmate's violent assault on a civilian worker—was entirely foreseeable.

Both Cpl. Nasta and COII Hanks knew that they were working with high security inmates who posed a significant threat to staff, other inmates, and the public. (**Ex. J** at 77:11-21, 78:2-6; **Ex. G** at 43:16-21, 45:2-4, 46:18-19; 46:22-23.) They also knew that the DA was a particularly dangerous place in the Rincon kitchen because it was a "blind spot" with no surveillance cameras and was therefore more likely to be a place where inmates would engage in violence or criminal activity. (**Ex. J** at 41:14-42:24, 49:14-50:8; **Ex. G** at 7:18-20; 28:17-29:7; 36:13-17.) They also knew that any staff member who needed to access the restroom would have to walk through the DA. (**Ex. G** at 36:24-37:6.) Because of this risk of

ROBBINS CURTIN MILLEA & SHOWALTER, LLC
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax:   (602) 265-0267

harm to staff, Cpl. Nasta and COII Hanks knew they were required to follow policies requiring the DA door to remain locked and to maintain direct supervision of any inmate within the DA. (**Ex. J** at 38:17-22, 41:9-13, 45:11-46:5, 62:12-63:10, 63:22-25, 80:12-16; 81:8-12; **Ex. G** at 9:4-6, 9:14-10:3, 29:9-11, 30:11-13, 30:15-16, 35:11-13, 42:14-18.)

Cpl. Nasta and COIII Hines knew that, because of the high security level of the unit, any inmate working in the Rincon kitchen posed a danger to staff if left unsupervised in the DA. (**Ex. J** at 77:11-21, 78:2-6; **Ex. G** at 43:16-21, 45:2-4, 46:18-19; 46:22-23.) In addition, Cpl. Nasta knew that Hines specifically posed a threat to O.W. because he was "very mouthy" toward her and had made her feel so uncomfortable on at least one recent occasion that she wanted him moved out of the kitchen. (**Ex. J** at 18:21-20:3.) Cpl. Nasta also knew that Hines did not like to follow orders, would often wander off or enter places where he was not supposed to be, and had received a ticket just days earlier for not showing up to work. (**Ex. L** at 12:14-25.)

Warden Josefowicz and Director Thornell, as prison administrators, knew that Rincon kitchen policies and the specific features of the DA placed staff at risk and that at least two prior inmate-on-staff incidents had already occurred there. Warden Josefowicz and Director Thornell knew there was no camera surveillance and would also have known there was no emergency alert or panic button available to staff in the DA. (**Ex. G** at 36:13-17; **Ex. Q** at pp. 4-5.) They were aware that there had been a previous attempted assault by inmate on a female corrections officer while she was in the DA restroom. (*See* **Ex. G** at 12:2-19, 36:13-17.) They also knew, due to the annual reported inmate assaults, that an inmate had physically assaulted a male Trinity worker in the DA just one year prior to the assault on O.W. (**Ex. O**.) Another assault on a staff member in that area was foreseeable.

Defendants claim that the assault was not foreseeable because O.W. had been trained not to be alone with an inmate and had been assigned OC spray and a radio. To the contrary, the fact that ADC had provided O.W. with some training and limited safety measures establishes that an unsafe situation with an inmate was entirely foreseeable. Similarly, O.W.'s perception that she did not feel at risk or threatened by Hines' presence in the DA

ROBBINS CURTIN MILLEA & SHOWALTER, LLC
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

does not mean that the harm was not foreseeable to Defendants. As a civilian worker, O.W. did not attend the correctional officers' training academy, she did not know how inmates were classified, she did not have access to Hines disciplinary or classification records, and she was not responsible for supervising and controlling inmates. Had Defendants informed O.W. that Hines had been found guilty of stalking and exposing himself to female staff, her perception of him would likely have been much different. *See Grubbs I*, 974 F.2d at 121 (noting that the defendants enhanced the plaintiff's vulnerability by misrepresenting the risks of her work and failing to inform her at hiring that she would be left alone with violent offenders).

### 2. A reasonable jury can, and likely will, conclude that the Individual Defendants acted with deliberate indifference because they were aware of the danger and failed to take steps to mitigate the risk.

In the context of a state-created-danger claim, deliberate indifference is a subjective standard that requires a plaintiff to present evidence supporting an inference that the official "recognized an unreasonable risk and actually intended to expose the plaintiff to such risk." *Polanco*, 76 F.4th at 928 (quoting *Herrera v. L.A. Unified Sch. Dist.*, 18 F.4th 1156, 1160–61 (9th Cir. 2021)). Intent may be inferred from evidence that the official failed to mitigate a known risk to the plaintiff. *Id.* (finding that a jury could infer that prison officials intended to expose a prison guard to the risk of COVID-19 because they failed to take steps to mitigate the risk of an outbreak by following testing and masking guidance).

#### a. Cpl. Nasta and COII Hanks

A reasonable jury could find Cpl. Nasta and COII Hanks were deliberately indifferent because they both admittedly recognized an unreasonable risk to staff and knew the DA was a dangerous "blind spot" where inmates would be more likely to engage in criminal activity and where staff would be vulnerable to harm. (**Ex. J** at 41:14-42:24, 49:14-50:8; **Ex. G** at 7:18-20; 28:17-28:19; 28:22-29:7; 36:13-17.) They also knew that policy required corrections staff to keep the DA door locked and to directly and continuously supervise any inmate in the DA and that this policy existed for the specific purpose of protecting the safety

of Trinity and corrections staff. (**Ex. J** at 62:12-63:10, 80:12-16; **Ex. G** at 9:14-10:3, 30:11-13; 30:15-16.) For that reason, they both understood that they were supposed to maintain visual contact on any inmate in the DA. (*See id.*) Cpl. Nasta in particular knew that Hines was alone and unsupervised in the DA and that any Trinity staff member who needed to access the restroom would be vulnerable while she was in the control room instead of maintaining a visual on Hines. (**Ex. J** at 41:14-42:24, 49:14-50:8, 62:12-63:10, 64:21-65:18, 71:8-20; **Ex. M** at p. 2.)

A jury can also conclude that Cpl. Nasta and COII Hanks intended to expose Trinity staff, including O.W., to the danger that their affirmative conduct created because they failed to mitigate the risk by, for example, simply informing the Trinity workers that an inmate was alone in the DA or requesting that an additional officer be assigned to fill in for the corrections officer who had called in sick that day.

### b. Warden Josefowicz and Director Thornell

A reasonable jury can also find that Warden Josefowicz and Director Thornell were deliberately indifferent to an unreasonable risk to staff working in the Rincon kitchen. A reasonable inference is that Warden Josefowicz and Director Thornell, as prison administrators, knew that prison policy was deeply flawed because an inmate who received an override from maximum to close custody could work in the kitchen without any additional evaluation or assessment that would normally be given to inmate workers in maximum custody. (*See* **Ex. F** at 61:18-62:4, 62:10-13, 62:21-23, 63:24-64:5, 64:8-15.) Warden Josefowicz and Director Thornell would also have been aware of the two prior inmate-on-staff incidents as well as the absence of a camera and emergency alert system within the DA. (**Ex. G** at 12:2-19, 36:13-17; **Ex. O**; **Ex. Q** at pp. 4-5.) A jury can infer that by allowing deficient policies and environmental conditions to persist, Warden Josefowicz and Director Thornell intended to subject Rincon kitchen staff to an unreasonable risk of harm.

### 3. The Individual Defendants are not entitled to qualified immunity because the right at issue was clearly established long before

**September 2023.**

The Individual Defendants are not entitled to qualified immunity on Plaintiff's § 1983 claim. Qualified immunity "shields an official from damages in a civil suit unless the plaintiff can make the showing that the official's actions violated a constitutional right, and that the right was 'clearly established' at the time of the violative conduct." *Nelson v. City of Davis*, 685 F.3d 867, 875 (9th Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). First, as shown above, the facts taken in the light most favorable to Plaintiff establish that the Individual Defendants engaged in affirmative conduct that exposed O.W. to an actual, particularized danger that she would not otherwise have faced and that the Individual Defendants acted with deliberate indifference to that danger. *Polanco*, 76 F.4th at 926. Second, Plaintiff's right to be free of state-created danger while working in a correctional facility has been clearly established since the Ninth Circuit's 1992 decision in *Grubbs I*, 974 F.2d at 121. In *Grubbs I*, the Ninth Circuit held that a registered nurse at a custodial institution could maintain a § 1983 state-created-danger claim against her supervisors who assigned an inmate to work as her "cart boy" despite the supervisors' knowledge that the inmate was a violent sex offender and was likely to assault a female if left alone with her.

Defendants suggest that *Grubbs I* and *II* are not factually similar enough to this case and that Plaintiff must identify a case where the "specific operational decisions" present in this case were found unconstitutional. (*See* Doc. 69, p. 18.) The law does not require this level of specificity. "While the clearly established requisite does not require 'a case directly on point, existing precedent must place the lawfulness of the particular [action] beyond debate.'" *Gonzalez v. City of Phoenix*, 163 F.4th 1289, 1301 (9th Cir. 2026) (quoting *Dist. of Columbia v. Wesby*, 583 U.S. 48, 64 (2018)). "Indeed, 'even in novel factual circumstances,' the Supreme Court has recognized, '[o]fficials can still be on notice that their conduct violates established law.' *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). "[I]t is not necessary that the alleged acts have been previously held unconstitutional, as long as the unlawfulness was apparent in light of existing law."

ROBBINS **C**URTIN **M**ILLEA **& S**HOWALTER, LLC
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

*Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1060–61 (9th Cir. 2003) (citing *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)).

In *Polanco*, the Ninth Circuit recently explained that *Grubbs I* and its subsequent decision in *Pauluk* placed prison officials on notice that they may be liable under the state-created-danger doctrine where (1) the harmed party is their employee; (2) the harmed party encountered the subject danger while carrying out his or her duties in a correctional facility; and (3) the danger was created by requiring the employee to work in close proximity to people or physical workplace conditions that posed a risk. *Polanco*, 76 F.4th at 931.

Here, Defendants assert that O.W. was the State's statutory employee. There is no dispute that she was working in the Rincon kitchen and carrying out her duties when she encountered the danger. (**Ex. K** at 16:5-6; **Ex. J** at 6:20-23.) Her job required her to work closely with inmates who had been convicted of serious felonies and were determined to be a high security risk to staff, other inmates, and the public. (*See* **Ex. E** at 2.3.2.) Certain physical conditions of the workplace—the lack of cameras and an emergency alert in the DA or restroom—also increased the risk of harm. (*See* **Ex. Q** at pp. 4-5.) Thus, Defendants were on notice that any affirmative conduct that increased the risk or placed O.W. in a "worse position" would potentially subject them to liability under the state-created-danger doctrine. *See Polanco*, 76 F.4th at 926, 931.

### B.  The State of Arizona is not entitled to summary judgment on O.W.'s claim for intentional infliction of emotional distress (Count Two).

The State is not entitled to summary judgment on Plaintiff's intentional infliction of emotional distress (IIED) claim because a jury could reasonably find that the State and its employees engaged in conduct that was extreme and outrageous when they placed a violent, high risk inmate with a known history of sexual harassment and misconduct toward female staff in a work environment with a female civilian; allowed the inmate to remain in the workplace even after the civilian reported that he made her uncomfortable and she wanted him moved; and subsequently left the inmate unsupervised in a restricted area where civilian

staff would go to use the restroom. (*See* **Ex. F** at 40:3-25, 45:10-46:5, 46:9-12, 46:20-47:1, 47:9-16, 48:6-49:20; **Ex. J** at 18:21-20:9, 65:23-66:8; **Ex. G** at 36:24-37:6.)

To prevail on a claim for IIED in Arizona, a plaintiff must establish three elements: "*first*, the conduct by the defendant must be 'extreme' and 'outrageous'; *second,* the defendant must either intend to cause emotional distress or recklessly disregard the near certainty that such distress will result from his conduct; and *third,* severe emotional distress must indeed occur as a result of defendant's conduct." *Ford v. Revlon, Inc.*, 153 Ariz. 38, 43, 734 P.2d 580, 585 (1987) (holding that a corporate employer's conduct was extreme and outrageous where the employer failed to respond to the plaintiff's complaints of sexual harassment in the workplace, leaving the plaintiff without redress for several months).

### 1. The State's conduct was extreme and outrageous.

Extreme and outrageous conduct is conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Christakis v. Deitsch*, 250 Ariz. 246, 250, ¶ 10, 478 P.3d 241, 245 (App. 2020) (citation omitted). "It does not include 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'" *Id.* (citation omitted). If reasonable minds could differ about whether the conduct is sufficiently outrageous, the issue should be decided by a jury. *Id.* (quoting *Johnson v. McDonald*, 197 Ariz. 155, 160, ¶ 23, 3 P.3d 1075, 1080 (App. 1999)).

The State argues that its conduct was not extreme or outrageous because Hines had been "written up several times for disobeying orders", there had been only two other inmate-on-staff incidents in the DA over the course of two to four years, and "allowing an inmate with [Hines'] history to work with civilian workers is not outrageous or extreme." (See Doc. 69, pp. 19-21.) The State's argument is unavailing because it significantly downplays Hines' disciplinary history and prior incidents of sexual misconduct toward women as well as the State's role in assigning Hines to work in close proximity to female civilians.

The evidence shows that the State, through its own policies and the actions of its employees, engaged in egregious conduct that placed O.W. in a position of extreme

Page 23 of 37

ROBBINS CURTIN MILLEA & SHOWALTER, LLC
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

ROBBINS CURTIN MILLEA & SHOWALTER, LLC
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

vulnerability and facilitated the sexual assault. The State's policies and conduct were outrageous because they allowed a maximum custody inmate to receive an override to close custody and also allowed such an inmate to be placed in a work assignment with civilians without any special review or consideration. (**Ex. H** at 4.1.1; **Ex. F** at 62:10-13, 62:21-23, 63:24-64:5, 64:8-15.) The State assigned Hines to work in the kitchen alongside female civilians even though Hines had a violent conviction for armed robbery, met the criteria for maximum custody but received an override, had more than fifty disciplinary infractions over three-and-a-half years, and had been found guilty of stalking and two incidents of indecent exposure toward female staff. (*See* **Ex. A**; **Ex. B**; **Ex. C**; **Ex. D**; **Ex. F** at 40:3-25, 46:9-12, 45:10-46:5, 46:9-12, 46:20-47:1, 48:6-49:20, 61:18-62:4.) Further, the State ignored O.W.'s complaint about Hines. (*See* **Ex. J** at 19:9-20:3.)

The State attempts to make light of Hines' discipline for masturbating toward female officers (*see* Doc. 69, p. 21), but the repeated nature of this conduct within a relatively short time frame placed the State on notice that Hines would do it again or even escalate his behavior. Moreover, the stalking incident in March 2020 bears strong similarities to this case. (*See* **Ex. C**; **Ex. D**.) There, Hines cornered a teacher alone in her classroom, blocked the doorway in a threatening manner, and prevented her from leaving until she pushed around him and left. (**Ex. B**, at 4, 6.) It was entirely foreseeable that Hines would take this behavior a step further and assault a female civilian if given another opportunity. A jury could easily find the State's decision to assign him to the kitchen outrageous and unacceptable under these circumstances.

Additional facts support the conclusion that the State and its employees engaged in conduct that was extreme and outrageous. Within about a month of the assault, O.W. reported to Cpl. Nasta that Hines gave her a weird feeling and she wanted him out of the kitchen. (**Ex. J** at 19:9-20:3.) Either Cpl. Nasta or O.W. submitted an IR about this incident.[9]

9 No copy of the IR has been produced. During her deposition, Cpl. Nasta testified that she attempted to locate a copy of the IR but was not able to find it, which was not unusual. (**Ex.**

ROBBINS CURTIN MILLEA & SHOWALTER, LLC
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

(**Ex. J** at 19:9-20:3.) However, no ADC personnel took steps to address O.W.'s concern, and Hines remained assigned to the kitchen. In the days before the assault, Hines' behavior in the kitchen was becoming increasingly problematic. He had received an "unsatisfactory" evaluation and had been written up for failing to come to work, in addition to several other disciplinary charges in mid- to late-September. (**Ex. A** at 10; **Ex. F** at 53:12-15, 54:17-25; **Ex. I** at ADCRR 3584-85; **Ex. J** at 35:24-36:17.) Finally, on the day of the assault, corrections staff left Hines alone and unsupervised in a restricted area that encompassed the only staff restroom in the Rincon kitchen, where they knew that inmates were likely to engage in criminal activity and where Trinity employees would be particularly vulnerable to harm. (**Ex. J** at 41:14-42:24, 49:14-50:8, 65:23-66:8; **Ex. G** at 7:18-20; 28:17-28:19; 28:22-29:4; 29:7; 36:13-17.)

A reasonable jury can find that any of these actions caused the sexual assault on O.W. and were extreme, outrageous, and "utterly intolerable." *See Christakis*, 250 Ariz. at 250, ¶ 10, 478 P.3d at 245.

### 2. The State recklessly disregarded the near certainty that its conduct would result in emotional distress.

Under the Restatement (Second) of Torts, the mental state of recklessness requires a "deliberate disregard of a high degree of probability that emotional distress will follow." *Doe v. W. Alton Marina, LLC*, 646 F. Supp. 3d 315, 326 (D.N.H. 2022) (holding that child victims of sexual abuse stated claims for IIED against marina owners for facilitating sexual abuse by the marina's manager) (quoting Restatement (Second) of Torts § 46, cmt. i); *see also Powers v. Taser Int'l, Inc.*, 217 Ariz. 398, 403, ¶ 19, 174 P.3d 777, 782 (App. 2007), as corrected (Jan. 4, 2008) (providing that Arizona courts generally follow the Restatement absent controlling law to the contrary). "Importantly, the definition of reckless conduct applies equally to action and inaction." *W. Alton Marina, LLC*, 646 F. Supp. 3d at 326. "A person behaves recklessly if he 'knows, or has reason to know . . . of facts which create a

**J** at 20:4-22:19.) She also asked an administrative assistant to look for it but never heard back or followed up. (*See id.*)

ROBBINS CURTIN MILLEA & SHOWALTER, LLC
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

high degree of risk of physical harm to another, and deliberately proceeds to act, or fails to act, in conscious disregard of, or indifference to, that risk.'" *Id.* at 326-27 (quoting Restatement (Second) of Torts § 500 cmt. a). "Further, a finding of recklessness does not require an allegation that an actor aim his conduct toward a specific person." *Id.* at 327 (quoting *Doe 1 ex rel. Doe 1 v. Roman Catholic Diocese of Nashville*, 154 S.W. 3d 22, 37 (Tenn. 2005) ("Recklessness cannot require that the actor aim the conduct toward a specific person or a specific result, for to do so would contradict the inattentive and thoughtless nature of disregard.")).

The evidence in this case supports a finding that the State and its employees knew or had reason to know that their conduct created a high risk of emotional distress to others, including civilian kitchen staff, yet they acted or failed to act with indifference to that risk. *See W. Alton Marina, LLC*, 646 F. Supp. 3d at 326. The State argues that Plaintiff cannot prove the requisite mental state because Warden Josefowicz and Director Thornell had no knowledge of Hines and Cpl. Nasta and COII Hanks did not intend to cause O.W. emotional distress "by not checking on Hines sooner . . . ." (*See* Doc. 69, p. 22.) However, Plaintiff is not limited to proving that these specific individuals intended to cause her harm or that their conduct was aimed at a specific result. *See Doe 1 ex rel. Doe 1*, 154 S.W. 3d at 37. The State also claims that O.W.'s post-incident conduct toward Cpl. Nasta and COII Hanks shows that they did not intend to cause her harm, but any inference that O.W. remained cordial or even friendly with Cpl. Nasta and COII Hanks after the assault is not evidence of whether Cpl. Nasta and COII Hanks acted with reckless disregard.

ADC staff and administrators knew that violent, high security inmates in the Rincon Unit would be assigned to work with civilians in the kitchen, and they knew that due to a lack of camera surveillance and a fixed emergency alert system, the DA was an especially vulnerable place for Trinity staff. (**Ex. J** at 41:14-42:24, 49:14-50:8; **Ex. G** at 7:18-20; 28:17-28:19; 28:22-29:4; 29:7; 36:13-17; **Ex. Q** at pp. 4-5.) ADC staff also assigned Hines to the kitchen with knowledge of his classification history and discipline that included several instances of sexual misconduct toward women. (**Ex. F** at 40:3-25, 46:9-12.) Cpl.

ROBBINS **CURTIN MILLEA & SHOWALTER,** LLC
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

Nasta knew that Hines had made O.W. feel so uncomfortable on at least one occasion that she wanted him removed from the kitchen. (**Ex. J** at 19:9-20:3.)

Moreover, Cpl. Nasta and COII Hanks—the only two corrections staff with responsibility for inmate kitchen workers on the day of the attack—both knew and understood the significant danger of allowing an inmate unattended in the DA. They both testified that they knew the DA was a "blind spot" where inmates were likely to engage in misconduct and that it was a particularly dangerous place for staff for this reason. (**Ex. J** at 41:14-42:24, 49:14-50:8; **Ex. G** at 7:18-20; 28:17-28:19; 28:22-29:4; 29:7; 36:13-17.) They also knew that policies were in place to protect themselves and Trinity staff, which required them to maintain visual contact on any inmate in the DA. (**Ex. J** at 62:12-63:10, 80:12-16; **Ex. G** at 9:14-10:3, 30:11-13; 30:15-16.)

Based on these facts, a reasonable jury could find that ADC staff knew or had reason to know that their conduct created a high degree of risk to civilian staff within the Rincon kitchen and that they acted or failed to act with conscious indifference to that risk. *W. Alton Marina, LLC*, 646 F. Supp. 3d at 326-27.

### 3. O.W. suffered severe emotional distress as a result of the State's conduct.

There is no dispute that O.W. suffered severe emotional distress. She has been diagnosed with post-traumatic stress disorder and has experienced an exacerbation in underlying depression and anxiety. (**Ex. P**, pp. 10-11.) Since the assault, she has experienced nightmares, hypervigilance, flashbacks, intrusive memories, anxiety, fear, social withdrawal, and cognitive and physical avoidance. (**Ex. P**, p. 10.) These symptoms have been present since the assault and have led to significant functional impairment, occupational challenges, decreased social engagement, and difficulty in O.W.'s ability to leave her house. *Id.*

### C. The State of Arizona is not entitled to summary judgment on O.W.'s negligence/gross negligence claims (Counts Three and Four).

Plaintiff asserted two claims for negligence/gross negligence against the State: one

ROBBINS CURTIN MILLEA & SHOWALTER, LLC
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ◆ Fax: (602) 265-0267

claim for the State's negligence in establishing inadequate policies, failing to adequately staff the Rincon Unit, failing to properly supervise and control inmates, and failing to properly train and supervise its employees (Count Three) and one claim for the State's vicarious liability for the negligence of its employees (Count Four). The State asserts that O.W. is the State's statutory employee and that the exclusivity provision of the Arizona Worker's Compensation Act bars her negligence claims.

### 1. The State has waived any "statutory employer" affirmative defense.

Under Arizona law, the "statutory employer" doctrine is an affirmative defense to liability. *See Pruitt v. State*, 571 P.3d 356, 362 (App. 2025), *review denied* (Nov. 4, 2025) (describing the defense as a statutory immunity). Rule 12(b) requires that "every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required." Affirmative defenses that are not raised in a defendant's answer to a complaint are generally deemed waived. *UL LLC v. Space Chariot Inc.*, 250 F. Supp. 3d 596, 612 (C.D. Cal. 2017). "A defendant is required to provide the plaintiff with fair notice of an affirmative defense in a pleading." *Pozez v. Ethanol Capital Mgmt., LLC*, 2012 WL 12871197, at *2 (D. Ariz. Oct. 26, 2012) (finding the defendant waived the defense of failure of consideration when it failed to re-plead the defense in its amended answer). However, a defendant may raise an affirmative defense for the first time in a motion for summary judgment "only if the delay does not prejudice the plaintiff." *UL LLC*, 250 F. Supp. 3d at 612 (quoting *Magana v. Com. of the N. Mariana Islands*, 107 F.3d 1436, 1446 (9th Cir. 1997)).

Under Arizona law, the "statutory employer" defense is an affirmative defense that provides immunity from suit. *See Pruitt v. State*, 571 P.3d 356, 361 (App. 2025), *review denied* (Nov. 4, 2025). The State of Arizona waived this affirmative defense by failing to properly and timely assert it in the State's Answer to O.W.'s First Amended Complaint.[10]

---

[10] Other jurisdictions have found that defendants waived affirmative immunity defenses under similar circumstances. *See e.g.*, *Cook v. Taylor*, 324 So. 3d 333, 334–35 (Miss. Ct. App. 2021) (holding that a firefighter waived a defense of qualified immunity under the Mississippi Tort Claims Act where he failed to assert it as an affirmative defense in his answer and "actively participated in the litigation process" for 14 months before raising the

ROBBINS CURTIN MILLEA & SHOWALTER, LLC
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

*See* Doc. 16, pp. 15-16. In fact, the State not only failed to affirmatively plead any defense related to the "statutory employer" or "exclusive remedy" provisions of Arizona's Workers' Compensation Act, but it also *expressly denied* that it was O.W.'s statutory employer. *Compare* Doc. 1-1, p. 30, ¶ 157, *with* Doc. 16, p. 14, ¶ 157. The State's boilerplate, "catch all" language that Defendants "may be immune pursuant to . . . other statutory and common law absolute and qualified immunities . . ." (*see* Doc. 16, ¶ 175) is not sufficient to assert the defense, especially in light of the express denial that the State was O.W.'s statutory employer. *See Perez v. Gordon & Wong Law Group, P.C.*, 2012 WL 1029425, at *10 (N.D. Cal. Mar. 26, 2012) (striking insufficiently pled affirmative defenses where defendants failed to allege basic factual allegations supporting the defenses and therefore deprived the plaintiff of fair notice).

The Court should reject the State's argument that Trinity's answer somehow placed Plaintiff on notice that the State would assert a statutory employer defense. (See Doc. 69, p. 24.) Trinity's answer asserted the affirmative defenses that were potentially available to it and have nothing to do with whether the State was or was not O.W.'s statutory employer. (*See* Doc. 17, ¶ 14.) Notably, the State could have amended its answer at an appropriate time but never did, likely because it perceived some litigation advantage to refusing to take a position on the employment relationship.

The State also misleadingly suggests that it "specifically cited this defense" in response to O.W.'s interrogatories. (*See* Doc. 69, p. 24.) In response to Plaintiff's contention interrogatories, the State equivocally responded that "*if* the State is her statutory employer,

---

defense in a motion for summary judgment); *Helton v. Brent Belcher Properties, Ltd.*, 64 So. 3d 25, 29 (Ala. Civ. App. 2010) (holding that the defendants waived their affirmative defense that a worker's tort claims against them were barred by the exclusivity provision of the Workers' Compensation Act where the defendants did not set forth the defense in their answer and stated it for the first time in motion for summary judgment); *Turner Const. Co. v. Hebner*, 419 A.2d 488, 491-92 (Pa. Super. 1980) (holding that the defendant's failure to timely plead its statutory employer affirmative defense resulted in waiver and thus the Workmen's Compensation Act did not bar a widow's trespass action).

**ROBBINS CURTIN MILLEA & SHOWALTER, LLC**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ◆ Fax: (602) 265-0267

*then* worker's compensation is her sole remedy . . ." (**Ex. R** at p. 3 (emphasis added).) The State also stated that the case "remains in the early stages of discovery" and failed to provide facts or evidence that purportedly supported any such defense. *Id.* Of course, the State was in possession of its contract with Trinity and could have identified facts supporting the defense had it wanted to do so.

The State repeatedly references the *Fox* case and suggests the outcome should be the same here, but the State neglects to inform the Court that in its answer to Ms. Fox's First Amended Complaint, the State clearly asserted that "[w]orkers' compensation provides the exclusive remedy for Plaintiff's claims against the State." (*See Fox v. State of Arizona, et al.*, 2:21-cv-01089-MTL, Doc. 36, p. 14.) These cases are not comparable for this reason.

Here, Plaintiff pled claims against the State under both state and federal law that required the State to take a position on its employment relationship with O.W. The State expressly denied that it was O.W.'s statutory employer in its answer then provided vague and ambiguous interrogatory responses that provided no clarity on its position. After actively participating in litigation for ten months, the State raised the issue for the first time in its motion to dismiss for lack of subject matter jurisdiction. (*See* Doc. 53.).

There was no justification for the State's failure to timely and properly assert the statutory employer defense. The State's failure to provide fair notice of this defense prejudiced O.W. by necessitating the expenditure of time, resources, and litigation costs for discovery, including expert opinions, on the negligence claims which the State now contends are barred. Under these circumstances, the Court should find that the State waived the statutory employer affirmative defense.

**2. O.W.'s negligence claims are not barred because claims arising from an intentional sexual assault are not within the scope of the Workers' Compensation Act.**

O.W. does not dispute that she worked for the private food service contractor that is the subject of the contract documents the State references in support of its motion. However, whether she was the State's statutory employee does not control. Because injuries arising

from an intentional sexual assault are not within the scope of Arizona's workers' compensation law, the exclusive remedy rule does not preclude O.W.'s tort claims against the State.

In Arizona, workers' compensation is mandated by the state constitution. *See* Ariz. Const., Art. XVIII, Sec. 8. The Arizona Constitution defines the compensation to be paid when a worker is injured or killed through "any *accident* arising out of and in the course of, such employment," or by "a necessary risk or danger inherent" in the employment. *Id.* (emphasis added). The test of compensability is whether the injury or death is caused or contributed to by a "necessary risk or danger of such employment, or a necessary risk or danger inherent in the nature thereof." *Id.* The Workers' Compensation Act ("the Act") likewise limits the right to compensation to employees who are injured or killed "*by accident arising out of and in the course of his employment . . . .*" A.R.S. § 23-1021 (emphasis added). Thus, an employee who slips and falls on the job due to a slippery or uneven walking surface has clearly experienced an "accident" arising out of and in the course of employment and is covered by workers' compensation. *See Pruitt*, 571 P.3d at 359 (employee of call center that contracted with ADC tripped in a pothole while escorting inmates across a prison complex); *Wagner,* 242 Ariz. at 96, ¶ 2, 393 P.3d at 157 (social worker for contracted healthcare provider tripped and fell on an unmarked wet floor while working at a prison complex).

However, sexual assaults and intentional or reckless conduct that facilitates such assaults are not "accidents" and are not compensable, even if they occur on the job. *See Ford v. Revlon, Inc.*, 153 Ariz. 38, 44, 734 P.2d 580, 586 (1987) (holding that a co-employee's sexual assault and employer's failure to respond to reports of sexual harassment and assault were not "accidents" and were not encompassed by the workers' compensation statute; therefore, the injured employee was free to enforce common-law liability); *Epperson v. Indus. Comm'n*, 26 Ariz. App. 467, 469, 549 P.2d 247, 249 (1976) (explaining that "[i]f the motivating cause of an assault is purely personal, compensation is ordinarily denied" because the assault does not arise out of the employment); *see also Estate of Sims v.*

ROBBINS **CURTIN MILLEA & SHOWALTER**, LLC
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

ROBBINS CURTIN MILLEA & SHOWALTER, LLC
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

*Industrial Commission of Arizona,* 138 Ariz. 112, 115, 673 P.2d 310, 313 (App. 1983) (murder while on training trip was not compensable).

A violent sexual assault is not an inherent risk of employment. Being the victim of a violent sexual assault and the resulting psychological injuries are not the type of risk that is inherent in or incident to any job. It is certainly not an inherent risk of working in the food service industry, even when working in a highly secured, state-operated prison.

The State contends that Hines' attack on O.W. was "distinctly work related" but the evidence suggests that the attack was both personal and premeditated. After the assault, another inmate informed an investigator that Hines had been high on spice (synthetic marijuana) and stated, "Today's the day, I'm gonna get that, that bitch is mine, I'm getting that." (**Ex. M** at pp. 6-7.) The inmate also reported that he had overheard Hines speaking with another inmate about sexually assaulting female staff members. *Id.* This strongly suggests that Hines had a personal reason for attacking O.W. *See Epperson*, 26 Ariz. App. at 469, 549 P.2d at 249 (affirming a finding that an assault on an employee was not compensable under Arizona's Worker's Compensation Act where the assailant, the employee's husband, was motivated by a personal dispute).

Although O.W. applied for and receives worker's compensation benefits, she is not seeking a "double recovery," nor has she been fully compensated. O.W. receives an amount equal to two-thirds ($^2/_3$) of her average monthly wage that she earned from Trinity in 2023, and worker's compensation covered her medical bills and the cost of re-training in the form of nail technician school. O.W. has not received any compensation for the severe psychological injuries, emotional distress, and loss of enjoyment of life that she seeks in this case.

### D. The State of Arizona is not entitled to summary judgment on O.W.'s Title VII hostile work environment claim (Count Six).

Title VII of the Civil Rights Act of 1964 prohibits sex discrimination, including sexual harassment, in employment. 42 U.S.C. § 2000e-2(a)(1). To succeed on a Title VII claim for hostile work environment, a plaintiff must establish that (1) she was subjected to

ROBBINS CURTIN MILLEA & SHOWALTER, LLC
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

a hostile work environment; and (2) her employer is liable for the harassment that caused the hostile environment to exist. *Fried v. Wynn Las Vegas, LLC*, 18 F.4th 643, 647 (9th Cir. 2021) (citing *Freitag v. Ayers*, 468 F.3d 528, 539 (9th Cir. 2006)). To establish she was subjected to a hostile work environment, a plaintiff is required to prove that: "(1) [s]he was subjected to verbal or physical conduct of a sexual nature; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." *Id.* (citing *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 966 (9th Cir. 2002)).

Under Title VII, an employer is only liable for its own acts, but it is well established that an employer creates a hostile work environment "by failing to take immediate and corrective action" in response to a coworker's or third party's sexual harassment which the employer knew or should have known about. *Fried v. Wynn Las Vegas, LLC*, 18 F.4th 643, 647 (9th Cir. 2021) (citations omitted); *see also Nichols v. Azteca Rest. Enterprises, Inc.*, 256 F.3d 864, 875 (9th Cir. 2001) ("When harassment by co-workers is at issue, the employer's conduct is reviewed for negligence."). Once an employer knows or should know of sexual harassment by a coworker or third party, a "remedial obligation kicks in." *Nichols*, 256 F.3d at 875 (quoting *Fuller v. City of Oakland, Cal.*, 47 F.3d 1522, 1528 (9th Cir. 1995), *as amended* (Apr. 24, 1995)). Remedies for sexual harassment should be "reasonably calculated to end the harassment", and the reasonableness of the remedy will depend on the employer's ability to (1) "stop harassment by the person who engaged in harassment;" and (2) "persuade potential harassers to refrain from unlawful conduct." *Id.* (quoting *Ellison v. Brady*, 924 F.2d 872, 882 (9th Cir. 1991)). "When the employer undertakes no remedy, or where the remedy does not end the current harassment and deter future harassment, liability attaches for both the past harassment and any future harassment." *Id.* at 875-76 (citing *Fuller,* 47 F.3d at 1528–29).

Summary judgment on Plaintiff's hostile work environment claim should be denied because there are disputed issues of material fact regarding whether the State knew or should have known of Hines' harassment of O.W. before the ultimate sexual assault and whether

the State took adequate remedial measures to end the harassment.

First, a jury could reasonably conclude that the State knew or should have known of Hines' harassment. The kitchen corrections supervisor, Cpl. Nasta, testified in her deposition that Hines' was "very mouthy" to O.W. and that O.W. had reported that Hines had done something to give her a "weird feeling" that was apparently so significant that O.W. wanted him removed from the kitchen. (**Ex. J** at 18:21-20:3.) Cpl. Nasta also testified that either she or O.W. had submitted an Information Report about this incident. (**Ex. J** at 19:9-20:3.) Summary judgment is not appropriate where the parties dispute the "specific nature" of the plaintiff employee's complaints. *See Reynaga v. Roseburg Forest Products*, 847 F.3d 678, 689 (9th Cir. 2017) (denying summary judgment on a hostile work environment claim where the employer argued the employee had not made a verbal complaint about a "racial issue" but the plaintiff employee testified that he had reported being harassed in a racist manner).

In addition, the State knew that Hines had a long disciplinary history that included egregious instances of stalking and exposing himself to female staff, yet it assigned him to work in the kitchen with female civilians despite known security issues, including a lack of camera surveillance that made the only staff restroom in the kitchen a security risk. (**Ex. B**; **Ex. C**; **Ex. D**; **Ex. F** at 40:3-25, 45:10-46:5, 46:9-12, 46:20-47:1, 48:6-49:20; **Ex. Q** at pp. 4-5.) The State's knowledge of Hines' prior incidents of sexual harassment and misconduct is "relevant and probative" of the State's "general attitude of disrespect toward [its] female employees." *Fuller v. Idaho Dep't of Corr.*, 865 F.3d 1154, 1162 n.8 (9th Cir. 2017) (quoting *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 445 (9th Cir. 2017)). The jury may consider this evidence in determining whether the State created an environment that was objectively hostile to female employees. *See Zetwick*, 850 F.3d at 445).

Summary judgment is also inappropriate because a jury can reasonably find that the State failed to take remedial action after O.W. reported her concern about Hines to Cpl. Nasta. "If an employer fails to take corrective action after learning of an employee's sexually harassing conduct, or takes inadequate action that emboldens the harasser to continue his misconduct, the employer can be deemed to have adopted the harasser's conduct and its

ROBBINS CURTIN MILLEA & SHOWALTER, LLC
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

results." *Garcia v. Los Banos Unified Sch. Dist.*, 418 F. Supp. 2d 1194, 1226 (E.D. Cal. 2006) (finding that a school district's response to a complaint of sexual harassment was adequate where "various steps of the complaint procedure were completed with relatively minimal delay", witnesses were contacted, and the plaintiff was interviewed).

Here, there was no follow-up whatsoever by Cpl. Nasta or anyone else within ADC to address O.W.'s concern and request that Hines be removed from the kitchen. ADC did not undertake an investigation to gather more information from O.W. about what had happened, to identify potential witnesses, or to speak with Hines. Given that Hines was an inmate in the custody of ADC, a simple and effective remedial measure would have been to simply assign him to a different position, like that of groundskeeper or maintenance worker, where he would not have had contact with female civilian workers. (**Ex. F** at 17:19-18:7.) A jury may reasonably infer that the State's complete inaction following O.W.'s verbal report to Cpl. Nasta endorsed and emboldened Hines to continue, and escalate, the misconduct.

### III.    Conclusion

Taking the facts in the light most favorable to Plaintiff, Defendants are not entitled to summary judgment on any count in the FAC. The Individual Defendants engaged in affirmative conduct that violated Plaintiff's clearly-established due process right to be free of state-created danger in the workplace. The State is not entitled to summary judgment on Plaintiff's negligence claims because it waived its affirmative defense of statutory employer immunity and because claims arising from an intentional sexual assault or the employer's conduct that facilitates an assault are not within the scope of Arizona's Worker's Compensation Act. Finally, there are disputed issues of material fact which preclude summary judgment for the State on Plaintiff's state law IIED claim and Title VII hostile work environment claim. Accordingly, Plaintiff respectfully requests that the Court deny the State Defendants' Motion for Summary Judgment.

//

//

ROBBINS CURTIN MILLEA & SHOWALTER, LLC
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ◆ Fax: (602) 265-0267

RESPECTFULLY SUBMITTED: June 22, 2026.

**ROBBINS CURTIN MILLEA & SHOWALTER, LLC**

By:  s/ Jesse M. Showalter
     Jesse M. Showalter
     Lauren E. Channell
     *Attorneys for Plaintiff*

ROBBINS CURTIN MILLEA & SHOWALTER, LLC
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

**CERTIFICATE OF SERVICE**

I hereby certify that on June 22, 2026, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the assigned Judge and the following ECF registrants:

Mark D. Lammers
Zoey Kotzambasis
Rusing Lopez & Lizardi, P.L.L.C.
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
mdlammers@rllaz.com
zkotzambasis@rllaz.com

*Attorney for Defendants State of Arizona, Ryan Thornell, Christopher Josefowicz, Kaylan Nasta, and Talon Hanks*

R. Shawn Oller
Chrisanne M. Gultz
Littler Mendelson
2425 E. Camelback Rd., Suite 900
Phoenix, Arizona 85016
soller@littler.com
cgultz@littler.com

*Attorney for Defendants TKC Holdings, Inc. and Trinity Services Group, Inc.*

By:    *s/ Jennie Leetham*

ROBBINS CURTIN MILLEA & SHOWALTER, LLC
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

## **TABLE OF CONTENTS – PLAINTIFF'S EXHIBITS**

A. Public ACIS Report

B. Inmate Disciplinary Record

C. Inmate Disciplinary Report

D. Inmate Disciplinary Report

E. ADCRR Department Order 801

F. Jennifer Valenzuela Deposition Transcript

G. Talon Hanks Deposition Transcript

H. ADCRR Department Order 903

I. Inmate Disciplinary Charges

J. Kaylan Nasta Deposition Transcript

K. O.W. Deposition Transcript

L. Kaylan Nasta CIU Interview Transcript

M. CIU Report

N. Rhonda Lehner Deposition Transcript

O. Rincon Aggravated Assault Statistics

P. Dr. Shaw Report

Q. Aubrey Land Report

R. State's Response to First Set of Discovery Responses

# EXHIBIT A

**Report:** 0460
**Run Date:** 12/02/2025 07:05
**Page:** 1 of 10

# ARIZONA DEPARTMENT OF CORRECTIONS
## INMATE RECORD
Public Report
including ALL episodes



ADC NO: 340557          Name: HINES, DEMARCO          Status: Out to Court

Last DOC#: 001          LOC:

Sex: M                  Age: 26          Release Type    Release Date
Race: Black             Custody: 5/5          CSBD   03/24/2028
                                              CSED   09/24/2029
                                              ERCD   03/26/2028
                                              SED    10/18/2028

## Commitments

**Episode #001**

| Com | County | Sent. Begin | Sent. Imp. | Status |
|-----|--------|-------------|------------|--------|
| A | Maricopa | 10/19/2017 | 11Y | Imposed |

| # | Case Num | Offense Description | Felony | Concurrent | Consecutive | Status |
|---|----------|---------------------|--------|------------|-------------|--------|
| 01 | 2017148317002 | ARMED ROBBERY | CL 2 D/NR | | | Active |

| Com | County | Sent. Begin | Sent. Imp. | Status |
|-----|--------|-------------|------------|--------|
| B | Maricopa | 08/14/2017 | 3Y 6M | Imposed |

| # | Case Num | Offense Description | Felony | Concurrent | Consecutive | Status |
|---|----------|---------------------|--------|------------|-------------|--------|
| 01 | 2017137455001 | THFT MEANS OF TRNSPRTATION | CL 3 ND/NR | A01 A01 | | Expired |

## Movements

**Episode #001**

| Date | Type | Destination | Reason For | Orign |
|------|------|-------------|------------|-------|
| 12/10/2019 | New Commitment | | New Felony Conviction | |
| 12/10/2019 | | ASPC-PHX RECEPTION | Routine | |
| 12/16/2019 | Transfer Out - Unit Departure | ASPC-T WINCHESTER | Action/Work Completed | |
| 12/16/2019 | Transfer Out - Prison/CIP Departure | ASPC-T WINCHESTER | Action/Work Completed | |
| 12/16/2019 | Transfer In - Prison/CIP Arrival | | Action/Work Completed | ASPC-T WINCHESTER |
| 12/16/2019 | Transfer In - Unit Arrival | | Action/Work Completed | ASPC-T WINCHESTER |
| 12/16/2019 | | ASPC-T WINCHESTER | Routine | |
| 03/16/2020 | Transfer Out - Unit Departure | ASPC-T SANTA RITA | Lateral Transfer | ASPC-T WINCHESTER |
| 03/16/2020 | Transfer In - Unit Arrival | | Lateral Transfer | |
| 03/16/2020 | | ASPC-T SANTA RITA | Routine | |
| 05/14/2020 | Transfer Out - Unit Departure | ASPC-T RINCON MHW | Mental Health Watch | ASPC-T SANTA RITA |
| 05/14/2020 | Transfer In - Unit Arrival | | Mental Health Watch | |
| 05/14/2020 | | ASPC-T RINCON MHW | Routine | |
| 05/14/2020 | Transfer Out - Unit Departure | ASPC-T RINCON MHW | Mental Health Watch | ASPC-T RINCON MHW |
| 05/14/2020 | Transfer In - Unit Arrival | | Mental Health Watch | ASPC-T RINCON MHW |
| 05/14/2020 | | ASPC-T RINCON MHW | Routine | |
| 05/16/2020 | | ASPC-T RINCON MHW | Unassigned from bed | |
| 05/16/2020 | | ASPC-T RINCON MHW | Routine | |
| 05/17/2020 | | ASPC-T RINCON MHW | Unassigned from bed | |
| 05/17/2020 | | ASPC-T RINCON MHW | Routine | |
| 05/17/2020 | | ASPC-T RINCON MHW | Unassigned from bed | |
| 05/17/2020 | | ASPC-T RINCON MHW | Routine | |
| 05/18/2020 | Transfer Out - Unit Departure | ASPC-T SANTA RITA | Completed Treatment | ASPC-T RINCON MHW |
| 05/18/2020 | Transfer In - Unit Arrival | | Completed Treatment | ASPC-T SANTA RITA |
| 05/18/2020 | | ASPC-T SANTA RITA | Routine | |
| 09/05/2020 | Out to Hospital | | Medical Needs | ASPC-T SANTA RITA |
| 09/05/2020 | Return from Hospital | ASPC-T SANTA RITA | Medical Needs | ASPC-T SANTA RITA |
| 09/05/2020 | | ASPC-T SANTA RITA | Unassigned from bed | |
| 09/05/2020 | | ASPC-T SANTA RITA | Routine | |

O.W. 002184

**Report:** 0460

# ARIZONA DEPARTMENT OF CORRECTIONS
## INMATE RECORD
Public Report
including ALL episodes



ADC NO: 340557          Name: HINES, DEMARCO                    Status: Out to Court



# Movements

### Episode #001

| Date | Type | Destination | Reason For | Origin |
|------|------|-------------|------------|--------|
| 09/05/2020 | | ASPC-T SANTA RITA | Unassigned from bed | |
| 09/05/2020 | | ASPC-T SANTA RITA | Routine | |
| 09/22/2020 | Transfer Out - Unit Departure | ASPC-T CIMARRON I | Custody Change | |
| 09/22/2020 | Transfer In - Unit Arrival | | Custody Change | ASPC-T CIMARRON I |
| 09/22/2020 | | ASPC-T CIMARRON I | Routine | |
| 09/22/2020 | Transfer Out - Unit Departure | ASPC-T CIMARRON I | Housing/Transfer Request | ASPC-T CIMARRON I |
| 09/22/2020 | Transfer In - Unit Arrival | | Housing/Transfer Request | ASPC-T CIMARRON I |
| 09/22/2020 | | ASPC-T CIMARRON I | Routine | |
| 12/08/2020 | | ASPC-T CIMARRON I | Unassigned from bed | |
| 12/08/2020 | | ASPC-T CIMARRON I | Routine | |
| 02/09/2021 | Transfer Out - Unit Departure | ASPC-T CIMARRON CDU | 805 Review | ASPC-T CIMARRON I |
| 02/09/2021 | Transfer In - Unit Arrival | | 805 Review | |
| 02/09/2021 | | ASPC-T CIMARRON CDU | Routine | |
| 02/09/2021 | Transfer Out - Unit Departure | ASPC-T CMPLEX CDU | 805 Review | ASPC-T CIMARRON CDU |
| 02/09/2021 | Transfer In - Unit Arrival | | 805 Review | ASPC-T CMPLEX CDU |
| 02/09/2021 | | ASPC-T CMPLEX CDU | Routine | |
| 02/22/2021 | | ASPC-T CMPLEX CDU | Unassigned from bed | |
| 02/22/2021 | | ASPC-T CMPLEX CDU | Routine | |
| 02/26/2021 | Transfer Out - Unit Departure | ASPC-T CIMARRON CDU | 805 Review | ASPC-T CMPLEX CDU |
| 02/26/2021 | Transfer In - Unit Arrival | | 805 Review | |
| 02/26/2021 | | ASPC-T CIMARRON CDU | Routine | |
| 03/16/2021 | | ASPC-T CIMARRON CDU | Unassigned from bed | |
| 03/16/2021 | | ASPC-T CIMARRON CDU | Routine | |
| 08/04/2021 | Transfer Out - Unit Departure | ASPC-E MAX INTAKE | Alternative To PC | |
| 08/04/2021 | Transfer Out - Prison/CIP Departure | ASPC-E MAX INTAKE | Alternative To PC | |
| 08/04/2021 | Transfer In - Prison/CIP Arrival | | Alternative To PC | ASPC-E MAX INTAKE |
| 08/04/2021 | Transfer In - Unit Arrival | | Alternative To PC | |
| 08/04/2021 | | ASPC-E MAX INTAKE | Routine | |
| 08/11/2021 | Transfer Out - Unit Departure | ASPC-E SMU I NORTH | Action/Work Completed | |
| 08/11/2021 | Transfer In - Unit Arrival | | Action/Work Completed | ASPC-E SMU I NORTH |
| 08/11/2021 | | ASPC-E SMU I NORTH | Routine | |
| 08/11/2022 | Transfer Out - Unit Departure | ASPC-T CIMARRON I | Custody Change | |
| 08/11/2022 | Transfer Out - Prison/CIP Departure | ASPC-T CIMARRON I | Custody Change | |
| 08/11/2022 | Transfer In - Unit Arrival | | Custody Change | ASPC-T CIMARRON I |
| 08/11/2022 | | ASPC-T CIMARRON I | Routine | |
| 10/05/2022 | | ASPC-T CIMARRON I | Unassigned from bed | |
| 10/05/2022 | | ASPC-T CIMARRON I | Routine | |
| 11/10/2022 | | ASPC-T CIMARRON I | Unassigned from bed | |
| 11/10/2022 | | ASPC-T CIMARRON I | Routine | |
| 12/06/2022 | Transfer Out - Unit Departure | ASPC-T CIMARRON CDU | Medical Needs | ASPC-T CIMARRON I |
| 12/06/2022 | Transfer In - Unit Arrival | | Medical Needs | ASPC-T CIMARRON CDU |
| 12/06/2022 | | ASPC-T CIMARRON CDU | Routine | |
| 12/07/2022 | | ASPC-T CIMARRON CDU | Unassigned from bed | |
| 12/07/2022 | | ASPC-T CIMARRON CDU | Routine | |
| 12/16/2022 | Transfer Out - Unit Departure | ASPC-T CIMARRON I | Lateral Transfer | ASPC-T CIMARRON CDU |
| 12/16/2022 | Transfer In - Unit Arrival | | Lateral Transfer | |
| 12/16/2022 | | ASPC-T CIMARRON I | Routine | |
| 12/16/2022 | | ASPC-T CIMARRON I | Routine | |
| 12/16/2022 | | ASPC-T CIM TRNST | Unassigned from bed | |
| 02/18/2023 | | ASPC-T CIMARRON I | Unassigned from bed | |

**Report:** 0460

**Run Date:** 12/02/2025 07:05

**Page:** 3 of 10

# ARIZONA DEPARTMENT OF CORRECTIONS
## INMATE RECORD
Public Report
including ALL episodes



ADC NO: 340557          Name: HINES, DEMARCO          Status: Out to Court

---

## Movements

**Episode #001**

| Date | Type | Destination | Reason For | Orign |
|------|------|-------------|------------|-------|
| 02/18/2023 | | ASPC-T CIMARRON I | Routine | |
| 02/24/2023 | | ASPC-T CIMARRON I | Unassigned from bed | |
| 02/24/2023 | | ASPC-T CIMARRON I | Routine | |
| 05/08/2023 | Transfer Out - Unit Departure | ASPC-T RINCON I | Lateral Transfer | ASPC-T CIMARRON I |
| 05/08/2023 | Transfer In - Unit Arrival | | Lateral Transfer | ASPC-T RINCON I |
| 05/08/2023 | | ASPC-T RINCON I | Routine | |
| 07/18/2023 | Transfer Out - Unit Departure | ASPC-T RINCON MHW | Security Risk | ASPC-T RINCON I |
| 07/18/2023 | Transfer In - Unit Arrival | | Security Risk | ASPC-T RINCON MHW |
| 07/18/2023 | | ASPC-T RINCON MHW | Routine | |
| 07/19/2023 | Transfer Out - Unit Departure | ASPC-T RINCON I | Completed Treatment | ASPC-T RINCON MHW |
| 07/19/2023 | Transfer In - Unit Arrival | | Completed Treatment | ASPC-T RINCON I |
| 07/19/2023 | | ASPC-T RINCON I | Routine | |
| 09/28/2023 | Transfer Out - Unit Departure | ASPC-E-BROWNING RSH | Disciplinary Problem | |
| 09/28/2023 | Transfer In - Unit Arrival | | Disciplinary Problem | ASPC-E-BROWNING RSH |
| 09/28/2023 | | ASPC-E-BROWNING RSH | Routine | |
| 10/19/2023 | Escorted Leave | | Medical Needs | ASPC-E-BROWNING RSH |
| 10/19/2023 | Return from Escorted Leave | ASPC-E-BROWNING RSH | Medical Needs | |
| 01/29/2024 | | ASPC-E-BROWNING RSH | Unassigned from bed | |
| 01/29/2024 | | ASPC-E-BROWNING RSH | Routine | |
| 02/08/2024 | | ASPC-E-BROWNING RSH | Unassigned from bed | |
| 02/08/2024 | | ASPC-E-BROWNING RSH | Routine | |
| 04/18/2024 | Out to Court | | Court Appearance | ASPC-E-BROWNING RSH |
| 08/29/2024 | Return from Court | | Court Appearance | ASPC-E-BROWNING RSH |
| 08/29/2024 | | ASPC-E-BROWNING RSH | Routine | |
| 09/17/2024 | | ASPC-E-BROWNING RSH | Unassigned from bed | |
| 09/17/2024 | | ASPC-E-BROWNING RSH | Routine | |
| 12/11/2024 | Transfer Out - Unit Departure | ASPC-E BROWNING UNIT | Lateral Transfer | ASPC-E-BROWNING RSH |
| 12/11/2024 | Transfer In - Unit Arrival | | Lateral Transfer | ASPC-E BROWNING UNIT |
| 12/11/2024 | | ASPC-E BROWNING UNIT | Routine | |
| 12/17/2024 | Transfer Out - Unit Departure | ASPC-E BROWNING DET# | Lateral Transfer | ASPC-E BROWNING UNIT |
| 12/17/2024 | Transfer Out - Unit Departure | ASPC-E BROWNING DET | Lateral Transfer | ASPC-E BROWNING UNIT |
| 12/17/2024 | Transfer In - Unit Arrival | | Lateral Transfer | ASPC-E BROWNING DET# |
| 12/17/2024 | Transfer In - Unit Arrival | | Lateral Transfer | ASPC-E BROWNING DET |
| 12/17/2024 | | ASPC-E BROWNING DET# | Routine | |
| 12/17/2024 | | ASPC-E BROWNING DET | Routine | |
| 01/16/2025 | | ASPC-E BROWNING DET# | Routine | |
| 01/16/2025 | | ASPC-E BROWNING DET# | Unassigned from bed | |
| 01/16/2025 | | ASPC-E BROWNING DET | Unassigned from bed | |
| 01/16/2025 | | ASPC-E BROWNING DET | Routine | |
| 01/21/2025 | Transfer Out - Prison/CIP Departure | ASPC-L RAST MAX | Protection | |
| 01/21/2025 | Transfer In - Unit Arrival | | Protection | ASPC-L RAST MAX |
| 01/21/2025 | | ASPC-L RAST MAX | Routine | |
| 03/24/2025 | | ASPC-L RAST MAX II | Routine | |
| 03/24/2025 | | ASPC-L RAST MAX | Unassigned from bed | |
| 03/24/2025 | | ASPC-L RAST MAX II | Unassigned from bed | |
| 03/24/2025 | | ASPC-L RAST MAX II | Routine | |
| 03/24/2025 | | ASPC-L RAST MAX II | Unassigned from bed | |
| 03/24/2025 | | ASPC-L RAST MAX II | Routine | |
| 05/07/2025 | Out to Court | | Court Appearance | ASPC-L RAST MAX II |

# ARIZONA DEPARTMENT OF CORRECTIONS
## INMATE RECORD
Public Report
including ALL episodes



ADC NO: 340557          Name: HINES, DEMARCO                    Status: Out to Court

## Housing History

**Episode #001**

| Date | Location | Type |
|------|----------|------|
| 12/10/2019 | B06-WD-E226M | Intake |
| 12/16/2019 | C41-HU06A16T | Medium |
| 03/16/2020 | C02-BL3A13B | Medium |
| 05/14/2020 | C29-HU-8C13B | Close |
| 05/14/2020 | C29-HU-8C13B | Close |
| 05/16/2020 | C29-HU-8B04B | Close |
| 05/17/2020 | C29-HU-8B03T | Close |
| 05/17/2020 | C29-HU-8B04B | Close |
| 05/18/2020 | C02-BL3A13B | Medium |
| 09/05/2020 | C02-BL2A19B | Medium |
| 09/05/2020 | C22*-BL2A20B | Close |
| 09/22/2020 | C11-CB1A19T | Close |
| 09/22/2020 | C11-CB1A19T | Close |
| 12/08/2020 | C11-CB1A22B | Close |
| 02/09/2021 | C11-CB2C02B | Close |
| 02/09/2021 | C04-DU-A216B | Detention |
| 02/22/2021 | C04-DU-A204F | Detention |
| 02/26/2021 | C13-CB2D16F | Detention |
| 03/16/2021 | C11-CB2D16B | Close |
| 08/04/2021 | A21-WG1C004B | Maximum |
| 08/11/2021 | A08-WG4D648U | Maximum |
| 08/11/2022 | C11-CB1D15T | Close |
| 10/05/2022 | C11-CB1D15B | Close |
| 11/10/2022 | C62-CB3D15B | Close |
| 12/06/2022 | C11-CB2D19B | Close |
| 12/07/2022 | C11-CB2D17B | Close |
| 12/16/2022 | C62-CB4C15B | Close |
| 12/16/2022 | C62-CB4D15B | Close |
| 02/18/2023 | C62-CB4D21B | Close |
| 02/24/2023 | C62-CB3D02T | Close |
| 05/08/2023 | C34-HU-1B03T | Close |
| 07/18/2023 | C29-HU-8B06B | Close |
| 07/19/2023 | C34-HU-1B03B | Close |
| 09/28/2023 | A73-WG4L050B | Maximum |
| 01/29/2024 | A21-WG3H030B | Maximum |
| 02/08/2024 | A21-WG3H027B | Maximum |
| 08/29/2024 | A21-WG3H031B | Maximum |
| 09/17/2024 | A73-WG4L031B | Maximum |
| 12/11/2024 | A21-WG3H053B | Maximum |
| 12/17/2024 | A33-WG2E013B | Detention |

O.W. 002187

**Report:** 0460
**Run Date:** 12/02/2025 07:05
**Page:** 5 of 10

# ARIZONA DEPARTMENT OF CORRECTIONS
## INMATE RECORD
Public Report
including ALL episodes



ADC NO: 340557          Name: HINES, DEMARCO                    Status: Out to Court



## Housing History

**Episode #001**

| Date | Location | Type |
|---|---|---|
| 01/16/2025 | A33-WG2F045B | Detention |
| 01/21/2025 | L21-HU3A211L | Maximum |
| 03/24/2025 | L77-HU3A513L | Maximum |
| 03/24/2025 | L77-HU3A517L | Maximum |
| 03/24/2025 | L77-HU3A509L | Maximum |

## Discipline Violations

**Episode #001**

| Date | Case | Type | Verdict | Disposition | Status |
|---|---|---|---|---|---|
| 02/03/2020 | 20-TC5-000284 | Aggravated Refusal of an Assignment | Dismiss | | Closed |
| 02/05/2020 | 20-TC5-000285 | Aggravated Refusal of an Assignment | Dismiss | | Closed |
| 02/06/2020 | 20-TC5-000286 | Resisting or Disobeying a Verbal or Written Order | Guilty-Minor | Loss of Privilege | Closed |
| 02/08/2020 | 20-TC5-000300 | Disrupting an Institution Count and/or Being Out of Place | Guilty-Minor | Loss of Privilege | Closed |
| 02/09/2020 | 20-TC5-000287 | Disrupting an Institution Count and/or Being Out of Place | Guilty-Minor | Loss of Privilege | Closed |
| 02/12/2020 | 20-TC5-000315 | Positive Test or Refusal of UA | Guilty-Major | Non-Contact Parole Class III Restitution Loss of Visits Loss of Privilege Earned Release Credits | Closed |
| 03/04/2020 | 20-TC5-000479 | Stalking (Inmate to Staff) | Uphold | Parole Class III Loss of Privilege Earned Release Credits | Closed |
| 03/18/2020 | 20-TC2-000440 | Disrupting an Institution Count and/or Being Out of Place | Guilty-Minor | | Closed |
| 04/15/2020 | 20-TC2-000566 | Disrupting an Institution Count and/or Being Out of Place | Informal Resolution | | Closed |
| 05/14/2020 | 20-TC2-000697 | Positive Test or Refusal of UA | Dismiss | | Closed |
| 07/20/2020 | 20-TC2-000975 | Disrupting an Institution Count and/or Being Out of Place | Guilty-Minor | Loss of Privilege | Closed |
| 07/20/2020 | 20-TC2-000970 | Aggravated Refusal of an Assignment | Guilty-Minor | | Closed |
| 07/21/2020 | 20-TC2-000979 | Resisting or Disobeying a Verbal or Written Order | Informal Resolution | | Closed |
| 07/30/2020 | 20-TC2-000998 | Disorderly Conduct | Guilty-Major | Loss of Privilege | Closed |
| 08/15/2020 | 20-TC2-001096 | Tattooing, Brands, Scarifications and Piercing | Guilty-Major | Parole Class III Loss of Privilege Earned Release Credits | Closed |
| 09/08/2020 | 20-TC2-001164 | Possession of Drugs or Narcotics | Guilty-Major | Parole Class III Restitution Loss of Visits Non-Contact Loss of Privilege Earned Release Credits | Closed |
| 09/16/2020 | 20-TC2-001210 | Resisting or Disobeying a Verbal or Written Order | Guilty-Minor | Loss of Privilege | Closed |

**Report:** 0460

# ARIZONA DEPARTMENT OF CORRECTIONS

**Run Date:** 12/02/2025 07:05

## INMATE RECORD

**Page:** 6 of 10

Public Report

including ALL episodes



ADC NO: 340557          Name: HINES, DEMARCO                    Status: Out to Court



## Discipline Violations

**Episode #001**

| Date | Case | Type | Verdict | Disposition | Status |
|------|------|------|---------|-------------|--------|
| 10/10/2020 | 20-TC6-002442 | Disrupting an Institution Count and/or Being Out of Place | Guilty-Major | Parole Class III | Closed |
| | | | | Loss of Privilege Earned Release Credits | |
| 10/13/2020 | 20-TC6-002460 | Aggravated Refusal of an Assignment | Guilty-Minor | | Closed |
| 10/24/2020 | 20-TC6-002576 | Resisting or Disobeying a Verbal or Written Order | Guilty-Minor | Loss of Privilege | Closed |
| 11/14/2020 | 20-TC6-002654 | Resisting or Disobeying a Verbal or Written Order | Guilty-Minor | | Closed |
| 01/29/2021 | 21-TC6-000244 | Smoking or Use of Tobacco in an Unauthorized Area | Guilty-Minor | Loss of Privilege | Closed |
| 02/05/2021 | 21-TC1-000162 | Disrespect to Staff | Guilty-Minor | Loss of Privilege | Closed |
| 02/09/2021 | 21-TC1-000236 | Fighting | Guilty-Major | Parole Class III | Closed |
| | | | | Earned Release Credits | |
| 02/09/2021 | 21-TC1-000194 | Positive Test or Refusal of UA | Guilty-Major | Parole Class III | Closed |
| | | | | Loss of Visits | |
| | | | | Loss of Privilege | |
| | | | | Earned Release Credits | |
| 02/21/2021 | 21-TC6-000397 | Indecent Exposure | Guilty-Major | Parole Class III | Closed |
| | | | | Loss of Privilege | |
| | | | | Earned Release Credits | |
| 02/24/2021 | 21-TC6-000395 | Criminal Damage | Guilty-Major | Parole Class III | Closed |
| | | | | Restitution | |
| | | | | Loss of Privilege | |
| | | | | Earned Release Credits | |
| 02/25/2021 | 21-TC6-000398 | Possession of Minor or Nuisance Contraband | Guilty-Minor | Loss of Privilege | Closed |
| 03/03/2021 | 21-TC6-000502 | Disrespect to Staff | Guilty-Minor | Loss of Privilege | Closed |
| 09/09/2021 | 21-EY1-001346 | Fighting | Guilty-Major | Parole Class III | Closed |
| | | | | Loss of Privilege | |
| | | | | Earned Release Credits | |
| 02/21/2022 | 22-EY1-000235 | Obstructing Staff | Informal Resolution | | Closed |
| 05/09/2022 | 22-EY1-000640 | Violation of any Published Department or Institution Rule | Informal Resolution | | Closed |
| 11/02/2022 | 22-TC6-001056 | Disrupting an Institution Count and/or Being Out of Place | Dismiss | | Closed |
| 11/07/2022 | 22-TC6-001062 | Resisting or Disobeying a Verbal or Written Order | Guilty-Minor | Loss of Privilege | Closed |
| 11/21/2022 | 22-TC6-001092 | Criminal Damage | Dismiss | | Closed |
| 01/07/2023 | 23-TC6-000025 | Resisting or Disobeying a Verbal or Written Order | Guilty-Minor | Loss of Privilege | Closed |
| 01/08/2023 | 23-TC6-000033 | Threatening or Intimidating | Guilty-Major | Loss of Privilege | Closed |
| 03/15/2023 | 23-TC6-000207 | Resisting or Disobeying a Verbal or Written Order | Guilty-Minor | Loss of Privilege | Closed |
| 04/04/2023 | 23-TC6-000270 | Disorderly Conduct | Guilty-Minor | | Closed |
| 04/05/2023 | 23-TC6-000280 | Disorderly Conduct | Guilty-Minor | Loss of Privilege | Closed |
| 04/06/2023 | 23-TC6-000282 | Aggravated Refusal of an Assignment | Guilty-Minor | | Closed |
| 04/09/2023 | 23-TC6-000300 | Indecent Exposure | Guilty-Major | Parole Class III | Closed |
| | | | | Loss of Privilege | |
| | | | | Earned Release Credits | |
| 04/11/2023 | 23-TC6-000311 | Aggravated Refusal of an Assignment | Guilty-Minor | Loss of Privilege | Closed |
| 04/13/2023 | 23-TC6-000344 | Aggravated Refusal of an Assignment | Guilty-Minor | Loss of Privilege | Closed |
| 04/19/2023 | 23-TC6-000365 | Aggravated Refusal of an Assignment | Guilty-Major | Parole Class III | Closed |

**Report:** 0460
**Run Date:** 12/02/2025 07:05
**Page:** 7 of 10

# ARIZONA DEPARTMENT OF CORRECTIONS
## INMATE RECORD
Public Report
including ALL episodes



ADC NO: 340557          Name: HINES, DEMARCO                    Status: Out to Court

## Discipline Violations

**Episode #001**

| Date | Case | Type | Verdict | Disposition | Status |
|------|------|------|---------|-------------|--------|
| | | | | Loss of Privilege<br>Earned Release Credits | |
| 04/21/2023 | 23-TC6-000383 | Aggravated Refusal of an Assignment | Guilty-Major | Parole Class III<br>Loss of Privilege<br>Earned Release Credits | Closed |
| 04/22/2023 | 23-TC6-000374 | Disrupting an Institution Count and/or Being Out of Place | Guilty-Minor | | Closed |
| 08/24/2023 | 23-TC1-001568 | Disrupting an Institution Count and/or Being Out of Place | Guilty-Minor | | Closed |
| 08/25/2023 | 23-TC1-001577 | Resisting or Disobeying a Verbal or Written Order | Guilty-Minor | | Closed |
| 08/28/2023 | 23-TC1-001580 | Aggravated Refusal of an Assignment | Guilty-Major | Parole Class III<br>Loss of Privilege<br>Earned Release Credits | Closed |
| 08/28/2023 | 23-TC1-001585 | Resisting or Disobeying a Verbal or Written Order | Dismiss | | Closed |
| 08/29/2023 | 23-TC1-001594 | Aggravated Refusal of an Assignment | Guilty-Minor | | Closed |
| 08/29/2023 | 23-TC1-001581 | Promoting Prison Contraband | Guilty-Major | Parole Class III<br>Loss of Privilege<br>Earned Release Credits | Closed |
| 09/21/2023 | 23-TC1-001768 | Positive Test or Refusal of UA | Guilty-Major | Parole Class III<br>Loss of Visits<br>Loss of Privilege<br>Earned Release Credits | Closed |
| 09/25/2023 | 23-EY5-000584 | Aggravated Refusal of an Assignment | Guilty-Major | Parole Class III<br>Loss of Privilege<br>Earned Release Credits | Closed |
| 09/28/2023 | 23-TC1-001803 | Assault (Sexual) | Guilty-Major | Parole Class III<br>Earned Release Credits<br>Loss of Privilege<br>Loss of Visits | Closed |
| 09/28/2023 | 23-TC1-001802 | Assault on Staff (that involved Serious Injury) | Guilty-Major | Loss of Visits | Closed |
| 01/25/2024 | 24-EY5-000091 | Promoting Prison Contraband | Guilty-Major | Parole Class III<br>Loss of Privilege<br>Earned Release Credits<br>Loss of Visits<br>Parole Class III<br>Loss of Privilege<br>Earned Release Credits | Closed |

## Parole Board Hearing

## Classification

**Episode #001**

| Date | Type | CU Score | IR Score | LOC | APVD |
|------|------|----------|----------|-----|------|
| 12/13/2019 | Initial Classification | 3 | 3 | | CFZ1 |
| 03/12/2020 | Reclassification | 3 | 4 | | RJJ9 |
| 09/17/2020 | Reclassification | 4 | 4 | | RJJ9 |

O.W. 002190



**Report:** 0460
**Run Date:** 12/02/2025 07:05
**Page:** 8 of 10

# ARIZONA DEPARTMENT OF CORRECTIONS
## INMATE RECORD
Public Report
including ALL episodes

ADC NO: 340557          Name: HINES, DEMARCO                    Status: Out to Court

## Classification

**Episode #001**

| Date | Type | CU Score | IR Score | LOC | APVD |
|------|------|----------|----------|-----|------|
| 12/10/2020 | Reclassification | 4 | 4 | | MKG6 |
| 04/30/2021 | Reclassification | 5 | 5 | | TBL4 |
| 12/10/2021 | Reclassification | 4 | 4 | | RJJ9 |
| 08/02/2022 | Reclassification | 4 | 4 | | MBM7 |
| 02/03/2023 | Reclassification | 4 | 4 | | MKG6 |
| 05/25/2023 | Reclassification | 4 | 4 | | MKG6 |
| 09/21/2023 | Reclassification | 4 | 4 | | MKG6 |
| 10/17/2023 | Reclassification | 5 | 5 | | KKS0 |
| 11/13/2023 | Reclassification | 5 | 5 | | RMSA |
| 03/12/2024 | Reclassification | 5 | 5 | | JGOM BRICH |
| 12/26/2024 | Reclassification | 5 | 5 | | KKS0 |

## Custody Class

**Episode #001**

| Date | Form | Custody |
|------|------|---------|
| | Max Custody Placement | Maximum |
| 12/13/2019 | Initial Classification | Medium |
| 03/12/2020 | Reclassification | Medium |
| 09/04/2020 | Reclassification | Maximum |
| 09/17/2020 | Max Custody Placement | Close |
| 09/17/2020 | Reclassification | Close |
| 12/10/2020 | Max Custody Placement | Close |
| 12/10/2020 | Reclassification | Close |
| 03/10/2021 | Reclassification | Maximum |
| 03/10/2021 | Reclassification | Maximum |
| 03/10/2021 | Reclassification | Maximum |
| 03/26/2021 | Reclassification | Maximum |
| 04/08/2021 | Reclassification | Maximum |
| 04/29/2021 | Reclassification | Maximum |
| 04/29/2021 | Max Custody Placement | Maximum |
| 04/30/2021 | Reclassification | Maximum |
| 05/17/2021 | Max Custody Placement | Maximum |
| 08/06/2021 | Max Custody Step Review | |
| 09/07/2021 | Max Custody Step Review | |
| 09/09/2021 | Max Custody Step Review | |
| 10/11/2021 | Max Custody Step Review | |
| 10/21/2021 | Max Custody Step Review | |
| 11/22/2021 | Max Custody Step Review | |
| 11/26/2021 | Max Custody Step Review | |

O.W. 002191

**Report:** 0460
**Run Date:** 12/02/2025 07:05
**Page:** 9 of 10

# ARIZONA DEPARTMENT OF CORRECTIONS
## INMATE RECORD
Public Report
including ALL episodes



ADC NO: 340557          Name: HINES, DEMARCO          Status: Out to Court

## Custody Class

**Episode #001**

| Date | Form | Custody |
|------|------|---------|
| 12/10/2021 | Max Custody Placement Review | Close |
| 12/10/2021 | Reclassification | Close |
| 12/29/2021 | Max Custody Step Review | |
| 01/31/2022 | Max Custody Step Review | |
| 02/27/2022 | Max Custody Step Review | |
| 02/28/2022 | Max Custody Step Review | |
| 03/18/2022 | Max Custody Step Review | |
| 03/25/2022 | Max Custody Step Review | |
| 04/22/2022 | Max Custody Step Review | |
| 05/25/2022 | Max Custody Step Review | |
| 06/24/2022 | Max Custody Step Review | |
| 07/19/2022 | Max Custody Step Review | |
| 08/02/2022 | Max Custody Placement | Close |
| 08/02/2022 | Reclassification | Close |
| 02/03/2023 | Max Custody Placement | Close |
| 02/03/2023 | Reclassification | Close |
| 04/18/2023 | Reclassification | Maximum |
| 05/03/2023 | Max Custody Placement | Maximum |
| 05/03/2023 | Reclassification | Maximum |
| 05/25/2023 | Max Custody Placement | Close |
| 05/25/2023 | Reclassification | Close |
| 08/31/2023 | Reclassification | Maximum |
| 09/21/2023 | Max Custody Placement | Close |
| 09/21/2023 | Reclassification | Close |
| 09/28/2023 | Reclassification | Maximum |
| 10/02/2023 | Max Custody Step Review | |
| 10/09/2023 | Max Custody Step Review | |
| 10/09/2023 | Reclassification | Maximum |
| 10/12/2023 | Reclassification | Maximum |
| 10/17/2023 | Reclassification | Maximum |
| 10/30/2023 | Max Custody Placement | Maximum |
| 11/07/2023 | Max Custody Step Review | |
| 11/13/2023 | Reclassification | Maximum |
| 11/28/2023 | Max Custody Placement Review | Maximum |
| 01/08/2024 | Max Custody Step Review | |
| 02/27/2024 | Max Custody Step Review | |
| 03/12/2024 | Reclassification | Maximum |
| 04/01/2024 | Max Custody Step Review | |
| 04/03/2024 | Max Custody Placement Review | Maximum |
| 05/02/2024 | Max Custody Step Review | |

O.W. 002192

**Report:** 0460

**Run Date:** 12/02/2025 07:05

**Page:** 10 of 10

# ARIZONA DEPARTMENT OF CORRECTIONS

## INMATE RECORD

Public Report

including ALL episodes



ADC NO: 340557        Name: HINES, DEMARCO        Status: Out to Court

## Custody Class

**Episode #001**

| Date | Form | Custody |
|------|------|---------|
| 09/17/2024 | Max Custody Step Review | |
| 09/18/2024 | Max Custody Step Review | |
| 10/18/2024 | Reclassification | Maximum |
| 10/22/2024 | Max Custody Step Review | |
| 11/01/2024 | Max Custody Step Review | |
| 12/26/2024 | Reclassification | Maximum |
| 01/03/2025 | Max Custody Placement Review | Maximum |
| 01/24/2025 | Max Custody Step Review | |
| 02/27/2025 | Max Custody Step Review | |
| 03/12/2025 | Reclassification | Maximum |
| 03/12/2025 | Max Custody Placement Review | Maximum |
| 03/27/2025 | Max Custody Step Review | |
| 05/01/2025 | Max Custody Step Review | |

## Work / Program Evaluations

**Episode #001**

| Eval Date | Assignment | Type | *Rating* | Hours | Rate | Location |
|-----------|------------|------|----------|-------|------|----------|
| 01/12/2021 | 3176 - Kitchen-Cook Helper | WIPP | S | 68.0 | 0.15 | TUCSON CIMARRON |
| 10/04/2022 | 406A - Groundskeeper | WIPP | S | 70.0 | 0.25 | TUCSON CIMARRON |
| 10/18/2022 | 406A - Groundskeeper | WIPP | S | 60.0 | 0.25 | TUCSON CIMARRON |
| 11/01/2022 | 406A - Groundskeeper | WIPP | S | 60.0 | 0.25 | TUCSON CIMARRON |
| 11/15/2022 | 406A - Groundskeeper | WIPP | S | 6.0 | 0.25 | TUCSON CIMARRON |
| 11/18/2022 | 3176 - Kitchen-Cook Helper | WIPP | S | 14.5 | 0.30 | TUCSON CIMARRON |
| 12/02/2022 | 3176 - Kitchen-Cook Helper | WIPP | E | 36.0 | 0.30 | TUCSON CIMARRON |
| 12/23/2022 | 3153 - Kitchen-Cook | WIPP | E | 36.0 | 0.35 | TUCSON CIMARRON |
| 01/13/2023 | 3153 - Kitchen-Cook | WIPP | S | 32.0 | 0.30 | TUCSON CIMARRON |
| 07/31/2023 | 3186 - Kitchen-Helper | WIPP | E | 16.0 | 0.20 | TUCSON RINCON |
| 08/14/2023 | 3186 - Kitchen-Helper | WIPP | E | 60.0 | 0.20 | TUCSON RINCON |
| 08/28/2023 | 3186 - Kitchen-Helper | WIPP | E | 64.0 | 0.20 | TUCSON RINCON |
| 09/11/2023 | 3186 - Kitchen-Helper | WIPP | U | 12.0 | 0.15 | TUCSON RINCON |

O.W. 002193

# EXHIBIT B

## (Pending Motion to Seal)

# EXHIBIT C

## (Pending Motion to Seal)

# EXHIBIT D

## (Pending Motion to Seal)

**EXHIBIT E**

**CHAPTER: 800**

**Inmate Management**

**DEPARTMENT ORDER:**

**801 – Inmate Classification**

**OFFICE OF PRIMARY RESPONSIBILITY:**

**OPS**
**OSB**

**Effective Date:**

**April 1, 2022**

**Amendment:**

**June 14, 2023**

**Supersedes:**

**DO 801 (7/21/17)**

**Scheduled Review Date:**

**July 1, 2024**

**ACCESS**

☐ **Contains Restricted Section(s)**

# Arizona Department of Corrections Rehabilitation and Reentry



## Department Order Manual

Ryan Thornell, Director

ADCRR_003073

# TABLE OF CONTENTS

**EXPECTED PRACTICES** ..................................................................................................1

**PURPOSE** ......................................................................................................................1

**PROCEDURES** ...............................................................................................................1

**1.0   CLASSIFICATION SYSTEM OVERVIEW**..............................................................1

**2.0   CUSTODY LEVEL PURPOSE AND DESCRIPTIONS** ..............................................2

**3.0   INITIAL AND RECLASSIFICATION CUSTODY OBJECTIVE SCORING CRITERIA** ............................3

**4.0   CLASSIFICATION PROCESS.** ..............................................................................6

**5.0   CLASSIFICATION CUSTODY DISCRETIONARY OVERRIDES**...............................8

**6.0   INTERNAL RISK LEVEL – PURPOSE AND DESCRIPTIONS** ..............................11

**7.0   INITIAL AND RECLASSIFICATION – INTERNAL RISK OBJECTIVE SCORING CRITERIA** ...............11

**8.0   CLASSIFICATION - INTERNAL RISK DISCRETIONARY OVERRIDES** .................12

**9.0   CRITERIA GOVERNING PLACEMENT INTO MAXIMUM CUSTODY** .......................13

**10.0  PROCEDURES FOR MAXIMUM CUSTODY PLACEMENT/REMOVAL – THE HEARING PROCESS** ....14

**11.0  MAXIMUM CUSTODY AND DETENTION 60 DAY CLASSIFICATION REVIEWS** ...........................16

**12.0  MAXIMUM CUSTODY AND DETENTION 180 DAY CLASSIFICATION REVIEWS** .........................16

**13.0  CLASSIFICATION CUSTODY APPEALS** ..............................................................17

**14.0  ASSESSMENT SCORES** ....................................................................................17

**15.0  INTERSTATE CORRECTIONS COMPACT (ICC) INMATES**....................................17

**16.0  DO NOT HOUSE WITH VERIFICATION PROCESS – VERIFICATIONS/REMOVALS/ADDITIONS** ......18

**IMPLEMENTATION** ......................................................................................................19

**DEFINITIONS/GLOSSARY** ...........................................................................................20

**FORMS LIST** ..............................................................................................................20

**AUTHORITY** ...............................................................................................................20

ADCRR_003074

1.7 Inmates may appeal the classification decisions for the following: {5-ACI-5B-07}

    1.7.1 The rationale for placement as outlined in section 10.0

    1.7.2 Factual basis for scoring

    1.7.3 Custody level discretionary overrides

1.8 Inmates shall be notified each time they are reclassified and their internal risk and/or custody score changes. The inmate notification form shall be automatically generated each time an inmate is reclassified. For information regarding procedures on the inmate notification form see the Classification Technical Manual.

1.9 Inmates returned to the Department with a new offense, who were on Community Supervision or in any Departmental release status at the time the new offense was committed, shall be classified at the receiving unit using the initial classification scoring criteria.

1.10 Inmates returned to the Department as the result of technical violations of parole or a supervised release shall be classified at the receiving unit using the reclassification scoring criteria.

1.11 Inmates who receive additional sentences while in Department custody shall be classified using the reclassification scoring criteria. A classification appointment will only be set if the additional sentence(s) result in a higher custody than the inmate's current score.

1.12 Inmates, whose sentence have been vacated and were re-sentenced without being released from the Department's custody, shall be classified using the reclassification criteria. The inmate is not required to return to Maximum Custody if reduction criteria had previously been met.

## 2.0 CUSTODY LEVEL PURPOSE AND DESCRIPTIONS {5-ACI-5B-02}

2.1 The custody level provides the minimum basis for classifying inmates to facilities. Inmates shall be placed at institutions that are consistent with the custody level necessary to ensure the safety and security of persons, the institution, and the community. An inmate may be housed temporarily or permanently in any facility which has capabilities exceeding the inmate's custody.

2.2 Each inmate shall be individually assessed to ensure an appropriate custody level assignment. Inmates are not permitted to request a particular custody level placement nor placement at a particular facility. There are insufficient resources available to transfer inmates for reasons of family hardships or any other elective reasons. Placement for these reasons shall not be recommended or approved.

2.3 The inmate classification custody system consists of five custody levels based upon the inmate's likelihood of escape or committing violence:

    2.3.1 Maximum Custody – Inmates who represent the highest risk to the public and staff and require housing in a single cell or double cell environment. These inmates have limited work opportunities within the secure perimeter and require frequent monitoring. These inmates require controlled movement within the institution. This custody level does not apply to inmates designated as SMI by mental health, female inmates or juveniles adjudicated as adults. *[Revision – June 14, 2023]*

ADCRR_003076

2.3.2 High Custody – Inmates who represent a high risk to the public and staff. These inmates shall not be assigned to work outside the secure perimeter of an institution. These inmates require controlled movement within the institution.

2.3.3 Medium Custody – Inmates who represent a moderate risk to the public and staff. These inmates shall not work outside the secure perimeter of an institution and require limited controlled movement within the institution.

2.3.4 Low Custody – Inmates who represent a low risk to the public and staff. These inmates may work outside the secure perimeter of an institution, to include community work crews, and do not require controlled movement within the institution.

2.3.5 Minimum Custody – Inmates who represent the lowest risk to the public and require minimal supervision. These inmates may be considered for community housing and work programs.

**3.0   INITIAL AND RECLASSIFICATION CUSTODY OBJECTIVE SCORING CRITERIA** {5-ACI-5B-07}

3.1 The following risk criteria, along with the non-discretionary criteria outlined in 3.2 of this section, shall be used for determining the custody levels for classification of inmates:

3.1.1 Most serious current offense

3.1.2 Most serious prior/other offense

3.1.3 Escape history

3.1.4 History of institutional violence

3.1.5 Gang affiliation status

3.1.6 Current age

3.1.7 Completion of major programs (Reclassification only)

3.2 Non-discretionary Overrides – The following criteria requires the inmate to be classified no lower than the highest custody level associated with the criteria as applicable to the inmate.

3.2.1 Death Sentence (All Adult Males) – No less than High Custody

3.2.2 Death Sentence (All Adult Females) - No less than High Custody

3.2.3 Life Sentence 0-5 years served – No less than High Custody

3.2.4 Life Sentence more than 5 years served – No less than Medium Custody

3.2.5 Validated un-renounced Security Threat Group – Who are placed in Maximum Custody per Security Threat Group (STG)/Special Services Unit (SSU) shall not reduce below Maximum Custody until completion of the required programming and have successfully completed a 24 month period, from the date of placement into Maximum Custody, where they have not participated in any documented STG/Gang or Terrorist activity.

ADCRR_003077

5.6.1.1 Custody level with finalized discretionary overrides shall be reviewed every six months. At any time staff may initiate an administrative review if they determine that the inmate's custody and/or internal risk levels need to be reviewed prior to the six month time frame.

5.6.2 Inmates placed in Maximum Custody as a result of a facility override shall be classified in accordance with the Maximum Custody procedures outlined in this policy.

5.7 Use of Confidential Informant Information

5.7.1 When information from a confidential source is used, the confidential source shall be protected without possible compromise, and the Confidential Informant Reliability Assessment Questionnaire (CIRAQ), Form 801-3, shall be completed accurately to document the evaluation of the confidential informant's reliability and reviewed by the unit's SSU Officer.

5.7.2 Custody overrides shall not be based solely on confidential information. Additional documentation shall be provided fully explaining why the inmate requires increased supervision to support the need for a recommended custody override.

**6.0 INTERNAL RISK LEVEL – PURPOSE AND DESCRIPTIONS** – The internal risk level provides the minimum basis for classifying inmates for internal purposes such as levels of supervision for work assignments, program, and housing decisions. The inmate classification internal risk system consists of five internal risk (IR) levels:

6.1 IR 5 is the highest risk to the public, staff, and other inmates of escape or committing violence within the perimeter and/or under the direct supervision of Department staff.

6.2 IR 4 is a high risk to the public, staff, and other inmates, of escape or committing violence within the perimeter and/or under the direct supervision of Department staff.

6.3 IR 3 is a moderate risk to the public, staff, and other inmates, of escape or committing violence within the perimeter or institutional grounds, and/or under the direct supervision of Department employees or contract staff.

6.4 IR 2 is a low risk to the public, staff, and other inmates, of escape or committing violence within the perimeter, on institutional grounds, or in the community and/or under the direct supervision of Department employees or contract staff.

6.5 IR 1 is the lowest risk to the public, staff, and other inmates of escapes or committing violence within the perimeter, on institutional grounds, or in the community and/or under the direct supervision of Department employees or contract staff.

**7.0 INITIAL AND RECLASSIFICATION – INTERNAL RISK OBJECTIVE SCORING CRITERIA**

7.1 The following risk criteria shall be used to determine the internal risk levels for initial and reclassifications:

7.1.1 Most serious current offense

7.1.2 Most serious prior offense

ADCRR_003085

# EXHIBIT F

## (Pending Motion to Seal)

# EXHIBIT G

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


O.W. an individual,                ) No. 2:25-cv-00044-DWL
                                   )
                Plaintiff,         )
vs.                                )
                                   )
State of Arizona, a body           )
politic; Ryan Thornell, an         )    VIDEOTAPED
individual, on his own behalf      )
and on behalf of his marital       )  VIDEOCONFERENCE
community; Christopher             )
Josefowicz, an individual, on      )   DEPOSITION OF
his own behalf and on behalf       )
of his marital community;          )    TALON HANKS
Kaylan Nasta, an individual,       )
on her own behalf and on           )
behalf of her marital              )
community; Talon Hanks, an         )  October 15, 2025
individual, on his own behalf      )   Tucson, Arizona
and on behalf of his marital       )     9:01 a.m.
community; TKC Holdings, Inc.,     )
a Missouri corporation;            )
Trinity Services Group, Inc.,      )
a Florida corporation; and         )
John and Jane Does 1-40,           )
                                   )
                Defendants.        )
_____)


(Contains "Attorneys' Eyes Only")




REPORTED STENOGRAPHICALLY BY:
MARY DAVIS, RPR
Certified Reporter No. 50271

PREPARED FOR:
ASCII/CONDENSED



(Certified Copy)

O.W. vs                                    Talon Hanks [Contains Attorneys' Eyes Only]
State of Arizona

Page 2

VIDEOTAPED DEPOSITION OF TALON HANKS,

located at Rusing Lopez & Lizardi, P.L.L.C., in Tucson,

Arizona, was taken on October 15, 2025, commencing at

9:01 a.m., via videoconference, before MARY DAVIS, a

Certified Reporter in the State of Arizona.

COUNSEL APPEARING:

For Plaintiff

        ROBBINS CURTIN MILLEA & SHOWALTER, LLC
        By: Jesse Showalter, Esq.
        By: Lauren Channell
        301 East Bethany Home, Suite B-100
        Phoenix, Arizona 85012


For Defendants State of Arizona, Ryan Thornell,
Christopher Josefowicz, Kaylan Nasta, and Talon Hanks

        RUSING LOPEZ & LIZARDI, P.LL.C
        By: Mark D. Lammers, Esq.
        By: Tyler Oberg, Esq.
        6363 North Swan Road, Suite 151
        Tucson, Arizona 85718


For Defendants TKC Holdings, Inc. and Trinity Services
Group, Inc.

        LITTLER MENDELSON
        By: Chrisanne M. Gultz,, Esq.
        2425 East Camelback Road, Suite 900
        Phoenix, Arizona 85016


ALSO PRESENT:

        Jonathan Williams, videographer
        Jennie Leetham
        Jacob Harris
        Aneta Wrzesez

Page 3

I N D E X

WITNESS                                                          PAGE

TALON HANKS

    Examination by Mr. Showalter                                  5

    Examination by Ms. Gultz                                     53

          "Attorneys' Eyes Only" Pages 31-34

E X H I B I T S

EXHIBITS                    DESCRIPTION                          PAGE

 No. 30  Tucson - Rincon Aggravated                              31
         Assaults Stats 2022-2023
         ADCRR_004903-00491
         "Attorneys' Eyes only"

O.W. vs                                    Talon Hanks [Contains Attorneys' Eyes Only]
State of Arizona

Page 4

                        PROCEEDINGS

                     *   *   *   *   *

            THE VIDEOGRAPHER:  Good morning.  We are
now on the record.  Today's date is October 15th, 2025,
and the time is 9:01 a.m., in Arizona.

            My name is Jonathan Williams, certified
legal video specialist with K-Video Productions.

            Our court reporter is Mary Davis
representing Griffin Group International, located at
3200 East Camelback Road, Suite 177, Phoenix, Arizona.

            We are participating over videoconference
to take the deposition of Talon Hanks in the United
States District Court, District of Arizona, case of
O.W. versus State of Arizona, et al.

            The attorneys will now introduce
themselves and anyone else attending with them,
noticing party first, please.  And then the court
reporter will swear in the witness.

            MR. SHOWALTER:  Jesse Showalter and
Attorney Lauren Channell -- and then also with us are
paralegals Jennie Leetham and Jacob Harris -- on behalf
of Plaintiff.

            MS. GULTZ:  Good morning.  This is
Chrisanne Gultz on behalf of Defendants TKC Holdings
and Trinity Services Group.

Page 5

MR. LAMMERS:  Mark Lammers and Tyler Oberg on behalf of Defendants.

TALON HANKS, a witness herein, having been first duly sworn by the Certified Court Reporter to speak the truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. SHOWALTER:

Q.   Officer Hanks, do you understand that you're here to testify in a lawsuit that involves a sexual assault on a Trinity Services employee at the prison?

A.   Yes.

Q.   And you know that employee as O.W.?

A.   That's correct.

Q.   And my understanding is that that assault occurred on September 28th of 2023.  Were you working at the prison at that time?

A.   That's correct.  I was working in the kitchen.

Q.   How long have you been with the Department of Corrections?

A.   Approximately just over 11 years.

Q.   That's as of today?

A.   Once again, approximately, yes.  Approximately

Page 7

employee restroom in the kitchen building.  And that employee restroom is attached to an employee dining room.  Is that true?

A.    That's correct.  It is connected to a dining room.

Q.    And that dining room is the staff dining room; right?

A.    I was never instructed on who the bath -- who the DA belonged to.  I was just told that it was connected to that dining room.

Q.    And I've seen it referred to as the DA.  Do you know what that stands for?

A.    DA would be dining area.

Q.    Okay.  Did you know that to be a location where DOC staff or Trinity staff would eat?

A.    We would eat in there.  We would eat in there, yes, when there was no inmates in there.

Q.    And as of September 28th of 2023, there was no camera in that room; correct?

A.    That's correct.

Q.    Was that room off limits to prisoners?

A.    We were instructed to utilize the dining area to serve small house -- small houses, like less than 40 inmates.  That came from above.  I'm not sure who came up with that.  We were just told to utilize it.

Page 9

would actually handle lunch.  We did -- I never was really involved in feeding lunch out of that DA, but we did -- the p.m. shift did utilize it for lunch.

Q.   Were the doors on the DA supposed to be locked and to remain locked?

A.   Yes.

Q.   Other than allowing smaller houses to use that DA for meals, were inmates permitted to use that DA?

A.   We would utilize the DA for our kitchen workers, to feed our kitchen workers in between feeding regular chow houses, just because we could keep them separate from the rest of the houses, and we could keep them kind of on task.

Q.   Okay.  When prisoners were permitted to be in that DA room, what were the requirements for monitoring and supervision of those prisons?

A.   There's always supposed to be an officer directly involved in the DA with them observing anything going on there.

Q.   And is that because there was no camera in that DA room at that time?

A.   That's correct.

Q.   And so anytime a prisoner was in that DA room, there was supposed to be a monitor -- an officer monitoring them; is that correct?

O.W. vs
State of Arizona

Talon Hanks [Contains Attorneys' Eyes Only]

Page 10

A.    That's correct.

Q.    And in this case, that didn't happen; correct?

A.    Correct.

Q.    Do you know why that didn't happen?

A.    I don't know why, unfortunately, sir.  I just know what I had done that day.

Q.    And so on that day, my understanding is that you and one other COII or COIII -- she may have been promoted to a COIII around that time -- were responsible for staffing the kitchen on the correction side.  Is that your understanding?

            MR. LAMMERS:  Foundation.

            I don't know what you mean by "staffing the kitchen," I guess, not to be difficult.

            MR. SHOWALTER:  That's quite all right.

BY MR. SHOWALTER:

Q.    Let me make it -- let me back it up.

        On September 28th of 2023, what was your assignment at that Rincon kitchen?

A.    My assignment on that day was kitchen officer of Rincon kitchen.

Q.    Were there any other kitchen officers working that day with you?

A.    I did have Corporal Nasta at the time.

Q.    And so was it just you and Corporal Nasta, or

O.W. vs
State of Arizona

Talon Hanks [Contains Attorneys' Eyes Only]

Page 12

A.    That's correct.

Q.    Now, prior -- my understanding, based on text messages that you sent to O.W., is that prior to this incident there had been a prior incident in which a -- some either civilian employee or DOC employee was the victim of an attempted assault of some kind in that DA room.

Are you aware of that?

A.    Absolutely.  So at the time -- I don't exactly remember the date or the time that it happened.  I do remember that I was still over in Cimarron kitchen, which is completely different unit.  The radio traffic went out that she needed a response to the small DA, that an inmate was attempting to gain access to that door.

Q.    And when you say "that door," do you mean the bathroom door?

A.    Yes.  He was actively at the bathroom door, and she was requesting immediate assistance.

Q.    Okay.  And do you have a -- I mean, you just testified you don't remember the date.  I understand that.

A.    Yeah.

Q.    Do you have a rough idea of the time frame when that occurred?

Page 19

MR. LAMMERS:  Foundation and form of the question.

BY MR. SHOWALTER:

Q.   You still have to answer it, if you know the answer.

A.   Once again, I don't know any of the policy stuff.  I just come in and just do my job unfortunately.

Q.   And for the entire time you worked the Rincon kitchen, the expectation if there was not a shortage, not a cross level, not somebody calling in sick, was that there would be a corporal and two COIIs staffing that shift at that location?

A.   That was my understanding.

Q.   Okay.  So on September 28th of 2023, was there -- did you have a partner on that day?

A.   No.

Q.   And it sounded like earlier you suggested that you did not know why that was.  Is that accurate?

A.   That's correct.  I have no idea why my partner was not there.

Q.   Is -- when you do have a partner, how would you and your partner divide roles working at that location on that shift?

A.   So a lot of the times, it would be -- we would

Page 21

to them.

And then, like I said, every once in a while we would swap.  I would check his work.  He would check my work to make sure that we were -- we were kind of working as a dedicated team.

Q.   Okay.  And then there's a -- there's a control room in the kitchen.  Is that accurate?

A.   That's correct.

Q.   Would there be an officer who was responsible for being in the control room and monitoring the kitchen area from there, as well as protecting the safety of officers and employees from there, or is that something that didn't occur?

A.   Absolutely.  We had Corporal Nasta in there at the time.

Q.   Okay.  And so the general -- your general experience was that Corporal Nasta would be in the control room.  She would be monitoring things from there.  And then you and your partner would be on the floor monitoring inmates directly?

A.   That's correct.

Q.   From the control room, can you see the door to the DA?

A.   Yes.  Actually, you can see both doors from the control room.  Yes.

O.W. vs
State of Arizona

Talon Hanks [Contains Attorneys' Eyes Only]

Page 22

Q.    Okay.

A.    Yes, you can.

Q.    Is Corporal Nasta still with DOC?

A.    I believe so.

Q.    And do you know where -- do you know where she currently works?

A.    I do not.

Q.    Now, one of the other things I read in your text is it looks like, based on your experience, you don't believe that Inmate Hines should have been assigned to Rincon.

Can you explain why that is?

A.    So after this situation, we get told by higher-ups like:  Okay.  This guy had this situation, this many points, or he was a disciplinary problem, or he was an override from a higher custody yard.  Once again, that's all beyond my -- beyond my scope of job.

Yeah.  Somebody cleared him to be in there. Once again, beyond me.  But from what I was understanding, his points were much higher than what he should be on that yard.

Q.    And so if I -- if I understand what you're saying correctly, it's that you received information that Hines's classification level required him to be in a higher custody yard, but that somebody had done an

Page 23

override that allowed him to be at Rincon.  Is that your understanding?

A.    That is --

MR. LAMMERS:  Foundation.

Go ahead.  My apologies.

A.    That is my understanding.

BY MR. SHOWALTER:

Q.    Do you recall where you acquired that information?

A.    I do not.

Q.    Okay.  So at the time -- at the time of the assault, do you recall where you were?

A.    I was on the back dock, or in the -- the receiving area, what we like to call the back dock or the cube, on a -- on a -- on a smoke break for all the -- all the inmates.

Q.    And do you smoke, or were just the inmates smoking?

A.    It was just the inmates.  I do not smoke tobacco.

Q.    Okay.  And so when you're back there on that back dock with those inmates, that means -- are there still other inmates inside the kitchen area?

A.    At the time, there should not have been. I made a call to pull all the inmates out of the

Page 24

kitchen because we just finished feeding.  I pulled all the inmates to have a smoke break, because that's usually what we did after we were done feeding.

Q.    And when you do that, do you guys keep a count on the number of inmates who are working in the kitchen?

A.    I do personally keep a loose count every couple of minutes.

Q.    And at any given time, what's the approximate -- I mean, it's going to vary day-to-day, I would imagine, but what is the rough number of inmates who work in the kitchen on that a.m. shift?

A.    So a rough day -- so when I was in there, a rough day-to-day time would probably be about 11 to 15 on my shift.

Q.    And that could vary some.  An inmate might have some reason they have to be somewhere else.  They might have a disciplinary.  They might have medical. They might -- who knows.  Is that fair?

A.    That's fair.

Q.    You get what you get.  But one of your responsibilities, and the responsibility of the other COs working that shift, is to have care, custody, and control for all those inmates.  Is that accurate?

A.    Correct.

Page 25

Q.   And so do you know how it came to be that Inmate Hines was left unmonitored in the DA room?

A.   I don't have any idea.

Q.   Did you have any -- after this happened, did you have a meeting with your supervisor, Sergeant Stein, or with Corporal Nasta, to discuss what went wrong that allowed -- allowed Inmate Hines to be unaccompanied in that DA room?

A.   I don't recall any type of meeting.  Honestly, I don't at the time.  It was a rather stressful situation.

Q.   And I'm sure that it was rather stressful on the day.  But on the following day, you potentially had the opportunity.  When you arrived at the prison and you're coming on shift, you would generally have a briefing.  Isn't that fair?

A.   That's correct.

Q.   And so did you -- on the following day, was there a briefing with your supervisor, with Corporal Nasta, to discuss the things that could be done differently or failures that occurred on the prior day to prevent future assaults?

A.   So we did have a security review, I'm guessing by people well above myself.  Nasta did not come in the next day.  It was -- I came in by myself.

Page 26

Q.   Okay.   And when you say there was a security review, do you know who conducted that security review?

A.   I do not, unfortunately.   That's above my pay grade, unfortunately.

Q.   How do you know that occurred?

A.   Because when I came back in, there was a camera placed in the DA.

Q.   Okay.   And so based on -- and did you -- so the assault happens on September 28th of 2023.   Do you -- were you back in on September 29th, the following day, or --

A.   Yes, I was back in the next day.

Q.   And so already by September 29th, they had placed a camera in the DA room; correct?

A.   That's correct.

Q.   And tell me -- I mean, what's the significance of having a camera at the prison?

A.   It allows us to review, to -- in case we have a disciplinary issue, it allows us to review to get evidence, in case we need it for a case.  It allows us to see places that we can't normally -- that we couldn't be at normally.  And it also keeps -- keeps people honest --

Q.   In other words --

A.   -- if they see a camera.  Unfortunately --

O.W. vs
State of Arizona

Talon Hanks [Contains Attorneys' Eyes Only]

Page 28

Yeah. Like I said, unfortunately, I'm not a mind reader. I'm only an officer.

Q. But one of the reasons that inmates were not allowed to be in the DA room unaccompanied is that there is no camera in there; is that correct?

MR. LAMMERS: Form. Foundation.

Form of the question.

BY MR. SHOWALTER:

Q. Did you hear my question?

MR. LAMMERS: Don't -- don't listen to what I'm saying.

THE WITNESS: Okay. Okay. My apologies.

MR. LAMMERS: But answer the question.

A. Okay. I'm sorry. If you could repeat the question. I'm sorry.

BY MR. SHOWALTER:

Q. Yeah. One of the reasons that inmates are not allowed to be in that DA room unaccompanied is the lack of cameras; correct?

MR. LAMMERS: Same objections.

Go ahead and answer.

A. Okay. I believe, yes, that they should not have utilized that DA.

BY MR. SHOWALTER:

Q. And so that's -- my understanding is that one

O.W. vs
State of Arizona

Talon Hanks [Contains Attorneys' Eyes Only]

Page 29

of the reasons that there was always supposed to be a COII in the DA room if there was an inmate in there, is because of the absence of cameras in that room; is that accurate?

MR. LAMMERS:   Same objections.

Go ahead.

A.   That's correct.

BY MR. SHOWALTER:

Q.   And the other thing I understand about that DA room, it's always supposed to be locked; correct?

A.   Correct.

Q.   And who would be the people who would have keys to that DA room?

A.   So our Trinity -- at the time, Trinity had a set that had a key on it and as well as security had a set with a key on it.

Q.   Okay.

A.   So both of us actually had a set of keys.

Q.   Okay.  And do you know -- do you know if, on that date, Corporal Nasta had unlocked that DA room door and had left it unlocked so that inmates could move freely in and out of that DA room?

A.   I do not know.

Q.   Do you know if you had done that?

A.   I did not.

O.W. vs
State of Arizona

Talon Hanks [Contains Attorneys' Eyes Only]

Page 30

Q.    Okay.  Were you ever advised that Corporal Nasta had a practice of leaving that DA room unlocked and allowing inmates to go through it or to use that room to access the outside yard so that they could go and do things like deal with disciplinary tickets?

A.    I know we would escort them through that DA and then escort them outside and then notify the yard officer that they were heading to wherever they were going, but they should have been escorted.

Q.    Okay.  And so it would be -- it would be dangerous and a violation of DOC policy to let an inmate into that DA room unaccompanied; correct?

MR. LAMMERS:  Foundation.

A.    Being at the custody level, yes, it would be dangerous.

BY MR. SHOWALTER:

Q.    And it would be dangerous -- well, strike that.

If an inmate is allowed to get into that DA room where there's no cameras, they could potentially ambush DOC employees or Trinity employees who enter that room; correct?

A.    I'm assuming so.

Q.    I mean, that's what happened here; right?

Page 35

MR. SHOWALTER:  Sure.

MR. LAMMERS:  -- so I don't interrupt?

Okay.  Thanks.

BY MR. SHOWALTER:

Q.   Would that be the first failure?

A.   I believe the first failure was communication. Nobody communicated that he was placed in there.

Q.   Okay.  And when you say "in there," do you mean the DA?

A.   That's correct.

Q.   Okay.  So having Hines in the DA without supervision would be a failure; correct?

A.   That's correct.

Q.   And if Hines was going to be placed into the DA without supervision, at the very minimum that should have been communicated to other staff members; correct?

A.   Correct.

Q.   And when -- was there -- there also would appear that there was a failure on the count when you took the inmates out on the smoke break; correct?

A.   I took all the inmates that I knew that I had in the kitchen.  All the inmates that I knew that I had, I took them with me.

Q.   Okay.

A.   I did not know that there was an inmate in

Page 36

that DA.

Q.   And what I'm trying to understand is how -- how could that inmate be in the DA without you knowing about it?

A.   Again, I don't -- somebody could have possibly put him in there and then not notified me that somebody was in there.

Q.   Okay.  And then another failure would be the failure to put a camera in the DA in the first place; correct?

A.   That would be on the admin side.  I can't say yes or no for that one.

Q.   But based on your own knowledge of that unit, and the prior attack on staff that you're aware of, it was known to staff, including the administration, that there was no camera in that DA; correct?

A.   That's correct.

Q.   And it was known to staff and the administration that that restroom was the only staff restroom for staff members working in the kitchen; correct?

A.   I cannot -- I cannot say for what admin knew or not.  I can only say for what I knew.

Q.   So you and the other people on your shift knew that was the only employee bathroom there?

O.W. vs
State of Arizona

Talon Hanks [Contains Attorneys' Eyes Only]

Page 37

A.    That's correct.

Q.    And so anybody who was working in the kitchen who needed to use the restroom who was staff, would have to go into the DA where there was no camera in order to access that bathroom?

A.    That's correct.

Q.    Okay.  So while you were on the smoke break, or, I'm sorry, while you were taking the inmates on the smoke break, what is -- what is your understanding of what Corporal Nasta was doing?

A.    I -- from what I was understanding, she was in the control room doing a face-to-face with Sergeant Stein because he had walked in.  I don't even question what time it was, but he walked in as I was walking out getting chow ready to go for lunch.  And so my only guesstimating is that they were doing a face-to-face, kind of almost like a briefing.

Q.    Okay.  And so Sergeant Stein and Corporal Nasta were in the -- your understanding is that they were actually in that control room?

A.    That is my understanding, yes.

Q.    How did you notify the corporal that you were taking the inmates outside for the smoke break?

A.    I would make -- I try not to utilize the radio because it would be like a face-to-face, and I would

O.W. vs                                    Talon Hanks [Contains Attorneys' Eyes Only]
State of Arizona

Page 42

MR. LAMMERS:  Same objections.

A.    I cannot speak for any other officer.  I can only speak for what I did that day.

BY MR. SHOWALTER:

Q.    And I understand that, but I'm talking about you and your experience at the prison; right?

You worked at the prison for a long time; correct?

A.    For a few years.

Q.    And you understand that Inmate Hines was not supposed to be in the DA without being monitored; correct?

A.    I was never advised that he was in the DA.

Q.    And I understand that.  But if -- but the policy was that door is supposed to be locked, and inmates are not supposed to be able to go into that room unmonitored; correct?

A.    I believe that's what the policy states.

Q.    And so if that policy had been followed, Inmate Hines never would have had the opportunity to attack O.W.; correct?

MR. LAMMERS:  Same objections.

A.    I believe that had conversation -- well, had people -- I cannot say for, you know, who put him in there or how this situation happened, but I did

Page 43

everything that I could in my power to ensure that something wouldn't have happened.

BY MR. SHOWALTER:

Q.   You do not fault O.W. in any way for the attack; correct?

A.   No.

MR. LAMMERS:   Form.   Foundation.   Calls for a legal conclusion.

BY MR. SHOWALTER:

Q.   And just -- just to be clear on the record, you agree with me that O.W. is not to blame for this attack?

MR. LAMMERS:   Same objections.

A.   I would agree with you.

BY MR. SHOWALTER:

Q.   And we've discussed that the prison is a dangerous place.   And the inmates who are on the Rincon are threats to members of the public and threats to staff; correct?

A.   I believe it's an inherent danger being the custody level that it is, yes.

Q.   And it's particularly important to protect food service employees because they do not have many of the -- they do not have the training and many of the resources that officers have; correct?

O.W. vs
State of Arizona

Talon Hanks [Contains Attorneys' Eyes Only]

Page 45

A.   No.  Only my tactical priorities.

Q.   You understood at all times that they were civilian workers who needed to be protected; correct?

A.   That's correct.

Q.   You also understood that the male inmates at Rincon, who were not generally in the company of women, might sexualize those employees and might attempt to sexually assault them; correct?

MR. LAMMERS:  Foundation.  Form of the question.  Calls for speculation.

A.   Once again, I cannot -- I can't say what these inmates are thinking because I'm not a mind reader. All I can say is for what my job entails and what I do at the unit.

BY MR. SHOWALTER:

Q.   And I'm not asking you to read any minds.

You were aware of a prior assault at Rincon in the DA on some sort of civilian employee or CO in that bathroom; correct?

A.   I was aware of one many years ago.

Q.   And -- well, you don't remember how long ago it was; correct?

A.   I don't.  Yeah.

Q.   I'm not sure what you mean by -- I mean, "many years ago," that's fairly vague; right?

Page 46

A.   Yeah.

Q.   It's not two decades ago; correct?

A.   That's correct.

Q.   It's within the last 11 years; correct?

A.   I -- once again, I don't want to speculate on times because -- yeah.  I...

Q.   Well, I thought you've only worked there for 11 years.  That's why --

A.   I have worked there -- so I have worked there for 11 years.  But within that 11 years, I've done a lot with the department, and I can not -- I don't want to speculate on exact times of when things happened.

Q.   I'm not trying to get you to speculate on time.  I'm saying, in the 11 years you worked with, you were the audio witness to somebody reporting an assault on staff at the DA on the radio; correct?

A.   An attempted assault.

Q.   And so you knew that that was a risky location; correct?

        MR. LAMMERS:  Foundation.  Calls for speculation.

A.   I knew that the kitchen and the unit we were on was a dangerous area.

BY MR. SHOWALTER:

Q.   And based on your own human knowledge and your

O.W. vs                                    Talon Hanks [Contains Attorneys' Eyes Only]
State of Arizona

Page 54

A.   That's correct.

Q.   What was your understanding of who was responsible for supervising inmates in the dining area?

A.   That would be my -- if they were in the kitchen area, that would be myself.  If they were in the dining area, it would utilize -- they would usually utilize an officer on the yard.

Q.   And who established that supervision requirement?

A.   That would be somebody in the policymaker's side.

Q.   And what authority, if any, did Trinity employees have over inmate supervision within the Rincon Unit kitchen?

A.   They had -- they could write tickets.  They could write IRs.  And we would come back and enforce them to whatever they requested us to do.

Q.   Were Trinity employees responsible for monitoring or restricting inmate access to staff-only areas?

A.   I'm sorry.  Can you repeat that one?

Q.   Were Trinity employees responsible for monitoring inmates in the dining area?

A.   No.  That was security.

Q.   Who made decisions about which inmates were

O.W. vs                                          Talon Hanks [Contains Attorneys' Eyes Only]
State of Arizona

Page 56

THE WITNESS:  Thank you.

MR. SHOWALTER:  I have no follow-ups.

MR. LAMMERS:  Okay.  Now we'll read and sign.

THE VIDEOGRAPHER:  This concludes the deposition of Corrections Officer Talon Hanks.  We are off the record at 10:22 a.m.

THE COURT REPORTER:  Mark, do you want a copy?

MR. LAMMERS:  Yes.

THE COURT REPORTER:  Chrisanne, do you want a copy?

MS. GULTZ:  Yes, I do as well.

                    (The deposition concluded at 10:22 a.m.)

                    _____
                                  TALON HANKS

Page 57

CERTIFICATE OF CERTIFIED REPORTER

BE IT KNOWN that the foregoing proceedings were taken before me; that the witness before testifying was duly sworn by me to testify to the whole truth; that the foregoing pages are a full, true and accurate record of the proceedings, all done to the best of my skill and ability; that the proceedings were taken down by me in shorthand and thereafter reduced to print under my direction; that I have complied with the ethical obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206 J(1)(g)(1) and (2).

I CERTIFY that I am in no way related to any of the parties hereto, nor am I in any way interested in the outcome hereof.

{X}  Review and signature was requested; any changes made by the witness will be attached to the original hereof.
{ }  Review and signature was waived/not requested.
{ }  Review and signature not required.

Dated at Phoenix, Arizona, this 29th day of October, 2025.

/s/ Mary Davis

_____
MARY DAVIS, RPR
Certified Reporter
Arizona CR No. 50271

*        *        *        *        *

I CERTIFY that GRIFFIN GROUP INTERNATIONAL, has complied with the ethical obligations set forth in ACJA 7-206 (J)(1)(g)(1) through (6).

/s/ Pamela A. Griffin

_____
GRIFFIN GROUP INTERNATIONAL
Registered Reporting Firm
Arizona RRF No. R1005

# EXHIBIT H

**CHAPTER: 900**

**Inmate Programs and Services**

**DEPARTMENT ORDER:**

**903 – Inmate Work Activities**

**OFFICE OF PRIMARY RESPONSIBILITY:**

**OPS
FS
IP&R**

**Effective Date:**

**December 3, 2021**

**Amendment:**

**N/A**

**Supersedes:**

**DO 903 (2/24/18)**

**Scheduled Review Date:**

**October 1, 2024**

**ACCESS**

☐ **Contains Restricted Section(s)**

# Arizona Department of Corrections Rehabilitation and Reentry



## Department Order Manual

David Shinn, Director

ADCRR_003268

# TABLE OF CONTENTS

**PURPOSE** ...........................................................................................................................1

**PROCEDURES** ....................................................................................................................1

   **1.0    INMATE WORK PROGRAMS** ........................................................................1

   **2.0    INMATE WORK INCENTIVE PAY PLAN (WIPP)** ............................................3

   **3.0    WORK PROGRAM ASSIGNMENT PROCESS** ...............................................5

   **4.0    MINIMUM CRITERIA FOR ASSIGNMENT – INTERNAL RISK/CUSTODY LEVEL** ............................10

   **5.0    ARIZONA CORRECTIONAL INDUSTRIES (ACI) ASSIGNMENTS AND PAY.** .................................16

   **6.0    WORK AND PROGRAM ASSIGNMENT EVALUATIONS** ...............................17

   **7.0    A.SAFETY REQUIREMENTS** ......................................................................18

   **8.0    CONTRACTUAL REQUIREMENTS FOR UTILIZING INMATE WORKERS** .....................................19

**IMPLEMENTATION** ...........................................................................................................20

**DEFINITIONS/GLOSSARY** ...............................................................................................20

**ATTACHMENTS** ................................................................................................................21

**FORMS LIST** ....................................................................................................................21

**AUTHORITY** ......................................................................................................................21

ADCRR_003269

**4.0    MINIMUM CRITERIA FOR ASSIGNMENT – INTERNAL RISK/CUSTODY LEVEL**

4.1    Inmates are eligible for placement in a work assignment based on their Internal Risk (IR) Level and Custody Levels as determined by the classification criteria. Work assignments shall be determined as follow:

4.1.1    Maximum Custody (IR5) – Placement by special assessment only, regardless of the inmate's internal risk level. Assignments to the kitchen are permissible, except inmates shall not work in the kitchen after evening formal count.

4.1.2    High Custody

4.1.2.1    IR4 – Limited potential assignments

4.1.2.2    IR3 – Eligible for an IR4 assignment

4.1.2.3    IR2 and IR1 – Eligible for any IR4 and IR3 assignments

4.1.3    Medium Custody

4.1.3.1    Same as High Custody as outlined in 4.1.2.1 through 4.1.2.3 of this section.

4.1.3.2    Inmates who are IR3 and below may work in an assignment outside the facility perimeter, if it is within the complex secure perimeter or those complexes that have an uninterrupted perimeter.

4.1.4    Low Custody

4.1.4.1    IR4 – Any assignment within the facility perimeter and shall not be assigned a job outside the facility's perimeter (e.g., cannot work on a complex perimeter assignment).

4.1.4.2    IR3 – Inmates may be assigned to any assignment outside institutional grounds that is supervised by Department employees, private prison employees or contractor supervisor staff. These assignments may include Arizona Department of Transportation (ADOT), Intergovernmental Agreement (IGA), or other authorized work crews where the Department's response time is within 60 miles with the following restrictions:

4.1.4.2.1    No Criminal Aliens

4.1.4.2.2    No current or prior conviction for murder or attempted murder

4.1.4.2.3    No current or prior conviction for kidnapping or attempted kidnapping

4.1.4.2.4    No Validated or Step Down Security Threat Group Members

4.1.4.2.5    Arrest, but no conviction, for a felony sex offense

4.1.4.2.6    Interstate Corrections Compact

ADCRR_003279

# EXHIBIT I

## (Pending Motion to Seal)

# EXHIBIT J

# (Pending Motion to Seal)

# EXHIBIT K

# In the Matter of:

*O.W.*

*vs*

*State of Arizona*

---

*O.W.*

*February 23, 2026*



# GRIFFIN GROUP
# INTERNATIONAL

3200 East Camelback Road, Suite 177
Phoenix, Arizona 85018

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF ARIZONA


O.W., an individual,            )
                                )
                Plaintiff,      )
                                )
            vs.                 )
                                )No. 2:25-cv-00044-DWL
State of Arizona, et al.,       )
                                )
                Defendants.     )
                                )




DEPOSITION OF O.W.




Tucson, Arizona
February 23, 2026
11:08 a.m.




REPORTED STENOGRAPHICALLY BY:
PAMELA A. GRIFFIN, RPR, CRR, CRC
Certified Reporter
Certificate No. 50010

PREPARED FOR:
CONDENSED/ASCII

(Certified Copy)



2

INDEX

WITNESS                                                    Page

O.W.

        Examination by Mr. Lammers


EXHIBITS

Deposition
Exhibits:        Description                              Page

            (No exhibits marked.)



3

                    DEPOSITION OF O.W. was taken on

February 23, 2026, commencing at 11:08 at the law offices

of Rusing Lopez Lizardi & Saffer,  N. Swan Road, Suite 151,

Tucson, Arizona, before PAMELA A. GRIFFIN, a Certified

Reporter in the State of Arizona.


COUNSEL APPEARING:


For the Plaintiff:

                    ROBBINS CURTIN MILLEA & SHOWALTER
                    By:  Jesse M. Showalter
                    301 E. Bethany Home Road
                    B-100
                    Phoenix, Arizona  85012

For the Defendants:

                    RUSING LOPEZ LIZARDI & SAFFER
                    By:  Mark D. Lammers
                         Zoey Kotzambasis
                    6363 N. Swan Road
                    Suite 151
                    Tucson, Arizona  85718


ALSO PRESENT:

                    Kaylan Nasta
                    Jennie Leetham (Via Zoom)
                    Jacob Harris (Via Zoom)
                    Lauren Channell (Via Zoom)
                    Tim Ray (Via Zoom)
                    Aneta Wrzeszcz (Via Zoom)



4

THE VIDEO SPECIALIST:  We are on the record. Today's date is February 23rd, 2026.  The time is 11:05 a.m.

This is the video-recorded deposition of O.W., noticed by counsel for the Defendants in the matter of O.W. versus the State of Arizona.

This matter is being held in the United States District Court for the District of Arizona.  Case number 2:25(c) V00044D WL.

Our location today is the law offices of Rusing Lopez Lizardi & Saffer, located at 6363 North Swan Road, Suite 151, Tucson, Arizona, 85718.

The certified court reporter is Pam Griffin with Griffin Group International.  Located at 3200 East Camelback Road, Suite 177, Phoenix, Arizona, 85018.

My name is Robin Smart.  I'm the certified legal video specialist for the firm of VideoDep Incorporated, located in Phoenix, Arizona.

All Zoom appearances today will be noted on the transcript.  Counsel present, please introduce yourselves and whom you represent, starting with Plaintiff's counsel, please.

MR. SHOWALTER:  Jesse Showalter of Robbins Curtin Millea & Showalter on behalf of Plaintiff O.W.

MR. LAMMERS:  Mark Lammers on behalf of the

individual defendants and the State.

THE VIDEO SPECIALIST:  Thank you, Counsel.

Also present today is attorney Zoey Kotzambasis and Kaylan Nasta.  The witness may be sworn in, please.

O.W.,

a witness herein, having been first duly sworn by the Certified Reporter to speak the truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. LAMMERS:

Q.   So throughout this deposition, we're going to -- I'll just refer to you as Miss or Ma'am, something like that or your initials, if necessary.  Okay?

A.   **Okay.**

Q.   Just for the record and everyone knows.

I know you went through a lot last week and then testifying in court --

A.   **Uh-huh.**

Q.   -- in the criminal matter, and I don't intend to ask a lot of the same questions.  Okay?

A.   **Okay.**

Q.   Some of the same rules apply, though.  You need to

Q.   Good for you.

You had some jobs, fast food restaurants and other.  Can you just give me kind of a list --

A.   Yeah.

Q.   -- what you worked at?

A.   I've worked at Jimmy John's, McDonald's, Starbucks.  I was a receptionist at a dog grooming salon. I've worked at a call center for AT&T and Costco.

Q.   Okay.  How did you learn about the position at Trinity?

A.   Indeed.com.

Q.   And what was -- what did Indeed say, if you can remember?  How did they describe that position?

A.   That it was a food service related position at the Arizona State Prison Complex Tucson.

Q.   And apparently you were interested?

A.   I was.

Q.   So what did you do?

A.   I applied for the job.

Q.   Online or --

A.   Online.

Q.   And I assume you got some communication back?

A.   I did.

Q.   And they interviewed you?

A.   Yes.

Q.    And you got the job?

A.    Yes.

Q.    When did you first get hired by Trinity?

A.    Somewhere in September of 2022.

Q.    And before you started working in the kitchens, you received some training of -- by DOC and by Trinity.  Is that right?

A.    Yes.

Q.    Can you break them up for me?  What kind of training did you get from Trinity about working in a kitchen and particularly working in a kitchen in a prison setting?

A.    So there was, like, computer-based modules that we did that included a ServSafe certification course.  Mostly related to the food.  There were other kind of computer modules we did, and those took place in an area called "the food factory," on the Arizona State Prison Complex.  And there were inmates present at that time, but it was not necessarily kitchen.  It was, like, kind of a packing facility where we would -- that food would be packed and sent to the units all over the prison.  So it was kind of like an introductory kind of space.

Q.    So it sounds like those two on computer module and the training at the food factory were more oriented to book serving -- preserving and serving, preparing food?



building?

A.   There's many different buildings you could check in from.  It depended on what unit you were being scheduled to work at.

Q.   So in this case you were working at Rincon?

A.   Yes.

Q.   So where would you check in there?

A.   So you would check in.  There's, like, a main entrance to the -- that contains a lot of -- like, if you go through this entrance, there's a lot of yards through this entrance.  There's also yards off separate from this entrance.  But to get to Rincon, I would go to this main entrance area where they would check my belongings, and I would go through a metal detector.  And then there would be a bus that would take you to whichever yard you needed to go to.  So I would take the bus to Rincon where that would -- procedure would be repeated again in front of the Rincon yard where they would check your belongings and send you through a metal detector.

MR. SHOWALTER:  Before your next question, I just got texted by my paralegal.  I don't think anybody on the Zoom can hear us.  I think maybe the audio and video aren't on.

MR. LAMMERS:  Sorry about that.  Can you hear us now?

O.W. vs
State of Arizona

O.W.

35

home, you return that equipment.  Correct?

A.   Yes.

Q.   When did you start working in the Rincon kitchen?

A.   A few months into me working there.  Possibly five -- anywhere from five to seven months in.

Q.   Who was the supervisor for Trinity at that time.  Do you remember?

A.   I'm not sure what you mean.

Q.   Well, when you got to the Rincon kitchen for the very first time, were there other Trinity workers working?

A.   Yes.

Q.   Do you remember who?

A.   A few.

Q.   Do you remember their names?

A.   I know Amy Link was the food service director.  I have a hard time remembering their names.

Q.   That's okay.

Was Amy Link your direct supervisor?

A.   She was everybody at Trinity's boss at Arizona State Prison Complex Tucson.

Q.   For Trinity?

A.   Yes.

Q.   And what I'm getting at is, was there anyone else between you and Amy to report incidents to or to report to?  She was the boss for Trinity in that unit.  Right?

40

Q.    And what would you do when they did one of these, stole product, back talked, didn't follow instruction? What would you do?

A.    I would speak to an officer about it.

Q.    Did Hines ever give you any problems before the incident?

A.    I don't remember.

Q.    Do you remember whether or not Trinity folks can do a write-up on a prisoner?

A.    We can do an information report.

Q.    And who do you give those to?

A.    It would depend.

Q.    What would it depend on?

A.    The -- it would depend on if it was needing to be -- like, if it needed to become a write-up or if it was just an information report and giving, passing information along.

Q.    Did you ever report something to an incident to a CO that resulted in a write-up?

A.    Yes.

Q.    Do you know how many times?

A.    I don't.

Q.    Did you ever tell anyone that Hines was giving you a hard time at any point?

A.    I don't remember.

53

said to him.

A.    I said:  "Damn, they locked you in here?"

Q.    Did he respond to that at all?

A.    He probably, like, chuckled or something or said yeah.

Q.    So when you got -- you unlocked the door, you go in.  You see Hines is there.  Did you lock the door again behind you?

A.    I did.

Q.    And then you go to the restroom.  Is that right?

A.    Yes.

Q.    What was Hines doing when you first walked in?

A.    Sweeping.

Q.    Now, there's another door that leads to the outside.  You don't have a key for that.  Correct?

A.    Correct.

Q.    And Hines was in there by himself.  There was not a CO?

A.    That's right.

Q.    Do you have any idea who put Hines in there?

A.    I believe it was Nasta.

Q.    And why do you believe that?

A.    I saw footage of her putting him in there.

Q.    So other than the video, you -- on that day you didn't see her?

54

A.    No, I did not.

Q.    When you are going to use -- when you were going to use the restroom, was it the procedure that you would let some other worker, like a Trinity worker or a CO, know that you were going to use the restroom?

A.    Not necessarily.

Q.    Did you do that on occasion?

A.    I did.

Q.    Was that something regular you did or not?

A.    If there was an officer or Trinity around when I was going, I would tell them I'm going to the restroom.

Q.    Do you remember telling anyone that day you were going to the restroom?

A.    I don't remember.

Q.    And the Trinity worker -- workers that day, they were Amy Link and Rhonda Laner?

A.    Yes.

Q.    When you first -- sorry.  When you first entered the dining area and you saw Hines in there, did you feel -- did you feel unsafe?  Was it an unsafe situation in your mind at that time?

MR. SHOWALTER:  Form and foundation.

THE WITNESS:  No.  It striked me as odd, but I figured he was in there for a reason.

. . .

55

BY MR. LAMMERS:

Q.    But you weren't afraid just because he was in there?

A.    No.

Q.    So you go to the restroom, use the restroom.  And I'm not going to take you through everything, but you did see some shadows under the door of the restroom?

A.    Yes.

Q.    And just for this record, the restroom does have a lock?

A.    It does.

Q.    And you lock it with a key or does it automatically lock?

A.    I don't really remember.  I felt like it automatically locked upon being shut.

Q.    Did you need a key to get out?

A.    No.

Q.    Was it sort of like the lock you have in your house bathroom?  It's one of those type of locks?

A.    I don't really remember.

MR. SHOWALTER:  Form and foundation.

BY MR. LAMMERS:

Q.    Okay.  What did you think when you saw the shadows under the door?

A.    I wasn't sure if he was just sweeping.  I figured



56

**he was just sweeping so I didn't want to open the door if**

**he was sweeping right there.**

Q.   Did you ever think, well, because he's sweeping

and has a broom, that he could hurt you in any way?

A.   I didn't.

Q.   Did you think that was risky that he was sweeping

and had a broom?

A.   **Not necessarily.**

Q.   What do you mean by "not necessarily"?

A.   **I felt like it was odd for him to have the broom**

**and be alone, but I'd figured he was in there for a reason.**

Q.   All right.  And you -- did you feel like there was

an increased risk, something could happen because he was

alone in there with a broom?

A.   **Yes.**

Q.   Is there -- what was the procedure, if any, if you

unlocked the DA door, you went in and you saw an inmate in

there by themselves?  Was there a procedure that you should

have -- that someone should follow?

MR. SHOWALTER:  Form.

**THE WITNESS:  I had no specific procedure for**

**that, no.**

BY MR. LAMMERS:

Q.   Did you get any instruction or training about

locking that door, keeping it locked?



57

A.    It was supposed to remain locked at all times, yes.

Q.    And who -- how did you learn that?

A.    Just upon coming to the Rincon Unit and being taught how to use the keys at that unit.

Q.    Did it ever cross your mind that maybe, hey, he's in here with a broom.  Maybe I should go get a CO to come in and either watch him or take him out of the DA while I used -- while you used the restroom?

A.    It didn't.

Q.    So you opened the door.  Right?

A.    Yes.

Q.    And he bursts in?

A.    Yes.

Q.    Okay.  I'm not going to go into what happened there because you testified to that last week and it's unnecessary.  I don't want to put you through it again.

But at some point a Trinity worker came to the bathroom?

A.    Yes.

Q.    And that was Laner?

A.    Yes.

Q.    How long -- you may have testified about this, but how long was it from the time you went into the bathroom and Laner coming to the bathroom?

Q.    She unlocked the door.  Right?

A.    Yes.

Q.    And you went to the Trinity office?

A.    Yes.

Q.    Did you run to the Trinity office?  Walk?

A.    Kind of speed walked.

Q.    Did you say anything or see -- say anything to anybody while you were walking back to the Trinity office?

A.    I had looked around, and I remember Sergeant Stein was there that day so I remember going:  "Stein, Stein." And not seeing him so I just went to the Trinity office.

Q.    And how do you know Stein was there that day?

A.    I had seen him.

Q.    Where was he when you saw him?

A.    When I came in, I don't remember if maybe he was the one who let me in the door that day or if I just saw him in the kitchen somewhere.

Q.    I just want to make something clear.  I know what you just testified to, but I read somewhere that Hines followed you into the DA room.  That's not correct?

A.    That's not accurate.

Q.    So you're in the Trinity room.  Right?

A.    Yes.

Q.    Amy Link's there?

A.    Yes.



O.W. vs
**State of Arizona**

O.W.

62

BY MR. LAMMERS:

Q.    So you remember initiating the ICS?

A.    I do.

Q.    And did you hear the ICS go off or what did you -- what did you hear, if anything?

A.    So I had said:  "Williams to Control."

And they said:  "Go ahead."

And I said:  "Initiating ICS.  Inmate Hines just raped me in the bathroom."

And he said -- the Control said:  "Inmate Hines?"

And I said:  "Yes."

And that's the last thing I remember hearing coming from the radio.

Q.    Did you ever hit what I call the panic button?

A.    No.  I only initiated.

Q.    What was that?

A.    I only initiated.

Q.    Other prison personnel show up, I assume --

A.    Yes.

Q.    -- is that right?

You probably don't remember who?

A.    I don't think -- even that day, I don't think I recognized any of the other people that showed up.

Q.    Okay.  My understanding, some Trinity folks showed

64

A.    I believe so.

Q.    Do you know whether he came to the Rincon kitchen to look at what was going on?

A.    I have no idea.

Q.    So at some point the ambulance -- 911 is called, and the ambulance shows up.  Right?

A.    Yes.

Q.    And I'm not going to hold you to the times, but can you give me kind of an estimate, how long it took from the time you initiated the ICS till the ambulance showed up?

A.    No more --

            MR. SHOWALTER:  Form and foundation.

            THE WITNESS:  No more than ten minutes.

BY MR. LAMMERS:

Q.    The EMTs probably checked you over?

A.    Yes.

Q.    Blood pressure, that sort of thing?

A.    Yes.

Q.    And then they put you on a stretcher and took you to TMC.  Right?

A.    Yes.

Q.    And Corporal Nasta was with you on that ride all the -- the whole ride she was with you?

A.    Yes.

86

Q.    And relatives?

A.    **Yes.**

Q.    For what kind of events?  Dinners?

A.    **Yeah.**

Q.    Sports events?  What do you do when they come over?

A.    **Watch a movie, make some dinner.**

Q.    Does that increase your anxiety at all in coming over and having dinner or watching movies, that sort of thing?

A.    **No.**

Q.    You find them supportive?

A.    **Yes.**

        MR. LAMMERS:  I'm almost done.  How about five minutes and I let you know?

        MR. SHOWALTER:  Sure.

        THE VIDEO SPECIALIST:  We are going off the record.  The time is 1:27 p.m.

        (Recess taken, 1:27 p.m. - 1:35 p.m.)

        THE VIDEO SPECIALIST:  We're back on the record.  The time is 1:35 p.m.

BY MR. LAMMERS:

    Q.    Did Trinity fail to provide continuous supervision of the inmate workers assigned to the kitchen?

        MR. SHOWALTER:  Form and foundation.

87

THE WITNESS:  Yes.

BY MR. LAMMERS:

Q.    Tell me why you think that.

A.    We were understaffed.

Q.    Trinity was understaffed?

A.    Yes.

Q.    How many staff members were you supposed to have on a given shift?

A.    Typically, with proper staffing, there would have been a manager who would be like the supervisor of the unit and at least two Trinity workers at a time.  Kitchen supervisors, we were called.

Q.    And how often was there understaffing?

A.    Most of the time that I was with Trinity.

MR. SHOWALTER:  There's a weird rattling coming from over there that's making me go crazy.  Can anybody else hear it?

THE WITNESS:  I can.

MR. LAMMERS:  I can't.

MR. SHOWALTER:  Do you know if it -- I don't -- I can't figure out what it could possibly be, but it seems like it's coming from behind the backdrop.

THE VIDEO SPECIALIST:  Do you want me to go off the record?

MR. LAMMERS:  Yeah, let's go off.

88

THE VIDEO SPECIALIST:  Going off the record, the time is 1:36 p.m.

(Discussion off the record.)

THE VIDEO SPECIALIST:  We're back on the record.  The time is 1:37 p.m.

BY MR. LAMMERS:

Q.   Ma'am, did you ever report the understaffing to Trinity?

A.   Yes.

MR. SHOWALTER:  Form and foundation.

BY MR. LAMMERS:

Q.   Yourself personally?

A.   Yes.

Q.   How many times?

A.   Most of the time, every day.

Q.   And who -- sorry.  What was the last part?

A.   Pretty much every time I worked.

Q.   And who did you report this to?

A.   Whoever was on shift, either Amy Link or sometimes there was an assistant director that I would speak to.

Q.   Did you ever report it in writing?

A.   No.

Q.   Did you ever have concerns that the prison was -- wasn't staffing the kitchen correctly, that it was understaffed?



O.W. vs
State of Arizona
O.W.

89

A.    With which kinds of workers, inmates or officers?

Q.    Officers.

A.    Yes.

Q.    And did you report that to anybody?

A.    I would speak about it to them, but not a written report, no.

Q.    Who would be "them"?

A.    Any officer.

Q.    Did you talk to Nasta about it?

A.    Several times, yes.

Q.    Hanks?

A.    Yes.

Q.    You did say a manager from time to time would come to the kitchen.  Right?

A.    Yes.

Q.    Would you tell that manager that there's chronic understaffing in the kitchen?

A.    Yes.

Q.    Do you think Corporal Nasta did anything wrong that day?

A.    Yes.

          MR. SHOWALTER:  Form and foundation.

BY MR. LAMMERS:

Q.    What?

A.    Putting Inmate Hines in that room.

94

SIGNATURE PAGE

I, O.W., the deponent in the above deposition, do acknowledge that I have read the foregoing transcript of my testimony, and state under oath that it, together with any attached Amendment Sheet pages, constitutes my sworn statement.

_____   I have made changes to my deposition.

_____   I have NOT made any changes to my deposition.

_____

O.W.



O.W. vs
State of Arizona

O.W.

95

CERTIFICATE OF CERTIFIED REPORTER

BE IT KNOWN that the foregoing proceedings were taken before me; that the witness before testifying was duly sworn by me to testify to the whole truth; that the foregoing pages are a full, true, and accurate record of the proceedings, all done to the best of my skill and ability; that the proceedings were taken down by me in shorthand and thereafter reduced to print under my direction; that I have complied with the ethical obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206 J(1)(g)(1) and (2).

I CERTIFY that I am in no way related to any of the parties hereto, nor am I in any way interested in the outcome hereof.

[X]  Review and signature was requested; any changes made by the witness will be attached to the original transcript.
[ ]  Review and signature was waived/not requested.
[ ]  Review and signature not required.

Dated at Phoenix, Arizona, this 12th day of March, 2026.


_____/s/ Pamela A. Griffin___ _
PAMELA A. GRIFFIN, RPR, CRR, CRC
Certified Reporter
Arizona CR No. 50010

*      *      *      *      *

I CERTIFY that GRIFFIN GROUP INTERNATIONAL, has complied with the ethical obligations set forth in ACJA 7-206 (J)(1)(g)(1) through (6).


_____/s/ Pamela A. Griffin_____
GRIFFIN GROUP INTERNATIONAL
Registered Reporting Firm
Arizona RRF No. R1005



# EXHIBIT L

# (Pending Motion to Seal)

# EXHIBIT M

# (Pending Motion to Seal)

# EXHIBIT N

# In the Matter of:

*O.W.*

*vs*

*State of Arizona*

---

*Rhonda Lehner*

*November 11, 2025*

---



GRIFFIN GROUP
INTERNATIONAL

3200 East Camelback Road, Suite 177
Phoenix, Arizona 85018

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| O.W. an individual, | ) No. 2:25-cv-00044-DWL |
| | ) |
| Plaintiff, | ) |
| vs. | ) |
| | ) |
| State of Arizona, a body | ) |
| politic; Ryan Thornell, an | )      VIDEOTAPED |
| individual, on his own behalf | ) |
| and on behalf of his marital | )   VIDEOCONFERENCE |
| community; Christopher | ) |
| Josefowicz, an individual, on | )    DEPOSITION OF |
| his own behalf and on behalf | ) |
| of his marital community; | )    RHONDA LEHNER |
| Kaylan Nasta, an individual, | ) |
| on her own behalf and on | ) |
| behalf of her marital | ) |
| community; Talon Hanks, an | ) |
| individual, on his own behalf | ) |
| and on behalf of his marital | )   November 11, 2025 |
| community; TKC Holdings, | )   Tucson, Arizona |
| Inc., a Missouri corporation; | )      9:09 a.m. |
| Trinity Services Group, Inc., | ) |
| a Florida corporation; and | ) |
| John and Jane Does 1-40, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

(Contains "Confidential" portions)

REPORTED STENOGRAPHICALLY BY:
MARY DAVIS, RPR
Certified Reporter No. 50271

PREPARED FOR:
ASCII/Condensed

(Certified Copy)



**Griffin Group International**
**888.529.9990 | 602.264.2230**

2

       VIDEOTAPED DEPOSITION OF RHONDA LEHNER,

located in Tucson, Arizona, was taken on November 11,

2025, commencing at 9:09 a.m., via videoconference,

before MARY DAVIS, a Certified Reporter in the State of

Arizona.


COUNSEL APPEARING:

For Plaintiff

      ROBBINS CURTIN MILLEA & SHOWALTER, LLC
      By: Jesse Showalter, Esq.
      301 East Bethany Home, Suite B-100
      Phoenix, Arizona 85012


For Defendants State of Arizona, Ryan Thornell,
Christopher Josefowicz, Kaylan Nasta, and Talon Hanks

      RUSING LOPEZ & LIZARDI, PLLC
      By: Mark D. Lammers, Esq.
      By: Tyler Oberg, Esq.
      6363 North Swan Road, Suite 151
      Tucson, Arizona 85718


For Defendants TKC Holdings, Inc. and Trinity Services
Group, Inc.

      LITTLER MENDELSON
      By: Chrisanne M. Gultz,, Esq.
      2425 East Camelback Road, Suite 900
      Phoenix, Arizona 85016


ALSO PRESENT:

      Katie Williams, videographer
      Jennie Leetham
      Aneta Wrzesez
      Justin Moore
      Jacob Harris
      Benjamin Rothmel, TKC Holdings



3

I N D E X

WITNESS                                                        PAGE

RHONDA LEHNER

        Examination by Mr. Showalter                    5

        Examination by Mr. Lammers                      62

        Further Examination by Mr. Showalter            98

        Further Examination by Mr. Lammers              103

            "CONFIDENTIAL" PORTIONS

                    Pages   33-?
                    Pages   49-52
                    Pages   57-61

                E X H I B I T S

EXHIBITS                DESCRIPTION                    PAGE

(No exhibits were marked.)



**Griffin Group International**
**888.529.9990 | 602.264.2230**

4

PROCEEDINGS

*   *   *   *   *

THE VIDEOGRAPHER:  Good morning.  We are now on the record.  Today's date is November 11, 2025, and the time is 9:09 a.m. in Arizona.

My name is Katie Williams, legal video specialist with K-Video Productions.

Our court reporter is Mary Davis representing Griffin Group International, located at 3200 East Camelback Road, Suite 177, Phoenix, Arizona.

We are participating over videoconference to take the deposition of Rhonda Lehner in the United States District Court, District of Arizona, case of O.W. versus State of Arizona, et al.

The attorneys will now introduce themselves and anyone else attending with them, noticing party first, please.

And then the court reporter will swear in the witness.

MR. SHOWALTER:  Jesse Showalter, along with paralegal Jennie Leetham, on behalf of Plaintiff.

MS. GULTZ:  Good morning.  Chrisanne Gultz on behalf of Defendants TKC Holdings and Trinity Services Group.

Also on the call from Trinity -- also on

5

the call from TKC Holdings is Ben Rothmel and Justin Moore.

MR. LAMMERS:  Good morning, everyone. This is Mark Lammers and Tyler Oberg.  We are representing Defendants Nasta, Hanks, and Thornell.

RHONDA LEHNER, a witness herein, having been first duly sworn by the Certified Court Reporter, was examined and testified as follows:

EXAMINATION

BY MR. SHOWALTER:

Q.    Okay.  Ms. Lehner, my name is Jesse Showalter. I'm an attorney.  I'm in Phoenix, and I represent O.W. in a civil lawsuit that she has brought against the State of Arizona and Trinity and TKC, which are related entities that I understand you used to work for; correct?

A.    Yes.

Q.    And so, you know, I know that you've already given statements potentially in the criminal matter, as well as I think you may have been interviewed by criminal investigators at the State, but I just wanted to let you know that -- you know, what my role is and

September 28 of 2023; correct?

A. Correct.

Q. And that was the date on which O.W. was sexually assaulted by an inmate; correct?

A. **That was the day that the incident happened.**

Q. Do you disagree that O.W. was sexually assaulted by an inmate?

A. **That's not what I saw.**

Q. So you -- so you don't agree that O.W. was sexually assaulted by an inmate is what you're saying?

A. **I don't know that.  I'm not saying she wasn't. I'm just saying that's not what I saw.**

Q. Okay.  What did you see?

A. When I walked in to -- I don't know if you know the backstory and all that.  Do you want me to go through the whole story or --

Q. Sure.

A. Okay.  So an inmate came up to me -- the gentleman that we're talking about came up to me and asked me if he could sweep the DA, which I thought was hilarious because inmates never volunteer to do anything, especially clean.  So I kind of laughed at him.  And he had a broom, also, again, funny because the broom was maybe 3 foot tall.  It was broke. I said, "What are you going to sweep with that?"

14

That's hilarious.

So I assume that he was told by somebody else to go sweep because nobody took it upon themselves to do that.  So I was like, "All right.  Well, then come on if you want to go sweep."  So we walked -- me and Demarcus walked to this small DA, dining area.  It's locked.  I unlocked it.  Walked in.  There's nobody in there.  He went in with his broom, and I said, "All right.  Go ahead; start sweeping."

I locked the door because it shuts and locks. I stood there for a minute.  It's got a little window in there, and I kind of watched him to make sure that's what he was doing.  I mean, there's really nothing else in there that -- I mean, the tables don't move.  Like, it's empty.  And he was sweeping.  And so he's locked in there, completely locked in there.  Unless you have a key, you can't get in there.  And then I walked away and I continued on whatever I was doing in the kitchen.

My shift was almost over, and I had to go to the bathroom so bad.  And in that DA -- you have to walk through that DA in order to get to our restroom. So I opened the door.  I noticed he -- I didn't see Demarcus anywhere.  I just assumed someone let him out, another CO, another -- we were called "white shirts." Another shirt could have let him out.  Any of those

81

Q.    The door that goes into the DA.

A.    Yes.

Q.    So then you walk to the bathroom, enter the bathroom, and you believe that door locked automatically?

A.    Yes, that door shuts.  You couldn't get into it from the outside if it's shut unless you had a key.

Q.    And that was -- do you remember the type of door?  Was it a wooden door?  A steel door?  Do you remember?

A.    I'm sure -- I think they're all steel doors.

Q.    When you -- let's back up again.  You were going to use the restroom yourself that day; correct?

A.    Correct.

Q.    Did you unlock the door to the DA, turn around and lock it, and then go to the bathroom door or --

A.    Yes.

Q.    -- tell us the sequence.  Okay.  Is that what happened?

A.    Yes.

Q.    So you got to the bathroom, and the door was open I think you said?

A.    Yes.

Q.    And in the bathroom was Hines and O.W.; right?

A.    Correct.



82

Q.   Did you hear anything, exchange of words or anything, before you got to the bathroom?

A.   Not word, just sounds.  And, I mean, I couldn't really tell what the sounds were.  They weren't distinctive.  It was just -- like I said, that wall was where -- that same wall was shared with the dish tank area with dishes being done.  So, I mean, I just knew I heard something, but, I mean, it wasn't clear of anything that -- you know.

Q.   Fair enough.

A.   That it was, yeah.

Q.   Did -- I think you said that O.W. said something to the effect of "Get me out of here"?

A.   Yes.

Q.   What was her expression like?  Was she upset?  Looked -- tell us what you saw.

A.   She --

Q.   (Indiscernible) strike that.

You said she was disheveled; correct?

A.   Uh-huh.  Yep.

Q.   I'm trying to get -- get more of a description of her, what you saw, her action, and maybe what you read into it.

A.   Uh-huh.

            MR. SHOWALTER:  Hold on.  Form and

83

foundation.  What is "read into it"?

MR. LAMMERS:  Fair enough.

BY MR. LAMMERS:

Q.  Did she seem upset?

A.  Yes.

Q.  Okay.  And how did you come to that conclusion?

A.  Her expression on her face.  Like I said before, she looked disheveled.  She didn't look put together.  She wasn't saying much.  She seemed awkward, like it was just -- something was wrong; I just didn't know what.  Does that make sense?  Like, I don't --

Q.  It does.

A.  It's just -- yeah.

Q.  And then you took her out of the bathroom through the DA and out the DA door?

A.  Correct.  And then she --

Q.  Did you --

A.  Well, I stood in there for a minute, and I told him he better sit down because they're coming for him.

Q.  Did you --

A.  And --

Q.  Go ahead.

A.  And he did.  I mean, he sat down at one of the

107

THE WITNESS:  It's -- so I guess I just have a question.  So if this ends up going to court, you'll send me some more -- different paperwork?

MR. SHOWALTER:  Yes.

THE WITNESS:  Okay.

MR. SHOWALTER:  So why don't we go off the record in terms of the deposition.  And then if you have any other questions and I can answer them, I will.

THE WITNESS:  Okay.

THE VIDEOGRAPHER:  This concludes today's deposition of Rhonda Lehner.  We are off the record at 11:42 a.m.

THE COURT REPORTER:  Just for my record, can I get your copy orders?

MR. LAMMERS:  Normal order, Mary.

(Ms. Gultz leaves the Zoom videoconference.)

MR. SHOWALTER:  Yes.

(The deposition concluded at 11:42 a.m.)

(Signature waived.)

_____

RHONDA LEHNER



108

CERTIFICATE OF CERTIFIED REPORTER

BE IT KNOWN that the foregoing proceedings were taken before me; that the witness before testifying was duly sworn by me to testify to the whole truth; that the foregoing pages are a full, true and accurate record of the proceedings, all done to the best of my skill and ability; that the proceedings were taken down by me in shorthand and thereafter reduced to print under my direction; that I have complied with the ethical obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206 J(1)(g)(1) and (2).

I CERTIFY that I am in no way related to any of the parties hereto, nor am I in any way interested in the outcome hereof.

{ }  Review and signature was requested; any changes made by the witness will be attached to the original hereof.
{X}  Review and signature was waived/not requested.
{ }  Review and signature not required.

Dated at Phoenix, Arizona, this 26th day of November, 2025.

/s/ Mary Davis
_____
MARY DAVIS, RPR
Certified Reporter
Arizona CR No. 50271

*     *     *     *     *

I CERTIFY that GRIFFIN GROUP INTERNATIONAL, has complied with the ethical obligations set forth in ACJA 7-206 (J)(1)(g)(1) through (6).

/s/ Pamela A. Griffin
_____
GRIFFIN GROUP INTERNATIONAL
Registered Reporting Firm
Arizona RRF No. R1005



**EXHIBIT O**

**(Pending Motion to Seal)**

**EXHIBIT P**

**(Pending Motion to Seal)**

**EXHIBIT Q**

**(Pending Motion to Seal)**

# EXHIBIT R

**RUSING LOPEZ & LIZARDI, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800
Facsimile: (520) 529-4262
mdlammers@rllaz.com
zkotzambasis@rllaz.com

Mark D. Lammers
State Bar No. 010335
Zoey Kotzambasis
State Bar No. 034607
*Attorneys for Defendants State of Arizona, Ryan Thornell,*
*Christopher Josefowicz, Kaylan Nasta, and Talon Hanks*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| O.W., an individual, | No. 2:25-cv-00044-DWL |
| Plaintiff, | |
| vs. | **DEFENDANT STATE OF ARIZONA'S RESPONSES TO PLAINTIFF'S FIRST SET OF DISCOVERY REQUESTS** |
| State of Arizona, et al., | |
| Defendants. | (Assigned to Hon. Dominic W. Lanza) |

Defendant State of Arizona hereby responds to Plaintiff's First Set of Discovery Requests as follows:

### REQUESTS FOR ADMISSION

1.      Plaintiff's exhibits 47, 48, and 49 include the entire contract and bid between Trinity Services Group and the Arizona Department of Corrections (aka Arizona Department of Corrections Rehabilitation and Reentry) and/or the State of Arizona.

Admit___**X**____ Deny_____

### INTERROGATORIES

1.      If your response to any Request for Admission is anything other than an unqualified admission, please provide the complete factual and legal basis for your response.

**RESPONSE:**      **Not applicable.**

**factual discovery. Defendant further objects because this interrogatory seeks premature privileged legal analysis, and legal analysis and conclusions, which are protected by the attorney work product doctrine. Defendant is not required to provide detailed legal arguments or analysis in response to discovery requests.**

**Subject to and without waiving the foregoing objections, Defendant states its defense is based on the following. O.W. alleges Intentional Infliction of Emotional Distress (Count Two), "Negligence/Gross Negligence – Failure to Adequately Staff, Train, Supervise, and Monitor" (Count Three), "Negligence/Gross Negligence – Vicarious Liability" (Count Four), and "Sex Discrimination, Hostile Work Environment" in violation of Title VII of the Civil Rights Act of 1964 against the State. O.W. cannot maintain both tort and employment claims against the State because if the State is her statutory employer, then worker's compensation is her sole remedy, which she has pursued. This case remains in the early stages of discovery and Defendant reserves the right to supplement this response.**

6. Please state, with specificity, the complete factual and legal basis for your affirmative defense that "Plaintiff's claims are barred, in whole or in part, by the statute of limitations," as set forth in paragraph 174 of your Answer (Doc. 16). Where applicable, your response should include references to relevant evidence, exhibits, documents, and materials which you claim support your position.

**RESPONSE:**        Upon further factual investigation, the State withdraws this defense.

7. Please state, with specificity, the complete factual and legal basis for your affirmative defense that you "may be immune pursuant to A.R.S. §§ 41-621, 12-821, 12-820.01, 12-820.02, 12-820.05, 12-820.04, quasi-judicial immunity, and other statutory and common law absolute and qualified immunities under state and federal law," as set forth in paragraph 175 of your Answer (Doc. 16). Where applicable, your response should include

Rusing Lopez & Lizardi, P.L.L.C.
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

the risk," as set forth in paragraph 188 of your Answer (Doc. 16). Where applicable, your response should include references to relevant evidence, exhibits, documents, and materials which you claim support your position.

**RESPONSE:        Defendant incorporates by reference the objections stated in response to Interrogatory No. 5. Subject to and without waiving the foregoing objections, Defendant states its defense is based on the following. O.W. may have assumed the risk of injury when she entered the small dining area by herself after she saw Hines through the window to the small dining area, when she went into the small dining area by herself without telling anyone in contravention of Defendants Hanks and Nasta's instructions, when she did not use her radio to ask correctional staff to remove Hines from the small dining area or when she saw Hines's shadow through the crack under the restroom door, when she saw Hines's shadow under the door and opened the door anyway, when she did not appropriately carry her radio or ADCRR-issued pepper spray, and when she did not employ defensive tactics consistent with her training.**

20.    For any other affirmative defense you allege, please state, with specificity, the complete factual and legal basis for your defense. Where applicable, your response should include references to relevant evidence, exhibits, documents, and materials which you claim support your position.

**RESPONSE:        Defendant incorporates by reference the objections stated in response to Interrogatory No. 5. Subject to and without waiving the foregoing objections, Defendant states its defense is based on the following. This case is in the early stages of discovery and further discovery may reveal additional defenses. Defendant reserves the right to supplement this response.**

## REQUEST TO PERMIT ENTRY ONTO DESIGNATED LAND

1.    Pursuant to Rule 34(a)(2), Fed. R. Civ. P., Plaintiff, through counsel undersigned, requests that the State of Arizona permit Plaintiff's counsel, counsel's staff, and

**Rusing Lopez & Lizardi, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

State of Arizona's Responses to PL's 1st Set of Discovery Requests(63639486.2)                    9

**21.** For any documents that you are not producing based on claims of confidentiality or privilege, produce a privilege log that fully identifies the documents, a fair description of their subject matter, their date of creation, and the basis for withholding the documents.

**RESPONSE:**      **Not applicable.**

DATED this June 20, 2025.

RUSING LOPEZ & LIZARDI, P.L.L.C.

*/s/ Mark D. Lammers*
    Mark D. Lammers
    Zoey Kotzambasis
    *Attorneys for Defendants State of Arizona,*
    *Ryan Thornell, Christopher Josefowicz,*
    *Kaylan Nasta, and Talon Hanks*

### CERTIFICATE OF SERVICE

I certify that on June 20, 2025, I electronically transmitted the attached document to following counsel of record:

Jesse M. Showalter
Lauren E. Channell
ROBBINS CURTIN MILLEA & SHOWALTER, LLC
301 East Bethany Home, #B-100
Phoenix, Arizona 85012
jesse@rcmslaw.com
lauren@rcmslaw.com
*Attorneys for Plaintiff*

R. Shawn Oller
Chrisanne M. Gultz
LITTLER MENDELSON, P.C.
Camelback Esplanade
2425 East Camelback Road, Suite 900
Phoenix, Arizona 85016
soller@littler.com
cgultz@littler.com

Rusing Lopez & Lizardi, P.L.L.C.
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Telephone: (520) 792-4800

State of Arizona's Responses to PL's 1st Set of Discovery Requests(63639486.2)                    15

*Attorneys for Defendants*
*TKC Holdings, Inc. and Trinity Services Group, Inc.*

By:      */s/ Aneta Wrzeszcz*

**Rusing Lopez & Lizardi, P.L.L.C.**
6363 North Swan Road, Suite 151
Tucson, Arizona  85718
Telephone: (520) 792–4800

State of Arizona's Responses to PL's 1st Set of Discovery Requests(63639486.2)                    16